UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION


UNITED STATES OF AMERICA,      )          CRIMINAL
                               )
              Plaintiff,       )        McAllen, Texas
                               )     Tuesday, July 10, 2012
       vs.                     )     (3:19 p.m. to 4:24 p.m.)
                               )
PEDRO ALVARADO,                )     CASE NO: 7:12-MJ-1397-1
ARNOLDO ALVARADO,              )     CASE NO: 7:12-MJ-1397-2
                               )
              Defendants.      )
_____)


MATERIAL WITNESS HEARING / PRELIMINARY EXAMINATION / DETENTION


BEFORE THE HONORABLE PETER E. ORMSBY,
UNITED STATES MAGISTRATE JUDGE


**Appearances:**          See next page

Court Recorder:           Rick Rodriguez

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, Texas 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


United States:                ANIBAL ALANIZ, ESQ.
                              Assistant United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, Texas 78501

Pedro Alvarado:               OSCAR ALVAREZ, ESQ.
                              600 S. 11th Street
                              McAllen, Texas 78501

Arnoldo Alvarado:             CARLOS A. GARCIA, ESQ.
                              1305 E. Griffin Pkwy.
                              Mission, Texas 78572

Material Witnesses:           KYLE WELCH, ESQ.
                              Assistant Federal Public Defender
                              1701 W. Business Hwy. 83
                              Suite 405
                              McAllen, Texas 78501

                              OSCAR LONGORIA, ESQ.
                              2416 E. Buddy Owens
                              McAllen, Texas 78504

<u>INDEX</u>

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEAN PAUL RENEAU | | | | |
| BY MR. ALANIZ | 5 | | 31 | |
| BY MR. GARCIA | | 21 | | 34 |
| BY MR. ALVAREZ | | 23 | | 33 |
| DEFENDANT'S EXHIBIT | | | | RECEIVED |
| 1 | | | | 22 |

<u>ARGUMENT</u>

BY MR. ALVAREZ                36

BY MR. ALANIZ                37/42

BY MR. GARCIA                41/43


<u>COURT'S FINDING(S)/RULING(S)</u>      35/43

4

1       **McAllen, Texas; Tuesday, July 10, 2012; 3:19 p.m.**

2                       **(Call to Order)**

3               **THE COURT:**  Okay.  Next is Magistrate Case Number M-

4       12-1397.  This is *United States versus Pedro Alvarado*.

5               **MR. ALANIZ:**  The Government is present and ready,

6       your Honor.

7               **THE COURT:**  If you could just come forward up here

8       and the same case also, Arnoldo Alvarado.  Okay.

9               **MR. GARCIA:**  Good afternoon, your Honor, Carlos

10      Garcia on behalf of Arnoldo Alvarado.

11              **MR. ALVAREZ:**  Oscar Alvarez for the defendant Pedro

12      Alvarado, your Honor.

13              **THE COURT:**  Okay, good afternoon.  In this case, the

14      defendants were named in a criminal complaint and so there are

15      two things we would need to address at this time.  First of all

16      is the preliminary examination or probable cause hearing.  And

17      on that, Mr. Alvarez, have you discussed with your client

18      whether or not he wishes to proceed with a probable cause

19      hearing?

20              **MR. ALVAREZ:**  We wish to have a probable cause

21      hearing.

22              **THE COURT:**  Okay.  And, Mr. Garcia, your client as

23      well?

24              **MR. GARCIA:**  Same response.

25              **THE COURT:**  Okay, very well.  We'll go ahead and take

Reneau - Direct / By Mr. Alaniz                    5

1  that up then and, Mr. Alvarado -- Mr. Alvarado, Sr. and Pedro,

2  you can have a seat next to your attorney there and,

3  Mr. Arnoldo Alvarado, you can have a seat next to your attorney

4  over here on the other side.  Okay.

5           **MR. ALANIZ:**  Yes, your Honor.  The Government would

6  call Jean Paul Reneau to the witness stand.

7           **THE COURT:**  Okay, very well.

8           **THE CLERK:**  Please raise your right hand.

9           **JEAN PAUL RENEAU, GOVERNMENT'S WITNESS, SWORN**

10          **MR. ALANIZ:**  May I proceed, your Honor?

11          **THE COURT:**  Yes, sir.

12                    **DIRECT EXAMINATION**

13  **BY MR. ALANIZ:**

14  Q    Sir, can you please state your full name?

15  A    Jean Paul Reneau.

16  Q    And where are you employed?

17  A    United States Homeland Security Investigations in McAllen,

18  Texas.

19  Q    And you're involved in the investigation on the case that

20  led to the arrest of Mr. Pedro Alvarado and Arnoldo Alvarado;

21  is that correct?

22  A    Yes, sir.

23  Q    Can you tell the Court what happened on -- around midnight

24  of June -- July the 3rd of this year?

25  A    On July the 3rd around midnight, special agents

1  established surveillance in the Hargill, Texas, area in

2  anticipation of a narcotics transaction that was going to occur

3  there.

4  Q    Okay.  And you say "special agents," how many agents were

5  actually -- were called out or went to the location in Hargill,

6  Texas?

7  A    For the initial surveillance, it was four agents.

8  Q    Okay.  And how many vehicles did you-all -- were you all

9  in?

10 A    Three vehicles.

11 Q    And were you one of the agents that were go -- went out

12 and traveled to Hargill, Texas, that night?

13 A    Yes, sir, I was.

14 Q    Can you give the Court some idea of where in Hargill you

15 were located or were driving around?

16 A    I was located to the east of Hargill approximately half a

17 mile on FM 490.

18 Q    Okay.  And were you by yourself or were you with you

19 another agent?

20 A    I was with another agent.

21 Q    The other two agents that were in other vehicles, who were

22 they, sir?

23 A    Special Agent Kelton Harrison was located south in Hargill

24 approximately at the intersection of FM 493 and Cemetery Road

25 and Special Agent Juan Mendez was located approximately on the

Reneau - Direct / By Mr. Alaniz                7

1    intersection of FM 88 and Mile 11.

2    Q    Okay.  And obviously you-all were out there because you

3    were expecting some kind of drug trafficking activity?

4    A    Correct, yes, sir.

5    Q    And the area or the location where you-all believed there

6    might be some drug trafficking activity, where was that located

7    -- where was that area?

8    A    That was east of Hargill, Texas, on Cemetery Road.

9    Q    Cemetery Road also is known as -- what is it, 11th Street?

10   A    Yes, sir.

11   Q    Okay.  And can you tell the Court whether 11th Street runs

12   east, west or which direction does it run?

13   A    It runs both directions east and west from 493 -- between

14   493 and FM 88 as well as west of FM 493.

15   Q    And 493 runs in which direction?

16   A    North and south.

17   Q    And you said that Agent Harrison was at that intersection

18   or the corner of 493 and what other road?

19   A    At Cemetery Road.

20   Q    And around what time did you hear over the radio anything

21   concerning any kind of a shots fired or some kind of activity

22   with Agent Harrison?

23   A    At approximately 3:30 a.m.

24   Q    And around 3:30 a.m., how long had you and these other

25   agents been out there doing surveillance?

Reneau - Direct / By Mr. Alaniz                               8

1   A      Approximately three hours.

2   Q      And can you tell the Court what happened around 3:30?

3   What did you hear?

4   A      Special Agent Harrison came on the radio and he stated

5   that he was being shot at.  He didn't state any additional

6   details at that time.

7   Q      Okay.  And from where Agent Harrison was, how far away

8   were you at that time that he called over the radio concerning

9   some shots fired?

10  A      Approximately half a mile.

11  Q      What did you do when you heard Agent Harrison over the

12  radio telling about there were shots fired?

13  A      Proceeded to the location where I believed that Agent

14  Harrison was located.

15  Q      And what location was that, sir?

16  A      493 and Cemetery Road, the intersection of those two.

17  Q      When you got there, what did you see?

18  A      Nothing.

19  Q      Okay.  So what did you do at that point?

20  A      At that point, I began traveling up and down FM 493 south

21  of FM 490 in an attempt to locate his vehicle along with

22  Special Agent Rudy Garza.

23  Q      Okay.  Now, once you -- when you first heard the initial

24  call over the radio about shots fired, after that did you --

25  were you still in contact with Agent Harrison or not?

