UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 7:12-CR-1136-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JULIO ARMANDO DAVILA, | ) | Monday, December 24, 2012 |
| | ) | ( 9:20 a.m. to 9:32 a.m.) |
| Defendant. | ) | (10:05 a.m. to 10:35 a.m.) |

ARRAIGNMENT AND DETENTION HEARING

BEFORE THE HONORABLE PETER E. ORMSBY,
UNITED STATES MAGISTRATE JUDGE

Appearances: See next page

Court Interpreter: Not used

Court Recorder: Rick Rodriguez

Transcribed By: Exceptional Reporting Services, Inc.
P.O. Box 18668
Corpus Christi, Texas 78480-8668
361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE. General Order 94-15, United States District Court, Southern District of Texas.

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES FOR:**

| | |
|---|---|
| Plaintiff: | GRADY LEUPOLD, ESQ.<br>Assistant United States Attorney<br>1701 W. Business Hwy. 83<br>Suite 600<br>McAllen, Texas 78501 |
| Defendant: | FRANCISCO J. RODRIGUEZ, ESQ.<br>1111 W. Nolana<br>McAllen, Texas 78504 |

**INDEX**

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEAN PAUL RANUE | 14 | 18/24 | | |
| **ARGUMENT** | | | | |
| BY MR. RODRIGUEZ | 26 | | | |
| BY MR. LEUPOLD | 27 | | | |
| **RULING OF COURT** | 29 | | | |

**McAllen, Texas; Monday, December 24, 2012; 9:20 a.m.**

**(Call to Order)**

**THE COURT:** Okay. We're going to call first a case here on Indictment, Number M-12-1136, *United States of America versus Julio Armando Davila*.

**MR. LEUPOLD:** United States present and ready, your Honor.

**THE COURT:** Please come forth, sir.

**MR. RODRIGUEZ:** Francisco Rodriguez, your Honor, for the defendant.

**THE COURT:** Okay. Good morning.

All right. In Mr. Davila's case, he was named in an indictment that was filed so there are two things we need to address in his case. One is the arraignment and then also the bond hearing. As far as the arraignment, Mr. Rodriguez, have you been able to go over the indictment with him and --

**MR. RODRIGUEZ:** I have, your Honor.

**THE COURT:** Okay. And do you believe he's competent at this time?

**MR. RODRIGUEZ:** I believe he is competent, your Honor.

**THE COURT:** And do you expect he'll wish to enter a plea of not guilty at this time?

**MR. RODRIGUEZ:** Yes, your Honor. We're going to plead not guilty and request a jury trial --

**THE COURT:** Okay.

**MR. RODRIGUEZ:** -- and also pretrial dates.

**THE COURT:** Okay. And do you anticipate that he'll wish to have the indictment read or to waive that?

**MR. RODRIGUEZ:** No, your Honor. We're going to go ahead and waive the reading of the indictment.

**THE COURT:** Okay. And Mr. Davila, I do need to ask you questions under oath for your arraignment.

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Please raise your right hand and the clerk will place you under oath.

**(Defendant sworn)**

**THE COURT:** Okay. And, sir, just to confirm we have your name correctly in the indictment, it is Julio Armando Davila. Is that right?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And, sir, I also just want to confirm what Mr. Rodriguez has indicated and that is that you have been able to review the indictment with your attorney and discuss the charge with your attorney. Is that correct?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And I also want to be sure that after doing that that you are able to understand the nature of the charge that's being alleged and understand the maximum penalties that could be imposed as to that. Do you understand

those things, sir?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And Mr. Rodriguez has indicated you wish to waive the reading of the indictment. All that means is that we won't read it out loud this morning, and is that correct, that you want to waive that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And he's also indicated you intend to plead not guilty at this time to the charge being alleged in the indictment. I just need to have you announce your plea at this point, and as to the charge in the indictment in your case how do you wish to plead, guilty or not guilty?

**THE DEFENDANT:** Not guilty.

**THE COURT:** And I do find Mr. Davila is competent based on the representation of counsel for purposes of the arraignment here today. He's entered a plea of not guilty at this time to the charge in the indictment.

