UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:12-CR-1136-3 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JULIO ARMANDO DAVILA, | ) | Monday, December 24, 2012 |
| | ) | ( 9:20 a.m. to  9:32 a.m.) |
| Defendant. | ) | (10:05 a.m. to 10:35 a.m.) |


ARRAIGNMENT AND DETENTION HEARING

BEFORE THE HONORABLE PETER E. ORMSBY,
UNITED STATES MAGISTRATE JUDGE


**Appearances:**          See next page

Court Interpreter:       Not used

Court Recorder:          Rick Rodriguez

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, Texas 78480-8668
                         361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiff:                      GRADY LEUPOLD, ESQ.
                                Assistant United States Attorney
                                1701 W. Business Hwy. 83
                                Suite 600
                                McAllen, Texas 78501

Defendant:                      FRANCISCO J. RODRIGUEZ, ESQ.
                                1111 W. Nolana
                                McAllen, Texas 78504

1                              INDEX

2    GOVERNMENT'S WITNESS        DIRECT     CROSS       REDIRECT   RECROSS

3    JEAN PAUL RANUE              14        18/24

4

5    ARGUMENT

6    BY MR. RODRIGUEZ            26

7    BY MR. LEUPOLD             27

8

9    RULING OF COURT            29

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**McAllen, Texas; Monday, December 24, 2012; 9:20 a.m.**</u>

**(Call to Order)**

**THE COURT:**  Okay.  We're going to call first a case here on Indictment, Number M-12-1136, *United States of America versus Julio Armando Davila*.

**MR. LEUPOLD:**  United States present and ready, your Honor.

**THE COURT:**  Please come forth, sir.

**MR. RODRIGUEZ:**  Francisco Rodriguez, your Honor, for the defendant.

**THE COURT:**  Okay.  Good morning.

All right.  In Mr. Davila's case, he was named in an indictment that was filed so there are two things we need to address in his case.  One is the arraignment and then also the bond hearing.  As far as the arraignment, Mr. Rodriguez, have you been able to go over the indictment with him and --

**MR. RODRIGUEZ:**  I have, your Honor.

**THE COURT:**  Okay.  And do you believe he's competent at this time?

**MR. RODRIGUEZ:**  I believe he is competent, your Honor.

**THE COURT:**  And do you expect he'll wish to enter a plea of not guilty at this time?

**MR. RODRIGUEZ:**  Yes, your Honor.  We're going to plead not guilty and request a jury trial --

1          **THE COURT:**  Okay.

2          **MR. RODRIGUEZ:**  -- and also pretrial dates.

3          **THE COURT:**  Okay.  And do you anticipate that he'll

4   wish to have the indictment read or to waive that?

5          **MR. RODRIGUEZ:**  No, your Honor.  We're going to go

6   ahead and waive the reading of the indictment.

7          **THE COURT:**  Okay.  And Mr. Davila, I do need to ask

8   you questions under oath for your arraignment.

9          **THE DEFENDANT:**  Yes, sir.

10          **THE COURT:**  Please raise your right hand and the

11   clerk will place you under oath.

12       **(Defendant sworn)**

13          **THE COURT:**  Okay.  And, sir, just to confirm we have

14   your name correctly in the indictment, it is Julio Armando

15   Davila.  Is that right?

16          **THE DEFENDANT:**  Yes, sir.

17          **THE COURT:**  And, sir, I also just want to confirm

18   what Mr. Rodriguez has indicated and that is that you have been

19   able to review the indictment with your attorney and discuss

20   the charge with your attorney.  Is that correct?

21          **THE DEFENDANT:**  Yes, sir.

22          **THE COURT:**  And I also want to be sure that after

23   doing that that you are able to understand the nature of the

24   charge that's being alleged and understand the maximum

25   penalties that could be imposed as to that.  Do you understand

1    those things, sir?

2             **THE DEFENDANT:**  Yes, sir.

3             **THE COURT:**  And Mr. Rodriguez has indicated you wish

4    to waive the reading of the indictment.  All that means is that

5    we won't read it out loud this morning, and is that correct,

6    that you want to waive that?

7             **THE DEFENDANT:**  Yes, sir.

8             **THE COURT:**  And he's also indicated you intend to

9    plead not guilty at this time to the charge being alleged in

10   the indictment.  I just need to have you announce your plea at

11   this point, and as to the charge in the indictment in your case

12   how do you wish to plead, guilty or not guilty?

13            **THE DEFENDANT:**  Not guilty.

14            **THE COURT:**  And I do find Mr. Davila is competent

15   based on the representation of counsel for purposes of the

16   arraignment here today.  He's entered a plea of not guilty at

17   this time to the charge in the indictment.

