UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. M-12-1317-S1-01 |
| | § | |
| PEDRO ALVARADO | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

COMES NOW the United States of America (hereinafter referred to as "Government") through its United States Attorney, Kenneth Magidson, and Assistant United States Attorney, Anibal J. Alaniz, and files this response to the defendant's motion to suppress evidence and statements and as good cause would show the Court the following:

I.

Surveillance in Hargill, Texas

On July 3, 2012 at approximately 12:15 a.m., Homeland Security Investigations (hereinafter referred to as "HSI") Agent Jean-Paul Reneau (hereinafter referred to as "Agent Reneau") received information from a confidential source that a large load of marijuana was going to be loaded into a tractor-trailer located at 9951 11th Street in Hargill, Texas and transported elsewhere. Based on this information, Agent Reneau, HSI Agent Christopher Villarreal (hereinafter referred to as "Agent Villarreal"), HSI Agent Juan Mendez (hereinafter referred to as "Agent Mendez") and HSI Agent Kelton Harrison (hereinafter referred to as "Agent Harrison") traveled to Hargill, Texas. Agents Reneau and Villarreal traveled together in the same vehicle while Agents Mendez and Harrison traveled in separate vehicles.

1

At approximately 12:59 a.m. Agents Reneau and Villarreal arrived in Hargill, Texas and located the tractor-trailer which was parked on the north side of 11th Street near the intersection of 11th Street and FM 88. After locating the tractor-trailer and in an effort to cover all possible exit routes for the tractor-trailer, Agent Reneau positioned Agent Mendez in an orchard near the intersection of 11th Street and FM 88 and Agent Harrison at the intersection of 12th Street and FM 493. Agent Harrison, however, did not find a suitable place to park the Jeep Cherokee that he was driving at that intersection and therefore parked instead at the northeast corner of the intersection of 11th Street and FM 493. The tractor-trailer under surveillance was approximately 1¼ mile to the east on 11th Street and Pedro Alvarado's (hereinafter referred to as "P. Alvarado") house is also located on 11th Street approximately ¼ mile east from Agent Harrison's location and approximately 1 mile west from the tractor-trailer under surveillance.

At approximately 2:55 a.m., Agent Mendez, while parked at the orchard near the intersection of 11th Street and FM 88, was approached by several Hidalgo County, Texas Sheriff's deputies. The deputies told Agent Mendez their office received a telephone call from a person who saw several men carrying firearms and loading drugs into a tractor-trailer in the area (the investigation revealed that the person who called the Hidalgo County, Texas Sheriff's Office was defendant Rene Garcia (hereinafter referred to as "R. Garcia"). At that time, Agent Mendez told the deputies that he and other agents were conducting surveillance in the area regarding the harboring and transportation of illegal aliens.

II.

Attempted Murder of Agent Harrison

At approximately 3:25 a.m., Agent Harrison while inside his Jeep Cherokee parked on the northeast corner of the intersection of 11th Street and FM 493 saw a pick-up truck (the

investigation revealed that the pick-up truck was driven by P. Alvarado with Arnoldo Alvarado (hereinafter referred to as "A. Alvarado") in the front passenger seat and P. Alvarado's juvenile son (hereinafter referred to as "Juvenile") in the back seat) with its headlights off, traveling west towards him on 11th Street. As the pick-up truck approached him, Agent Harrison turned on his Jeep Cherokee's headlights with the intent of driving away from the area. However, as soon as Agent Harrison turned on his Jeep Cherokee's headlights P. Alvarado turned on his pick-up truck's high beam headlights and A. Alvarado and the Juvenile began firing their weapons at Agent Harrison. In an attempt to flee from the attack Agent Harrison tried to drive west on 11th Street but was unable to get onto 11th Street because a second pick-up truck (the investigation revealed that this second pick-up truck was driven by defendant Rene Garcia with defendants Miguel Angel Romo and David Olivarez as passengers) blocked his pathway. Therefore, instead of going west on 11th Street Agent Harrison drove onto FM 493 and traveled north.

As Agent Harrison drove north on FM 493, he was chased by P. Alvarado's and R. Garcia's pick-up trucks. As Agent Harrison fled the area at a high rate of speed P. Alvarado's continued to chase Agent Harrison for several miles on FM 493 while his sons A. Alvarado and the Juvenile continued to fire their weapons at Agent Harrison. In fact, although fired upon at the intersection of 11th Street and FM 493 none of the bullets that hit his Jeep Cherokee struck his body.

