UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. M-12-1317-S1-02 |
| | § | |
| ARNOLDO ALVARADO | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

COMES NOW the United States of America (hereinafter referred to as "Government") through its United States Attorney, Kenneth Magidson, and Assistant United States Attorney, Anibal J. Alaniz, and files this response to the defendant's motion to suppress evidence and statements and as good cause would show the Court the following:

I.

Surveillance in Hargill, Texas

On July 3, 2012 at approximately 12:15 a.m., Homeland Security Investigations (hereinafter referred to as "HSI") Agent Jean-Paul Reneau (hereinafter referred to as "Agent Reneau") received information from a confidential source that a large load of marijuana was going to be loaded into a tractor-trailer located at 9951 11th Street in Hargill, Texas and transported elsewhere. Based on this information, Agent Reneau, HSI Agent Christopher Villarreal (hereinafter referred to as "Agent Villarreal"), HSI Agent Juan Mendez (hereinafter referred to as "Agent Mendez") and HSI Agent Kelton Harrison (hereinafter referred to as "Agent Harrison") traveled to Hargill, Texas. Agents Reneau and Villarreal traveled together in the same vehicle while Agents Mendez and Harrison traveled in separate vehicles.

At approximately 12:59 a.m. Agents Reneau and Villarreal arrived in Hargill, Texas and located the tractor-trailer which was parked on the north side of 11th Street near the intersection of 11th Street and FM 88. After locating the tractor-trailer and in an effort to cover all possible exit routes for the tractor-trailer, Agent Reneau positioned Agent Mendez in an orchard near the intersection of 11th Street and FM 88 and Agent Harrison at the intersection of 12th Street and FM 493. Agent Harrison, however, did not find a suitable place to park the Jeep Cherokee that he was driving at that intersection and therefore parked instead at the northeast corner of the intersection of 11th Street and FM 493. The tractor-trailer under surveillance was approximately 1¼ mile to the east on 11th Street and Pedro Alvarado's (hereinafter referred to as "P. Alvarado") house is also located on 11th Street approximately ¼ mile east from Agent Harrison's location and approximately 1 mile west from the tractor-trailer under surveillance.

At approximately 2:55 a.m., Agent Mendez, while parked at the orchard near the intersection of 11th Street and FM 88, was approached by several Hidalgo County, Texas Sheriff's deputies. The deputies told Agent Mendez their office received a telephone call from a person who saw several men carrying firearms and loading drugs into a tractor-trailer in the area (the investigation revealed that the person who called the Hidalgo County, Texas Sheriff's Office was defendant Rene Garcia (hereinafter referred to as "R. Garcia"). At that time, Agent Mendez told the deputies that he and other agents were conducting surveillance in the area regarding the harboring and transportation of illegal aliens.

II.

Attempted Murder of Agent Harrison

At approximately 3:25 a.m., Agent Harrison while inside his Jeep Cherokee parked on the northeast corner of the intersection of 11th Street and FM 493 saw a pick-up truck (the

investigation revealed that the pick-up truck was driven by P. Alvarado with Arnoldo Alvarado (hereinafter referred to as "A. Alvarado") in the front passenger seat and P. Alvarado's juvenile son (hereinafter referred to as "Juvenile") in the back seat) with its headlights off, traveling west towards him on 11th Street. As the pick-up truck approached him, Agent Harrison turned on his Jeep Cherokee's headlights with the intent of driving away from the area. However, as soon as Agent Harrison turned on his Jeep Cherokee's headlights P. Alvarado turned on his pick-up truck's high beam headlights and A. Alvarado and the Juvenile began firing their weapons at Agent Harrison. In an attempt to flee from the attack Agent Harrison tried to drive west on 11th Street but was unable to get onto 11th Street because a second pick-up truck (the investigation revealed that this second pick-up truck was driven by defendant Rene Garcia with defendants Miguel Angel Romo and David Olivarez as passengers) blocked his pathway. Therefore, instead of going west on 11th Street Agent Harrison drove onto FM 493 and traveled north.

As Agent Harrison drove north on FM 493, he was chased by P. Alvarado's and R. Garcia's pick-up trucks. As Agent Harrison fled the area at a high rate of speed P. Alvarado's continued to chase Agent Harrison for several miles on FM 493 while his sons A. Alvarado and the Juvenile continued to fire their weapons at Agent Harrison. In fact, although fired upon at the intersection of 11th Street and FM 493 none of the bullets that hit his Jeep Cherokee struck his body.