Reneau - Direct / By Mr. Alaniz                        9

1   A    No.  For approximately ten minutes we lost contact with

2   Agent Harrison.

3   Q    So after going to the intersection of 493 and Cemetery

4   Road and didn't find Agent Harrison there, what did you do at

5   that point?

6   A    We canvassed the area for his vehicle or any additional

7   vehicles that might be involved.

8   Q    Okay.  And at some point did you find out where Agent

9   Harrison was --

10  A    Correct, yes, sir.

11  Q    -- located?

12  A    He called me on his cell phone.

13  Q    On his personal cell phone?

14  A    Yes, sir.

15  Q    And -- okay.  And what did he tell you at that point?

16  A    At that point, he stated he was located in the bushes

17  where the road dead ends.

18  Q    Okay.  Other than that information, anything about which

19  road or anything like that that he gave you?

20  A    No, sir.

21  Q    Okay.  So what did you do at that point?

22  A    At that point, I proceeded north on FM 493 to the

23  intersection of FM 493 and FM 186.

24  Q    Okay.  And that intersection of 493?

25  A    Yes, sir.

Reneau - Direct / By Mr. Alaniz                    10

1   Q    And the other was what?  I'm sorry.

2   A    FM 186.

3   Q    Okay.  How far away from where Agent Harrison initially

4   was stationed or conducting surveillance -- how far of a

5   distance is that?

6   A    Approximately three miles.

7   Q    Can you tell the Court what you saw when you got to the

8   intersection of those two roads?

9   A    When I got to the intersection of those two roads, to the

10  north of the road in a field I observed S.A. Harrison's vehicle

11  facing eastbound.

12  Q    Okay.  And did you see Agent Harrison at that time?

13  A    At that time, no.

14  Q    Okay.  What did -- what happened next?

15  A    I exited my vehicle, jumped a fence, proceeded to S.A.

16  Harrison's vehicle.  At that point, I observed S.A. Harrison.

17  Q    Okay.  What was he doing at that time?

18  A    He was walking towards me.

19  Q    Let, let me ask you -- take you back for a little bit.  At

20  what point did you find out that Agent Harrison had actually

21  been shot?

22  A    He had stated on the radio shortly after calling out that

23  shots were fired that he had been shot and no further details

24  were provided.

25  Q    So when you get the -- when you find Agent Harrison, he's

Reneau - Direct / By Mr. Alaniz                        11

1   walking around but you already -- you do know that he had been

2   shot?

3   A     Correct.

4   Q     Okay.  So what did you do next?

5   A     At that point, we set him on the ground and then the

6   decision was made to transport him to a hospital.

7   Q     Okay.  And who transported him to the hospital?

8   A     S.A. Rudy Garza in his government vehicle.

9   Q     Other than putting him in the vehicle, did you look around

10  at all or examine his vehicle or anything of that nature?

11  A     At that time, no.

12  Q     Okay.  After taking Agent Harrison to the hospital, have

13  -- did you ever examine his vehicle, who was in it?

14  A     Yes, sir, I took pictures.

15  Q     Okay.  When was that?  Was that the next day or when?

16  A     No, sir.  That was that same morning after transporting

17  Agent Harrison to the ambulance that was waiting at FM 107 and

18  281.  I returned to the scene of the accident and took

19  pictures.

20  Q     Okay.  Now, can you tell the Court and describe to the

21  Court the type of damage that Agent Harrison's vehicle had

22  sustained?

23  A     The front right fender of Agent Harrison's vehicle was

24  completely destroyed.  There were two holes in the passenger

25  side vehicle -- correction -- the passenger window.  The rear

Reneau - Direct / By Mr. Alaniz                    12

1   window of the SUV was knocked out and there was numerous

2   scratches over the entire vehicle.

3   Q    And you took pictures of that vehicle.  Was it that same

4   morning?

5   A    Yes, sir.

6   Q    Okay.  Agent Harrison -- when you spoke to him that night,

7   did he give you any indication at all who -- as to who might be

8   involved or might have been involved in the assault of Agent

9   Harrison?

10  A    He didn't give an indication.  He stated he had been

11  followed by two pickup trucks.

12  Q    Okay.  Did he -- was he able to describe the type of

13  pickup trucks that were following him?

14  A    I believe he stated one was an F-250.

15  Q    Okay.  Now, after this incident on July the 3rd, what did

16  special agents do to try to investigate who might have -- who

17  might be involved in the assault of Agent Harrison?

18  A    Special agents conducted two consent searches at residence

19  there in Hargill, Texas, one being believed to be where the

20  narcotics were originally stored.  The second location was a

21  previously identified stash house that was near where Agent

22  Harrison was initially parked.

23  Q    These two locations that you just described to the Court

24  are -- where are they specifically in Hargill, on what, what

25  road or what street?

Reneau - Direct / By Mr. Alaniz                    13

1   A    They're both located on Cemetery Road.

2   Q    Okay.  The stash house -- or the house that you-all

3   believed there might be some drug trafficking activity -- in

4   regards to where Agent Harrison was located, how far is it from

5   that location?

6   A    The initial stash house during the course of the

7   investigation was approximately a hundred or a hundred and

8   fifty yards from S.A. Harrison's location.

9   Q    Okay.  And that residence is -- who does it belong to?

10  A    Pedro Alvarado.

11  Q    And so Pedro Alvarado's home or residence is about a

12  hundred to a hundred and fifty yards from where Agent Harrison

13  was parked?

14  A    Approximately, yes, sir.

15  Q    Okay.  Can you describe to the Court what type of a

16  structure Pedro Alvarado's home is and what kind of a -- does

17  he have a fence?  Does it have walls or -- can you describe

18  that to the Judge?

19  A    It's a pink residence, brick house, shingle roof.  It does

20  have a fence out front that's usually locked around the

21  residence.  The entire property is fenced in surrounded on

22  three sides by trees.

23  Q    Okay.  And that residence is on the east or west of 493?

24  A    It's going to be on the east side.

25  Q    Okay.  And between the residence of Mr. Alvarado -- Pedro

Reneau - Direct / By Mr. Alaniz                              14

1    Alvarado and where agent Harrison was located, what's in

2    between there?

3    A     Bushes.

4    Q    Now, as to the residence that you-all were looking at that

5    made -- might have -- there might have been some drug traffic

6    activity, where is that one located?

7    A     It's approximately one mile from where S.A. Harrison was

8    parked on Cemetery Road, to the east.

9    Q     Now, when agents went and did a consent search of the

10   Pedro Alvarado residence, can you tell the Court what happened

11   then?

12   A     During the initial consent, agents asked to search the

13   residence for illegal aliens.  At that time, special agents had

14   made contact with Mr. Alvarado.  He did state there were two

15   illegal aliens inside the roof of his residence.

16   Q    Okay.  Were those aliens ever apprehended or arrested?

17   A     Yes, sir, they were.

18   Q    Okay.  And after the rest of the illegal aliens, what

19   happened to Mr. Alvarado and his son Arnoldo Alvarado?

20   A     Both individuals were transported to the FBI building here

21   in McAllen, Texas.

22   Q    What day was that, sir?

23   A     That would have been July 3rd.

24   Q    Okay.  What time approximately, if you remember?

25   A     I don't remember.

1  Q    Okay.  Now, once at the FBI building, did either Mr. Pedro

2  Alvarado or Arnoldo Alvarado agree to talk to agents?

3  A    We read Arnoldo Alvarado his Miranda rights.  He agreed to

4  waive those rights and speak to special agents without an

5  attorney present.

6  Q    Okay.  And were you involved in the interview of

7  Mr. Arnoldo Alvarado?

8  A    I had stepped in and out, yes, sir.

9  Q    Some other agents were conducting the interview?

10  A    Yes, sir.

11  Q    Can you tell the Court, Agent Reneau, what Mr. Arnoldo

12  Alvarado told the agents was his role in this assault of Agent

13  Harrison?

14  A    Mr. Arnoldo Alvarado stated that he had been firing a 9 mm

15  handgun at a silver vehicle earlier that morning.