His case is assigned to Judge Crane. The final pretrial conference is set for January -- excuse me, February the 1st at 9:00 o'clock. The jury selection will be February 5th at 9:30. The deadline for motions will be January the 7th. The Government's responses will be due January 25th and the deadline for motions for continuance will be January 18th.

So those dates will control further proceedings in

Mr. Davila's case and your attorney will be able to assist you in addressing your case on that schedule or otherwise helping you to resolve this.

We also need to address the issue of bond. In this case, based on the nature of the charge that's being alleged under federal law there is a presumption against bond. It is a rebuttable presumption but it shifts the burden of moving forward to the defendant. I'm going to be taking notice of the factual information in the pretrial services report except to the extent it's clarified or corrected in connection with the hearing.

And at this time, Mr. Rodriguez, is there evidence or argument you wish to present on the issue of bond?

**MR. RODRIGUEZ:** Yes, your Honor. One of the things that Mr. Davila indicates to me at least on the presentence -- or the report is that his criminal history. There are some -- at least one charge, maybe more, that did not belong to him.

Actually, he's not the individual that he was charged with. His dad does have a similar name and he believes that some of those charges were actually his father's charges. Additionally, he does have a --

**THE COURT:** And is that some of those -- the older charges or which ones are you talking about?

**MR. RODRIGUEZ:** Okay. The one dated April the 4th, 1989, unlawfully carrying a weapon. That was dismissed,

according to his recollection. The one on September 18th, 1992, aggravated assault on a peace officer, we believe that that's actually his dad. He was never charged with an aggravated assault on a peace officer, from his recollection.

The -- additionally, there is a pending aggravated assault with a deadly weapon. That was filed on August the 19th of this year. He has -- I represent him on the state -- that's a state charge, your Honor.

**THE COURT:** Right.

**MR. RODRIGUEZ:** -- and he has made all the appearances voluntarily; and in this particular case, he also turned himself in.

Additionally, he has no ties to Mexico. All his family resides -- the daughters and his ex-wife, of course, and his sons reside here in the Valley for many, many, many years.

So he does have some essential ties to the community and I would, on his behalf, ask that the Court set a -- maybe $100,000 surety bond with $10,000 cash deposit which his ex-wife, who he has good relationships with or a good relation, is willing to post, and I believe that she has a business -- that she would entertain the -- hiring him or having him work with her and he can assist -- or she can assist in supervising him.

**THE COURT:** Okay. Thank you. And as far as the Government's position on bond as to Mr. Davila, Mr. Leupold?

**MR. LEUPOLD:** Your Honor, the Government recommends

detention and agrees with the recommendation made in the Pretrial Services Report based primarily upon the rebuttable presumption which the Government believes has not been rebutted in light of the defendant's criminal history and the Government's position is supported by not only the current charge but also those previous convictions.

So to the extent that the defendant contests those convictions, the Government does believe that they are the defendant's convictions and relies upon those as a basis of its opinion.

The Government also notes the defendant's previous drug use and the fact that while he doesn't have any self-reported ties, his mother appears to be a lawful permanent resident and does believe that the seriousness of the current offense in tandem with the seriousness of the charged offense at the state does provide an incentive with the -- to the defendant to flee the jurisdiction and, as such, does believe there are no conditions or combination of conditions that can either reasonably assure his presence at future court proceedings and/or ensure the welfare of the community. Thank you, your Honor.

**THE COURT:** And, Mr. Leupold, one of the factors is the weight of the evidence and I see what the indictment says as far as the nature of the charge but I'm not aware of the -- some of the circumstances alleged as to the first two

co-defendants but I'm not sure exactly -- well, I think I know how this may allegedly relate to the first three counts but I'm not certain about that and I'm also not really aware of the circumstances alleged in Count Four as to Mr. Davila. Did you want to make any kind of proffer about that or --

**MR. LEUPOLD:** Unfortunately, your Honor, the Government was not prepared to provide either a proffer or additional evidence today. But should the Court require that for its decision, I can ensure that that's available to the Court at the next available setting.

**THE COURT:** Okay. And as to the -- these prior charges so that the two or the ones that are in dispute -- 1989 and 1992. Is that correct, Mr. Rodriguez?