18            His case is assigned to Judge Crane.  The final

19   pretrial conference is set for January -- excuse me, February

20   the 1st at 9:00 o'clock.  The jury selection will be

21   February 5th at 9:30.  The deadline for motions will be January

22   the 7th.  The Government's responses will be due January 25th

23   and the deadline for motions for continuance will be

24   January 18th.

25            So those dates will control further proceedings in

1   Mr. Davila's case and your attorney will be able to assist you

2   in addressing your case on that schedule or otherwise helping

3   you to resolve this.

4          We also need to address the issue of bond.  In this

5   case, based on the nature of the charge that's being alleged

6   under federal law there is a presumption against bond.  It is a

7   rebuttable presumption but it shifts the burden of moving

8   forward to the defendant.  I'm going to be taking notice of the

9   factual information in the pretrial services report except to

10  the extent it's clarified or corrected in connection with the

11  hearing.

12         And at this time, Mr. Rodriguez, is there evidence or

13  argument you wish to present on the issue of bond?

14      **MR. RODRIGUEZ:**  Yes, your Honor.  One of the things

15  that Mr. Davila indicates to me at least on the presentence --

16  or the report is that his criminal history.  There are some --

17  at least one charge, maybe more, that did not belong to him.

18         Actually, he's not the individual that he was charged

19  with.  His dad does have a similar name and he believes that

20  some of those charges were actually his father's charges.

21  Additionally, he does have a --

22      **THE COURT:**  And is that some of those -- the older

23  charges or which ones are you talking about?

24      **MR. RODRIGUEZ:**  Okay.  The one dated April the 4th,

25  1989, unlawfully carrying a weapon.  That was dismissed,

1    according to his recollection.  The one on September 18th,

2    1992, aggravated assault on a peace officer, we believe that

3    that's actually his dad.  He was never charged with an

4    aggravated assault on a peace officer, from his recollection.

5         The -- additionally, there is a pending aggravated

6    assault with a deadly weapon.  That was filed on August the

7    19th of this year.  He has -- I represent him on the state --

8    that's a state charge, your Honor.

9         **THE COURT:**  Right.

10        **MR. RODRIGUEZ:**  -- and he has made all the

11   appearances voluntarily; and in this particular case, he also

12   turned himself in.

13        Additionally, he has no ties to Mexico.  All his

14   family resides -- the daughters and his ex-wife, of course, and

15   his sons reside here in the Valley for many, many, many years.

16        So he does have some essential ties to the community

17   and I would, on his behalf, ask that the Court set a -- maybe

18   $100,000 surety bond with $10,000 cash deposit which his ex-

19   wife, who he has good relationships with or a good relation, is

20   willing to post, and I believe that she has a business -- that

21   she would entertain the -- hiring him or having him work with

22   her and he can assist -- or she can assist in supervising him.

23        **THE COURT:**  Okay.  Thank you.  And as far as the

24   Government's position on bond as to Mr. Davila, Mr. Leupold?

25        **MR. LEUPOLD:**  Your Honor, the Government recommends

1   detention and agrees with the recommendation made in the

2   Pretrial Services Report based primarily upon the rebuttable

3   presumption which the Government believes has not been rebutted

4   in light of the defendant's criminal history and the

5   Government's position is supported by not only the current

6   charge but also those previous convictions.

7            So to the extent that the defendant contests those

8   convictions, the Government does believe that they are the

9   defendant's convictions and relies upon those as a basis of its

10  opinion.

11           The Government also notes the defendant's previous

12  drug use and the fact that while he doesn't have any self-

13  reported ties, his mother appears to be a lawful permanent

14  resident and does believe that the seriousness of the current

15  offense in tandem with the seriousness of the charged offense

16  at the state does provide an incentive with the -- to the

17  defendant to flee the jurisdiction and, as such, does believe

18  there are no conditions or combination of conditions that can

19  either reasonably assure his presence at future court

20  proceedings and/or ensure the welfare of the community.  Thank

21  you, your Honor.

22           THE COURT:  And, Mr. Leupold, one of the factors is

23  the weight of the evidence and I see what the indictment says

24  as far as the nature of the charge but I'm not aware of the --

25  some of the circumstances alleged as to the first two

1   co-defendants but I'm not sure exactly -- well, I think I know

2   how this may allegedly relate to the first three counts but I'm

3   not certain about that and I'm also not really aware of the

4   circumstances alleged in Count Four as to Mr. Davila.  Did you

5   want to make any kind of proffer about that or --

6       MR. LEUPOLD:  Unfortunately, your Honor, the

7   Government was not prepared to provide either a proffer or

8   additional evidence today.  But should the Court require that

9   for its decision, I can ensure that that's available to the

10  Court at the next available setting.

11      THE COURT:  Okay.  And as to the -- these prior

12  charges so that the two or the ones that are in dispute -- 1989

13  and 1992.  Is that correct, Mr. Rodriguez?

14      **(Defendant confers with counsel)**

15      MR. RODRIGUEZ:  Excuse me, Judge.  I'm sorry.  He was

16  talking to me.