However, while fleeing from the attack and approximately ½ mile from the intersection of 11th Street and FM 493 (at the intersection of FM 493 and FM 490) Agent Harrison felt a bullet strike him in the upper back. Even though he was shot and injured Agent Harrison continued to drive north on FM 493 unaware that FM 493 dead ends when it intersects with FM 186. Because of the high rate of speed at which he was traveling and in his efforts to survive the

attack of P. Alvarado and his two sons, Agent Harrison drove his Jeep Cherokee across the intersection of FM 186, drove through a fence, and into the brush.

Once the Jeep Cherokee came to a stop, Agent Harrison got off and ran several hundred yards further into the brush in an attempt to get away from the attack of P. Alvarado and his two sons. After hiding in the brush for approximately 10 to 15 minutes, Agent Harrison returned to the Jeep Cherokee and found his cellular telephone which he used to call Agent Reneau. Shortly thereafter Agent Reneau along with other agents found Agent Harrison who was transported to McAllen Medical Center where he underwent surgery.

## II.

### Investigation of the Attempted Murder of Agent Harrison

Before Agent Harrison was taken into surgery, he was unable to provide any information regarding the persons who tried to kill him other than give a general description of the two pick-up trucks that chased him.

A. Search of Magdaleno Valdez's Residence

In the morning of July 3, 2012, agent continued the surveillance of the tractor-trailer. While conducting surveillance agents saw a vehicle leave the property and conducted a traffic stop. During the traffic stop the driver was identified as Magdaleno Valdez (hereinafter referred to as "Valdez") and agents obtained consent to search his property. During the search, agents did not find any marijuana on the property nor did they find any evidence regarding the attempted murder of Agent Harrison.

B. Search of Tractor-Trailer

In the afternoon of July 3, 2012, agents obtained a federal search warrant for the tractor-trailer located on Valdez's property. Agents did not find any marijuana in the tractor-trailer or any evidence regarding the attempted murder of Agent Harrison.

   C.      Break in the Case

On July 3, 2012 at approximately 8:00 a.m. Agent Reneau received information from a confidential source that Rene Garcia from Hargill, Texas might have been involved or may have information regarding the attempted murder of Agent Harrison.

   D.      Arrest of Illegal Aliens at Pedro Alvarado's Residence

On July 3, 2012 at approximately 12:50 p.m. HSI Agents Adrian Olivarez (hereinafter referred to as "Agent Olivarez") and Robert Castillon (hereinafter referred to as "Agent Castillon") approached the residence of P. Alvarado. At the residence, Agents Olivarez and Castillon spoke to P. Alvarado and told him that they had information that he was harboring illegal aliens (agents did not have such information but used this as an excuse to approach the residence). Agents Olivarez and Castillon obtained verbal consent to from P. Alvarado to search his residence. Before beginning the search, P. Alvarado told them that there were two illegal aliens hiding in his attic. Agents subsequently found and arrested Mario Ascencio-Martir (hereinafter referred to as "Ascencio-Martir") and Joel Eliazar Gutierrez-Mendez (hereinafter referred to as "Gutierrez-Mendez") both citizens of El Salvador.

After finding Ascencio-Martir and Gutierrez-Mendez in P. Alvarado's attic, agents asked P. Alvarado whether he knew a Rene Garcia who might have lived there. P. Alvarado told the agents that Rene Garcia has never lived at his residence but did tell the agents where Rene Garcia lived and gave them a description of the property. Agents Olivarez and Castillon then left

P. Alvarado's residence and traveled to the residence of R. Garcia leaving other agents with P. Alvarado.

  E.  Residence of Rene Garcia

On July 3, 2012 at approximately 1:30 p.m. agents arrived at the residence of R. Garcia located on the west side of FM 493 approximately ¼ mile north of FM 490 in Hargill, Texas. Agent Olivarez and HSI Agent Juan Jose Flores (hereinafter referred to as "Agent Flores") spoke to R. Garcia who told them that the night before he had seen suspicious vehicles in the Hargill, Texas area; that he called the Hidalgo County, Texas Sheriff's office to report the suspicious activity; that he saw a Jeep vehicle parked near Pete's (P. Alvarado) house; and that he called P. Alvarado and told him about the Jeep vehicle parked near his house. R. Garcia then told Agents Olivarez and Flores that after calling P. Alvarado, he got into his F-250 Ford pick-up truck and traveled south on FM 493; that while driving south on FM 493 he saw the Jeep vehicle driving north on FM 493 at a high rate of speed followed by P. Alvarado's pick-up truck; that someone from inside P. Alvarado's pick-up truck was shooting at the Jeep vehicle; and that P. Alvarado's two sons were in the pick-up truck with P. Alvarado.