However, while fleeing from the attack and approximately ½ mile from the intersection of 11th Street and FM 493 (at the intersection of FM 493 and FM 490) Agent Harrison felt a bullet strike him in the upper back. Even though he was shot and injured Agent Harrison continued to drive north on FM 493 unaware that FM 493 dead ends when it intersects with FM 186. Because of the high rate of speed at which he was traveling and in his efforts to survive the

attack of P. Alvarado and his two sons, Agent Harrison drove his Jeep Cherokee across the intersection of FM 186, drove through a fence, and into the brush.

Once the Jeep Cherokee came to a stop, Agent Harrison got off and ran several hundred yards further into the brush in an attempt to get away from the attack of P. Alvarado and his two sons. After hiding in the brush for approximately 10 to 15 minutes, Agent Harrison returned to the Jeep Cherokee and found his cellular telephone which he used to call Agent Reneau. Shortly thereafter Agent Reneau along with other agents found Agent Harrison who was transported to McAllen Medical Center where he underwent surgery.

II.

Investigation of the Attempted Murder of Agent Harrison

Before Agent Harrison was taken into surgery, he was unable to provide any information regarding the persons who tried to kill him other than give a general description of the two pick-up trucks that chased him.

A.   Search of Magdaleno Valdez's Residence

In the morning of July 3, 2012, agent continued the surveillance of the tractor-trailer. While conducting surveillance agents saw a vehicle leave the property and conducted a traffic stop. During the traffic stop the driver was identified as Magdaleno Valdez (hereinafter referred to as "Valdez") and agents obtained consent to search his property. During the search, agents did not find any marijuana on the property nor did they find any evidence regarding the attempted murder of Agent Harrison.

B.   Search of Tractor-Trailer

In the afternoon of July 3, 2012, agents obtained a federal search warrant for the tractor-trailer located on Valdez's property. Agents did not find any marijuana in the tractor-trailer or any evidence regarding the attempted murder of Agent Harrison.

C.  Break in the Case

On July 3, 2012 at approximately 8:00 a.m. Agent Reneau received information from a confidential source that Rene Garcia from Hargill, Texas might have been involved or may have information regarding the attempted murder of Agent Harrison.

D.  Arrest of Illegal Aliens at Pedro Alvarado's Residence

On July 3, 2012 at approximately 12:50 p.m. HSI Agents Adrian Olivarez (hereinafter referred to as "Agent Olivarez") and Robert Castillon (hereinafter referred to as "Agent Castillon") approached the residence of P. Alvarado. At the residence, Agents Olivarez and Castillon spoke to P. Alvarado and told him that they had information that he was harboring illegal aliens (agents did not have such information but used this as an excuse to approach the residence). Agents Olivarez and Castillon obtained verbal consent to from P. Alvarado to search his residence. Before beginning the search, P. Alvarado told them that there were two illegal aliens hiding in his attic. Agents subsequently found and arrested Mario Ascencio-Martir (hereinafter referred to as "Ascencio-Martir") and Joel Eliazar Gutierrez-Mendez (hereinafter referred to as "Gutierrez-Mendez") both citizens of El Salvador.

After finding Ascencio-Martir and Gutierrez-Mendez in P. Alvarado's attic, agents asked P. Alvarado whether he knew a Rene Garcia who might have lived there. P. Alvarado told the agents that Rene Garcia has never lived at his residence but did tell the agents where Rene Garcia lived and gave them a description of the property. Agents Olivarez and Castillon then left

P. Alvarado's residence and traveled to the residence of R. Garcia leaving other agents with P. Alvarado.

  E.  Residence of Rene Garcia

On July 3, 2012 at approximately 1:30 p.m. agents arrived at the residence of R. Garcia located on the west side of FM 493 approximately ¼ mile north of FM 490 in Hargill, Texas. Agent Olivarez and HSI Agent Juan Jose Flores (hereinafter referred to as "Agent Flores") spoke to R. Garcia who told them that the night before he had seen suspicious vehicles in the Hargill, Texas area; that he called the Hidalgo County, Texas Sheriff's office to report the suspicious activity; that he saw a Jeep vehicle parked near Pete's (P. Alvarado) house; and that he called P. Alvarado and told him about the Jeep vehicle parked near his house. R. Garcia then told Agents Olivarez and Flores that after calling P. Alvarado, he got into his F-250 Ford pick-up truck and traveled south on FM 493; that while driving south on FM 493 he saw the Jeep vehicle driving north on FM 493 at a high rate of speed followed by P. Alvarado's pick-up truck; that someone from inside P. Alvarado's pick-up truck was shooting at the Jeep vehicle; and that P. Alvarado's two sons were in the pick-up truck with P. Alvarado.