16  Q    Okay.  Did he tell you anything about how this all got

17  started, if you can recall?

18  A    He stated that on July 3rd in the morning, he was awoken

19  by his dad, himself and his brother.  They were instructed to

20  retrieve their weapons and proceeded to their vehicles.

21  Q    Okay.  And what vehicle did Mr. Arnoldo Alvarado tell you

22  that they got into at that time?

23  A    They got into a blue F-150.

24  Q    And who got into that F-150 Ford?

25  A    Pedro Alvarado was operating the vehicle.  Arnoldo

Reneau - Direct / By Mr. Alaniz                    16

1   Alvarado was in the front passenger side and the minor was in

2   the rear passenger seat.

3   Q    And did Arnoldo Alvarado tell you what type of weapons and

4   who had weapons when they got into the vehicle?

5   A    Yes, sir.  Arnoldo Alvarado stated he was carrying a 9 mm

6   handgun and the minor in the rear seat was carrying a .22

7   rifle.

8   Q    Okay.  Once they got into the pickup truck, did he tell

9   you where -- in which direction they drove to?

10  A    Yes, sir.  They proceeded west on Cemetery Road.

11  Q    Let me take you back for a second.  Did Arnoldo Alvarado

12  tell you as to why at that point of the night they decided to

13  get into the vehicles with their weapons and travel outside

14  their property?

15  A    Yes, sir.  He stated that Pedro Alvarado had received a

16  phone call earlier that evening explaining there was a

17  suspicious vehicle near their residence.

18  Q    And now, in order to get out of the Pedro Alvarado

19  residence, do they have to go through some kind of gate or

20  anything?

21  A    Yes, sir.  There is a gate at the front entrance to that

22  property.

23  Q    Okay.  And in which direction did Pedro Alvarado and his

24  sons drive when they got out of the residence?

25  A    They proceeded westbound on Cemetery.

Reneau - Direct / By Mr. Alaniz                        17

1   Q    Okay.  Toward which intersection?

2   A    Towards the intersection of Cemetery Road and FM 493.

3   Q    And that's where who was located?

4   A    S.A. Harrison was located.

5   Q    What did Arnoldo Alvarado tell you that he did or his

6   brother did on the way -- on -- when they were traveling

7   towards the intersection of 493 and Cemetery Road?

8   A    Mr. Arnoldo Alvarado stated that as they were proceeding

9   that way, he heard his brother -- the minor located in the rear

10  seat begin firing approximately six shots with the .22 rifle

11  towards the silver vehicle.

12  Q    Okay.  And the silver vehicle, who -- was occupied by who?

13  A    Special Agent Kelton Harrison.

14  Q    What did Arnoldo Alvarado tell you that he did after his

15  brother -- younger brother, the minor fired his -- the rifle at

16  Agent Harrison's vehicle?

17  A    Arnoldo Alvarado stated that at that time, he fired

18  approximately two rounds into the air from his 9 mm handgun.

19  Q    And then what he did do after that?

20  A    At that point, the silver vehicle began traveling

21  northbound on FM 493.  Pedro Alvarado began following that

22  vehicle.  Arnoldo Alvarado stated he began firing his 9 mm

23  handgun at the silver vehicle.

24  Q    Okay.  Did he ever -- Mr. Arnoldo Alvarado ever talk --

25  tell the agents how many rounds he fired approximately?

Reneau - Direct / By Mr. Alaniz                          18

1  A    No.  Approximately he did not.  He did state that he had

2  emptied the clip that was inside the magazine initially and

3  then reloaded that second magazine at some point.

4  Q    Subsequent investigation as to -- concerning Agent

5  Harrison, did you-all discover or find out at what point Agent

6  Harrison was actually hit with the gunshot?

7  A    Agent Harrison stated to me that he believed he was hit

8  with a round approximately at the intersection of 490 and 493

9  while fleeing northbound.

10 Q    Now, where -- what part of his -- of Agent Harrison's body

11 did the shot hit him?

12 A    The lower back.

13 Q    Now, you said that Agent Harrison told you that he was hit

14 with a gunshot north of his location where he was parked.

15 A    Correct.

16 Q    How far away from where he was parked doing surveillance

17 did -- and the location where he actually got hit, how far is

18 that?

19 A    Approximately a quarter of a mile, probably less.

20 Q    During the interview of Arnoldo Alvarado, did he ever

21 mention to agents anything about as to why he shot at this

22 vehicle?

23 A    Not to my knowledge, no.

24 Q    And what did Arnoldo tell you that he did and his father

25 did when they were chasing or following the silver vehicle?

EXCEPTIONAL REPORTING SERVICES, INC

Reneau - Direct / By Mr. Alaniz                    19

1   A    Arnoldo Alvarado stated while he was chasing the vehicle,

2   he was firing his weapon at the vehicle.  At some point, he

3   claimed the silver Jeep was too far in front of his vehicle,

4   the F-150, and he began just firing rounds into the air.

5   Q    And what did he tell you that he -- they did after they

6   lost sight of the silver vehicle?

7   A    He claimed they turned around and returned to their

8   residence.

9   Q    And once they got back to the residence, did Arnoldo

10  Alvarado tell agents what they did with the weapons that they

11  used?

12  A    Not to my knowledge, no.

13  Q    Do you know whether or not those weapons were ever located

14  and seized?

15  A    Yes, sir, they were.

16  Q    Where were they found, sir?

17  A    They were found in the attic of Pedro Alvarado's residence

18  under the insulation, concealed.

19  Q    The Pedro Alvarado that was -- that you've been talking

20  about during the testimony, Agent Reneau, do you see him

21  present in the courtroom today?

22  A    I do.

23  Q    Can you tell the Court where he sits -- where he's sitting

24  and what he's wearing?

25  A    Arnoldo Alvarado is sitting to my right wearing a green

1    T-shirt.

2    Q     Arnoldo Alvarado?

3    A     Yes, sir.

4    Q     How about Pedro Alvarado?

5    A     He's also sitting to my right wearing a red T-shirt with

6    maroon lettering.

7              **MR. ALANIZ:**  Your Honor, I would ask the Court to let

8    the record reflect that the witness identified the Defendants.

9              **THE COURT:**  Okay.  Yes, it will.

10             **MR. ALANIZ:**  And at this time the Government will

11   pass the witness, your Honor.

12             **THE COURT:**  Okay, very well.  And let's see,

13   Mr. Alvarez?

14             **MR. ALVAREZ:**  Well, Mr. Garcia is going to be going

15   first, your Honor.

16             **THE COURT:**  Okay, very well.  If you could point the

17   microphone over towards him then.

18             **MR. ALVAREZ:**  Yes, your Honor.

19             **MR. GARCIA:**  Your Honor, if I may, may I approach the

20   witness?

21             **THE COURT:**  Sure.

22        **(Counsel approached)**

23   //

24   //

25   //

1                    **CROSS EXAMINATION**

2    **BY MR. GARCIA:**

3    Q    Agent Reneau, I'm going to show you Defendant's Exhibit

4    Number 1.  I'm going to ask you to look at it.  Do you

5    recognize that map?

6    A    Yes, I do.

7    Q    Would you tell the Court what it illustrates or what it

8    shows?

9    A    It's a satellite image of the intersection of FM 493 and

10   Cemetery Road in Hargill, Texas.

11   Q    And that map shows the residence -- the Alvarado

12   residence?

13   A    Yes, it does.

14   Q    And it shows the property, the Alvarado property, correct?

15   A    It shows the residence.  I'm not aware of the property.

16   Q    The -- are you aware that the house that's at the

17   intersection of Cemetery Road and 493 is part of the Alvarado

18   property?

19   A    I heard a statement to that effect but I don't have any

20   supporting evidence.

21   Q    Where did you hear that statement?

22   A    I don't know, during an interview.

23   Q    Interview of who?

24   A    It would have been some information passed to me from

25   another agent.