**(Defendant confers with counsel)**

**MR. RODRIGUEZ:** Excuse me, Judge. I'm sorry. He was talking to me.

**THE COURT:** I'm just -- and I'm just trying to make sure I had clear what the two charges that were being questioned as far as his record and I understood you to say the 1989 charge for unlawfully carrying a weapon and the 1992 charge for aggravated assault on a peace officer.

**MR. RODRIGUEZ:** That's correct, your Honor. Yeah, Mr. Davila says that he has never been convicted of those charges.

**THE DEFENDANT:** On those charges, the other charge

applies to me. I was never convicted on that other charge, Judge.

**THE COURT:** So the 1989 one that was you but it was dismissed is what you're remembering, Mr. Davila. Is that right?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Okay.

**MR. RODRIGUEZ:** And in fact, your Honor, I believe that the State of Texas had issued him a concealed weapons license and they would not have done so with a -- with that prior criminal history, I don't believe.

**THE COURT:** Right, if he disclosed it then, yeah. Or they should have done a records check also. So, right and that would be -- okay. And --

**MR. LEUPOLD:** Your Honor, I can provide the Court with a proffer and actually do have a witness available to provide the Court with additional evidence on the strength of the evidence.

But the proffer is that the role of the defendant in the indicted offense was that he, in tandem with four co-conspirators, planned to steal a load of marijuana of a quantity of approximately 2,000 kilograms that occurred or was planned to occur the same night that the federal agent was shot by co-defendants. So that's the Government's proffer; and if the Court requires additional evidence, I do have an agent

available.

**THE COURT:** So that's what the Government is alleging and do you have anything as far as why you all believe that Mr. Davila was involved in this or --

**MR. LEUPOLD:** I would have to put the agent on to provide, I think, more evidence, your Honor.

**THE COURT:** Okay. I'll leave that up to you as far as, Mr. Leupold, if you want to --

**(Defendant confers with counsel)**

**MR. LEUPOLD:** Yeah, I think it's important. I --

**THE COURT:** Okay. We'll go ahead and --

**MR. LEUPOLD:** -- I haven't had an opportunity to speak to Defense counsel but I believe that detention is very much contested at this point.

**THE COURT:** In light of that -- well, let's go ahead and we'll hear the Government's witness and, Mr. Davila, you can have a seat at counsel table with your attorney and we'll take that up.

**(Pause)**

**MR. LEUPOLD:** Your Honor, is there a chance that we could reset this matter for later in the docket? Apparently, there are some facts associated with this case that I was not made aware of. So I'd like --

**THE COURT:** All right.

**MR. LEUPOLD:** -- just a few more moments, your Honor.

**THE COURT:** Sure. Let's just go ahead and recall -- and, Mr. Davila, you can go ahead and have a seat over here in the -- we'll just leave you with the marshals for a few minutes and we'll address the other cases here and then come back to this. If we need to, we can take a recess at the end there to give you a little additional time on that.

**(Court attends other matters from 9:32 a.m. to 10:05 a.m.)**

**THE COURT:** Okay. And going back to Mr. Davila's case, Criminal Number M-12-1136, *United States versus Julio Armando Davila*, and --

**MR. LEUPOLD:** The United States is again present and ready, your Honor.

**THE COURT:** Do you need a -- need for us to take a recess or --

**MR. LEUPOLD:** No. Your Honor, the Government is ready to proceed and the Government would like to provide the Court with evidence.

**THE COURT:** Okay. A witness or --

**MR. LEUPOLD:** So the Government will call Special Agent Ranue to the stand.

**THE COURT:** Okay.

**THE CLERK:** Please raise your right hand.

**JEAN PAUL RANUE, GOVERNMENT'S WITNESS, SWORN**

//

//

**DIRECT EXAMINATION**

**BY MR. LEUPOLD:**

Q Sir, please state your full name for the record.

A Jean Paul Ranue.

Q How are you employed, sir?

A Special Agent with the United States Homeland Security Investigations in McAllen, Texas.

Q Are you familiar with the indictment that has been returned against a Julio Armando Davila?

A I am.

Q Are you the case agent assigned to the investigation that ultimately gave rise to the indictment?

A Yes, sir.