17      THE COURT:  I'm just -- and I'm just trying to make

18  sure I had clear what the two charges that were being

19  questioned as far as his record and I understood you to say the

20  1989 charge for unlawfully carrying a weapon and the 1992

21  charge for aggravated assault on a peace officer.

22      MR. RODRIGUEZ:  That's correct, your Honor.  Yeah,

23  Mr. Davila says that he has never been convicted of those

24  charges.

25      THE DEFENDANT:  On those charges, the other charge

11

1   applies to me.  I was never convicted on that other charge,

2   Judge.

3          THE COURT:  So the 1989 one that was you but it was

4   dismissed is what you're remembering, Mr. Davila.  Is that

5   right?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Okay.

8          MR. RODRIGUEZ:  And in fact, your Honor, I believe

9   that the State of Texas had issued him a concealed weapons

10  license and they would not have done so with a -- with that

11  prior criminal history, I don't believe.

12         THE COURT:  Right, if he disclosed it then, yeah.  Or

13  they should have done a records check also.  So, right and that

14  would be -- okay.  And --

15         MR. LEUPOLD:  Your Honor, I can provide the Court

16  with a proffer and actually do have a witness available to

17  provide the Court with additional evidence on the strength of

18  the evidence.

19         But the proffer is that the role of the defendant in

20  the indicted offense was that he, in tandem with four co-

21  conspirators, planned to steal a load of marijuana of a

22  quantity of approximately 2,000 kilograms that occurred or was

23  planned to occur the same night that the federal agent was shot

24  by co-defendants.  So that's the Government's proffer; and if

25  the Court requires additional evidence, I do have an agent

1    available.

2            **THE COURT:**  So that's what the Government is alleging

3    and do you have anything as far as why you all believe that

4    Mr. Davila was involved in this or --

5            **MR. LEUPOLD:**  I would have to put the agent on to

6    provide, I think, more evidence, your Honor.

7            **THE COURT:**  Okay.  I'll leave that up to you as far

8    as, Mr. Leupold, if you want to --

9        **(Defendant confers with counsel)**

10           **MR. LEUPOLD:**  Yeah, I think it's important.  I --

11           **THE COURT:**  Okay.  We'll go ahead and --

12           **MR. LEUPOLD:**  -- I haven't had an opportunity to

13   speak to Defense counsel but I believe that detention is very

14   much contested at this point.

15           **THE COURT:**  In light of that -- well, let's go ahead

16   and we'll hear the Government's witness and, Mr. Davila, you

17   can have a seat at counsel table with your attorney and we'll

18   take that up.

19       **(Pause)**

20           **MR. LEUPOLD:**  Your Honor, is there a chance that we

21   could reset this matter for later in the docket?  Apparently,

22   there are some facts associated with this case that I was not

23   made aware of.  So I'd like --

24           **THE COURT:**  All right.

25           **MR. LEUPOLD:**  -- just a few more moments, your Honor.

1       **THE COURT:**  Sure.  Let's just go ahead and recall --

2  and, Mr. Davila, you can go ahead and have a seat over here in

3  the -- we'll just leave you with the marshals for a few minutes

4  and we'll address the other cases here and then come back to

5  this.  If we need to, we can take a recess at the end there to

6  give you a little additional time on that.

7       **(Court attends other matters from 9:32 a.m. to 10:05 a.m.)**

8       **THE COURT:**  Okay.  And going back to Mr. Davila's

9  case, Criminal Number M-12-1136, *United States versus Julio*

10 *Armando Davila*, and --

11      **MR. LEUPOLD:**  The United States is again present and

12 ready, your Honor.

13      **THE COURT:**  Do you need a -- need for us to take a

14 recess or --

15      **MR. LEUPOLD:**  No.  Your Honor, the Government is

16 ready to proceed and the Government would like to provide the

17 Court with evidence.

18      **THE COURT:**  Okay.  A witness or --

19      **MR. LEUPOLD:**  So the Government will call Special

20 Agent Ranue to the stand.

21      **THE COURT:**  Okay.

22      **THE CLERK:**  Please raise your right hand.

23      **JEAN PAUL RANUE, GOVERNMENT'S WITNESS, SWORN**

24 //

25 //

1                          **DIRECT EXAMINATION**

2      **BY MR. LEUPOLD:**

3      Q     Sir, please state your full name for the record.

4      A     Jean Paul Ranue.

5      Q     How are you employed, sir?

6      A     Special Agent with the United States Homeland Security

7      Investigations in McAllen, Texas.

8      Q     Are you familiar with the indictment that has been

9      returned against a Julio Armando Davila?

10     A     I am.

11     Q     Are you the case agent assigned to the investigation that

12     ultimately gave rise to the indictment?

13     A     Yes, sir.

14     Q     Is the individual that is the subject of your

15     investigation and of the indictment present in the courtroom

16     today?

17     A     He is.

18     Q     Could you describe his location in the courtroom as well

19     as an article of clothing that he's wearing?

20     A     He's sitting to my right wearing a white collared shirt.

21          **MR. LEUPOLD:**  Your Honor, please let the record

22     reflect the witness has identified the defendant.