  F.  9 mm Ammunition found in Pedro Alvarado's Residence

After speaking with R. Garcia, Agents Olivarez and Flores told HSI Agent Victor Hugas (hereinafter referred to as "Agent Hugas") that R. Garcia had implicated P. Alvarado and his two sons in the attempted murder of Agent Harrison.

On July 3, 2012 at approximately 2:00 p.m. Agent Hugas approached P. Alvarado and asked him whether he owned any firearms. P. Alvarado told Agent Hugas that he owned no firearms. Agent Hugas asked P. Alvarado for consent to search his residence to which P. Alvarado agreed and signed a consent to search form.

Shortly after beginning the search of the residence, Agent Hugas found 9 mm ammunition as well as a firearm magazine in one of the rooms. After finding these items, Agent Hugas asks P. Alvarado whether he owns a pick-up truck and P. Alvarado responds that he does. After being questioned about his pick-up truck, Agent Hugas noticed that P. Alvarado became extremely nervous.

Agent Hugas then asks P. Alvarado whether he is willing to go with him to the Federal Bureau of Investigations (hereinafter referred to as "FBI") office in McAllen, Texas to be interviewed. At approximately 2:30 p.m., P. Alvarado agrees to go voluntarily and is placed, without being handcuffed, in the passenger seat of Agent Hugas' vehicle with Ranger Mankin in the back seat. Shortly thereafter, A. Alvarado and the Juvenile are placed in separate vehicles and are transported to the FBI office by Hidalgo County Constable's Office Precinct 4 deputies Joaquin Vasquez and Bradley Brown.

G.     Pedro Alvarado's First Statement

Once P. Alvarado is placed in Agent Hugas' vehicle, Ranger Mankin turned on a recording device to record their conversation. On the way to the FBI office P. Alvarado tells Agent Hugas and Ranger Mankin that he spent five years in prison in South Carolina; that he has five children; that one of his children lives in Michigan; that he is currently unemployed; gives agents the ages of his children; that he needs to talk to the agents because people have tried to bust into his house in the past; that is why he freaked out last night; that there have been two incidents at his house; that is the reason his door is all messed up; that he does not want to say anything that will mess him up; and that he needs legal advice.

After stating that he "needs legal advice", P. Alvarado continues to talk without questioning from either Agent Hugas or Ranger Mankin. Specifically, P. Alvarado tells Agent

Hugas and Ranger Mankin that he feels sorry for the ICE agent and that one time people had his wife at gunpoint but that he never reported the incident.

Shortly after P. Alvarado makes these statements, Agent Hugas tells him that he wants to hear what he has to say; that he wants to help him out; that they can talk about the illegal aliens later because that is not why they were there; that he needs to know about the other thing; that if there was a misunderstanding that he understands; and that in order to help him out he needs to be truthful. P. Alvarado tells Agent Hugas that he is willing to talk but that he first needs to talk to his boys.

Agent Hugas continues to tell P. Alvarado that there is a big difference between a misunderstanding and someone going after a federal agent. P. Alvarado tells Agent Hugas that is his main concern; that he does not want to say something to incriminate himself but that he is going to say it anyway; that he goes to ask a question and that they "haul ass"; that he does not know what they are doing there; that he hears gunshots; that he goes behind them; that it happened at 3:30 a.m.; that someone wakes him up to tell him that someone is there; that he wished that they put lights on cars; and that the guy who woke him up this morning was Rene Garcia.

After making the above statements, Agent Hugas begins to ask P. Alvarado a question but stops himself by saying "we'll ask you when we get over there". P. Alvarado immediately tells Agent Hugas that he can tell him whatever. At that time, Agent Hugas and Ranger Mankin tell P. Alvarado that it is best if they inform him of his Miranda rights. P. Alvarado responds "I have the right to remain silent and all that good stuff". Ranger Mankin then reads P. Alvarado the Miranda rights for the first time. After reading him the Miranda rights, Ranger Mankin asks him whether he understands and P. Alvarado says "Yes Sir". Before asking him a question,

Agent Hugas again asks P. Alvarado whether he understands his rights and P. Alvarado says that he does since he has already been locked up.