  F.  9 mm Ammunition found in Pedro Alvarado's Residence

After speaking with R. Garcia, Agents Olivarez and Flores told HSI Agent Victor Hugas (hereinafter referred to as "Agent Hugas") that R. Garcia had implicated P. Alvarado and his two sons in the attempted murder of Agent Harrison.

On July 3, 2012 at approximately 2:00 p.m. Agent Hugas approached P. Alvarado and asked him whether he owned any firearms. P. Alvarado told Agent Hugas that he owned no firearms. Agent Hugas asked P. Alvarado for consent to search his residence to which P. Alvarado agreed and signed the consent to search form.

Shortly after beginning the search of the residence, Agent Hugas found 9 mm ammunition as well as a firearm magazine in one of the rooms. After finding these items, Agent Hugas asks P. Alvarado whether he owns a pick-up truck and P. Alvarado responds that he does. After being questioned about his pick-up truck, Agent Hugas noticed that P. Alvarado became extremely nervous.

Agent Hugas then asks P. Alvarado whether he is willing to go with him to the Federal Bureau of Investigations (hereinafter referred to as "FBI") office in McAllen, Texas to be interviewed. At approximately 2:30 p.m., P. Alvarado agrees to go voluntarily and is placed, without being handcuffed, in the passenger seat of Agent Hugas' vehicle with Ranger Mankin in the back seat. Shortly thereafter, A. Alvarado and the Juvenile are placed in separate vehicles and are transported to the FBI office by Hidalgo County Constable's Office Precinct 4 deputies Joaquin Vasquez and Bradley Brown.

      G.      Statement of Arnoldo Alvarado

After A. Alvarado arrived at the FBI office he was taken into an interrogation room. Once in the interrogation room, A. Alvarado was showed a document that contained the Miranda rights. Agents read A. Alvarado his rights and allowed him to read them himself. The agents asked A. Alvarado whether he understood his rights and he responded that he did. Subsequently, A. Alvarado acknowledged his rights and waived them by signing the form and agreed to answer agent's questions. The interrogating agents made no promises nor did they threaten or coerce A. Alvarado into waiving his Miranda rights.

During the interrogation, A. Alvarado told agents that on the night of July 2, 2012 he went to the movies with his girlfriend at the Cinemark Movies in Pharr, Texas; that he returned home alone at about midnight; that approximately 2:30 a.m. he heard his father's (P. Alvarado)

cellular telephone ring and overheard him talking to someone; that immediately after the telephone call P. Alvarado yelled at him and his brother to get up and get the guns; that P. Alvarado told him that he received a call from R. Garcia regarding a vehicle parked near their property; that he grabbed a 9 mm Ruger handgun he kept in his room, inserted a loaded magazine and cocked a round into the chamber; that his brother grabbed a .22 Remington semi-automatic rifle. After getting the firearms A. Alvarado told agents that all three ran outside and they got into their blue Ford F-150 pick-up truck; that P. Alvarado was driving, he was the front passenger and his brother sat in the backseat. Once they were in the pick-up truck, A. Alvarado told agents that his father began driving westbound on Cemetery Street (11th Street) with the lights off and all the windows down; that before they reached the intersection of Cemetery Road (11th Street) and FM 493 he saw a silver vehicle facing south on the northeast side of the intersection; at the time he saw the silver vehicle he saw the headlights of another vehicle approaching the intersection of FM 493 and Cemetery Street (11th Street) from the north; that he heard four shots outside the vehicle that sounded they were coming from the west and from a pistol; that he immediately "ducked" when his brother began firing at the silver vehicle; that his brother fired all six rounds from within the pick-up truck; that he then got up and fired two rounds from the handgun into the air; that his father and the driver of the silver vehicle simultaneously turned on their headlights; that the silver vehicle began driving away in a northwesterly direction towards FM 493; that he began shooting at the rear of the silver vehicle shattering its rear window; that he shot all rounds in the magazine; that the he estimates that the magazine holds 14 to 15 rounds; that he then inserted another magazine into the handgun as they were chasing the silver vehicle; and that he fired several shots in the air because the silver vehicle was driving too fast and was too far ahead of them.

H.     Guns found at Alvarado Residence

During an interview of Ascencio-Martir, he told agents that he had been living at P. Alvarado's residence for the past three weeks. He also told agents that in the early morning hours of July 3, 2013, P. Alvarado went the room in which he and A. Alvarado and the Juvenile were sleeping; that P. Alvarado woke up the Juvenile and told him that they needed to look into something that was suspicious; and that after P. Alvarado and the Juvenile left he went back to sleep.