1      **MR. GARCIA:**  Your Honor, I ask that Defendant's

2  Exhibit Number 1 be admitted.

3      **THE COURT:**  Okay.

4      **MR. ALANIZ:**  No objection, your Honor.

5      **THE COURT:**  Okay.  It will be admitted for purposes

6  of the hearing here.

7      **(Defendant's Exhibit Number 1 was received in evidence)**

8  **BY MR. GARCIA:**

9  Q    How long had this investigation been taking place, Agent?

10 A    Approximately two years.

11 Q    And in the two years, you hadn't thought to look who owned

12 that property where the stash house was?

13 A    The stash house, yes, sir, not the property adjacent to

14 the stash house.

15 Q    And the stash -- that property there -- that part of the

16 stash house belonged to who?

17 A    I believe it's registered to Mr. Alvarado's wife.

18 Q    Was Agent Harrison armed?

19 A    Not to my knowledge.

20 Q    Did he fire a weapon?

21 A    Not to my knowledge.

22 Q    Were any tests conducted to see if he fired a weapon?

23 A    I believe those tests are under way.

24 Q    Where do you get that information from?

25 A    The vehicle Agent Harrison was occupying was transported

                    Reneau - Cross / By Mr. Alvarez              23

1   to the FBI in San Antonio for further analysis.

2   Q    Okay.  The fact is, my client Arnoldo told you he'd been

3   fired upon, correct?

4   A    He believed he had heard four shots, yes, sir.

5   Q    That they were shot in his direction, correct?

6   A    I don't know that information.

7   Q    Well you were in and out of the interview, right?

8   A    Correct.

9   Q    But part of the interview he told you he shot in self-

10  defense?

11  A    I wasn't in there for that portion.

12  Q    Who was?

13  A    Special Agent Jorgé -- I don't know his last name -- from

14  the Federal Bureau of Investigation, Special Agent Ernie Baca

15  (phonetic) from Homeland Security Investigations.

16  Q    Agent Harrison was parked on private property?

17  A    From my understanding, yes, sir.

18  Q    Did he have permission to be on that property?

19  A    Not to my knowledge.

20          **MR. GARCIA:**  Your Honor, I pass the witness.

21          **THE COURT:**  Okay.  Mr. Alvarez.

22                         **CROSS EXAMINATION**

23  **BY MR. ALVAREZ:**

24  Q    Do you have a weapon?

25  A    Sir?

1  Q    Were you carrying a weapon?

2  A    Yes, I was.

3  Q    What about the other agents?

4  A    To my knowledge, yes, they were.

5  Q    Why was Harrison not carrying a weapon?

6  A    I don't have that information.

7  Q    Would that be unusual for him not to be carrying a weapon

8  being out there at 3:00 o'clock in the morning doing

9  surveillance in a drug trafficking investigation that had been

10 taking place for a period of two years?

11 A    It would be unusual, yes, sir.

12 Q    Was it determined what slug was found in his body, whether

13 it was from the 9 mm or the .22?

14 A    That slug has not been removed.  From what I understand

15 based on x-rays, the doctors believe it's a 9-mill.

16 Q    We don't know that for a fact yet?

17 A    Based on the size on the x-ray, my understanding is they

18 believe it's a 9-mill.  We do not know that for a fact.

19 Q    And the -- were any cases recovered at the scene or

20 anywhere else?

21 A    Yes, sir.  There were casings recovered at the scene as

22 well as at the accident site.

23 Q    And the cases were from what type of weapon?

24 A    9 mm.

25 Q    Were any cases recovered fired from a .22 caliber rifle?

Reneau - Cross / By Mr. Alvarez                          25

1    A    Not to my knowledge.

2    Q    The second vehicle that you testified had been trailing

3    the Alvarado vehicle, whose vehicle was that?

4    A    That's a F-250 driven by a Rene Garcia.

5    Q    Did he fire any -- did he fire a weapon, to your

6    knowledge?

7    A    The investigation has not determined that yet.

8    Q    Have there been any scientific tests conducted of the

9    Defendants that determine whether or not they fired a weapon?

10   A    Not to my knowledge.

11   Q    And according to your information, Mr. Pedro Alvarado did

12   not fire a weapon; is that correct?

13   A    That is correct.

14   Q    And you have no information from anybody that he ordered

15   his sons to fire a weapon, correct?

16   A    Correct.

17   Q    And you do have information that Pedro Alvarado received a

18   telephone call approximately, I guess, 3:00 in the morning to

19   indicate that there was a suspicious vehicle on his property,

20   correct?

21   A    Yes, sir.

22   Q    And how dark is it out there?

23   A    It's very dark.  There's very few streetlights.

24   Q    And the agent was not in uniform; is that right?

25   A    Correct.

Reneau - Cross / By Mr. Alvarez                              26

1   Q    And he was not in a marked unit, correct?

2   A    Correct.

3   Q    And the Alvarados actually were investigating a vehicle

4   that in plain view could not be determined whether that was law

5   enforcement or not, correct?

6   A    Correct.

7   Q    And when they approached that vehicle, that vehicle exited

8   their property and took off; is that right?

9   A    Correct.

10  Q    No explanation was made by that person to identify himself

11  in any way, correct?

12  A    Not to my knowledge, no.

13  Q    Did you happen to interview Mrs. -- Mr. Alvarado's wife?

14  A    Other agents did.  I did not.

15  Q    And you heard about a home invasion that had occurred at

16  their home approximately some months back; is that correct?

17  A    Yes, sir.

18  Q    And they indicated that in that home invasion, shots were

19  exchanged as well, correct?

20  A    Yes, sir.

21  Q    And it is common knowledge in the Hargill area that

22  numerous home invasions take place pretty regularly, correct?

23  A    I do not have any information as far as that's concerned.

24  Q    But if a home invasion took place, that -- the town of

25  Hargill is not an incorporated community; is that correct, or a

Reneau - Cross / By Mr. Alvarez                          27

1    town?

2    A    Correct, yes, sir.

3    Q    They have no police?

4    A    Yes, sir.

5    Q    They have no law enforcement at all, correct?

6    A    They are under the jurisdiction of the county.

7    Q    Of the county.  Have you any idea how long it would take a

8    county to respond to an incident of home invasion in the

9    Hargill area?

10   A    No, sir.

11   Q    Would it surprise you that it could be as long as an hour?

12   A    That would not surprise me, no.

13   Q    So would it be unreasonable for a homeowner to protect

14   their property by investigating who's trespassing on their

15   property in an unmarked vehicle?  Would that be unreasonable to

16   do?

17   A    Not to my knowledge, no.

18   Q    Have you learned that the Alvarado residence is actually a

19   12-acre tract of land?

20   A    No, sir.

21   Q    When you had arrived at the Alvarado residence sometimes

22   later to investigate after the shooting had taken place, did

23   the family cooperate with the agents?

24   A    Yes, sir.

25   Q    Did they in any way try to hide the aliens in between the

Reneau - Cross / By Mr. Alvarez                     28

1   shooting and the time you guys arrived?

2   A     No, sir.

3   Q     They were still there, correct?

4   A     Yes, sir.

5   Q     And they -- the family told you where the weapons were

6   located?

7   A     I believe so, yes, sir.

8   Q     And who lives at the residence?

9   A     Arnoldo Alvarado, Pedro Alvarado, his wife, the minor son

10  and from what we can tell, the two illegal aliens.

11  Q     You would not consider that a stash house, correct?

12  A     Stash house for what?

13  Q     People who were living there.

14  A     Correct.  But we did have information it was a narcotics

15  stash house.