Q Is the individual that is the subject of your investigation and of the indictment present in the courtroom today?

A He is.

Q Could you describe his location in the courtroom as well as an article of clothing that he's wearing?

A He's sitting to my right wearing a white collared shirt.

**MR. LEUPOLD:** Your Honor, please let the record reflect the witness has identified the defendant.

**THE COURT:** Okay.

**MR. RODRIGUEZ:** No objection.

//

**BY MR. LEUPOLD:**

Q So I understand that the defendant was True Billed by the grand jury for conspiring to commit an offense on July 3rd, 2012. Is that consistent with your investigation?

A Yes, sir.

Q Can you please briefly describe for the Court the nature of the transaction that gave rise to the criminal count in this case against the defendant?

A In approximately January of 2011, Homeland Security Investigations began a narcotics investigation. At a certain point, the defendant was approached by law enforcement and his cooperation was gained by the United States Government.

On July 2nd, we received information from this individual about a narcotics shipment in Hargill, Texas. During the subsequent surveillance, Special Agent Kelton Harrison was shot in Hargill, Texas, on the morning of July the 3rd. Subsequent to that shooting, we learned that the defendant, as well as four other individuals, were planning to steal the load of narcotics in Hargill, Texas, that agents were out there surveilling that evening.

Q And, sir, if you could, just briefly summarize for the Court what evidence have you developed through the course of your investigation to support the allegation that the defendant planned the intended theft of the load on or about July 3rd?

A We have the defendant’s statements as well as other

individuals' cooperating statements as well as the facts that led up to the shooting as well as evidence that we gathered subsequent to the shooting.

Q Have you had an opportunity to speak with any of the co-defendants in this case?

A I have. Yes, sir.

Q And do any of those co-defendants implicate the defendant in the offense?

A They do.

Q Did the -- you mentioned previously that the defendant provided a statement. Did you initially provide the defendant with his Miranda Warnings before obtaining that statement?

A I'm not sure. I wasn't there present for that particular statement. As you know, the defendant did provide a statement regarding events of July the 3rd as well as the planning of the theft of narcotics in Hargill.

Q And to the best of your knowledge or belief that was after he had waived his rights and agreed to provide a knowing and voluntarily statement to agents?

A Correct. Yes, sir. Correct.

Q What, if anything, did the defendant state about his historical participation in the smuggling of narcotics?

A Based on statements by the defendant as well as other individuals, we know the defendant was involved as well as other individuals in the storage, transportation, selling of

narcotics for at least a year prior to the shooting on July 3rd.

Q Was the defendant able and -- based on the information that the defendant provided as well as that of co-defendants, was your investigation able to lead you to an opinion as to the -- I guess, the overall quantity of drugs that the defendant has smuggled over that period of time?

A I'd be purely speculating as far as the overall amount.

Q Let me ask it differently. What was the total quantity of drugs seized in this case?

A In this case to date, we've seized approximately 3,000 pounds of marijuana, 30 kilos of cocaine.

Q Did the defendant and/or other co-defendants provide agents with an indication as to how frequently they were moving or ripping (phonetic) loads over that period of time?

A I don't have a frequency. It was provided by other co-defendants that the defendant was involved in stealing narcotics frequently. But I don't have a time.

Q And did the investigation develop information that would lead you to believe that the size of the loads were consistent with the quantity of drugs that have been seized during the course of your investigation?

A Correct. Yes, sir.

**MR. LEUPOLD:** Pass the witness, your Honor.

**THE COURT:** Okay. Mr. Rodriguez?

**CROSS EXAMINATION**

**BY MR. RODRIGUEZ:**

Q When did you first meet Mr. Davila?

A First meet him?

Q Correct.

A May of last year, approximately.

Q And you said that he had been cooperating with you?

A Correct.

Q Were you outside when the Assistant U.S. Attorney that you work with said that Mr. Davila would not be a flight risk? Were you out there? Did you hear him say that?

A Right out here in the hall?

Q Sure.

**MR. LEUPOLD:** Just a -- objection. Relevance, your Honor.

**MR. RODRIGUEZ:** I'm talking about flight risk, your Honor, which is one of the factors that goes into a bond, whether he would appear.