23          **THE COURT:**  Okay.

24          **MR. RODRIGUEZ:**  No objection.

25     //

1   BY MR. LEUPOLD:

2   Q    So I understand that the defendant was True Billed by the

3   grand jury for conspiring to commit an offense on July 3rd,

4   2012.  Is that consistent with your investigation?

5   A    Yes, sir.

6   Q    Can you please briefly describe for the Court the nature

7   of the transaction that gave rise to the criminal count in this

8   case against the defendant?

9   A    In approximately January of 2011, Homeland Security

10  Investigations began a narcotics investigation.  At a certain

11  point, the defendant was approached by law enforcement and his

12  cooperation was gained by the United States Government.

13           On July 2nd, we received information from this

14  individual about a narcotics shipment in Hargill, Texas.

15  During the subsequent surveillance, Special Agent Kelton

16  Harrison was shot in Hargill, Texas, on the morning of July the

17  3rd.  Subsequent to that shooting, we learned that the

18  defendant, as well as four other individuals, were planning to

19  steal the load of narcotics in Hargill, Texas, that agents were

20  out there surveilling that evening.

21  Q    And, sir, if you could, just briefly summarize for the

22  Court what evidence have you developed through the course of

23  your investigation to support the allegation that the defendant

24  planned the intended theft of the load on or about July 3rd?

25  A    We have the defendant's statements as well as other

1    individuals' cooperating statements as well as the facts that

2    led up to the shooting as well as evidence that we gathered

3    subsequent to the shooting.

4    Q    Have you had an opportunity to speak with any of the co-

5    defendants in this case?

6    A    I have.  Yes, sir.

7    Q    And do any of those co-defendants implicate the defendant

8    in the offense?

9    A    They do.

10   Q    Did the -- you mentioned previously that the defendant

11   provided a statement.  Did you initially provide the defendant

12   with his Miranda Warnings before obtaining that statement?

13   A    I'm not sure.  I wasn't there present for that particular

14   statement.  As you know, the defendant did provide a statement

15   regarding events of July the 3rd as well as the planning of the

16   theft of narcotics in Hargill.

17   Q    And to the best of your knowledge or belief that was after

18   he had waived his rights and agreed to provide a knowing and

19   voluntarily statement to agents?

20   A    Correct.  Yes, sir.  Correct.

21   Q    What, if anything, did the defendant state about his

22   historical participation in the smuggling of narcotics?

23   A    Based on statements by the defendant as well as other

24   individuals, we know the defendant was involved as well as

25   other individuals in the storage, transportation, selling of

1   narcotics for at least a year prior to the shooting on

2   July 3rd.

3   Q    Was the defendant able and -- based on the information

4   that the defendant provided as well as that of co-defendants,

5   was your investigation able to lead you to an opinion as to the

6   -- I guess, the overall quantity of drugs that the defendant

7   has smuggled over that period of time?

8   A    I'd be purely speculating as far as the overall amount.

9   Q    Let me ask it differently.  What was the total quantity of

10  drugs seized in this case?

11  A    In this case to date, we've seized approximately 3,000

12  pounds of marijuana, 30 kilos of cocaine.

13  Q    Did the defendant and/or other co-defendants provide

14  agents with an indication as to how frequently they were moving

15  or ripping (phonetic) loads over that period of time?

16  A    I don't have a frequency.  It was provided by other co-

17  defendants that the defendant was involved in stealing

18  narcotics frequently.  But I don't have a time.

19  Q    And did the investigation develop information that would

20  lead you to believe that the size of the loads were consistent

21  with the quantity of drugs that have been seized during the

22  course of your investigation?

23  A    Correct.  Yes, sir.

24          MR. LEUPOLD:  Pass the witness, your Honor.

25          THE COURT:  Okay.  Mr. Rodriguez?

**CROSS EXAMINATION**

**BY MR. RODRIGUEZ:**

Q    When did you first meet Mr. Davila?

A    First meet him?

Q    Correct.

A    May of last year, approximately.

Q    And you said that he had been cooperating with you?

A    Correct.

Q    Were you outside when the Assistant U.S. Attorney that you work with said that Mr. Davila would not be a flight risk? Were you out there?  Did you hear him say that?

A    Right out here in the hall?

Q    Sure.

        **MR. LEUPOLD:**  Just a -- objection.  Relevance, your Honor.

        **MR. RODRIGUEZ:**  I'm talking about flight risk, your Honor, which is one of the factors that goes into a bond, whether he would appear.

        **MR. LEUPOLD:**  And he's seeking a legal conclusion through a witness and the Government objects.

        **MR. RODRIGUEZ:**  No, it was a conversation that was outside in his presence.

        **THE COURT:**  Right, but -- and I understand what you're getting at, Mr. Rodriguez, but even if Mr. Leonard said that or whoever said that, I'm the one that would have to

1    determine based on the, you know, the circumstances.  So if he

2    thinks that he's not a flight risk then, you know, that's fine.