Agent Hugas then asks P. Alvarado whether there is a gun somewhere that they need to go get. P. Alvarado responds that there was a gun since there was a shooting and that is why he needs to talk to his boys. Agent Hugas then asks P. Alvarado whether one of his boys did the shooting and P. Alvarado tells Agent Hugas "that is why I need legal advice and I don't want to say something that". Agent Hugas and Ranger Mankin tell P. Alvarado that they want to know what was going through his mind; that they do not believe that it happened on purpose; and that they are simply trying to find out what happened. P. Alvarado then states "misunderstanding or not someone was shot, that is my main concern". P. Alvarado tells Agent Hugas and Ranger Mankin that what really hurts is that he was an agent and that he wants to talk to his boys to tell them that they need to speak up because he already told them to deny everything.

Once they arrived at the FBI office, P. Alvarado is allowed to speak to his sons. P. Alvarado tells A. Alvarado "that these guys already know what happened"; that they did not know that the guy was an agent; that they heard shots; that they freaked out; and that the guy took off and we shot at him several times. P. Alvarado then tells the Juvenile to tell them that A. Alvarado is the one who shot with the gun.

Shortly thereafter, Ranger Mankin tells P. Alvarado that they will have an opportunity to talk to him and his sons separately. P. Alvarado then asks Ranger Mankin whether he can have a lawyer present. In response to questions from Agent Hugas P. Alvarado stated that they did not think that they shot anyone; that he was the one driving; that the reason they followed the guy was because they were afraid they might return; and that he really needs to talk to a lawyer. Ranger Mankin then tells P. Alvarado that now that he requested a lawyer he needs to be given

9

that right. However, without questioning P. Alvarado continues to talk. P. Alvarado tells Ranger Mankin that he really feels sorry for the agent; that he did his time for drugs; that he is no longer involved with drugs; that his boys do not know anything about violence; that he gets a call in the morning; that he saw a couple more driving around; that is why they got the gun in the first place; this time no one invaded my property; the car was parked on my property; he thought they were doing something to the house and that is why they got aggressive; he does not think that the guy shot but in his mind he heard shots. Ranger Mankin reminds P. Alvarado that since he has already requested a lawyer that he needs to talk to a lawyer and discuss what he has told the agents.

      H.      Pedro Alvarado's Second Statement

After arriving at the FBI office and having requested a lawyer, P. Alvarado was no longer questioned and was put in a holding room with his two sons. After approximately 15 minutes, A. Alvarado and the Juvenile were removed from the room and P. Alvarado was left by himself in the room. While in the holding room, FBI Agent Graham Jenkins (hereinafter referred to as "Agent Jenkins") was assigned to guard P. Alvarado.

From the time that P. Alvarado arrived at the FBI office, he was not handcuffed or shackled; he was provided with water on a regular basis; he was afforded restroom breaks; he was given a snack at approximately 6:00 p.m.; and he was given two cheeseburgers at approximately 8:00 p.m.

Shortly after arriving at the FBI office, P. Alvarado asked Agent Jenkins when he would be able to speak to a lawyer. Agent Jenkins told P. Alvarado that he would have to check with the other agents. Periodically, Agent Jenkins and P. Alvarado engaged in casual conversation but

Agent Jenkins never questioned him concerning the shooting of Agent Harrison in Hargill, Texas the night before.

While in the presence of Agent Jenkins, P. Alvarado made the following unsolicited statements: (1) that he was born in Diaz Ordaz, Mexico and that his grandmother still lives there; that he is not a member of any gang; that he has numerous tattoos and that each one has a story; that he is concerned about the agent and hopes he will be alright; that on the evening of July 2, 2012 he was telephonically advised that there was a vehicle parked outside his sister-in-laws house; that the caller advised him the vehicle did not look like it was occupied by "cops"; that after receiving the telephone call, he left his house to "check it out" and that is when everything happened; that as he and his sons approached the vehicle, it drove away; that as the vehicle drove away, he heard gunshots; that he heard on the news that it was an agent; and that he wants the agent to know that he and his sons are sorry for what happened.

I. Guns found at Alvarado Residence

During an interview of Ascencio-Martir, he told agents that he had been living at P. Alvarado's residence for the past three weeks. He also told agents that in the early morning hours of July 3, 2013, P. Alvarado went the room in which he and A. Alvarado and the Juvenile were sleeping; that P. Alvarado woke up the Juvenile and told him that they needed to look into something that was suspicious; and that after P. Alvarado and the Juvenile left he went back to sleep.