Asencio-Martir then told agents that when he woke up in the morning he overheard a conversation in which P. Alvarado mentioned an incident in which he and his sons were involved in the shooting of a vehicle. Shortly thereafter, the Juvenile approached Ascencio-Martir and asked him to help him in hiding two weapons in the attic. Ascencio-Martir and the Juvenile then hid a 9 mm handgun and a 22 caliber rifle in the attic under the insulation. Based on this information, agents searched the attic of P. Alvarado's residence and found the two weapons.

V.

Legal Analysis

A.     Arnoldo Alvarado's Statement

Statements made by an accused in response to custodial interrogation are only admissible if the accused was informed of the Miranda rights and waived these rights both intelligently and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

In this case, agents advised A. Alvarado regarding his Miranda rights not only verbally but in writing. A. Alvarado read the form that contained the Miranda rights and acknowledge by signing the form that he understood the rights and that he was willing to waive these rights. At

no time during the questioning did A. Alvarado request to an attorney or invoke his right to remain silent.

  B. Evidence Recovered at Pedro Alvarado's Residence

After Ascencio-Martir told agents that he and the Juvenile hid the 9 mm handgun and the 22 caliber rifle under the insulation of the attic, agents conducted a search of the attic and recovered both weapons. The search of the attic was conduct pursuant to the written consent given by P. Alvarado.

  C. Probable Cause to Arrest Arnoldo Alvarado

Under the Fourth Amendment, a warrantless arrest must be based on probable cause. *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999). Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense. *United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008). Furthermore, in *Moreno-Vallejo v. United States*, 414 F.2d 901, 904 (5th Cir. 1969) the Court held that probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who makes the arrest.

In this case, law enforcement knew that Agent Harrison was attacked at the intersection of 11th Street and FM 493 in Hargill, Texas; that the persons involved were in two pick-up trucks; and that the persons involved used a 9 mm firearm. At the time that law enforcement approached P. Alvarado's residence they had information from a confidential source that a person named Rene Garcia may have been involved.

The first time that law enforcement approached P. Alvarado lead to not only the discovery of two illegal aliens in his attic but to the discovery of where R. Garcia lived.

Subsequently, R. Garcia told agents that he saw P. Alvarado, A. Alvarado and the Juvenile in their pick-up truck chasing and shooting at the Jeep Cherokee the night before.

The information provided by R. Garcia lead law enforcement to approach P. Alvarado again. During this approach, Agent Hugas asked P. Alvarado whether he owned any firearms. P. Alvarado told Agent Hugas that he did not own any firearms. After obtaining written consent to search his residence, agents discovered 9 mm ammunition and a magazine in one of the bedrooms. Agent Hugas asked P. Alvarado whether he owned a pick-up truck and P. Alvarado immediately showed visible signs of nervousness.

Based on the collective knowledge of law enforcement, that is, (1) Agent Harrison statements that two pick-up trucks chased and shot at him; (2) P. Alvarado lived approximately ¼ mile from where Agent Harrison was attacked; (3) Agent Harrison was shot at with a 9 mm firearm; (4) the discovery of 9 mm ammunition inside P. Alvarado's residence; (5) P. Alvarado lying about not owning a firearm; (6) P. Alvarado's nervousness when asked about whether he owned a pick-up truck; and (7) R. Garcia telling agents that he saw P. Alvarado, A. Alvarado and the Juvenile in their pick-up truck chasing and shooting at the Jeep Cherokee, law enforcement had sufficient probable cause to believe that A. Alvarado was involved in the attempted murder of Agent Harrison.

WHEREFORE, PREMISES CONSIDERED the Government request that the Court deny defendant's motion to suppress evidence and statements in their entirety.

    Respectfully submitted,

    KENNETH MAGIDSON
    United States Attorney


    *s/Anibal J. Alaniz*
    Anibal J. Alaniz

                Assistant United States Attorney
                State Bar No. 00966600
                Federal I.D. No. 12590
                1701 W. Business Highway 83
                Suite 600
                McAllen, Texas 78501

<u>CERTIFICATE OF SERVICE</u>

  On this 2nd day of April, 2013 a true and correct copy of the Government's Response to Defendant's Motion to Suppress Evidence and Statements was filed by ECF and served on counsel of record.

                <u>*Anibal J. Alaniz*</u>
                Anibal J. Alaniz
                Assistant United States Attorney