16  Q     Did you find any narcotics?

17  A     Not at that time, no.

18  Q     Have you ever found narcotics there?

19  A     No, sir.

20  Q     You've never found narcotics at any time?

21  A     Not to my knowledge, no, sir.

22  Q     Any large amounts of money?

23  A     No, sir.

24  Q     Any drug paraphernalia?

25  A     Not to my knowledge, no, sir.

Reneau - Cross / By Mr. Alvarez                     29

1  Q    And you have interviewed the material witnesses; is that
2  correct?
3  A    They were -- one of them was interviewed, to my knowledge.
4  The other one did not wish to make a statement.
5  Q    Which one was interviewed?
6  A    Mario Ascencio (phonetic) Martir (phonetic).
7  Q    Did he not tell you that he was involved in a major
8  traffic accident nearby --
9  A    Correct.
10 Q    -- near the Alvarado residence?
11 A    Correct, yes, sir.
12 Q    Why he was being transported somewhere else; is that
13 right?
14 A    From what I understand, yes, sir.
15 Q    And his presence in the United States did not involve
16 Mr. Alvarado; is that correct?
17 A    Not to my knowledge, no.
18 Q    And he actually approached the Alvarado residence for
19 assistance because of his injuries, correct?
20 A    According to him, yes, sir.
21 Q    And he had -- he and the other alien had been severely
22 injured in an accident, correct?
23 A    I don't have any information to that.
24 Q    And they told you that they had been working there as
25 employees, correct?

Reneau - Cross / By Mr. Alvarez                    30

1  A    Correct.

2  Q    And there are countless people in the United States that

3  employ illegal aliens, correct?

4  A    Yes, sir.

5  Q    Including some public officials?

6  A    I'm sure.

7  Q    And you took -- you arrested Mr. Alvarado.  You handcuffed

8  him and took him -- brought him to the FBI building; is that

9  right?

10  A    No, sir.  I believe they asked him to go to the FBI for an

11  interview.  He was not handcuffed.

12  Q    All right.  Did he make any statement?

13  A    He didn't make statements on the way to the FBI building,

14  from what I understand.  I was not present for those

15  statements.

16         **MR. ALVAREZ:**  Okay.  That's all, your Honor.  Thank

17  you, Agent.

18         **THE COURT:**  Okay.

19         **MR. ALVAREZ:**  Oh, by the way, how is Agent Harrison

20  doing?

21         **THE WITNESS:**  He's making a full recovery from what

22  we understand.

23         **MR. ALVAREZ:**  Very well, good.

24         **MR. ALANIZ:**  I have some follow-up questions, your

25  Honor.

Reneau - Redirect / By Mr. Alaniz                31

1          **THE COURT:**  Yes, uh-huh.

2                      **REDIRECT EXAMINATION**

3     **BY MR. ALANIZ:**

4     Q    Just in regards to the property where Mr. Alvarado and his

5     family lives, they live in -- what they have, was is it a house

6     and what other structures are there?

7     A    There's a house.  There's some small auxiliary structures

8     in the rear probably associated with some type of animal care.

9     Q    Okay.  And is that on the north side or south side of

10    Cemetery Road?

11    A    It's on the north side.

12    Q    Okay.  And the house and the structures are surrounded by

13    what, by a fence or what kind of -- what is it?

14    A    Yes, sir, they're surrounded by a fence.

15    Q    By a fence, okay.  What type of fence?

16    A    It's a barbed wire fence, from my understanding.

17    Q    Okay.  Now, that's where Mr. Alvarado's family lives; is

18    that correct?

19    A    Correct, yes, sir.

20    Q    Okay.  Now, if you go from that -- from that residence, if

21    you go, I guess, west towards 493, what's in between 493 and

22    the Alvarado residence?

23    A    There's another structure there that's abandoned also on a

24    fenced-in portion of land.  In between those two structures is

25    nothing but trees.

1   Q    Okay.  It's brush basically?

2   A    Correct, yes, sir.

3   Q    So between the intersection of 493 and Cemetery Road and

4   the Alvarado property is just brush area?

5   A    Correct, besides one house.

6   Q    Okay.  Besides one house.  And where is that house located

7   in relation to the intersection of 493 and Cemetery Road?

8   A    That abandoned residence sits right on the intersection of

9   those two streets.

10  Q    Okay.  And you noticed that nobody lives there?

11  A    From what I could tell, yes, sir.

12  Q    Okay.  And how could tell that nobody lives there?

13  A    Number one, there were no power lines hooked up to the

14  residence.  The inside was filled with wood and junk.

15  Q    Okay.  So the property or the place where Agent Harrison

16  was parked is how far away from the fenced area of where the

17  Alvarados live?

18  A    Approximately a hundred yards.

19  Q    And do you have information that that property at the

20  corner intersection of 493 and Cemetery Road is owned by the

21  Alvarados?

22  A    No, I don't.

23        **MR. ALANIZ:**  I'll pass the witness, your Honor.

24        **THE COURT:**  Okay.  So right -- as of right now,

25  you've -- Special Agent Reneau, you indicated that Special

Reneau - Recross / By Mr. Alvarez                33

1   Agent Harrison was parked on private property but as of right

2   now, you don't know whose private property that is; is that

3   correct or --

4           **THE WITNESS:**  Yes, Judge.  I remember someone stating

5   it belonged to a relative of the family but I can't say for

6   sure.

7           **THE COURT:**  Okay.  And --

8           **MR. ALVAREZ:**  Your Honor, may I ask a --

9           **THE COURT:**  Sure.

10          **MR. ALVAREZ:**  -- couple follow-up questions in that

11  regard?

12                  **RECROSS EXAMINATION**

13  **BY MR. ALVAREZ:**

14  Q    The location where Agent Harrison was parked, is it fenced

15  -- did he have to go through any kind of fence, any kind of

16  structure to be able to park his vehicle in that location?

17  A    No, sir.  It's fenced on two sides, the north side and the

18  east side but the west side and south side are open.

19  Q    So he didn't have to go through any kind of gate or fence

20  or anything at all whatsoever to be able to park his vehicle

21  there?

22  A    Correct.

23  Q    And how far away from Cemetery Road was he parked

24  approximately?

25  A    Ten yards, 15 yards, approximately.

1          **MR. ALVAREZ:**  I have no further questions, your

2    Honor.

3          **THE COURT:**  Okay.  Anything else?

4          **MR. GARCIA:**  I have a few follow-up questions.

5          **THE COURT:**  Sure.

6                        **RECROSS EXAMINATION**

7    **BY MR. GARCIA:**

8    Q    It's not a public roadway, is it?

9    A    I'm sorry.

10   Q    Where he was parked -- Agent Harrison wasn't parked on a

11   public roadway --

12   A    No, sir.

13   Q    -- correct?

14   A    No, sir.

15   Q    He was parked on someone else's property --

16   A    Yes, sir.

17   Q    -- right?

18   A    Correct.

19   Q    Conducting surveillance?

20   A    Correct.

21   Q    All right.  In a -- at a house -- conducting surveillance

22   of a house -- let me just clarify.  Was he conducting

23   surveillance of the house where the Alvarados lived?

24   A    No, sir.

25   Q    Another house?

Reneau - Recross / By Mr. Garcia                    35

1   A     Correct, yes, sir.

2   Q     Was he parked in that tree in front of that house?

3   A     I believe he was parked directly to the east of that tree.

4   Q     And that tree, you'd agree, is in that satellite image

5   that you looked at earlier, correct?

6   A     I'd have to look at the image again but probably.

7   Q     Okay.

8           **MR. GARCIA:**  Your honor, I have no further questions.

9           **THE COURT:**  Okay.

10          **MR. ALVAREZ:**  No questions, your Honor.

11          **THE COURT:**  Okay.  If there's nothing else, then I

12   guess you can go ahead and step down.  Thank you.

13                  **(Witness stepped down)**

14          **THE COURT:**  On the issue of probable cause,

15   Mr. Garcia, did you wish to make an argument at this time on

16   probable cause as to Arnoldo Alvarado?

17          **MR. GARCIA:**  Not an issue of probable cause, your

18   Honor.

19          **THE COURT:**  Okay.  And as to Pedro Alvarado,

20   Mr. Alvarez, is there --

21          **MR. ALVAREZ:**  No, your Honor.

22          **THE COURT:**  I do find based on the testimony of

23   Special Agent Reneau that there is probable cause.  However,

24   that's not a finding of guilt and at this stage, the Government

25   has a much lower level of proof that applies here.  It's simply

1    whether there is reason to or probable -- whether it's probable

2    that there was a crime committed and that the Defendants were

3    involved with that.  I do find that that's been established.