**MR. LEUPOLD:** And he's seeking a legal conclusion through a witness and the Government objects.

**MR. RODRIGUEZ:** No, it was a conversation that was outside in his presence.

**THE COURT:** Right, but -- and I understand what you're getting at, Mr. Rodriguez, but even if Mr. Leonard said that or whoever said that, I'm the one that would have to

determine based on the, you know, the circumstances. So if he thinks that he's not a flight risk then, you know, that's fine. But, ultimately, I've got to decide so --

**MR. RODRIGUEZ:** I understand that, Judge. But he's a representative of the U.S. Government who uttered that Mr. Davila was not a flight risk. Here in court, they're taking the opposite --

**THE COURT:** If you're representing that somebody said out -- said that, Mr. Rodriguez, I'll accept that; and we don't need to have the witness, you know, kind of repeat it. So that's fine.

**BY MR. RODRIGUEZ:**

Q Now, are you telling the Court -- and I want to be very clear regarding this -- are you telling the Court that Mr. Davila had anything directly to do with the shooting of the government agent?

A You'll have to be more specific on your question, please.

Q Do you think Mr. Davila set up the government agent to be shot, for example?

A Indirectly or directly?

Q Directly.

A Directly, I don't know if that was his intention. I can't speculate on his mindset.

Q Well, as a government agent, you do know that every time there is some drugs, dealings -- drug deals going down or

whatever, there's always a risk that a government agent or the defendant is going to get shot. You understand that, right?

A I personally, yes, sir. I can't speak for the other agents.

Q Right. Now, how was it that you came upon Hargill, Texas? What information did you have that led the agents to go out there regarding some drug deal going down?

A We received information from the defendant regarding the drug deal -- proposed drug deal.

Q Okay. You mentioned defendant, co-defendants. Okay. Specifically, who are you referring to?

A Mr. Davila.

Q Okay. So Mr. Davila was the one who called you?

A Correct.

Q And but for him calling the government agents, you all would not be out there in Hargill?

A Correct.

Q And the information that was supposedly given to you was that there was some sort of drug deal going down. Is that correct?

A Yes, sir.

Q And you did what you have done in previous occasions when you -- when you mentioned that he had cooperated with you on prior occasions. Is that correct?

A I don't understand your question.

Q Well, I thought you said that he cooperated with the government on prior occasions.

A He did. However, on July 3rd that was a new instance between us. I had never done that type of investigation with his information. So that would be the first instance that I did that type of investigation with his information.

Q Okay. Well, regarding the information that he had given you on prior occasions --

A Uh-huh.

Q -- have that resulted in any drug seizures?

A Yes, sir.

Q So when you're saying that in this investigation that you have seized -- what did you say, 3,000 pounds of marijuana?

A Approximately. Approximately.

Q Pounds or kilograms?

A It would be pounds.

Q Okay. And you said also cocaine?

A Yes, sir.

Q And so this -- the drugs that you seized was as a result of some cooperation that you got from Mr. Davila?

A No. A portion of that, yes. Excuse me.

Q Okay. And so a portion -- do you know approximately how much?

A Six hundred pounds.

Q Six hundred pounds.

A Of marijuana.

Q Okay. Now, who are the other co-defendants that you claim have implicated Mr. Davila?

A The other co-defendants who have implicated him?

Q Yes.

A Was that your question?

Q Yes. You said you talked to two co-defendants that implicated Mr. Davila. Who are they?

A I don't know if I talked to two but there's other co-defendants that implicated him. His former girlfriend/fiancé implicated him.

Q Aida Palacios?

A Correct. Aida Palacios. Yes, sir.

Q Okay. She's not a co-defendant in the indictment, is she?

A No, sir. She's not on this current indictment. My understanding is she will be indicted.

Q Okay. Well, let me -- let me try to, I guess -- when you say co-defendants --

A Correct.

Q -- you're talking about suspects or people who have actually been indicted this case.

A Not people that have been indicted in this case. It would be individuals under investigation in the broader investigation. I apologize if there was a misunderstanding.

Q Okay. Just so we can be -- co-defendants -- when you said

"co-defendants," you're talking about people who have not been arrested yet?

A Correct.