3    But, ultimately, I've got to decide so --

4              **MR. RODRIGUEZ:**  I understand that, Judge.  But he's a

5    representative of the U.S. Government who uttered that

6    Mr. Davila was not a flight risk.  Here in court, they're

7    taking the opposite --

8              **THE COURT:**  If you're representing that somebody said

9    out -- said that, Mr. Rodriguez, I'll accept that; and we don't

10   need to have the witness, you know, kind of repeat it.  So

11   that's fine.

12   **BY MR. RODRIGUEZ:**

13   Q    Now, are you telling the Court -- and I want to be very

14   clear regarding this -- are you telling the Court that

15   Mr. Davila had anything directly to do with the shooting of the

16   government agent?

17   A    You'll have to be more specific on your question, please.

18   Q    Do you think Mr. Davila set up the government agent to be

19   shot, for example?

20   A    Indirectly or directly?

21   Q    Directly.

22   A    Directly, I don't know if that was his intention.  I can't

23   speculate on his mindset.

24   Q    Well, as a government agent, you do know that every time

25   there is some drugs, dealings -- drug deals going down or

1    whatever, there's always a risk that a government agent or the

2    defendant is going to get shot.  You understand that, right?

3    A    I personally, yes, sir.  I can't speak for the other

4    agents.

5    Q    Right.  Now, how was it that you came upon Hargill, Texas?

6    What information did you have that led the agents to go out

7    there regarding some drug deal going down?

8    A    We received information from the defendant regarding the

9    drug deal -- proposed drug deal.

10   Q    Okay.  You mentioned defendant, co-defendants.  Okay.

11   Specifically, who are you referring to?

12   A    Mr. Davila.

13   Q    Okay.  So Mr. Davila was the one who called you?

14   A    Correct.

15   Q    And but for him calling the government agents, you all

16   would not be out there in Hargill?

17   A    Correct.

18   Q    And the information that was supposedly given to you was

19   that there was some sort of drug deal going down.  Is that

20   correct?

21   A    Yes, sir.

22   Q    And you did what you have done in previous occasions when

23   you -- when you mentioned that he had cooperated with you on

24   prior occasions.  Is that correct?

25   A    I don't understand your question.

1  Q    Well, I thought you said that he cooperated with the

2  government on prior occasions.

3  A    He did.  However, on July 3rd that was a new instance

4  between us.  I had never done that type of investigation with

5  his information.  So that would be the first instance that I

6  did that type of investigation with his information.

7  Q    Okay.  Well, regarding the information that he had given

8  you on prior occasions --

9  A    Uh-huh.

10  Q    -- have that resulted in any drug seizures?

11  A    Yes, sir.

12  Q    So when you're saying that in this investigation that you

13  have seized -- what did you say, 3,000 pounds of marijuana?

14  A    Approximately.  Approximately.

15  Q    Pounds or kilograms?

16  A    It would be pounds.

17  Q    Okay.  And you said also cocaine?

18  A    Yes, sir.

19  Q    And so this -- the drugs that you seized was as a result

20  of some cooperation that you got from Mr. Davila?

21  A    No.  A portion of that, yes.  Excuse me.

22  Q    Okay.  And so a portion -- do you know approximately how

23  much?

24  A    Six hundred pounds.

25  Q    Six hundred pounds.

1   A    Of marijuana.

2   Q    Okay.  Now, who are the other co-defendants that you claim

3   have implicated Mr. Davila?

4   A    The other co-defendants who have implicated him?

5   Q    Yes.

6   A    Was that your question?

7   Q    Yes.  You said you talked to two co-defendants that

8   implicated Mr. Davila.  Who are they?

9   A    I don't know if I talked to two but there's other co-

10  defendants that implicated him.  His former girlfriend/fiancé

11  implicated him.

12  Q    Aida Palacios?

13  A    Correct.  Aida Palacios.  Yes, sir.

14  Q    Okay.  She's not a co-defendant in the indictment, is she?

15  A    No, sir.  She's not on this current indictment.  My

16  understanding is she will be indicted.

17  Q    Okay.  Well, let me -- let me try to, I guess -- when you

18  say co-defendants --

19  A    Correct.

20  Q    -- you're talking about suspects or people who have

21  actually been indicted this case.

22  A    Not people that have been indicted in this case.  It would

23  be individuals under investigation in the broader

24  investigation.  I apologize if there was a misunderstanding.

25  Q    Okay.  Just so we can be -- co-defendants -- when you said

Ranue - Cross / By Mr. Rodriguez                    23

1    "co-defendants," you're talking about people who have not been

2    arrested yet?

3    A    Correct.

4    Q    And one of them is Aida Palacios?

5    A    Correct.

6    Q    Now, where was Julio when the agent was shot?

7    A    I'm not sure.

8    Q    Did you see him anywhere?  Did any agent report it that he

9    was out there?