Asencio-Martir then told agents that when he woke up in the morning he overheard a conversation in which P. Alvarado mentioned an incident in which he and his sons were involved in the shooting of a vehicle. Shortly thereafter, the Juvenile approached Ascencio-Martir and

11

asked him to help him in hiding two weapons in the attic. Ascencio-Martir and the Juvenile then hid a 9 mm handgun and a 22 caliber rifle in the attic under the insulation.

Based on this information, agents searched the attic of P. Alvarado's residence and found the two weapons.

V.

Legal Analysis

A.   Pedro Alvarado's First Statement

Was Pedro Alvarado in "custody"?

Statements made by an accused in response to custodial interrogation are only admissible if the accused was informed of the Miranda rights and waived these rights voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The corollary to this statement is that if the accused is not in "custody" any statements that the accused makes in response to law enforcement interrogation are admissible.

An accused is "in custody" for purposes of Miranda when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associate with formal arrest. *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). The question is an objective one – the subjective intent of the questioners and the subjective fear of the questioned person are irrelevant. *Stansbury v. California*, 511 U.S. 318, 326, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

In *Howes v. Fields*, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012), the Supreme Court dealt with the issue of whether an inmate questioned about criminal activity he had allegedly engaged in before coming to prison was automatically "in custody" for purposes of *Miranda*. The

Supreme Court held that "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the "objective circumstances of the interrogation" a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Koeohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). In order to determine how a suspect would have "gauge[d]" his freedom of movement, courts must examine "all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, see *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d at 1045 (2010); its duration, see *Berkemer v. McCarty*, 468 U.S. 420, 437-438, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); statements made during the interview, see *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); the presence or absence of physical restraints during the questioning, see *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 82 L. Ed. 2d 550 (1984); and the release of the interviewee at the end of the questioning, see *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (*per curiam*).

The Supreme Court then stated "[d]etermining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry and instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody. In summary, an objective determination that a person would not feel at liberty

is not the test, but rather a triggering event for the "ultimate inquiry": did the restraint objectively present a "serious danger of coercion" that is of a degree associated with a formal arrest?

In this case agents approached P. Alvarado at his residence in Hargill, Texas. After finding the 9 mm ammunition, Agent Hugas asked P. Alvarado whether he was willing to go to the FBI office for an interview. P. Alvarado agreed and willingly accompanied Agent Hugas and Ranger Mankin to the FBI office. Before P. Alvarado got into the passenger seat of Agent Hugas' vehicle, no one told him he was under arrest and he was not handcuffed. P. Alvarado then got into the front passenger seat with Agent Hugas driving and Ranger Mankin in the back seat.

Therefore, based on P. Alvarado's voluntary decision to accompany the agents to the FBI office; the fact that he was never told he was under arrest; and the fact that there were no physical restraints did not present a "serious danger of coercion" that is of a degree associated with a formal arrest.

"I need legal advice"
an Equivocal Request for a Lawyer?

An accused has a 5th and 14th Amendment right to counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). An accused , . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id*.

Further, a suspect's ambiguous reference to counsel is not enough to trigger the requirement that police must immediately stop questioning the suspect. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the

circumstances would have understood only that the suspect might be invoking the right to counsel, [Supreme Court's] precedents do not require the cessation of questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). Rather a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officer stop questioning the suspect. *Id*. Moreover, law enforcement officers conducting the questioning have no obligation to attempt to clarify the ambiguous comment of the accused. *United States v. Montes*, 602 F.3d 381 (5th Cir. 2010).

During the trip to the FBI office, P. Alvarado tells Agent Hugas and Ranger Mankin that people have tried to invade his home several times and then tells the agents that he does not want to say something that is "going to mess me up" and that is why he "needs legal advice". After P. Alvarado makes the statement regarding needing legal advice, neither Agent Hugas nor Ranger Mankin ask him any other questions. However, P. Alvarado then initiates the conversation telling the agents that he feels really bad about the ICE agent.