4              Again, that doesn't mean that either Defendant is

5    guilty of anything at this point.  Obviously, there are various

6    defenses that might be raised and other issues that could be

7    raised as the case proceeds forward but we don't need to get

8    into those at this time.  The only issue is whether there is

9    sufficient evidence to allow the case to go forward.

10   And on that, we do need to address the issue of bond as to both

11   Pedro Alvarado and Arnoldo Alvarado and I am going to take

12   judicial notice of the factual information in the Pretrial

13   Services Report except to the extent it's clarified or

14   corrected in connection with the hearing.

15             And, Mr. Alvarez, with regard to Pedro Alvarado, is

16   there evidence or argument you wanted to present at this time?

17             **MR. ALVAREZ:**  There is no evidence to present other

18   than just pointing out some things in the Presentence Report.

19   As far as the criminal history is concerned, that's one of

20   those things that was taken into account in the recommendation.

21   I would like to point out to the Court that one of the

22   convictions is 18 years old and the other two are approximately

23   ten years old.

24             The other aspects of the Report are pretty positive

25   as far as his ties to the community but I don't believe he's a

1   risk of flight.  As far as the danger, just like I mentioned,

2   these convictions are old.  I think that there can be a

3   combination of conditions that would assure his appearance

4   in court, your Honor, and guarantee the safety of the

5   community.  So I'm asking for bond in this case.

6           **THE COURT:**  Okay, thank you.  And just addressing

7   first with regard to Pedro Alvarado and, Mr. Alaniz, what is

8   the Government's position on that?

9           **MR. ALANIZ:**  We would ask for a detention, your

10  Honor.  Obviously, the evidence is just pretty clear as to what

11  happened in this case.  You have a father basically asking his

12  two sons -- one of them which is a minor -- to basically go get

13  the guns, to go outside their property -- not on their property

14  -- go outside their property in a vehicle and then start

15  shooting just a vehicle that they see and, you know, park near

16  the intersection of these two roads.  Let's stop there.

17          They continue following the vehicle and shooting at

18  the vehicle without regard as to who's driving, how many people

19  are in there.  As far as danger to the community, Judge, I

20  think it's pretty self-evident that this Defendant could not

21  be, you know, released on bond without, you know, bringing a

22  risk of this type of activity.  So for those reasons, Judge,

23  we're asking the Court to deny bond to Mr. Pedro Alvarado.

24          **THE COURT:**  Okay.  And in determining bond, I am

25  required to apply the factors under The Federal Bail Reform

1    Act.  I'll just go ahead and note in my findings as to those

2    factors.  And with regard to Mr. Pedro Alvarado, first of all,

3    the factors that I'm required to take into account under

4    federal law begin with the nature and seriousness of the

5    alleged offense.

6              Obviously, there's a very serious offense being

7    alleged against both Defendants, the conduct here involving

8    shooting firearms and obviously in this case injuring a

9    government special agent and luckily, you know, he wasn't

10   killed.  I mean, that kind of situation could have easily come

11   out with a much worse situation and hopefully he will recover

12   fully.  But obviously the -- again, the nature of the charge

13   here is a very serious one and it suggests a high degree of

14   danger to the community and the situation with firearms being

15   involved here.  So that's one of the factors to be taken into

16   account.

17             The other is the weight of the evidence.  At this

18   point, it's early in the -- this -- an early stage here.  It's

19   not part of the process at this point to try to predict what

20   will happen as the case goes forward.  The evidence is very

21   strong that both of these Defendants were shooting at the

22   person who turned out to be a special agent and as far as the

23   other issues that might relate to the crime that's being

24   alleged, you know, those things that may be arguments that

25   could be made as the case goes forward.

1   Looking at the other factors under The Bail Reform Act, I'm

2   required to take into account the personal circumstances and

3   characteristics of the Defendant.  There are positive factors

4   with regard to Pedro Alvarado.  He is -- essentially a lifetime

5   resident of the area.  He's a United States citizen.  So

6   there's no immigration issues we would need to worry about

7   here.  In the past, he's had employment in different

8   capacities.  I believe they actually -- some years back, the

9   family had done farm labor which is certainly an honest and

10  honorable type of work.  He does have the support of his wife

11  and so those are positive factors to take into account in

12  considering bond and so I will consider those things.  As was

13  pointed out by Mr. Alvarez, there are positive circumstances

14  there to look at.

15          On the negative side though, there's some serious

16  concern, especially given Mr. Alvarado's criminal history.

17  Although it was on older conviction, he has this prior felony

18  conviction.  It was a drug trafficking type of a conviction

19  since apparently it involved the sale of 25 kilograms or more

20  of marijuana.  That was back in 1994 or some years back.  If

21  that was the only thing, then, then you might say that was a

22  long time ago and things have changed but about -- less than

23  ten years later he picked up two other felony drug trafficking

24  convictions, one for trafficking again in marijuana, more than

25  ten pounds but less than 100 pounds, also trafficking cocaine.

1          And so he has these prior drug-related convictions

2    and in the context of the case here where he then -- first of

3    all, presumably he should not have been in possession of a

4    firearm at all being a -- presumably a felon who should not be

5    anywhere near a firearm to begin with but then to be in this

6    situation where he's out and firing or taking his sons out --

7    and actually I guess as to him, he didn't actually possess the

8    firearm.  So maybe that's the distinction that might -- he

9    might try to draw but where he tells his sons to get weapons

10   and goes out, it's at least as bad.  So that's a difficult, I

11   mean, situation that makes the circumstances much more

12   troubling.

13         In addition, he's also got an issue with drug use and

14   has, you know, as of even recently been using cocaine.  And if

15   that were the only thing, again, there are conditions we might

16   set to assist with some treatment or something like that but

17   together with the nature of the charge and his prior drug

18   convictions, I do find that under those circumstances that

19   there are no conditions that would reasonably assure -- in this

20   case, the safety of the community is the main issue.  I agree

21   with counsel for Mr. Alvarado that the risk of flight is not

22   the primary concern here but I do find that based on those

23   circumstances that any conditions that are available would not

24   be adequate to address those circumstances.

25         If there's any material new information or facts that

1    come to light, Mr. Alvarado, your attorney will be able to move

2    to reopen the hearing to consider those things if there is

3    something like that but at this time, I do find that as far as

4    Pedro Alvarado, we'll need to leave here with the Marshals

5    pending further proceedings.

6            Was there anything else that we ought to address as

7    to him -- to your client here today, Mr. Alvarez?

8            **MR. ALVAREZ:**  No, your Honor.

9            **THE COURT:**  Okay.  And we appreciate your assisting

10   Mr. Alvarado in this case, Mr. Alvarez, and we'll go ahead and

11   excuse you all.

12           And then as to Mr. Arnoldo Alvarado, Mr. Garcia, did

13   you have evidence or argument you wish to present as to bond?

14           **MR. GARCIA:**  I do, your Honor.  If I may, I've

15   provided access of the documents.  I'd ask the Court to

16   consider Defendant'' Exhibit Number 2, 3, 4, 5, 6, 7, 8 and 9

17   in regards to Arnoldo Alvarado, your Honor, and, in effect,

18   what they are is his registration to attend STC in the fall,

19   his high school diploma -- Exhibit -- Defendant's Exhibit

20   Number 4.  Five and 6 are photographs of when he played

21   football at Economedes High School.

22           Defendant's Exhibit Number 7, 8 and 9, your Honor,

23   are presented to the Court for consideration in regards to the

24   outstanding warrant for Mr. Alvarado out of County Court Number

25   Two in Edinburgh.  Specifically, Defendant's Exhibit Number 7,

1    the judgment nisi was issued on Mr. Alvarado and, again, this

2    was a altercation that took place while he was 17 years old at

3    high school -- attending high school and the notice of the

4    court setting was sent to P.O. Box 2101 in Hargill.  The family

5    does not live at 2101.  In fact, the documents themselves

6    reflect a different P.O. Box number on the same -- on the

7    previous document, Defendant's Exhibit Number 7.  So he never

8    received notice of the court hearing to confront the

9    allegations of the misdemeanor assault and so we'd ask the

10   Court to consider the Defendant's exhibit when deciding.

11          **THE COURT:**  Okay, very well.