Q And one of them is Aida Palacios?

A Correct.

Q Now, where was Julio when the agent was shot?

A I'm not sure.

Q Did you see him anywhere? Did any agent report it that he was out there?

A No. Not to my knowledge.

Q Did -- as a result of you being out at or the agents being out in Hargill for the -- for which Mr. Davila is indicted, the 1,000 kilograms of marijuana, correct?

A Correct. Yes, sir.

Q Was there any marijuana that was actually seized on July this year?

A No. There was not.

**MR. RODRIGUEZ:** Pass the witness, your Honor.

**THE COURT:** Okay.

**MR. LEUPOLD:** I have nothing further, your Honor.

**THE COURT:** And -- okay. And just to make sure I understood, Special Agent Ranue, you're saying that Mr. Davila himself indicated that in connection with that night that these events happened -- that, I guess, in connection with the marijuana that you were all looking for that he intended with

others to, I guess, take that from someone else or -- I'm not sure I understood what all that was --

**THE WITNESS:** Yes, Judge. Based on Mr. Davila's statements, as well as the statements of Aida, these individuals were planning to steal that load of narcotics on July the 2nd or 3rd.

**THE COURT:** Okay. And I guess maybe we don't need to get into this but I'm just confused as to -- so on the one hand, he sends you guys out there or sent -- gives you all information but on the other hand he was planning to take the marijuana himself. I'm missing something there about how that was supposed to work.

**THE WITNESS:** My understanding, Judge, is HSI special agents were called after these individuals believed the marijuana had already been stolen. That's my understanding as to why there were two different plans.

**THE COURT:** Oh, okay. All right. Anyway, was there anything else for the witness?

**MR. RODRIGUEZ:** Yes, your Honor.

**FURTHER CROSS EXAMINATION**

**BY MR. RODRIGUEZ:**

Q That night, how many times did you talk to Mr. Davila that night?

A That evening? On the 2nd or the 3rd? Which one?

Q The 3rd. The 2nd and through the 3rd.

A I believe I received two phone calls from him at approximately midnight on July 2nd. I then spoke to him one more time at approximately 1:30, 2:00 a.m., on July the 3rd. Then I spoke to him again on July the 3rd at approximately 5:00 a.m., 6:00 a.m.

Q Okay. Around four or five times, correct?

A Approximately. Yes, sir.

Q Okay. Now, when was the first time that he called that you got information regarding the drug deal in Hargill?

A The 2nd around midnight. So it would have been right on the line between the 2nd and the 3rd.

Q Okay. And what time was the agent shot?

A Approximately 3:00 a.m., July 3rd.

Q Okay. So Julio calls you before anything happens to tell you about the deal. Then an hour, two hours later when you all show up over there or the agent shows up, that's when the agent got shot? Is that correct?

A Correct. Yes, sir.

Q But you're saying that, I guess, the plan was that Julio and others were going to steal the load.

A Correct.

Q But yet they're calling you to go out there --

A Correct.

Q -- and subsequent to that, the agent gets shot.

A Correct.

Q And you don't find that strange?

A I find it very strange.

**MR. RODRIGUEZ:** Pass the witness, your Honor.

**THE COURT:** Okay. Anything else?

**MR. LEUPOLD:** Briefly, your Honor. I guess --

**THE COURT:** Okay. I mean, right. We don't need to sort all this out since we're just deciding bond here but, anyway, you can do whatever you'd like. That's fine.

**(Laughter)**

**MR. LEUPOLD:** Nothing further, your Honor. Thank you.

**THE COURT:** Okay. Thank you, sir.

**THE WITNESS:** Thank you.

**THE COURT:** Okay. As far as -- did you wish to add anything else, Mr. Rodriguez, or any other argument on the issue of bond?

**MR. RODRIGUEZ:** The only -- well, there are some things, your Honor. Considering the totality of the circumstances -- and I'm talking about the factors that are required by the Court to consider in setting bond, I would urge to the Court that Mr. Davila, based on some of the testimony, is that he's not a flight risk.

Some of the information that has been made available to the Court through testimony, the proffers and through the Pretrial Officer's Report all indicate that he has lots of

essential ties to the community. He has no ties to Mexico.