10   A    No.  Not to my knowledge.

11   Q    Did -- as a result of you being out at or the agents being

12   out in Hargill for the -- for which Mr. Davila is indicted, the

13   1,000 kilograms of marijuana, correct?

14   A    Correct.  Yes, sir.

15   Q    Was there any marijuana that was actually seized on July

16   this year?

17   A    No.  There was not.

18        **MR. RODRIGUEZ:**  Pass the witness, your Honor.

19        **THE COURT:**  Okay.

20        **MR. LEUPOLD:**  I have nothing further, your Honor.

21        **THE COURT:**  And -- okay.  And just to make sure I

22   understood, Special Agent Ranue, you're saying that Mr. Davila

23   himself indicated that in connection with that night that these

24   events happened -- that, I guess, in connection with the

25   marijuana that you were all looking for that he intended with

 1  others to, I guess, take that from someone else or -- I'm not

 2  sure I understood what all that was --

 3          THE WITNESS:  Yes, Judge.  Based on Mr. Davila's

 4  statements, as well as the statements of Aida, these

 5  individuals were planning to steal that load of narcotics on

 6  July the 2nd or 3rd.

 7          THE COURT:  Okay.  And I guess maybe we don't need to

 8  get into this but I'm just confused as to -- so on the one

 9  hand, he sends you guys out there or sent -- gives you all

10  information but on the other hand he was planning to take the

11  marijuana himself.  I'm missing something there about how that

12  was supposed to work.

13          THE WITNESS:  My understanding, Judge, is HSI special

14  agents were called after these individuals believed the

15  marijuana had already been stolen.  That's my understanding as

16  to why there were two different plans.

17          THE COURT:  Oh, okay.  All right.  Anyway, was there

18  anything else for the witness?

19          MR. RODRIGUEZ:  Yes, your Honor.

20                   FURTHER CROSS EXAMINATION

21  BY MR. RODRIGUEZ:

22  Q    That night, how many times did you talk to Mr. Davila that

23  night?

24  A    That evening?  On the 2nd or the 3rd?  Which one?

25  Q    The 3rd.  The 2nd and through the 3rd.

Ranue - Cross / By Mr. Rodriguez                    25

1   A    I believe I received two phone calls from him at

2   approximately midnight on July 2nd.  I then spoke to him one

3   more time at approximately 1:30, 2:00 a.m., on July the 3rd.

4   Then I spoke to him again on July the 3rd at approximately 5:00

5   a.m., 6:00 a.m.

6   Q    Okay.  Around four or five times, correct?

7   A    Approximately.  Yes, sir.

8   Q    Okay.  Now, when was the first time that he called that

9   you got information regarding the drug deal in Hargill?

10  A    The 2nd around midnight.  So it would have been right on

11  the line between the 2nd and the 3rd.

12  Q    Okay.  And what time was the agent shot?

13  A    Approximately 3:00 a.m., July 3rd.

14  Q    Okay.  So Julio calls you before anything happens to tell

15  you about the deal.  Then an hour, two hours later when you all

16  show up over there or the agent shows up, that's when the agent

17  got shot?  Is that correct?

18  A    Correct.  Yes, sir.

19  Q    But you're saying that, I guess, the plan was that Julio

20  and others were going to steal the load.

21  A    Correct.

22  Q    But yet they're calling you to go out there --

23  A    Correct.

24  Q    -- and subsequent to that, the agent gets shot.

25  A    Correct.

Ranue - Cross / By Mr. Rodriguez                    26

1  Q     And you don't find that strange?

2  A     I find it very strange.

3          **MR. RODRIGUEZ:**  Pass the witness, your Honor.

4          **THE COURT:**  Okay.  Anything else?

5          **MR. LEUPOLD:**  Briefly, your Honor.  I guess --

6          **THE COURT:**  Okay.  I mean, right.  We don't need to

7  sort all this out since we're just deciding bond here but,

8  anyway, you can do whatever you'd like.  That's fine.

9          **(Laughter)**

10         **MR. LEUPOLD:**  Nothing further, your Honor.  Thank

11  you.

12         **THE COURT:**  Okay.  Thank you, sir.

13         **THE WITNESS:**  Thank you.

14         **THE COURT:**  Okay.  As far as -- did you wish to add

15  anything else, Mr. Rodriguez, or any other argument on the

16  issue of bond?

17         **MR. RODRIGUEZ:**  The only -- well, there are some

18  things, your Honor.  Considering the totality of the

19  circumstances -- and I'm talking about the factors that are

20  required by the Court to consider in setting bond, I would urge

21  to the Court that Mr. Davila, based on some of the testimony,

22  is that he's not a flight risk.

23         Some of the information that has been made available

24  to the Court through testimony, the proffers and through the

25  Pretrial Officer's Report all indicate that he has lots of

1    essential ties to the community.  He has no ties to Mexico.