After P. Alvarado makes several statements that suggest he was involved in the attempted murder of Agent Harrison, Ranger Mankin reads him his Miranda rights. In response to questions regarding the gun used to shoot Agent Harrison, P. Alvarado again says he "needs legal advice". Although this statement, taken in isolation, would suggest that P. Alvarado was invoking his right to counsel, a review of the circumstances surrounding the making of the statement suggest otherwise. First, based on fact that after making this statement the first time he alone initiated the conversation Agent Hugas and Ranger Mankin believed that this statement was an ambiguous request for an attorney. Second, based on the fact that P. Alvarado continued

to make statements without being questioned suggested that his statement regarding needing legal advice was an ambiguous request for an attorney. In fact, at one point Agent Hugas tells P. Alvarado that they can discuss the matter once they get to the FBI office, however, P. Alvarado tells Agent Hugas to go ahead and ask whatever he wants.

Therefore, based on the totality of the circumstances P. Alvarado's statement "I need legal advice" was an ambiguous request for an attorney that did not require Agent Hugas or Ranger Mankin to cease their questioning.

### B. Pedro Alvarado's Second Statement

Once P. Alvarado confessed to his involvement in the attempted murder of Agent Harrison, he was placed in custody in a room at FBI office. While in custody, P Alvarado unsolicited statement to Agent Jenkins are admissible since they were not the product of custodial "interrogation". *United States v. Moreno-Flores*, 33 F. 3d 1164 (9th Cir. 1994).

### C. Evidence Recovered at Pedro Alvarado's Residence

After Ascencio-Martir told agents that he and the Juvenile hid the 9 mm handgun and the 22 caliber rifle under the insulation of the attic, agents conducted a search of the attic and recovered both weapons. The search of the attic was conduct pursuant to the written consent given by P. Alvarado.

### D. Probable Cause to Arrest Pedro Alvarado

Under the Fourth Amendment, a warrantless arrest must be based on probable cause. *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999). Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense. *United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008).

Furthermore, in *Moreno-Vallejo v. United States*, 414 F.2d 901, 904 (5th Cir. 1969) the Court held that probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who makes the arrest.

In this case, law enforcement knew that Agent Harrison was attacked at the intersection of 11th Street and FM 493 in Hargill, Texas; that the persons involved were in two pick-up trucks; and that the persons involved used a 9 mm firearm. At the time that law enforcement approached P. Alvarado's residence they had information from a confidential source that a person named Rene Garcia may have been involved.

The first time that law enforcement approached P. Alvarado lead to not only the discovery of two illegal aliens in his attic but to the discovery of where R. Garcia lived. Subsequently, R. Garcia told agents that he saw P. Alvarado and his two sons in their pick-up truck chasing and shooting at the Jeep Cherokee the night before.

The information provided by R. Garcia lead law enforcement to approach P. Alvarado again. During this approach, Agent Hugas asked P. Alvarado whether he owned any firearms. P. Alvarado told Agent Hugas that he did not own any firearms. After obtaining written consent to search his residence, agents discovered 9 mm ammunition and a magazine in one of the bedrooms. Agent Hugas confronted P. Alvarado about lying and P. Alvarado showed visible signs of nervousness.

Based on the collective knowledge of law enforcement, that is, (1) Agent Harrison statements that two pick-up trucks chased and shot at him; (2) P. Alvarado lived approximately ¼ mile from where Agent Harrison was attacked; (3) Agent Harrison was shot at with a 9 mm firearm; (4) the discovery of 9 mm ammunition inside P. Alvarado's residence; (5) P. Alvarado lying about not owning a firearm; (6) P. Alvarado's nervousness when asked about whether he

owned a pick-up truck; and (7) R. Garcia telling agents that he saw P. Alvarado and his two sons in their pick-up truck chasing and shooting at the Jeep Cherokee, law enforcement had sufficient probable cause to believe that P. Alvarado and his sons were involved in the attempted murder of Agent Harrison.

WHEREFORE, PREMISES CONSIDERED the Government request that the Court deny defendant's motion to suppress evidence and statements in their entirety.

    Respectfully submitted,

    KENNETH MAGIDSON
    United States Attorney

    *s/Anibal J. Alaniz*
    Anibal J. Alaniz
    Assistant United States Attorney
    State Bar No. 00966600
    Federal I.D. No. 12590
    1701 W. Business Highway 83
    Suite 600
    McAllen, Texas 78501

## CERTIFICATE OF SERVICE

On this 2nd day of April, 2013 a true and correct copy of the Government's Response to Defendant's Motion to Suppress Evidence and Statements was filed by ECF and served on counsel of record.

    *Anibal J. Alaniz*
    Anibal J. Alaniz
    Assistant United States Attorney