12          **MR. GARCIA:**  And it's our position, your Honor, that

13   we do believe that there are conditions or a combination of

14   conditions to assure his appearance in court and also the

15   safety of the community.

16          Mr. Alvarado did nothing more than defend himself,

17   his property and his family from what they perceived to be a

18   threat.  I have nothing further.

19          **THE COURT:**  Okay, thank you.  And Mr. Alaniz?

20          **MR. ALANIZ:**  Yes, we'd ask -- also ask for detention,

21   your Honor, obviously that, you know, there's nothing more

22   dangerous than an individual who basically coming upon a

23   vehicle that he knows is occupied, starts basically shooting

24   into the vehicle and as a matter of fact, I think he finishes

25   up one of the clips and then reloads again and follows the

1    vehicle and shoots at it again.  Obviously, there is no

2    evidence at all at this point from anywhere from any witness

3    that this was done in defense of anyone, including the

4    Defendant.  The evidence is clear, I mean, he -- they went

5    outside with their weapons and started shooting at a vehicle

6    that they knew was occupied with the intent to kill people that

7    were inside.

8            Based on that, Judge, obviously, that there -- you

9    know, this Defendant is a huge danger to society and we'd ask

10   the Court to detain him without a bond.

11           **MR. GARCIA:**  Your Honor, if I may?

12           **THE COURT:**  Yes, sir.

13           **MR. GARCIA:**  The Court will recall Agent Reneau's

14   testimony that it's been Mr. Alvarado's position from the

15   beginning that he fired after he thought he was fired upon.

16   That's when he fired and that came from the agent's mouth

17   during his testimony.

18           **THE COURT:**  Okay.  Again, I'm required to apply the

19   same factors under federal law in determining bond.  Again, as

20   to Mr. Arnoldo Alvarado, there is a very serious charge being

21   alleged against him.  It's undisputed that he was out that

22   evening with a 9 mm handgun firing at a vehicle and it looks

23   like it's likely that he was -- that he may have fired one of

24   the bullets that hit Special Agent Harrison or the one that

25   lodged in his back.

1              The other parts of -- I mean, in that circumstance,

2       it's certainly as, you know, dangerous as you get in terms of,

3       again, a person firing a weapon in that way.  Now, you know,

4       maybe things will look different as things are developed

5       further.  As far as this suggestion that they were responding

6       to what they thought was fired from somewhere else but at this

7       point, that doesn't seem to be supported and there's also his

8       own testimony that his brother was already firing the .22

9       before he started firing the 9 mm.

10             And so that whole circumstance and just grabbing the

11      guns and racing -- you know, running out there is circumstance

12      that's troubling by itself but, again, as it -- as the case

13      goes forward, there could be some explanations that would put

14      this in a different light or evidence that might do so but for

15      right now, it's a very serious and dangerous type of

16      circumstances that are reflected by the allegations in the

17      Complaint.

18             The other factors related to Mr. Arnoldo Alvarado are

19      positive.  He's a lifetime resident in the area.  It -- he's

20      gone to school here in this area.  Obviously his family's here.

21      The thing in this case about his family ties -- normally that's

22      a positive circumstance we would look at that his family would

23      help in terms of the Court being able to rely on them to, you

24      know, influence a person to appear in court and not commit

25      other offenses and so forth.

1           In this case, though, you've got his brother and his

2    father that were actually out with him so as a, sort of a

3    family -- they were out there as a family -- the three of them

4    at least were out there with their weapons and so that makes it

5    more difficult in that sense to consider that a positive factor

6    -- those particular ties.  There's no indication his mother had

7    anything to do with this and she certainly is willing and

8    wishes to help her son in any way she can.  So that's a

9    positive circumstance to consider there.

10          He has worked in the past as a migrant worker.

11   Again, that's, you know, a great thing to have been -- have

12   done.  His plans to attend school -- I note from the papers

13   that were submitted, that he was planning to do that which,

14   again, certainly is a good thing for him to be doing and so I

15   note those things.

16          The -- it is a concern that he already had a pending

17   assault charge that was brought against him.  Right now the

18   record stands that, you know, when his case was called, he

19   failed to appear and there was a warrant issued for his arrest.

20   There's been an explanation about having the wrong box number.

21   Of course, we don't have very many of the facts at this point

22   as to who gave that box number to begin with, whether that's

23   something they got from him initially or what the situation is

24   with that.  But at this point, there is a warrant that's

25   outstanding.  So at least as of now, even if the Court released

1    Mr. Alvarado, I assume he would be taken into custody by their

2    -- remain in custody and go over to the State and address that.

3         **MR. GARCIA:**  Your Honor, I failed to explain.  On

4    Defendant's Exhibit Number 7, the correct address that he gave

5    is actually his address and it's on Defendant's Exhibit Number

6    7.  Defendant's Exhibit 8 where it was mailed, was mailed to

7    the incorrect address.  He gave the correct address and it was

8    mailed to the incorrect address.  On the top of Defendant's 7

9    has the correct P.O. Box and they sent it to the incorrect P.O.

10   Box on Defendant's 8.

11        **(Judge conferred with clerk)**

12        **THE COURT:**  All right.  Okay, so I can see where that

13   -- although it is just a form that indicates there is the

14   correct address on one of these forms as to, you know, where

15   that came from and so forth and then on the other one, it's got

16   a different address on there for whatever reason.  Although I

17   am a little confused by the -- what this is trying to show here

18   because the -- he failed to appear according to the information

19   pretrial got.  That was in November of 2011.  The form with the

20   wrong address is dated January of 2012.  So I'm not sure --

21        **MR. GARCIA:**  I can explain that, your Honor.  What

22   happens is after the court date, the court will issue what's

23   called that judgment nisi.

24        **THE COURT:**  Right.

25        **MR. GARCIA:**  That judgment nisi is sent to the same

1    address that they initially sent the notice to, that 2101.

2    That's where that came from.

3            THE COURT:  Well, you're assuming that they sent the

4    initial notice to the wrong address rather than the right one

5    that's on Number 7.

6            MR. GARCIA:  I'm not assuming that.  I'm proffering

7    that to the Court based on the -- on my client's mother

8    bringing in these documents in order to explain what had

9    occurred and what she tried to do at the County.  And just --

10   we just ask the Court to consider it and make a ruling, your

11   Honor.  Thank you.

12           THE COURT:  Okay.  In any event, I think it's a

13   little unclear exactly what happened with that and it may be as

14   the family was suggested -- suggesting that there may be --

15   it's -- I'd say that's not clear from at least the things I'm

16   looking at.  There's -- if we had the actual -- presumably

17   there would have been a notice that would have said, you know,

18   this is set for November 2nd, 2011.  And if that -- we just had

19   a copy of that that was addressed to the wrong address, then

20   that would be a little more clear as far as that being the

21   cause of that problem.

22           But in any event -- so that is outstanding that

23   there's that and there was also a charge that Mr. Alvarado had

24   as a juvenile as well that's not as significant in this context

25   but it was a drug-related matter and so that's not a helpful

1    thing either though.

2         In looking at the circumstances, again as to

3    Mr. Arnoldo Alvarado, I am going to enter an Order of Detention

4    based on the very troubling nature of the alleged offense here,

5    the circumstances of him going out with his brother and father

6    and firing his weapon in that way and then together with the

7    outstanding warrant for his arrest for failure to appear.

8         If there's new information or if there's other

9    information that we could look at on this further, again, the

10   situation I think is closer with -- clearly closer with regard

11   to Arnoldo Alvarado given, you know, his situation being

12   different and so if there is material additional evidence or

13   information we could look at, you could -- counsel could move

14   to reopen the hearing and it's maybe appropriate in connection

15   with this to consider that further if that's the case.  But I'm

16   going to enter an Order of Detention based on those --

17   considering all the factors including the positive

18   circumstances but that's the reason for the Court's ruling.