He has been cooperating to the extent that -- to some extent with the Government. He's got no reason to flee. He turned himself in. He has made all prior court appearances with -- in state court involving the aggravated assault, involving Ms. Aida Palacios, who the Court now knows is one of the -- a co-defendant or someone to be indicted. And I don't seriously believe that the Government themselves believe that Mr. Davila is a flight risk, your Honor.

So for all those reasons, I would urge the Court to set some sort of bond. The family has already indicated they have 10 percent or $10,000 to post. And we have Ms. Davila here and their sons. We would proffer their testimony that she has a place of employment. She has agreed to take him over or help with the supervision. He can stay there. That's all in the report. And so for all those reasons, I believe that a bond would be appropriate in this case.

**THE COURT:** Okay. Thank you. Mr. Leupold, did you wish to add anything or --

**MR. LEUPOLD:** I do, your Honor. I do concede and acknowledge that this is primarily a dangerousness case. As the Court is well aware, in the Bail Reform Act, the type of crime that the grand jury has True Billed in this case against the defendant is the very type of case that entitles the Government to a hearing.

And the Government would suggest that the very dangerousness that the Government believes is a concern regarding the defendant does satisfy the nexus issue with regards to the underlying offense.

In other words, in this case the Court needs to determine, even if the defendant rebuts its presumption, whether or not there’s clear and convincing evidence that the defendant would remain a danger to the community. And the Government would suggest here that based upon the defendant’s criminal history as well as the evidence the Government elicited from the case agent, there is a wealth of evidence to suggest that the defendant has been engaged in the long-term smuggling of narcotics and particularly the violent smuggling of narcotics that ultimately, in this instance, resulted in the very grave injury to a federal agent who got caught in the crossfire of the defendant’s transaction, albeit confusing transaction, gone awry.

The Government would also suggest here that the strength of the evidence should be considered in the Government’s favor given that this is an indictment and that this case has been True Billed by the grand jury based upon a consideration of the evidence presented to it.

So based upon the strength of the evidence, the criminal history, the nature of this offense, the quantity of the drugs involved, the Government does believe that detention

is appropriate to ensure the safety and welfare of the community. Thank you.

**THE COURT:** Okay. Again, I'm required to apply the factors under federal law in determining bond; and on that, the first factor is the nature and seriousness of the alleged offense. In this case, there's a serious drug trafficking charge being alleged against Mr. Davila. He's not alleged in the indictment to have, you know, participated with or caused the shooting of the agent actually. I mean, that may or may not be, I guess, a theory as the case goes forward. But at least I'm just looking at what the charge is in the indictment. So there's, not taking that part of this into account, the fact that an agent was shot here since he's not being charged related to that at this point, and I know -- I have no knowledge that he would be at any point.

So but there is a very serious charge alleged -- that allegedly involves conspiracy to possess with the intent to distribute over 1,000 kilograms of marijuana and, obviously, that's a serious felony offense that's being alleged against Mr. Davila.

I'm also required to consider the weight of the evidence. This whole circumstance is confusing but it does appear that there is significant evidence here in that at least a part of that evidence includes Mr. Davila's own statements about his intentions and involvement and it appears to be

corroborated also by this other lady as well.

And so -- but it's not a prediction of the outcome of the case since in any case as things go forward the circumstances may look different. The evidence may look stronger or weaker as the case proceeds. There may be other aspects that will come to light. So I'm not predicting how this will turn out. But I am required under the Bail Reform Act to consider the weight of the evidence at this point and it appears the evidence of Mr. Davila's involvement in the charge being alleged is significant, at least at this time.

So those are two of the factors. The other factors related to -- essentially, to the personal circumstances and characteristics of the defendant. I think Mr. Rodriguez has pointed out well the positive factors here and there are positive factors.

Mr. Davila is a lifetime resident of the area. He does have significant and strong family ties here in the area. It does not appear that -- there's no indication he has ties in Mexico and so those are positive circumstances.

He has children that are here from his previous marriage. It is a positive circumstance and, you know, a bit unusual that his ex-wife is actually very willing to assist him so that's a good circumstance there in terms of his situation now, and it's a little bit unusual that that would occur but that's a positive circumstance to consider and provides the

possibility of other conditions that might be considered.