2          He has been cooperating to the extent that -- to some

3    extent with the Government.  He's got no reason to flee.  He

4    turned himself in.  He has made all prior court appearances

5    with -- in state court involving the aggravated assault,

6    involving Ms. Aida Palacios, who the Court now knows is one of

7    the -- a co-defendant or someone to be indicted.  And I don't

8    seriously believe that the Government themselves believe that

9    Mr. Davila is a flight risk, your Honor.

10          So for all those reasons, I would urge the Court to

11    set some sort of bond.  The family has already indicated they

12    have 10 percent or $10,000 to post.  And we have Ms. Davila

13    here and their sons.  We would proffer their testimony that she

14    has a place of employment.  She has agreed to take him over or

15    help with the supervision.  He can stay there.  That's all in

16    the report.  And so for all those reasons, I believe that a

17    bond would be appropriate in this case.

18          **THE COURT:**  Okay.  Thank you.  Mr. Leupold, did you

19    wish to add anything or --

20          **MR. LEUPOLD:**  I do, your Honor.  I do concede and

21    acknowledge that this is primarily a dangerousness case.  As

22    the Court is well aware, in the Bail Reform Act, the type of

23    crime that the grand jury has True Billed in this case against

24    the defendant is the very type of case that entitles the

25    Government to a hearing.

1            And the Government would suggest that the very

2    dangerousness that the Government believes is a concern

3    regarding the defendant does satisfy the nexus issue with

4    regards to the underlying offense.

5            In other words, in this case the Court needs to

6    determine, even if the defendant rebuts its presumption,

7    whether or not there's clear and convincing evidence that the

8    defendant would remain a danger to the community.  And the

9    Government would suggest here that based upon the defendant's

10   criminal history as well as the evidence the Government

11   elicited from the case agent, there is a wealth of evidence to

12   suggest that the defendant has been engaged in the long-term

13   smuggling of narcotics and particularly the violent smuggling

14   of narcotics that ultimately, in this instance, resulted in the

15   very grave injury to a federal agent who got caught in the

16   crossfire of the defendant's transaction, albeit confusing

17   transaction, gone awry.

18           The Government would also suggest here that the

19   strength of the evidence should be considered in the

20   Government's favor given that this is an indictment and that

21   this case has been True Billed by the grand jury based upon a

22   consideration of the evidence presented to it.

23           So based upon the strength of the evidence, the

24   criminal history, the nature of this offense, the quantity of

25   the drugs involved, the Government does believe that detention

1    is appropriate to ensure the safety and welfare of the

2    community.   Thank you.

3            **THE COURT:**   Okay.   Again, I'm required to apply the

4    factors under federal law in determining bond; and on that, the

5    first factor is the nature and seriousness of the alleged

6    offense.   In this case, there's a serious drug trafficking

7    charge being alleged against Mr. Davila.   He's not alleged in

8    the indictment to have, you know, participated with or caused

9    the shooting of the agent actually.   I mean, that may or may

10   not be, I guess, a theory as the case goes forward.   But at

11   least I'm just looking at what the charge is in the indictment.

12   So there's, not taking that part of this into account, the fact

13   that an agent was shot here since he's not being charged

14   related to that at this point, and I know -- I have no

15   knowledge that he would be at any point.

16           So but there is a very serious charge alleged -- that

17   allegedly involves conspiracy to possess with the intent to

18   distribute over 1,000 kilograms of marijuana and, obviously,

19   that's a serious felony offense that's being alleged against

20   Mr. Davila.

21           I'm also required to consider the weight of the

22   evidence.   This whole circumstance is confusing but it does

23   appear that there is significant evidence here in that at least

24   a part of that evidence includes Mr. Davila's own statements

25   about his intentions and involvement and it appears to be

1    corroborated also by this other lady as well.

2           And so -- but it's not a prediction of the outcome of

3    the case since in any case as things go forward the

4    circumstances may look different.  The evidence may look

5    stronger or weaker as the case proceeds.  There may be other

6    aspects that will come to light.  So I'm not predicting how

7    this will turn out.  But I am required under the Bail Reform

8    Act to consider the weight of the evidence at this point and it

9    appears the evidence of Mr. Davila's involvement in the charge

10   being alleged is significant, at least at this time.

11          So those are two of the factors.  The other factors

12   related to -- essentially, to the personal circumstances and

13   characteristics of the defendant.  I think Mr. Rodriguez has

14   pointed out well the positive factors here and there are

15   positive factors.

16          Mr. Davila is a lifetime resident of the area.  He

17   does have significant and strong family ties here in the area.

18   It does not appear that -- there's no indication he has ties in

19   Mexico and so those are positive circumstances.

20          He has children that are here from his previous

21   marriage.  It is a positive circumstance and, you know, a bit

22   unusual that his ex-wife is actually very willing to assist him

23   so that's a good circumstance there in terms of his situation

24   now, and it's a little bit unusual that that would occur but

25   that's a positive circumstance to consider and provides the

1    possibility of other conditions that might be considered.