19        Mr. Garcia, was there anything else that we ought to

20   take up here today with regard to Mr. Arnoldo Alvarado?

21        **MR. GARCIA:**  No, your Honor.

22        **THE COURT:**  We do also need to address the material

23   witnesses and so -- and, Mr. Alvarado, if you could just please

24   come forward, sir, right up here in front.  And there were two

25   witnesses that were detained in this case.  There has been a

1    motion that's been filed to take the depositions of the

2    material witnesses and -- is there two of them or --

3              **THE CLERK:**  Yes.  Mr. Longoria filed his and

4    Mr. Welch has not as of today.

5              **THE COURT:**  Okay.  And so I guess as to one of the

6    material witnesses, there's a motion and as to your client,

7    Mr. Welch or --

8              **MR. WELCH:**  Thank you, your Honor.  Kyle Welch, your

9    Honor, with the Federal Defender's Office.  We were appointed

10   to represent Mr. Gutierrez-Mendez who is one of the material

11   witnesses in this case.  He's -- I have not had a chance to

12   meet with him.  He's been kept at a remote location.  I intend

13   to meet with him this week.  I know that the usual procedure on

14   material witnesses is to file a motion to depose the witnesses

15   in a very expeditious fashion but I feel like I should -- it's

16   a little premature in this case but obviously, your Honor, this

17   is not the run-of-the-mill case and given all the circumstances

18   that I know about as to the circumstances in which he was

19   detained, I think it would be appropriate before I file that

20   motion to meet with Mr. Gutierrez to consult further with the

21   government and to make sure that Mr. Gutierrez's rights are

22   protected with regard to any exposure or liability that he

23   might have in this case, your Honor.

24              I would anticipate that I would get a reasonable

25   amount of time to meet with him and to investigate the case a

1   little further and I will be filing that motion and -- but I

2   haven't filed it at this point.  So I guess what I would ask

3   the Court to do is to hold this matter in abeyance with regard

4   to this particular issue of material witness depositions and to

5   give me a chance to consult with him and perhaps we can take

6   this matter up in a week or so.

7           THE COURT:  Okay.  And on behalf of the material

8   witnesses, Mr. Longoria, we appreciate you in assisting the

9   other material witness, I should say, in connection with this.

10  Oh, there you are and --

11          MR. LONGORIA:  Thank you, your Honor.  Just for the

12  record, I haven't had a chance to meet my client.  I was

13  looking forward to possibly meeting with him this week or next

14  week.

15          THE COURT:  All right.  Why don't we reset this as to

16  the witnesses?  It's a little bit different from the standpoint

17  of, you know, there may be some different issues from the

18  standpoint of the Defendants in this case as compared to some

19  of the other cases where we typically have material witnesses.

20  I'm not sure about that but at least I think the additional

21  time would probably be helpful for everyone.  So I'm going to

22  reset this for a week from today, Tuesday at --

23          MR. UNIDENTIFIED:  I'm on vacation next week --

24          THE COURT:  Okay.

25          MR. UNIDENTIFIED:  -- all next week.

1           **THE COURT:**  All right.  Well --

2           **MR. WELCH:**  I would have no objection being set the

3    following week, your Honor.  That would -- both of these -- our

4    clients are from El Salvador.  They're not going to be going

5    anywhere very quickly anyway and I certainly -- you know, it's

6    kind of a matter of balancing the clients (indiscernible) and

7    moving expeditiously in setting up the depositions but also

8    making sure that I've had an opportunity to evaluate -- or

9    we've had an opportunity to evaluate whatever exposure that

10   they might have arising out of this transaction as well.  So I

11   would have no objection to the Court setting this matter until

12   -- for the following week.

13          **THE COURT:**  Mr. Alvarez, let me just ask this.  I

14   mean, if you -- is that something -- as far as the motion to

15   depose to material witnesses, I mean do you already know your

16   client's position on that at this time?  And if so, we could --

17   you know, if you want to -- we could address that now and then

18   it would be up to the, you know, counsel.

19          **MR. GARCIA:**  Normally I would have no objection to

20   the motion but, you know, this is a different type of case.  I

21   may have an objection to it but after I discuss this with my

22   client, I think I -- with Mr. Welch here, I think we just need

23   some time to --

24          **THE COURT:**  Right.

25          **MR. GARCIA:**  -- determine whether or not we're going

1   to waive or not -- depose or not.

2          **THE COURT:**  Okay.  And, Mr. Garcia, at this point, do

3   you have a position already with regard to Mr. Arnoldo

4   Alvarado?

5          **MR. GARCIA:**  Not yet, your Honor.

6          **THE COURT:**  Okay.  So given the circumstances here --

7   and I do believe it's appropriate to continue the determination

8   on the motion to depose that's already been filed with regard

9   to one of the material witnesses and then have some additional

10  time to determine on behalf of the other material witness

11  whether or not they -- how they wish to proceed.

12          Just for the Defendant's benefit, I mean, what we're

13  discussing is that two individuals were held -- are being held

14  in custody that the Government has named as witnesses.  The

15  Government's filed an affidavit indicating that these

16  individuals had knowledge of facts essentially that are related

17  to the charge in this case.  Because they're in the United

18  States illegally, they're going to remain in custody until

19  their testimony can be taken in connection with this.

20          The typical procedure in cases where there are

21  material witnesses is that there's a deposition that's taken

22  and the Defendants' attorneys participate in that and examine

23  the witnesses on behalf of the Defendant to protect their

24  interest and then once the depositions are taken, then the

25  material witnesses can be released and not need to remain

1   further in custody.  So that's what we're addressing at this

2   point.

3           The -- by taking the depositions and having each of

4   your attorneys present and ask questions, then the right to

5   each Defendant to confront witnesses is preserved.  At the same

6   time, the witnesses would not need to remain in custody for a

7   longer time which might otherwise be necessary.  So the

8   difficulty I have is I would not be able to set this for the --

9   that next week unless I can convince Judge Ramos to handle this

10  for me.  I'm actually going to be at a court workshop that

11  week.  So it would have to either be the next week which would

12  be -- that would take it to three weeks or I can discuss this

13  with Judge Ramos and see if we can have her handle this.  Any

14  preference on which way we go with that?

15          **MR. UNIDENTIFIED:**  I have no preference, your Honor.

16          **MR. UNIDENTIFIED:**  No preference, your Honor.

17          **MR. UNIDENTIFIED:**  No preference, your Honor.

18          **MR. UNIDENTIFIED:**  Your Honor, I'm not – I'm not able

19  to bring in my calendar on my phone into the courtroom so I

20  can't get tell the Court.

21          **THE COURT:**  That's -- yeah.  Okay.  Well, what I'm

22  going to do is I'm going to set this for the 31st which is

23  three weeks from today at 3:00 o'clock and if in consulting

24  with your calendars or otherwise considering this further,

25  anyone has an objection either to waiting that long or to that

54

1  particular date, you-all can just, you know, file a brief

2  motion and I'd be willing to consider resetting that and unless

3  I hear anything, I'll keep it set for that date as opposed to

4  trying to address that earlier.

5          And if you talk to the -- your client's, Mr. Welch

6  and Mr. Longoria, and it's obvious they want to proceed and

7  would like to do so more quickly, then if you'll, you know,

8  request that, you know, the hearing be expedited, then I'm

9  pretty sure Judge Ramos would be willing to handle that sooner.

10          **MR. UNIDENTIFIED:**  Very well, your Honor.  I will be

11  seeing my client this week.

12          **THE COURT:**  Okay.  So we'll go ahead and do that as

13  to the material witness issue and I believe that should be

14  everything we would need to address in this case.  Was there

15  anything else that we had to take up here today?  Thank you.

16  You-all can be excused then.  Thank you.

17          **(This proceeding was adjourned at 4:24 p.m.)**

18

19

20

21

22

23

24

25

<u>**CERTIFICATION**</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>September 6, 2012</u>

        Signed                                                    Dated



*TONI HUDSON, TRANSCRIBER*