And so I do note that and I note that the family has some -- put together some funds to assist in setting a bond also and so I note that there's that circumstance.

The -- on the other hand, there are some circumstances that are not so positive. I note that Mr. Davila has worked in the past and in connection with a law office as well as worked as a bail bondsman. So both those employments, of course, would otherwise be positive circumstances that he has that type of prior employment.

I think he's not been employed as recently in those capacities but I'm not -- I guess maybe he was employed at the time of his arrest perhaps. I should also note that it is a positive circumstance that Mr. Davila did turn himself in in connection with this case. I do note that, and that's to his credit as well.

His circumstances -- he worked as a migrant worker reportedly and then after that worked as -- in a law office in a bail bondsman role and so I note those things. His income from his employment was pretty limited and at least in -- as reported and recently. And so does make it a little confusing -- he owes more on a truck that was bought this past year than he apparently makes per month, which is something that's hard to understand how that circumstance arose.

But in any event, the more serious concern or the

criminal history that Mr. Davila has -- he has a number of prior arrests. I will consider or consider the possibility that at least one of these may have been his father, perhaps, and also another one might have been dismissed. But still and so when there is not a conviction, we don't assume that the person has committed those crimes; but it's still a factor and a circumstance of fact to consider when a person has been arrested and charged on a number of occasions with different crimes in this case. Mr. Davila, in the past, has been charged with attempt to commit murder way back in 1986; unlawfully carrying a weapon in 1989. We'll assume that the '92 charge was his father; but in 1993, there was assault in connection with a family violence and criminal trespass. In 2005, another assault. All those were -- did not result in convictions but the fact of so many arrests on those types of charges is a circumstance to take into account -- not on the same level as a conviction, again, but it is a circumstance.

More troubling is he does have this pending charge -- aggravated assault with a deadly weapon. Now, I do note that that actually occurred after the alleged offense in this case so it's not a matter of him committing the current offense while he was on release from that prior case.

But I do note the nature of that prior case is troubling, that the type of charge that's being alleged in connection with that is, obviously, a very serious one also --

felony charge that's being alleged there and he's facing the felony charge in this case.

And looking at all of the circumstances, also I note that under federal law, there's this presumption that applies. I do find the presumption has been overcome with regard to the risk of flight in Mr. Davila's circumstances and I agree with, I think, Mr. Rodriguez as well as if Mr. Leonard or whoever said that and I think Mr. Leupold has acknowledged this as well, that the risk of flight has not been the main concern.

The Court is also required to determine that, you know, conditions of release would assure the safety to the community and it is presumed that a person is a danger to the community if they are charged and probable cause is found with regard to a drug-related charge. This case, the type of allegation is involving a large amount of drugs and also allegedly involved an ongoing type of a enterprise allegedly that was going on.

So it is the type of circumstances and type of charge and type of ongoing activity that Congress particularly was concerned about as reflected in legislative history, the Bail Reform Act.

So the presumption there, even as to the risk of dangerousness, it's not a huge burden to overcome but even where it is overcome it remains as a factor. I find, ultimately, that there should be an order of detention as to

Mr. Davila based on the dangerousness to the community that's -- he has these two felony charges that are pending now and the circumstances of the alleged offense in this case is such that combined with the other -- all the other circumstances here, I do find that the conditions would not reasonably assure the safety of the community.

If there is any new information or material change in circumstances or something -- this is a close case in my view and because, Mr. Davila, there are positive factors here to be sure and especially with his ties and so forth -- but given this other part of it, I do find ultimately that by clear and convincing evidence that there are not conditions that would reasonably assure the safety of the community.

But, again, if there is something new or material to -- materially different that we could look at, I'd be willing to consider that further. But I'm going to go ahead and enter that order at this time.

Was there anything else that we ought to take up in Mr. Davila's case here today? Mr. Rodriguez, did you have anything else in this case?

**MR. RODRIGUEZ:** No, your Honor. Not at this time.

**THE COURT:** Okay. Thank you. You-all can be excused then. Thank you.

**(This proceeding was adjourned at 10:35 a.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**March 28, 2013**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***