2         And so I do note that and I note that the family has

3    some -- put together some funds to assist in setting a bond

4    also and so I note that there's that circumstance.

5         The -- on the other hand, there are some

6    circumstances that are not so positive.  I note that Mr. Davila

7    has worked in the past and in connection with a law office as

8    well as worked as a bail bondsman.  So both those employments,

9    of course, would otherwise be positive circumstances that he

10   has that type of prior employment.

11        I think he's not been employed as recently in those

12   capacities but I'm not -- I guess maybe he was employed at the

13   time of his arrest perhaps.  I should also note that it is a

14   positive circumstance that Mr. Davila did turn himself in in

15   connection with this case.  I do note that, and that's to his

16   credit as well.

17        His circumstances -- he worked as a migrant worker

18   reportedly and then after that worked as -- in a law office in

19   a bail bondsman role and so I note those things.  His income

20   from his employment was pretty limited and at least in -- as

21   reported and recently.  And so does make it a little confusing

22   -- he owes more on a truck that was bought this past year than

23   he apparently makes per month, which is something that's hard

24   to understand how that circumstance arose.

25        But in any event, the more serious concern or the

1   criminal history that Mr. Davila has -- he has a number of

2   prior arrests.  I will consider or consider the possibility

3   that at least one of these may have been his father, perhaps,

4   and also another one might have been dismissed.  But still and

5   so when there is not a conviction, we don't assume that the

6   person has committed those crimes; but it's still a factor and

7   a circumstance of fact to consider when a person has been

8   arrested and charged on a number of occasions with different

9   crimes in this case.  Mr. Davila, in the past, has been charged

10  with attempt to commit murder way back in 1986; unlawfully

11  carrying a weapon in 1989.  We'll assume that the '92 charge

12  was his father; but in 1993, there was assault in connection

13  with a family violence and criminal trespass.  In 2005, another

14  assault.  All those were -- did not result in convictions but

15  the fact of so many arrests on those types of charges is a

16  circumstance to take into account -- not on the same level as a

17  conviction, again, but it is a circumstance.

18          More troubling is he does have this pending charge --

19  aggravated assault with a deadly weapon.  Now, I do note that

20  that actually occurred after the alleged offense in this case

21  so it's not a matter of him committing the current offense

22  while he was on release from that prior case.

23          But I do note the nature of that prior case is

24  troubling, that the type of charge that's being alleged in

25  connection with that is, obviously, a very serious one also --

1    felony charge that's being alleged there and he's facing the

2    felony charge in this case.

3         And looking at all of the circumstances, also I note

4    that under federal law, there's this presumption that applies.

5    I do find the presumption has been overcome with regard to the

6    risk of flight in Mr. Davila's circumstances and I agree with,

7    I think, Mr. Rodriguez as well as if Mr. Leonard or whoever

8    said that and I think Mr. Leupold has acknowledged this as

9    well, that the risk of flight has not been the main concern.

10        The Court is also required to determine that, you

11   know, conditions of release would assure the safety to the

12   community and it is presumed that a person is a danger to the

13   community if they are charged and probable cause is found with

14   regard to a drug-related charge.  This case, the type of

15   allegation is involving a large amount of drugs and also

16   allegedly involved an ongoing type of a enterprise allegedly

17   that was going on.

18        So it is the type of circumstances and type of charge

19   and type of ongoing activity that Congress particularly was

20   concerned about as reflected in legislative history, the Bail

21   Reform Act.

22        So the presumption there, even as to the risk of

23   dangerousness, it's not a huge burden to overcome but even

24   where it is overcome it remains as a factor.  I find,

25   ultimately, that there should be an order of detention as to

34

1   Mr. Davila based on the dangerousness to the community that's

2   -- he has these two felony charges that are pending now and the

3   circumstances of the alleged offense in this case is such that

4   combined with the other -- all the other circumstances here, I

5   do find that the conditions would not reasonably assure the

6   safety of the community.

7           If there is any new information or material change in

8   circumstances or something -- this is a close case in my view

9   and because, Mr. Davila, there are positive factors here to be

10  sure and especially with his ties and so forth -- but given

11  this other part of it, I do find ultimately that by clear and

12  convincing evidence that there are not conditions that would

13  reasonably assure the safety of the community.

14          But, again, if there is something new or material to

15  -- materially different that we could look at, I'd be willing

16  to consider that further.  But I'm going to go ahead and enter

17  that order at this time.

18          Was there anything else that we ought to take up in

19  Mr. Davila's case here today?  Mr. Rodriguez, did you have

20  anything else in this case?

21          **MR. RODRIGUEZ:**  No, your Honor.  Not at this time.

22          **THE COURT:**  Okay.  Thank you.  You-all can be excused

23  then.  Thank you.

24      **(This proceeding was adjourned at 10:35 a.m.)**

25

35

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    March 28, 2013
   Signed                                               Dated


*TONI HUDSON, TRANSCRIBER*