UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


UNITED STATES OF AMERICA,      )            CRIMINAL
                               )
            Plaintiff,         )        McAllen, Texas
                               )
                               )    Tuesday, April 10, 2013
vs.                            )    ( 9:16 a.m. to 12:41 p.m.)
                               )    (12:43 p.m. to  1:19 p.m.)
                               )
PEDRO ALVARADO,                )    CASE NO: 7:12-CR-1136-1
ARNOLDO ALVARADO,              )    CASE NO. 7:12-CR-1136-2
                               )
            Defendants.        )
_____

SUPPRESSION HEARING

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE


Appearances:            See Next Page

Court Recorder:         Richard Cortez

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                          ANIBAL J. ALANIZ, ESQ.
                                    JAMES HENRY STURGIS, ESQ.
                                    ERIC PAXTON WARNER, ESQ.
                                    Assistant United States Attorney
                                    1701 W. Business Hwy. 83
                                    Suite 600
                                    McAllen, Texas 78501

Defendant Pedro Alvarado:           OSCAR ALVAREZ, ESQ.
                                    600 South 11th Street
                                    McAllen, TX 78501

Defendant Arnoldo Alvarado:         CARLOS ANDRES GARCIA, ESQ.
                                    1305 East Griffin Parkway
                                    Mission, TX 78572

INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RAUL GARZA, JR. | | | | |
| BY MR. ALANIZ | 20 | | | |
| BY MR. GARCIA | | 24 | | |
| BY MR. ALVAREZ | | 29 | | |
| JEAN-PAUL RENEAU | | | | |
| BY MR. ALANIZ | 32 | | | |
| BY MR. GARCIA | | 42 | | |
| BY MR. ALVAREZ | | 61 | | |
| ADRIAN OLIVARES | | | | |
| BY MR. ALANIZ | 74 | | | |
| BY MR. GARCIA | | 84 | | |
| BY MR. ALVAREZ | | 93 | | |
| VICTOR HUGAS | | | | |
| BY MR. ALANIZ | 103 | | | |
| BY MR. GARCIA | | 119 | | |
| BY MR. ALVAREZ | | 145 | | |
| MARTIN BROWN | | | | |
| BY MR. ALANIZ | 170 | | | |
| BY MR. GARCIA | | 173 | | |
| KYLE BOYNTON | | | | |
| BY MR. ALANIZ | 179 | | | |
| BY MR. GARCIA | | 185 | | |

4

**INDEX (CONTINUED)**

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ERNESTO BACA | | | | |
| BY MR. ALANIZ | 191 | | | |
| BY MR. GARCIA | | 196 | | |

**DEFENDANT'S WITNESS**

| JORGE VELASCO | | | | |
|---|---|---|---|---|
| BY MR. GARCIA | 205 | | | |

| GOVERNMENT'S EXHIBIT | | | | RECEIVED |
|---|---|---|---|---|
| 1 | | | | 184 |

| DEFENDANT'S EXHIBITS | | | | RECEIVED |
|---|---|---|---|---|
| 9 | | | | 175 |
| 10 | | | | 175 |
| 12 | | | | 175 |
| 4 | | | | 176 |

**McAllen, Texas; Tuesday, April 10, 2013; 9:16 a.m.**

1                    **(Call to Order)**

2          **THE COURT:**  Let me just call both cases for

3    announcement now.  12-cr-1136-1, *USA versus Pedro Alvarado*.

4          **MR. ALANIZ:**  Present and ready, sir.  The Government

5    is present and ready, your Honor.

6          **THE COURT:**  All right.  And 12-cr-1136-2, *USA versus*

7    *Arnoldo Alvarado*.

8          **MR. GARCIA:**  Ready, your Honor.

9          **THE COURT:**  All right.  So we have a couple -- maybe

10   three things that I feel like I need to address this morning.

11   And of course, this was initially set for the suppression

12   issue.  So that foremost.  And then we also still have this

13   sort of lingering Motion to Disqualify or Recuse one or both of

14   the prosecuting attorneys.  And then, now we have this issue

15   about a subpoena and a Motion to Quash the Subpoena.

16          I don't really know what order to take them in

17   because they're all maybe a little bit intertwined.  But my

18   intention was to take up the suppression issue first and then

19   we can maybe get to some of the other issues.  I didn't know,

20   though, if the suppression evidence depended on some of these

21   other issues or not so --

22          **MR. GARCIA:**  Your Honor, it's our position --

23          **THE COURT:**  -- on the defense side.

24          **MR. GARCIA:**  -- again, this is the first time that

1    we've -- from my understanding, the -- the Government is -- is

2    opposed to Mr. Alaniz testifying even at the suppression

3    hearing.  And that's why we served Mr. Alaniz with a subpoena

4    for his testimony at the suppression hearing.

5              **THE COURT:**  Well, it's somewhat unorthodox to call a

6    prosecuting lawyer to testify in -- in any circumstance.  Here,

7    probably unnecessary given the number of other people that were

8    there witness to the events.  But the Government's going to put

9    on its evidence of the confession that was done lawfully and

10   not coerced and -- which is the statement you're trying to

11   suppress.  And so I -- it would be, I guess, some evidence that

12   you might want to elicit from them that would be germane to the

13   hearing.

14             After having heard from all of the witnesses the

15   Government intends to call, it may be a moot point.

16             **MR. GARCIA:**  Right.

17             **THE COURT:**  So why don't we sort of see where we are

18   at that point --

19             **MR. GARCIA:**  Right.

20             **THE COURT:**  -- and then, we -- we can take up the

21   issue then.

22             **MR. GARCIA:**  Yes, your Honor.

23             **THE COURT:**  All right.  Did you want to make an

24   appearance?

25             **MR. WARNER:**  Your Honor, I -- if I could very

1   briefly.  Paxton Warner on behalf of the United States of

2   America.  And when and if that subpoena of Mister or AUSA

3   Alaniz becomes an issue, your Honor, I -- I will be the one to

4   address that Motion to Quash.

5           **THE COURT:**  All right.

6           **MR. WARNER:**  Thank you, your Honor.

7           **THE COURT:**  We'll take it up perhaps later this

8   morning.

9           **MR. STURGIS:**  Does that mean -- may I address the

10  Court?

11          In regards to the subpoena, as the Court knows, I was

12  not subpoenaed and that was because of discussions with

13  Mr. Garcia in which I told him that I would be willing to

14  stipulate to the Court my part in any of the statements that

15  were taken of Mr. Carlo -- excuse me, Arnoldo Davila --

16  Alvarado -- excuse me, Arnoldo Alvarado.

17          I was in the room during the statements very briefly.

18  Maybe twice in and out for a matter of seconds, maybe a minute.

19  I have no factual basis to assist one side or the other in

20  regards to any of the warnings that were given or anything of

21  any consequence to the statement.

22          And representing this to Mr. Garcia, he indicated

23  then that he was -- did not wish to subpoena me on that.  So I

24  told him that I would bring this to the Court's attention so

25  that it would be on the record.

1          **THE COURT:**  All right.  And -- okay.  So noted.  Why

2  don't we get to the other issue once the Government puts on its

3  suppression evidence because it may become moot.

4          **MR. STURGIS:**  Right.

5          **THE COURT:**  Or it may become quite important.  And

6  that would all factor into the Court's decision.

7          **MR. ALANIZ:**  And before I -- before I call a witness,

8  I want to let the Court know I did file a response --

9          **THE COURT:**  I did review that.

10          **MR. ALANIZ:**  -- to both.  Just in -- in regards to

11  Pedro Alvarado, your Honor, basically the Government has -- has

12  reconsidered its position regarding the -- the initial,

13  recorded oral statement that Mr. Alvarado gave to two agents

14  who transported him from the Hargill residence to the FBI

15  building.

16          We decided that we're not going to -- we're not going

17  to offer that statement during our case-in-chief.  Obviously,

18  we reserve the right to use it if -- if he testifies --

19          **THE COURT:**  Um-hum.

20          **MR. ALANIZ:**  -- for hearing purposes.  So that

21  statement is not going to be an issue at -- at that pretrial

22  hearing.

23          **THE COURT:**  So there's no opposition to the Motion to

24  Suppress?

25          **MR. ALANIZ:**  On that one.

1          **THE COURT:**  On that one.

2          **MR. ALVAREZ:**  Well, Judge --

3          **MR. ALANIZ:**  There's -- there's another -- there's

4    another statement, Judge, that -- that --

5          **THE COURT:**  Sure.

6          **MR. ALVAREZ:**  -- all the statements that he made

7    while he was in custody at the FBI building that were basically

8    unsolicited.  And that's going to be the -- the -- the

9    Government's position that he made certain statements that --

10   that were not pursuant to interrogation although he was in --

11   in custody.

12         **THE COURT:**  Okay.

13         **MR. ALANIZ:**  Those are the only statements that --

14   that the Government intends to -- to introduce if the Court

15   allows them at our -- during our case-in-chief in regards to

16   the statements of Pedro Alvarado.

17         **THE COURT:**  All right.

18         **MR. ALVAREZ:**  Your Honor, in regards to those

19   statements --

20         **THE COURT:**  Um-hum.

21         **MR. ALVAREZ:**  -- well, the -- the initial statements

22   that were made and recorded by Agent Mankin (phonetic), we

23   intend to use those at trial.  So they --

24         **THE COURT:**  Well, it's going to be tough to get them

25   in.  But -- I mean, you can't just play your own --

1          **MR. ALVAREZ:**  Well, you know --

2          **THE COURT:**  -- statements.

3          **MR. ALVAREZ:**  -- well, I mean, we plan to, you know,

4   if -- if -- if legally permissible, you're going --

5          **THE COURT:**  Sure.  I mean, a --

6          **MR. ALVAREZ:**  -- you're going to allow --

7          **THE COURT:**  -- a big hurdle there though.  You can't

8   just introduce hearsay and --

9          **MR. ALVAREZ:**  And the -- the Motion to Suppress that

10  we have filed is strictly addressed on the issue of the

11  discovery of the aliens and the weapons and ammunition.

12         **MR. ALANIZ:**  Does that mean that he's not contesting

13  the statements that he made -- Mr. Alvarado made to a -- an

14  officer, you know, while he was in custody in the FBI building?

15         **THE COURT:**  That's what Mr. Alvarez just said.

16         **MR. ALANIZ:**  If that's the case, then I -- then less

17  witnesses also.

18         **THE COURT:**  Sure.  Okay, there are going to be less

19  witnesses then.  Can -- do we need to take these up separately?

20  I -- I don't -- I'm trying to even figure out what it -- what

21  did --

22         **MR. ALANIZ:**  My -- my -- my plan, your Honor, because

23  one of the -- one of the issues is they're claiming that there

24  was not -- there was no probable for the -- for them to be

25  detained at the Hargill residence and therefore, I guess, some

1  of the statements as to Mister, I guess, Pedro Alvarado is

2  no -- has basically fruit of the -- the illegal arrest.  I've

3  got to put in some background information about the

4  investigation to be able to tell the Court what probable cause

5  the agents had --

6          **THE COURT:**  Um-hum.

7          **MR. ALANIZ:**  -- and in regards to that, to the

8  detention of Mr. Arnoldo Alvarado.

9          And then besides those agents, if he had the

10  background and the probable cause for the detention, then I've

11  got to talk -- bring in, I think there's three witnesses in

12  regards to the -- the oral statement taken from Mr. Arnoldo

13  Alvarado.

14          **THE COURT:**  All right.  Let's give me a -- a preview

15  here.

16          **MR. ALANIZ:**  Yes, sir.

17          **THE COURT:**  I want to just figure out what's still in

18  play here.  The agents on this evening go to the home of the

19  Alvarados.  At the home, they do a knock and talk, and they say

20  "We're here.  We received information there's something illegal

21  occurring and" --

22          **MR. ALANIZ:**  Right.

23          **THE COURT:**  -- "may we -- may we come in and" --

24          **MR. ALANIZ:**  Oral consent.  That's what --

25          **THE COURT:**  -- and then they "sure.  I mean, our

12

1    home's open to anyone."  And they come in and there were

2    discussions there --

3              **MR. ALANIZ:**  They -- they found two illegal aliens.

4              **THE COURT:**  -- and then -- and two aliens.  They see

5    two people, they ID them, and they find out they're illegals.

6    So that is one of the issues is this whole encounter and

7    entrance into the home?

8              **MR. ALANIZ:**  Yes, your Honor.

9              **THE COURT:**  All right.  Were any -- are there any

10   statements that were made there at the scene, at the home that

11   are -- that are in -- in issue here?

12             **MR. ALVAREZ:**  There is a statement, your Honor, of

13   where prior to the discovery of the aliens, Pedro Alvarado

14   allegedly making a statement that they were two aliens hiding

15   in the attic.

16             **THE COURT:**  All right.  Okay.

17             **MR. ALANIZ:**  And he was not in custody at the time.

18   There was just an approach that the residence was still --

19             **THE COURT:**  Sure.  And were they -- they're not

20   charged with any --

21             **MR. ALANIZ:**  No.

22             **THE COURT:**  -- any alien harboring?

23             **MR. ALANIZ:**  No.

24             **THE COURT:**  All right.  Okay.  So then the aliens are

25   encountered, they're arrested, the aliens are --

1          **MR. ALANIZ:**  Right.

2          **THE COURT:**  -- are turned over.  Anyway, they're

3     placed in custody.  And then my understanding is, you're your

4     response, the Government then says, "we want to talk to each of

5     you, that the two Alvarados, will you come" --

6          **MR. ALANIZ:**  Not -- not yet, Judge.  What happens --

7          **THE COURT:**  -- "downtown."

8          **MR. ALANIZ:**  -- is after they found the aliens at the

9     house, the agents asked Mr. Pedro Alvarado "does Rene Garcia

10    live here" and he goes "no, Rene Garcia does not live here.  He

11    lives over there".  So they -- he tells the agents where Rene

12    Garcia lives.  Some agents stay at the Alvarado residence with

13    the aliens and with the Alvarados --

14         **THE COURT:**  Um-hum.

15         **MR. ALANIZ:**  -- while other agents then go over to

16    Rene Garcia's property.

17         **THE COURT:**  Okay.

18         **MR. ALANIZ:**  In Hargill.

19         **THE COURT:**  I'm sure.

20         **MR. ALANIZ:**  And when they talk --

21         **THE COURT:**  So --

22         **MR. ALANIZ:**  -- to Rene Garcia, Rene Garcia

23    implicates the Alvarados in the shooting.

24         **THE COURT:**  Okay.

25         **MR. ALANIZ:**  They go back to -- to -- to the -- to

1   the Alvarados, the agents who were at Garcia's residence, they

2   then ask for written consent to search the house from Mr. Pedro

3   Alvarado.  And he gives written consent.  Before they go in,

4   they ask him "do you own any -- do you own any firearms?"  He

5   said "I don't own any -- any guns".  The minute they walk in,

6   they find 9 mm ammunition and magazines at the time.

7           So they pulled out to -- to allow the FBI to recover

8   evidence --

9           **THE COURT:**  Do a sweep.

10          **MR. ALANIZ:**  -- to come over.

11          **THE COURT:**  Sure.

12          **MR. ALANIZ:**  At that point, then they ask

13  Mr. Alvarado ,"are you willing to come to the FBI building with

14  us?"  And he says "yes".  And that's when they transport

15  Mr. Alvarado -- Pedro -- and his two sons to the FBI building.

16          **THE COURT:**  And they're transported separately?

17          **MR. ALANIZ:**  All three separately; yes, sir.

18          **THE COURT:**  In the back seat of vehicles, no

19  handcuffs?

20          **MR. ALANIZ:**  Well, handcuffs -- Mr. Alvarado -- Pedro

21  Alvarado was -- was in the front seat, not handcuffed.  The --

22  the juvenile and Mr. Arnoldo were handcuffed and put in -- in

23  the patrol vehicle.

24          **THE COURT:**  Okay.  But we've agreed none of the

25  statements made --

1          **MR. ALANIZ:**  Right.

2          **THE COURT:**  -- during that -- that transport are --

3     are going to be used?

4          **MR. ALANIZ:**  The Government is not going to introduce

5     them; that's right.

6          **THE COURT:**  Okay.

7          **MR. ALVAREZ:**  We've agreed but --

8          **MR. ALANIZ:**  Yeah.

9          **THE COURT:**  Well, sure.

10         **MR. ALVAREZ:**  **--** for the purposes of today's hearing,

11    nothing is going to be considered.

12         **MR. ALANIZ:**  Our --

13         **THE COURT:**  Okay.

14         **MR. ALVAREZ:**  We're not representing (indiscernible),

15    Judge.

16         **THE COURT:**  All right.  So then let's -- why don't we

17    -- I have a pretty -- a good lay of the land now.

18         **MR. ALVAREZ:**  Okay.

19         **THE COURT:**  I know what evidence is relevant and not

20    relevant.  That's what I was trying to figure out.

21         **MR. ALANIZ:**  Yes, sir.

22         **THE COURT:**  Do you want to add anything to --

23         **MR. GARCIA:**  Well, there's the --

24         **THE COURT:**  -- what the issues are?

25         **MR. GARCIA:**  -- we don't agree with what the

16

1    Government just -- so for -- for one thing, there weren't

2    magazines, they used a plural, found in the home.  There was a

3    magazine that was found in the home.  There's just certain

4    facts specific to the investigation that the -- the Government

5    kind of, you know, generalizes.  And I -- I believe that after

6    testimony is given, it's going to be quite different than what

7    the Government just presented --

8              THE COURT:  What's your argument on the -- on the --

9              MR. GARCIA:  The -- the crutch of the issue, Judge,

10   is that my client didn't consent to go to the FBI office.  He's

11   handcuffed --

12             THE COURT:  Okay, but --

13             MR. GARCIA:  -- and placed in the back of a patrol

14   car.

15             THE COURT:  -- well, I'm just talking about --

16             MR. ALANIZ:  It's not -- it's not an issue.  We --

17   we'll agree to the fact that he was detained.

18             THE COURT:  Right.

19             MR. GARCIA:  Specific facts --

20             MR. ALANIZ:  Right.

21             MR. GARCIA:  That together -- allow me to finish,

22   please.  After he is transported, it all goes to the

23   voluntariness of any waiver that he may have signed.

24             THE COURT:  Okay, but let's -- I want to kind of

25   separate the statements he made in FBI custody versus the

1    search of the home.  You don't -- you don't seem to have an

2    issue with the search of the home?

3              **MR. GARCIA:**  Well, I -- specifically, your Honor,

4    That I -- I don't know yet until the testimony is provided

5    because the discovery up to this point speaks of discovery of

6    ammunition or discovery of -- of a -- of a magazine --

7              **THE COURT:**  Um-hum.

8              **MR. GARCIA:**  -- and there's -- I won't know until the

9    actual testifies as to where it was found and whether or not my

10   client has a right to object to that.  So just based on the

11   discovery up to this point, I don't know.

12             **THE COURT:**  Okay.  So you're not sure yet?

13             **MR. GARCIA:**  Yes.

14             **THE COURT:**  Well, then let's briefly put on that

15   evidence.  It doesn't sound like it will be very difficult.

16   Perhaps one agent, maybe two.

17             All right.  Anything else you-all want to add?  No.

18   Why don't you-all be seated then.  Do you need your clients

19   next to you?

20             **MR. GARCIA:**  I do, your Honor, yes.

21             **THE COURT:**  Okay.

22         **(Voices off the record)**

23             **THE COURT:**  So Senior on this side of the table,

24   Junior --

25         **(Voices off the record)**

1          **MR. ALVAREZ:**  Judge, can we agree that any questions

2  that -- that the Government has could -- could --

3          **THE COURT:**  One lawyer asks will be good as to both,

4  correct.  This will be a --

5          **MR. ALVAREZ:**  Unless I object.

6          **THE COURT:**  -- this will be a joint hearing, sure.

7  Any lawyer's objection will be good as to both Defendants and

8  any question of one lawyer will be good as to both.

9          **MR. GARCIA:**  Your Honor, I'm going to ask that my

10  client be unhandcuffed.  He needs to take notes for me as the

11  agents testify.  If -- if he needs to give -- pass me a note, I

12  need for him to be able to write.  And he can't write with the

13  handcuffs on his waist.

14          **THE COURT:**  All right.

15          **MR. ALVAREZ:**  Same thing with mine, your Honor.  He's

16  handcuffed as well.

17          **THE COURT:**  Okay.  We'll -- we'll --

18          **MR. GARCIA:**  Thank you.

19          **THE COURT:**  One side.

20      **(Pause)**

21          **THE COURT:**  All right.  You want to give them the

22  right pens?  Okay.

23          **MR. GARCIA:**  Thank you, your Honor.

24          **THE COURT:**  All right.  So Mr. Alaniz --

25          **MR. ALANIZ:**  Yes, sir.  The Government will call --

1      **THE COURT:**  -- if you want to present your --

2      **MR. ALANIZ:**  -- will call its first witness, Raul

3    Garza.

4      **THE COURT:**  Are there going to be documents used?

5      **MR. ALANIZ:**  I'm sorry?

6      **THE COURT:**  Do you contend to -- do you need the

7    document projector?

8      **MR. ALANIZ:**  Yeah, I -- I've got three -- three

9    documents.  But I -- I can show the Court.  I don't need to use

10   the Elmo at all, your Honor.

11     **THE COURT:**  All right.

12     **MR. ALANIZ:**  Raul Garza, Jr. to the witness stand.

13     **MR. GARCIA:**  Your Honor, we would invoke the rule at

14   this time.

15     **THE COURT:**  All right.  Do you have any other

16   witnesses present in Court?

17     **MR. ALANIZ:**  Judge, they're -- they're all in -- in

18   the -- in the witness room.  Can I go and inform them of the

19   witness being invoked?

20     **THE COURT:**  Sure.  They're just not to discuss their

21   testimony with any other witness or to be in the courtroom

22   while anybody else testifies.

23     All right.  Agent, if you could please raise your

24   right hand at this time and be administered the oath.

25   //

Garza - Direct / By Mr. Alaniz                          20

1          **RAUL GARZA, JR., GOVERNMENT'S WITNESS, SWORN**

2          **THE COURT:**  All right.  If you could be seated over

3    here, sir.

4          **MR. ALANIZ:**  Now, I'm going to go ahead and at this

5    time, give a copy of Mr. Garza's report to the defense counsel,

6    your Honor, so they can look at it while I -- I direct.

7          May I proceed, your Honor?

8          **THE COURT:**  You may.

9                           **DIRECT EXAMINATION**

10   BY MR. ALANIZ:

11   Q    Sir, can you please state your full name?

12   A    Raul Garza, Jr.

13   Q    And can you tell the Court where you're employed, sir?

14   A    I'm deployed -- employed by the Homeland Security

15   Investigations.

16   Q    And how long have you been employed with the Homeland

17   Security Investigations?

18   A    Over two and a half years.

19   Q    And were -- were you on -- on duty or working on the night

20   of July the 3rd of 2012, sir?

21   A    Yes.

22   Q    Can you tell the Court briefly what -- what happened that

23   -- that night around midnight?

24   A    It was about 2:45 in the morning.  I was called out to a

25   -- to a -- an operation we were going to have in Hargill,

1   Texas.  And on my way out there, I was informed by Case Agent

2   J.P. Reneau that we're going to follow a tractor-trailer being

3   loaded with some marijuana or something like that.  And he'd

4   brief me when we got out there.

5   Q    Okay.  So -- so -- so you took off from your home in

6   Rockwell around -- around what time approximately?

7   A    Probably around 3:20, somewhere around there -- 3:15.

8   Q    Okay.  And then what happens on the way over there?  What

9   -- what -- what did -- what did you hear over the radio?

10  A    On the way over there and over the radio, I heard a faint

11  distress signal that "I've been shot".  I don't know who it

12  was, I couldn't really hear at the time because I was pretty

13  far away.

14  Q    Okay.

15  A    And I started heading towards that area a little bit

16  faster.  And when I got to the Hargill area, they started

17  telling me that it was Kelton.  I kind of figured out it was

18  Kelton Harrison that had been shot.  So they were kind of

19  looking for him in the area.

20  Q    And Kelton Harrison is another HSI agent?

21  A    Yes, he's a special agent with HSI.

22  Q    And when -- when -- who was telling you that Agent

23  Harrison had been shot?

24  A    Nobody had told us that he had been shot yet but we

25  couldn't get a hold of anybody at the time -- at -- Kelton at

```
 1   the time, so we believed it was him that had been shot.  There
 2   were several minutes in there where we -- we -- we didn't get a
 3   hold of them or we couldn't find him at the time.  So --
 4   Q    Okay.
 5   A    -- we kind of figured it was him because everybody else
 6   had responded.
 7   Q    At some point, did you-all find Agent Harrison?
 8   A    Yes --
 9   Q    Where?
10   A    -- we found him north on 186 and 493.
11   Q    At the intersection or at the side --
12   A    At the intersection, yes.
13   Q    -- of the road?  Okay.  Where -- where was his vehicle at
14   the -- let the Court -- tell the Court that.
15   A    His vehicle was -- it -- it kind of rolled over into the
16   ditch.  He went through the intersection and he kind of rolled
17   into the ditch and he was kind of hiding out there.
18   Q    Okay.  When you -- when you go there, were you one of the
19   first agents who got to the scene?
20   A    Yes.
21   Q    Okay.  What did -- tell the Court what you saw.
22   A    Well, as we approached, we started looking at the fence.
23   And we saw the fence had been damaged, so we figured he was in
24   that area.  So we started to get off.  We -- we -- we also saw
25   his lights to his car turned on, his emergency lights.  So we
```

1  figured it was him.  We jumped the fence and went up there and

2  found him.  He was without a shirt carrying his -- his vest

3  with him.

4  Q    And did you notice anything about Agent Harrison at the

5  time?

6  A    Yes.  I asked him if he was okay, what was going on.  And

7  he says "I've been shot.  I feel something."  He didn't have a

8  shirt on so I looked at his back.  I saw what appeared to me to

9  be a bullet hole in -- in his back buried.

10 Q    Was -- was he still being able to walk around and speak at

11 that point?

12 A    He -- he did talk to me.  He was breathing a little heavy

13 but I didn't see any blood on him so I wasn't concerned that he

14 might have had like internal bleeding or something like that.

15 Q    So what did you do at that point, Agent Garza?

16 A    At that point, we decided to call an ambulance right away.

17 I -- I knew they would take a long time to get there.  For

18 Kelton's safety, I got him in my car and started to head

19 towards the hospital.  And we were contacting the ambulance

20 during -- during the way.

21 Q    On -- on the way over to the -- to take him to the

22 hospital -- Agent Harrison to the hospital -- did -- did he

23 tell you anything about what -- what happened to him?

24 A    He was -- he -- he was pretty bad off but I did ask him

25 real quick if he can just give -- if there was anything he

Garza - Cross / By Mr. Garcia                                    24

1   wanted to tell me about the shooting that if he could.  And he

2   just told me that, you know, those two -- two trucks that were

3   close to him and started shooting at him.  And -- and he just

4   took off.  So that was basically it.  And then he wanted to

5   talk to his wife so I was just trying to keep him calm.

6   Q     So besides telling you that there was two trucks involved,

7   that that was the extent of the information that he gave you

8   that night?

9   A     Yes.

10          **MR. ALANIZ:**  I'll pass the witness, your Honor.

11          **MR. GARCIA:**  If I may, your Honor?

12          **THE COURT:**  You may.

13                          **CROSS EXAMINATION**

14   BY MR. GARCIA:

15   Q     Agent Garza, when you were called at 3:15 or 3:20 in the

16   morning, were you in bed or when you left the house, were you

17   -- in other words, did they wake you up?

18   A     Yes.

19   Q     Okay.  And what goes on as you get ready to go out to a

20   location like this?

21   A     Well, we get dressed and we get in our vehicle, get all

22   our equipment in, and head to the area.

23   Q     What kind of equipment?

24   A     Everything we need.  Vest, guns, everything.

25   Q     So it's normal for you to get the vest, a weapon, other

1   materials that you may need when you're going out to

2   surveillance?

3   A    Yes.

4   Q    Okay.  And did you have that on that night?

5   A    Yes.

6   Q    Okay.  Upon arrival and finding Agent Harrison -- but

7   before you found Agent Harrison, did you go to the intersection

8   of  Eleventh  Street  or what's known as Cemetery Road  and

9   493?

10  A    I don't know the area that well but I believe we went to

11  an area to where he was supposed to be -- where he was supposed

12  to be positioned at.

13  Q    Okay.

14  A    We went to that area to look for him first.  An area where

15  he was parked at.

16  Q    Where did you get that information from?

17  A    From J.P. Reneau, the case agent.

18  Q    Okay.  And -- and that information was provided to you via

19  telephone or in person or how did that happen?

20  A    That happened over the radio.

21  Q    Okay.  And so are you traveling alone or with someone

22  else?

23  A    By myself.

24  Q    Okay.  And who is Agent J.P. Reneau traveling with?

25  A    I believe he was with another agent.

1   Q    Do you know who that other agent was?

2   A    Yes.  Christopher -- Christopher Young.

3   Q    Christopher Young.  You said that you've been working with

4   HSI for about two and a half years so back when this shooting

5   occurred, it was less than two years that you had been with

6   HSI?

7   A    Yes.

8   Q    Before then, who were you with?

9   A    I was with the McAllen Police Department.

10  Q    Okay.  As a police officer?

11  A    As an investigator.  I was there for 15 years.

12  Q    Okay.  And how long -- estimate how long before you found

13  Agent Harrison.

14  A    I don't know.  I can't give you an estimation -- 20 or 30

15  minutes, less, I don't know -- I don't know, somewhere around

16  there.

17  Q    Did you see any other vehicles out there?

18  A    No.

19  Q    Did you ever see my client out there?

20  A    No.

21  Q    All right.  Did you ever go to the Alvarado residence as

22  you were searching -- before you found Agent Harrison, did you

23  ever go the Alvarado residence?

24  A    No.

25  Q    Do you know where the Alvarado residence is?

Garza - Cross / By Mr. Garcia                    27

1   A    No.

2   Q    Was the Alvarado residence the reason you were out there?

3   A    I'm not too sure at this time.

4   Q    I'm not asking you whether or not it was subject of the

5   investigation.  Is that the information that you had at that

6   time?

7   A    No.

8   Q    Okay.  When you find Agent Harrison and you -- did you

9   look in his vehicle?

10  A    No.

11  Q    Okay.  How far away from his vehicle was he when you found

12  him?

13  A    Ten yards, twenty yards, something like that.

14  Q    Okay.  And did you know why he had his shirt off?

15  A    No, I don't.

16  Q    Did you ask him?

17  A    No.  I was mostly --

18  Q    Did you ask him if he was wearing his vest?

19  A    I was more concerned about his safety than anything else.

20          THE COURT:  Did you ask if he was -- why he wasn't

21  wearing his vest was the question.

22          THE WITNESS:  Okay.  No.

23  BY MR. GARCIA:

24  Q    Okay.  Did you ask him for his weapons?

25  A    No.

1    Q    Okay.  Is it normal for agents not to be armed out on

2    surveillance like that?

3    A    I don't know what you mean by "normal", like can you

4    explain that question better?

5    Q    Is it normal for you to be armed when you're going out to

6    do surveillance on a -- on a drug case?

7    A    I'm armed, yes.

8    Q    Is it common practice for agents to be armed when they're

9    -- when they're working?

10   A    Yes.

11   Q    How about when you're not working?

12   A    We have -- we have our weapons with us also.

13   Q    Okay.  Did you ask Agent Harrison for his?

14   A    At some point, I did ask him but it wasn't there.

15   Q    Where was it?

16   A    I think it was at the hospital.

17   Q    You asked him at the hospital?

18   A    Yes.

19   Q    And what did he tell you?

20   A    That he had it with him in the car and he could have lost

21   or something like that.

22   Q    Okay.

23   A    I didn't get to ask him too much about it.  I was just

24   wanting to make sure it wasn't in the ambulance or anywhere

25   else.

Garza - Cross / By Mr. Alvarez                    29

1           **THE COURT:**  Even --

2    Q     Did you look in the ambulance?

3    A     No, I didn't.

4    Q     Did you look anywhere else?

5    A     My vehicle.  He was in my vehicle so I did look in my

6    vehicle.

7    Q     You looked in your vehicle?  Was it there?

8    A     No.

9    Q     And what weapon would that be?

10   A     I don't know.

11   Q     Do you know the caliber?

12   A     No, I don't.

13          **MR. GARCIA:**  Your Honor, I pass the witness.

14                      **CROSS EXAMINATION**

15   **BY MR. ALVAREZ:**

16   Q     Agent Garza, you indicated that Agent Harrison had stated

17   that two vehicles -- two trucks were following him and were

18   involved in a shooting?

19         I didn't say "following him", I just said that they

20   approached him and started shooting.

21   Q     And that is -- gun -- gun fire coming from two vehicles?

22   A     Yes.

23   Q     That's what he said?

24   A     That two vehicles approached him and started shooting,

25   that's what he said.

1    Q    Did he identify the vehicles for you at that time?

2    A    No, sir.

3    Q    Did he tell you how many shots came from each one of the

4    vehicles?

5    A    No, sir.

6    Q    Now, you indicated in your testimony that you had located

7    Agent Harrison on 186 and 493; is that correct?

8    A    Yes.

9    Q    And you just answered counsel's question about he was

10   about how many feet from the vehicle when you located him?

11   A    About twenty yards, something like that.

12   Q    Now, the -- he had no shirt on.  Did you locate a shirt

13   near the area when you --

14   A    He had his shirt in his hand.  He did -- he just didn't

15   have it on.

16   Q    Do you know why he had it in his hand and not on him?

17   A    No, I didn't ask him that.

18   Q    The vest that he had, did he have it in his hand as well?

19   A    Yes.

20   Q    Now, you indicated that at -- at the hospital, at some

21   time, you asked him about the weapon, correct?

22   A    Um-hum.

23   Q    Why did the -- why did the issue of where the weapon was

24   come up at that particular time with you?

25   A    We just wanted to locate his property, get his personal

1   property together, and stuff like that.

2   Q    Did somebody -- did somebody call you and tell you or ask

3   you that question about where his weapon was?

4   A    I don't remember anybody calling me.  We just -- he -- he

5   had vest with him and stuff and we just wanted to get all his

6   stuff together.

7   Q    Well, you don't have a particular interest in the weapon.

8   Why did -- why was -- why did you have an interest in asking

9   him about the weapon at the hospital at that -- at that time?

10  A    Well, it's a -- it's a safety issue.  I mean, I want to

11  make sure he didn't leave the weapon in the ambulance or

12  anywhere else.  We -- we just wanted to get it secured.

13  Q    And you heard that he --

14        **THE COURT:**  Wait, wait, wait a minute.  This has

15  nothing to do with suppression.  I mean, I'm letting it go

16  because maybe it has some other discovery issues but this has

17  nothing to do with suppression so let's -- let's move on.

18  Q    That's all.

19        **THE COURT:**  All right.  Any redirect?

20        **MR. ALANIZ:**  No, sir.

21        **THE COURT:**  All right.  Thank you, agent, so much for

22  being here.  You're excused at this time.

23        **(Governing Witness Raul Garza, Jr. is excused)**

24        **MR. ALANIZ:**  May he be excused, your Honor?

25        **THE COURT:**  Yes.  I'm trying to get an idea of the

1   lay of the land and where these two homes were.  What -- the

2   agent proceeds which direction on 493?

3          MR. ALANIZ:  Then -- well, can I -- let me call

4   another agent --

5          THE COURT:  He'll explain it?

6          MR. ALANIZ:  -- the case agent.  That way it will

7   give the Court a little better background.

8          THE COURT:  All right.

9          MR. ALANIZ:  Let me -- let me Agent Reneau.

10          THE COURT:  Reneau, all right.

11      (Pause)

12          MR. ALANIZ:  Your Honor, the Government would Jean-

13   Paul Reneau to the witness stand.

14          THE COURT:  All right.  Agent Reneau, if you could

15   step forward and be administered the oath before you testify.

16          JEAN-PAUL RENEAU, GOVERNMENT'S WITNESS, SWORN

17          THE COURT:  All right.  You may begin.

18          MR. ALANIZ:  I'm going to give again defense counsel

19   a copy of Reneau's report.

20                    DIRECT EXAMINATION

21   BY MR. ALANIZ:

22   Q    Sir, can you please state your full name for the record?

23   A    Jean-Paul Reneau.

24   Q    And where are you employed, sir?

25   A    Homeland Security Investigations in McAllen, Texas.

1  Q    And how long have you been an agent with Homeland Security

2  Investigations?

3  A    Approximately five years.

4  Q    And are -- were you one of the case agents involved in

5  this case?

6  A    Correct.

7  Q    And can you tell the jury -- I'm sorry, not the jury but

8  the Court -- what -- what happened on midnight on July the 3rd

9  of this year -- of this past year?

10        **THE COURT:**  And Mister -- Agent Reneau, can I get you

11  to sit up in your chair so that the microphone is closer to

12  you?

13        **THE WITNESS:**  Yes, sir.

14        **THE COURT:**  Thank you.

15        **THE WITNESS:**  On July 2nd, 2012, agents responded to

16  Hargill, Texas, in reference to an ongoing narcotics smuggling

17  venture that was believed to be occurring there.

18  **BY MR. ALANIZ:**

19  Q    Okay.  And "they", did you mean yourself and other agents?

20  A    Correct; yes, sir.

21  Q    What kind of message did you receive on that night of July

22  the 2nd?

23  A    I received information that a tractor-trailer was going to

24  be utilized to transport a large amount of marijuana to an

25  unknown destination.

Reneau - Direct / By Mr. Alaniz                    34

1   Q    And that -- did the information that you received, was it

2   specific about where this tractor-trailer was located?

3   A    Yes, it was.

4   Q    Can you tell the Court where that was?

5   A    The information received was that the vehicle was located

6   east of Hargill, Texas, on Eleventh Street.

7   Q    Okay.  And did -- did you know that location prior to --

8   to taking off to that -- to that place?

9   A    No, I did not.

10  Q    So how -- how did you get there?  What -- what direction

11  did you go?

12  A    I went north on 281 to 490 and then drove to Hargill,

13  continued through Hargill into the area, where I believed it

14  would be.

15  Q    And Eleventh Street -- just for the -- the record,

16  Eleventh Street runs which -- which directions?

17  A    East and west.

18  Q    And 493 runs which direction?

19  A    493 runs north and south.

20  Q    And so the tractor-trailer was located, what east of that

21  intersection?

22  A    Correct, yes.

23  Q    When -- when you took -- when you took off to that

24  location, did you go in -- did you have somebody with you in

25  your vehicle?

1   A    I did.

2   Q    Who was that?

3   A    Special Agent Christopher Villarreal.

4   Q    And before you -- I'm assuming you picked him up at some

5   place that night?

6   A    Correct; yes, sir.  I picked him up from his residence.

7   Q    Around what time did you pick him up?

8   A    It was approximately midnight.

9   Q    Okay.  So that was into July the 3rd?

10  A    Yes, sir.  It would have been into July the 3rd on our way

11  out there.

12  Q    Okay.  Now, once you picked up Agent Villareal, did you

13  call any other agents to assist you in this surveillance?

14  A    Initially, no.  I took myself and Agent Villareal out to

15  the location where we believed -- based on the information,

16  where we believed the tractor-trailer was going to be stored.

17  Once myself and Agent Villareal verified the information, I

18  then contacted my supervisor, who asked me to call additional

19  individuals out there.

20  Q    When -- did you actually find the tractor-trailer that --

21  that the confidential source had given you?

22  A    Correct; yes, sir.

23  Q    Where was that -- where was that located?

24  A    It was located on a ranch directly east of Hargill on

25  Eleventh Street near FM 88.

1   Q    Is it -- is it east of -- of Eleventh Street and 493?

2   A    Correct; yes, sir.

3   Q    How -- how far away on east -- on Eleventh Street from the

4   intersection of 493 and Eleventh Street did you find the

5   tractor-trailer approximately?

6   A    It's approximately a mile and a half from that

7   intersection.

8   Q    And is the property on the north or south -- south side of

9   Eleventh Street?

10  A    North side.

11  Q    And so you found -- you found the tractor-trailer and the

12  location of that trailer.  You then called other agents to

13  assist you in the surveillance?

14  A    That is correct.

15  Q    Who did you call?

16  A    I called Special Agent Juan Mendez, Special Agent Rudy

17  Garza, and Special Agent Kelton Harrison.

18  Q    And when -- when they got to the Hargill area, these other

19  agents, what did you -- what did you tell them at that point?

20  A    At that point, we -- I informed them either via radio or

21  telephone the information that we had received as well as what

22  we were going to do, which was establish a box around the

23  vehicle in an effort to determine when it leaved, what

24  direction it would be traveling.

25  Q    Okay.  At that point, did you position agent -- for

Reneau - Direct / By Mr. Alaniz                     37

1   example, Agent Mendez, in a certain location?

2   A    Correct; yes, sir.

3   Q    Well, where did -- where did you ask him to -- to park his

4   vehicle?

5   A    I asked him to park on FM 88 north of Eleventh Street.

6   Q    Okay.  And how about Agent Harrison?

7   A    He was asked to park near or monitor the intersection of

8   Twelfth Street and FM 493.

9   Q    At some point after you told Agent Harrison to -- to park

10  in that area, did you communicate with him later and find out

11  that he had moved to another location?

12  A    Yes, sir.  I believe he either called me or announced on

13  the radio that he couldn't find a suitable place to park his

14  vehicle on Twelfth Street and 493 and he was going to move his

15  vehicle.

16  Q    Where did he move it to?

17  A    He didn't say.

18  Q    Okay.  So what -- when you have Agent Mendez and Agent

19  Harrison park, what are you and Agent Villareal doing at that

20  time?

21  A    We are also parked north on 490 from the intersection of a

22  dirt road and 490, away from the tractor-trailer.

23  Q    Now, at some point, did you hear over the radio Agent

24  Harrison telling you that he had to -- to move?

25  A    Correct, I did.

Reneau - Direct / By Mr. Alaniz                          38

1  Q    What -- what exactly did he tell you over the radio?

2  A    At approximately 3:30, he told me that he saw a vehicle

3  approaching his location and he was going to move.

4  Q    Okay.  And what happened then?

5  A    Following that transmission, he broadcast again that he

6  was being shot at.

7  Q    At that point, was he able to tell you which direction he

8  was headed?

9  A    No.

10 Q    Were you able to communicate with him during that time?

11 A    There was only one other transmission from Agent Harrison

12 that he was, in fact, shot.  I did try several times to raise

13 him on the radio but it was unsuccessful.

14 Q    So at that point, what -- what did you and Agent Villareal

15 do?

16 A    Myself and Agent Villareal proceeded to the last location

17 where we believed Agent Harrison would have been, which would

18 have been the intersection of Twelfth Street and 493.

19 Q    But what happened when you got there?

20 A    We did not locate him.

21 Q    So -- so what did you do then?

22 A    Myself and the other agents that were out there began

23 basically scouring the area in an effort to determine where

24 Mr. Harrison was located.

25 Q    And what happened?

Reneau - Direct / By Mr. Alaniz                    39

1  A    We were still unable to locate him.

2  Q    How -- how long after you -- you got that last

3  transmission that he had been shot, how much longer was it

4  before you heard from Agent Harrison again?

5  A    I believe it was approximately 15 minutes.

6  Q    And how did you hear from Agent Harrison again?

7  A    He contacted me telephonically on my personal cell phone.

8  Q    And at that point, what did he tell you?

9  A    At that point, he told me he was where the road ends or

10 dead-ends and he was in the bushes.

11 Q    Okay.  Besides that, did you have any idea where that

12 might be?

13 A    No.

14 Q    So what did you do?

15 A    We then proceed northbound on 493 headed towards FM 186.

16 Q    Okay.  And what happens when you get to that intersection?

17 A    When we arrived at the corner of 493 and FM 186, we see

18 Special Agent Harrison's vehicle in a field.  At that point in

19 time, the emergency lights were activated, so we're able to see

20 the vehicle.

21 Q    And did -- did you find Agent Harrison there?

22 A    We did.

23 Q    Where -- where was he?

24 A    When I approached, there was a fence there.  When I

25 approached the fence with the other agents, Mr. Harrison was

Reneau - Direct / By Mr. Alaniz                           40

1   walking towards us from the field.

2   Q    And what did -- what did he -- what did he look like?  Was

3   he in distress?

4   A    Yeah.  He was in stress.  He had his bulletproof vest in

5   his hand, a yellow shirt, I believe, that had blood stains on

6   it.  He looked disoriented.

7   Q    Did -- did you also get to see the vehicle -- his vehicle

8   at that time?

9   A    At that time, I didn't look at the vehicle extensively.

10  Q    What did -- what did you do once you -- you found Agent

11  Harrison?  What -- what happened then?

12  A    We sat Mr. Harrison down while we discussed a little bit

13  about what happened and then the next course of action.  We

14  informed Mr. Harrison that the ambulance was on the way because

15  we had already contacted an ambulance company.

16  Q    During the time that -- that you called the ambulance, did

17  Agent Harrison give you any information concerning who might be

18  involved in the shooting?

19  A    At that time, he stated that he was pursued by a pickup

20  truck and possibly one other vehicle but he didn't have any

21  information regarding make or model.

22  Q    And then what -- what happened after that?  Was Agent

23  Harrison transported to the hospital?

24  A    After that, the decision was made to move Mr. Harrison.

25  He was then transported to -- basically, we rendezvoused with

1    the ambulance on the corner of University and 281.

2    Q    The -- the next morning when you -- when you-all were

3    conducting the investigation as to who might be involved in the

4    shooting, did you receive any information that early that

5    morning from a confidential source?

6    A    I did.

7    Q    And what -- what information did you receive?

8    A    From the confidential source, I received the information

9    that Mr. Rene Garcia was possibly involved in the shooting.  To

10   what extent, I don't know.

11   Q    Did he -- did the source -- was he able to tell you where

12   Rene Garcia was?

13   A    No, he was not.

14   Q    So other than the name of Garcia, any other information

15   about -- about Rene Garcia at that point?

16   A    No, sir.

17   Q    And the -- the next morning, were you out there on the --

18   at the crime scene and were you able to see the vehicle that

19   Agent Harrison was -- was in?

20   A    Yes, sir, I was.

21   Q    Can you describe to the Court what -- what it looked like.

22   A    The vehicle was severely damaged.  The front fender was

23   destroyed.  The wheel was destroyed.  There were several bullet

24   holes in the windows.  It did not look like the vehicle could

25   have been driven at that point.

Reneau - Cross / By Mr. Garcia                           42

1   Q    And during the -- during the subsequent investigation,

2   Agent Reneau, did agents from either the sheriff's office or --

3   or DPS, did they recover any -- any kind of casings off the --

4   from the roadway of 493?

5   A    Yes, they did.

6   Q    And what kind -- what type of casings did they recover?

7   A    From my understanding, they discovered or recovered 9 mm

8   casings and then a rifle round.  But I don't believe the rifle

9   round was a casing; I believe it was a bullet.

10  Q    And -- and specifically, I -- how far was -- how far is

11  the intersection of 493 and Eleventh Street to where 493 dead

12  ends at 186, approximately?

13  A    Approximately, three and a half miles.

14  Q    And did casings that were located or were found and -- and

15  recovered, do you remember -- do you know approximately where

16  those casings were recovered?

17  A    They recovered casings at the intersection of 493 and 186

18  and they also recovered casings at the intersection of 493 and

19  Eleventh Street.

20          MR. ALANIZ:  I'll pass the witness, your Honor.

21          THE COURT:  All right.  You may proceed.

22                      CROSS EXAMINATION

23  BY MR. GARCIA:

24  Q    Agent, who's the confidential source you got information

25  from?

Reneau - Cross / By Mr. Garcia                        43

1            **MR. ALANIZ:**  Objection, your Honor, as to relevance.

2            **MR. GARCIA:**  May I address that, your Honor?

3            **THE COURT:**  You -- you may address it.

4            **MR. GARCIA:**  Okay.  Well, my -- by the Government's

5    own response, they're looking at the collective knowledge of

6    law enforcement for the probable cause to arrest my client.

7    And it goes to the probable cause to arrest or the information

8    that they had to go out there and just because they've received

9    information from some source, was that source reliable?  Who

10   was that source?  Was that information reliable?

11           **THE COURT:**  Well, we don't know -- I don't know yet

12   that that's the reason they went to the Alvarados' house --

13           **MR. ALANIZ:**  Right.

14           **THE COURT:**  -- was because they got a tip about a

15   Rene Garcia --

16           **MR. ALANIZ:**  Right.

17           **THE COURT:**  -- so at this point --

18           **MR. ALANIZ:**  Yeah.

19           **THE COURT:**  -- premature.  But I -- I mean, I --

20   that's something we may need to reconsider.  But I don't -- we

21   want to see what other evidence there is if that's what they

22   relied upon to go to the Alvarado house or not.

23           **MR. GARCIA:**  Okay.  So the Court is not going to

24   allow the witness to testify as to who the confidential source

25   was?

1          **THE COURT:**  Not at this time.

2          **MR. GARCIA:**  Okay.

3    **BY MR. GARCIA:**

4    Q     Agent Reneau, you testified that you got a call on your

5    personal cell phone, correct?

6    A     From Agent Harrison; yes, sir.

7    Q     Okay.  Did the confidential source call you on your

8    personal cell phone?

9    A     No, he did not.

10   Q     On what phone did he call you?

11   A     On my Government-issued phone.

12   Q     How many phones do you carry?

13   A     Two.

14   Q     Have you provided your cell phone records to the

15   Government in this case?

16   A     Not to my knowledge, no.  Sorry, no.

17   Q     Okay.  Did they ask --

18         **THE COURT:**  Let's keep the questions -- well, let's

19   keep the questions to the suppression issue.  This isn't a

20   discovery hearing; it's a suppression hearing.  Whether he

21   provided his -- his phone records to the Government has nothing

22   to do with a suppression issue.

23         **MR. GARCIA:**  It is a suppression issue.

24         **THE COURT:**  No, it doesn't have anything to do with a

25   suppression issue.

1          Next question.

2          MR. GARCIA:  Your Honor, may I cross the witness on

3     the testimony that was elicited by the Government?

4          THE COURT:  From him or are you asking can you --

5          MR. GARCIA:  No.

6          THE COURT:  -- cross him on the other witnesses'

7     testimony?

8          MR. GARCIA:  I'm asking if the Court is going to

9     allow me to question the witness about testimony that was

10    elicited by the Government.

11         THE COURT:  You can ask him any relevant question.

12         MR. GARCIA:  May I ask him questions about --

13         THE COURT:  The -- the -- relevant to the suppression

14    issue, not the bigger case.  We could be here for days on that.

15    You can ask him any question relevant to the suppression issue.

16         MR. GARCIA:  Then may I ask -- can the Government ask

17    questions just about anything then?  Because up to that point,

18    there's nothing about my client.  They didn't ask him one

19    question about my client.

20         THE COURT:  We're -- the Government, I assume, was

21    establishing knowledge of -- that these persons had at the

22    scene --

23         MR. ALANIZ:  Correct.

24         THE COURT:  -- leading up to this event that I assume

25    we're going to get to with the next witness --

1          **MR. ALANIZ:**  Right.

2          **THE COURT:**  -- where they actually go into the

3    Alvarado house.  So this is sort of predicate as they've

4    established there was a shooting --

5          **MR. ALANIZ:**  Where it happened.

6          **THE COURT:**  -- when it happened, the -- the -- where

7    the casings were found, so some direction of flight.

8          **MR. ALANIZ:**  Type of casings.

9          **THE COURT:**  And type -- and type of casings.

10         **MR. ALANIZ:**  And -- and the testimony of Agent

11   Harrison about who might be involved as far as the pickup

12   trucks.

13         **THE COURT:**  Right.

14         **MR. ALANIZ:**  Which that will have some relevance

15   later on when the agents testify.

16         **THE COURT:**  Okay.

17         **MR. GARCIA:**  Can I cross-examine him then on those --

18         **THE COURT:**  Any of those -- of course.

19   **BY MR. GARCIA:**

20   Q    Who was at the location with you of when you found Agent

21   Harrison?

22   A    Those agents that were with me were Christopher Villareal,

23   Special Agent with HSI, S.A. Rudy Garza, and there were, I

24   believe, two sheriff's deputies from Hidalgo County also

25   present at the time.

Reneau - Cross / By Mr. Garcia                                              47

1    Q    Okay.  Who were they?

2    A    I don't know their names off the top of my head.  But I do

3    have their information.

4    Q    Did you ask them to leave?

5    A    No.

6    Q    Did they eventually leave?

7    A    No.

8    Q    Okay.  The information that you had received about the

9    marijuana that was in a tractor-trailer, you remember

10   testifying about that, right?

11   A    Yes, sir.

12   Q    Okay.  Was that tractor-trailer -- up to -- up at that

13   point -- to that point, did you have any information that the

14   Alvarados were involved with that tractor-trailer?

15   A    No.

16   Q    Once Agent Harrison is wounded and is taken to the -- by

17   ambulance to the hospital, did you continue to have involvement

18   with this case?

19   A    I did.  I returned to the scene of the vehicle accident.

20   Q    Okay.  Is that when you took the photographs?

21   A    Yes, sir.

22   Q    Okay.  It was still dark when you took those photographs,

23   correct?

24   A    Yes, sir.

25   Q    Okay.  Okay.

1        **MR. GARCIA:**  Your Honor, although the Government did

2   not ask Agent Reneau about what he did in regards to after the

3   shooting and basically, the -- that his testimony was truncated

4   up to the point to where he was shot but may I ask him

5   questions about the investigation about my client and his home

6   and --

7        **THE COURT:**  Sure.  Up to -- yeah, it all goes to his

8   state of mind --

9        **MR. GARCIA:**  Okay.  I mean --

10       **THE COURT:**  -- and whether they had probable cause

11  to --

12       **MR. GARCIA:**  Okay.  Thank you.

13       **THE COURT:**  -- and the reasons for why he did what he

14  did.

15  **BY MR. GARCIA:**

16  Q    Agent Reneau, have you been to the Alvarado house?

17  A    I have done spot checks and surveillance.  I have not been

18  on the property, no.

19  Q    Did you ever go inside?  I'm talking about the July 3rd --

20  A    Um-hum.

21  Q    -- 2012.

22  A    Yes.

23  Q    Did you go on the property?

24  A    No.

25  Q    Okay.  Did other agents go on the property?

1   A     Yes, sir.

2   Q     Okay.  And you've reviewed their reports?

3   A     I have looked them over; yes, sir.

4   Q     Okay.  And the Government seized evidence from the

5   Alvarado home, did they not?

6   A     They did.

7   Q     Okay.  Where was that evidence seized from specifically?

8   A     From my understanding, it was seized in the upstairs --

9   the attic of the residence as well as a dresser specifically in

10  the first bedroom.

11  Q     Okay.  And whose bedroom is the dresser in the first

12  bedroom?  Whose -- whose bedroom is that?

13  A     The report did not state and I don't have that

14  information.

15          **THE COURT:**  So none of this is your first hand

16  knowledge?  You're just telling us what somebody told you or

17  wrote?

18          **THE WITNESS:**  Correct, your Honor.

19          **THE COURT:**  All right.

20          **MR. GARCIA:**  I believe he's allowed to testify on --

21  on what part of the investigation showed -- I mean, agents

22  elicit hearsay during suppression hearings all the time.

23          **THE COURT:**  All right.

24          **MR. GARCIA:**  So I'd ask the Court to allow it.

25          **THE COURT:**  For whatever -- I mean, I'll give it

1   whatever weight it's worth.  I'm just trying to establish it

2   may or may not be reliable information.

3   **BY MR. GARCIA:**

4   Q    Who found that information?  I mean, who found --

5        **MR. GARCIA:**  Your Honor, may I continue?

6        **THE COURT:**  Sure.

7   **BY MR. GARCIA:**

8   Q    Who found the -- the evidence in the first bedroom in the

9   dresser?

10  A    Special Agent Victor Hugas (phonetic), from my

11  understanding.

12  Q    And Special Agent Victor Hugas is the one who ordered the

13  detention of my client, correct?

14  A    I don't have that information.

15  Q    You looked over the reports, did you not?

16  A    Yes, sir.

17  Q    Okay.  What other evidence was found besides the attic and

18  the first bedroom in a dresser?

19  A    I don't have that information as far as any other evidence

20  that was found at the scene -- at the residence, excuse me.

21  Q    Okay.  So then what evidence was it -- based on your

22  knowledge and what you understand about the investigation, what

23  was found at the Alvarado home?

24  A    Shell casings, two pistols -- correction, one pistol and

25  one rifle, and some magazines.

Reneau - Cross / By Mr. Garcia                          51

1              **THE COURT:**  Plural.  Multiple magazines.

2    Q    How -- how many magazines?

3    A    I don't have the number but yes, plural, I believe so.

4    Q    You believe so or you don't know?

5    A    I believe there were -- well, based on other agents'

6    statements, I know there were magazines present at the

7    residence.  I don't know the exact number.

8    Q    Have you seen them?

9    A    No.

10   Q    Where are they?

11   A    I believe they're in FBI custody.

12   Q    Okay.  When you say "casings" are you referring to empty

13   casings that were found inside the Alvarado residence?

14   A    I believe so.  There was ammo found inside the Alvarado

15   residence as well as casings on the ground outside the

16   residence.  Again, that's what I've been told, I wasn't there.

17   Q    Okay.  Are you the lead agent on this case?

18   A    Yes, sir, I am.

19   Q    Okay.  And -- well, the ammo that was found and the pistol

20   and the rifles and the magazines, plural, those were found

21   where?

22   A    The -- I believe the weapons were found in the attic.  The

23   ammo and the magazines, again from another agent's statements

24   to me, was in that first bedroom.  That's all I'm aware of.

25   Q    Okay.

Reneau - Cross / By Mr. Garcia                    52

1        **(Pause)**

2   Q    You'd agree that on -- on -- that Eleventh Street is also

3   referred to as "Cemetery Road", correct?

4   A    That is correct.

5   Q    Okay.  And you'd agree that just -- have you driven that

6   road lately?

7   A    Yes, sir.

8   Q    Okay.  And the fact is you cannot go past the Alvarado

9   house very far because there's a big berm in the way, correct?

10  A    Unless you have a four by four; yes, sir.

11  Q    Okay.  Do you have a four by four?

12  A    My Government vehicle is a four by four.

13  Q    Okay.  And did you -- have you gone over that berm to get

14  to the other location?

15  A    No, sir.  You can go another way.

16  Q    Okay.  How high would you say that berm is?

17  A    Approximately three, four feet.

18  Q    Okay.  And would you say that a tractor-trailer like the

19  one you were looking at for surveilling, would that be able to

20  traverse that Eleventh Street back and forth?

21  A    No.

22  Q    Okay.

23            **THE COURT:**  So where's this berm on Eleventh Street?

24  Is it east or west of 493?

25            **MR. GARCIA:**  It's just east of 493, just past the

Reneau - Cross / By Mr. Garcia                          53

1   Alvarado residence, maybe -- you know, 50 feet maybe.  There's
2   a -- a big -- the roadway is blocked and there are signs there.
3   And there's a --
4           THE COURT:  Is that just temporary construction or
5   was it like that at the time?
6           THE WITNESS:  It was like that at the time.
7           THE COURT:  And -- but you -- I thought somebody said
8   you -- you-all were positioned east of that berm.
9           MR. GARCIA:  They went around, your Honor.  I believe
10  they went around --
11          THE COURT:  Okay.
12          MR. GARCIA:  -- to 88.
13          THE COURT:  All right.  And then when you went back
14  to look for the agent who -- Harrison, did you also go around
15  or did you go straight down and just cross over the berm?
16          THE WITNESS:  No, your Honor, we went around.
17          THE COURT:  Okay.  All right.
18          MR. GARCIA:  Thank you, your Honor.
19  BY MR. GARCIA:
20  Q    At any time during -- again up to the point that -- that
21  my client was taken into custody, did you ever see him in
22  custody?
23  A    No, I did not.
24  Q    Okay.  Did you ever go the FBI office?
25  A    Yes, I was there all day.

Reneau - Cross / By Mr. Garcia                                    54

1   Q    Okay.  While he was being questioned?

2   A    No.  I was not there for that.

3   Q    What time did you arrive at the FBI office?

4   A    Approximately 9:00 a.m., I -- I didn't write it down but

5   approximately.

6   Q    Okay.  And -- and you left at what time?

7   A    I -- I couldn't answer that, it was late in the evening.

8   But I don't have the approximate time.

9   Q    Okay.  So the entire day, you're that -- you're at the FBI

10  office?

11  A    That's correct; yes, sir.

12  Q    Do you agree that that's where my client was taken?

13  A    Yes, sir.

14  Q    Okay.  And explain for me, because I don't know, where

15  were you in the FBI building in relation to where my client

16  was?

17  A    For the most part of the day, I was upstairs on the third

18  floor.  I believe your client was downstairs in the detention

19  cell, processing area, which is on the first floor.

20  Q    Okay.  Is that where he would have been questioned?

21  A    Yes, sir; I believe so.

22  Q    Okay.  And so you were never on the first floor?

23  A    I was on the first floor; yes, sir.

24  Q    Okay.  What were you doing there?

25  A    Checking on the status of interviews.  I spoke to Mr. Rene

1    Garcia at one point, so I was down there too.

2    Q    You spoke to Rene Garcia?

3    A    Yes, sir.

4    Q    Okay.  And why did you do that?

5    A    He was brought in -- he was asked to come in to be a

6    witness to what he saw that evening.

7    Q    Okay.  What time of the day was that?

8    A    I'd have to check my notes.  It was -- I believe it was

9    approximately 7:00 p.m. but I would have to check my report --

10   excuse me.

11   Q    Okay.  So then it was after my client had arrived?

12   A    Yes, sir.

13   Q    Okay.  How many people total or as far as my client,

14   obviously his dad was there as well, his younger brother Marcus

15   was there --

16   A    Um-hum.

17   Q    -- how many other Defendants were there?

18   A    There were -- there were those individuals you mentioned

19   as well as three additional individuals that were brought in as

20   witnesses.

21   Q    Okay.  Do you know when my client was arrested at his

22   home?

23   A    Just from what I've been told, I believe he left with the

24   constables at approximately 2:30.  But again, that's what I was

25   told.

1  Q    Okay.

2           THE COURT:  This is a.m. in the morning?

3           THE WITNESS:  No, your Honor, it would have been

4  2:30 --

5           THE COURT:  In the afternoon?

6           THE WITNESS:  -- p.m.

7           MR. GARCIA:  Okay.

8  BY MR. GARCIA:

9  Q    At 2:30 p.m., or before 2:30 p.m., what information did

10  you have that my client had shot Agent Harrison?

11  A    Up until that point in time, the only information I had

12  was a statement made by Rene Garcia during an interview of him

13  at his residence.

14  Q    When you spoke to Rene Garcia at his residence, the fact

15  is that he told you that the Alvarados were in a vehicle,

16  correct?

17  A    I did not speak to Rene Garcia at his residence.

18  Q    Okay.  What statement are you referring to then about Rene

19  Garcia making a statement?

20  A    He made a statement to other agents who then --

21  Q    Yeah.

22  A    -- relayed that information.

23  Q    All right.  What other agents did he make a statement to?

24  A    Adrian Olivares, a special agent with HSI, and Juan

25  Flores, HSI.

1   Q    Excuse me.  Adrian Olivares and Juan Flores?

2   A    Yes, sir.

3   Q    Okay.  Where were you -- I guess you would have been at

4   the FBI office when that statement was made?

5   A    Correct.

6   Q    Okay.  And that information is being relayed to you in --

7   in what manner?

8   A    Via telephone and not directly to me.  We had established

9   a command center at the FBI so all communication would go

10  through the command center.

11  Q    What do you mean "go through the command center"?

12  A    The agents in the field are instructed to contact certain

13  individuals -- supervisors and individuals at the command

14  center who then input that information as it comes in into a

15  log.

16  Q    Okay.  You said -- backtracking a little here, back to

17  when you first received the information to get -- get you out

18  to Hargill, you said that you contacted your supervisor?

19  A    Correct.

20  Q    Who is that supervisor?

21  A    Mario Campbell.

22  Q    And when you said that you verified the information that

23  you had received, what information did you verify?

24  A    Well, we verified the -- as much of the information as we

25  could.  So we verified that there was a tractor-trailer that

1    was in the location or general location that was provided to

2    us.

3    Q    A tractor-trailer.  How far off of Eleventh Street was

4    that tractor-trailer?

5    A    Off of Eleventh from what?

6    Q    You had testified earlier that it was on the north side,

7    correct?

8    A    Correct; yes, sir.

9    Q    How far north off of Eleventh Street was the tractor-

10   trailer?

11   A    The tractor-trailer was stationary on Eleventh Street.

12   Q    So it was actually parked on the -- on the -- on the road?

13   A    Correct; yes, sir.

14   Q    Okay.  How many other tractor-trailers were out at that

15   location?

16   A    I only saw the one.

17   Q    Now, you'd agree that at least Eleventh Street, that once

18   you passed the Alvarado home, is a dirt or caliche road,

19   correct?

20   A    Yes.

21   Q    Is that true all the way to FM 88?

22   A    Yes.

23   Q    Okay.  And so this tractor-trailer was on the dirt caliche

24   road on -- on Eleventh Street?

25   A    Yes.

1   Q    Facing what direction?

2   A    Facing westbound.

3   Q    Was it near a home?

4   A    It was.

5   Q    Okay.  And whose home was it near?

6   A    I don't recall the individual's name.  I believe it was --

7   no, I don't recall the individual's name.

8   Q    Okay.  But was that individual a target of your

9   investigation?

10  A    At that point --

11       **MR. ALANIZ:**  Objection, your Honor, as to relevance

12  as to who the target of the investigation is.

13       **THE COURT:**  Sustained.

14  **BY MR. GARCIA:**

15  Q    Were there any businesses out there?

16  A    No.

17  Q    Was it just that one home?

18  A    Yes.

19  Q    Was that part of the information that you had received?

20  A    We received no information about the residence, just the

21  vehicle.

22  Q    Okay.  And what information did you receive about that

23  vehicle?

24  A    That that vehicle was going to be utilized to transport a

25  large amount of marijuana.

Reneau - Cross / By Mr. Garcia                                60

1  Q    What was the description you received of the vehicle?

2  A    I received the fact that it was a tractor-trailer and the

3  -- the license plate number that was located on the trailer.

4  Q    And the license plate number was the same license plate

5  number that you had received?

6  A    Correct, it was.

7  Q    Had you been to this location or Eleventh Street before?

8  A    I had been to Eleventh Street, not that location.

9  Q    Okay.  If -- but -- had you traveled east and west between

10 493 and FM 88 on Eleventh Street?

11 A    I had been east from 493 on Eleventh Street just past the

12 Alvarados' residence and then I had gone south from 490 on

13 another dirt road and traveled west on Eleventh Street prior.

14 Q    And was that to get around that berm?

15 A    Correct, yes.

16 Q    Okay.  It -- it's impossible for that tractor-trailer to

17 make it over that berm, correct?

18 A    I would assume so.

19 Q    I mean, you wouldn't -- you would have been surprised if

20 you had seen that tractor-trailer traveling down that

21 direction, right?

22 A    Correct, yes.

23 Q    All right.

24         MR. GARCIA:  I pass the witness, your Honor.

25         THE COURT:  Anything else, Mr. Alvarez?

**CROSS EXAMINATION**

**BY MR. ALVAREZ:**

Q    Agent Reneau, after having discovered that Agent Harrison

had been shot and you responding to that, discovering him at

that location wounded -- having that information in your

possession, knowing what you know of the initial narcotics

investigation, is it fair to say that based on that knowledge

at that time, there was no reason at all to approach the

Alvarado residence at all for any reason?

A    Based on what I knew at that time, that would be correct,

yes.

Q    And in fact, the -- the -- do you know who approached the

Alvarado residence on July 3rd at 12:50 in the afternoon?

A    I just know it was several HSI agents and possibly FBI but

I don't know all of them.

Q    The residence was approached on more than one occasion,

correct?

A    To my knowledge, it was only approached once and agents

remained on that scene for --

Q    Well, there was -- there was the incident involving the

discovery of the aliens?

A    Correct.

Q    And then there was the incident regarding the discovery of

the ammunition?

A    Correct.  From my understanding, the agents --

Reneau - Cross / By Mr. Alvarez                    62

1   Q    Well, I'm not through.

2   A    -- never left.

3   Q    And then there's -- they approached it again by -- and

4   searched it when they discovered the weapons, correct?

5   A    Correct.

6   Q    So it's been -- it's more than one occasion like you're

7   testifying today, correct?

8   A    I'm testifying that from my understanding, the agents

9   never left that area.  They were there the entire time.

10  Q    Now -- so when the agents approached on July 3rd, 2012,

11  were those agents Adrian Olivares and Robert Castillo --

12  Castillon (phonetic)?

13  A    Those were two of the agents, yes.

14  Q    All right.  Now, at that point, if you know, what

15  information did they have in their possession causing them to

16  go to the Alvarado residence?

17  A    At that point, the only information they had was the --

18  from my understanding was that the residence was near the

19  location where the shooting occurred and that the residence was

20  possibly utilized in narcotics smuggling.

21  Q    Okay.  And you testified to that at your detention hearing

22  that -- that the Alvarado residence was being used as a stash

23  house, correct?

24  A    Correct, but we had information.  I don't know it if was

25  being used.

1  Q    But what you know today is that, in fact, that residence

2  was not being utilized for any narcotics.  Especially the

3  investigation you were conducting on July 3rd, correct?

4  A    I only know that on July 3rd, no narcotics were found at

5  that residence.  I don't know about any other occasions.

6  Q    Now -- so the -- if you know, to your knowledge, then the

7  approach that was made by Agent Olivares and Agent Castillon

8  on July 3rd at 12:50 was just based on contacting any residence

9  located near the incident of this attempted -- attempted

10  homicide?

11  A    Based on my knowledge, they -- they approached based on

12  that and the fact that the -- the -- the assault occurred

13  within close proximity to that residence.

14  Q    Now, were there other residences around the area?

15  A    There are.

16  Q    How many residences, to your knowledge, are around the

17  area?

18  A    There's an abandoned structure on the corner of 493 and

19  Eleventh, and then south of that intersection, there's three or

20  four residences.

21  Q    Were all -- were there residences also approached by

22  agents?

23  A    I believe DPS troopers did approach those residences.  I

24  wasn't there.

25  Q    All of them?

Reneau - Cross / By Mr. Alvarez                          64

1   A      I believe so.

2   Q      Now, the -- when -- who had stated the obvious that

3   clearly at -- on July 3rd, 2012, at 12:50 in the afternoon,

4   agents had no probable cause to believe that the Alvarados were

5   involved in any criminal activity, correct?

6   A      No probable cause?

7   Q      Correct, yes or no?

8   A      There was -- there was no probable cause at that point.

9   Q      Okay.  Now -- and the -- the agents actually lied to the

10  Alvarados as to their reasons for them being there, correct?

11  A      I don't know if they lied to the Alvarados.

12  Q      Do you -- have you any information that the agents --

13  Agents Olivares and Castillion went there inquiring of the

14  Alvarados whether there were any legal -- any illegal aliens in

15  their residence, that they knew that there was information

16  there was illegal aliens in their residence.  Do you know that

17  they said that?

18  A      I know they said they were there for illegal aliens.  I

19  don't know if they had information related to that residence

20  regarding illegal aliens.

21  Q      You don't know whether they used that as a ruse or an

22  excuse to be able to approach the Alvarados with the

23  allegation?

24  A      I believed they used it as a ruse; yes, sir.  But I don't

25  know, I wasn't there.

1  Q    So if it's a ruse, then they were actually intentionally

2  lying and misrepresenting to the Alvarados their -- their

3  reason for their presence at their residence, correct?

4  A    I -- I wasn't there.  I can't say what their intentions

5  were.

6  Q    How do you identify -- how -- how would you describe a

7  "ruse"?

8  A    As a attempt to gain entry into the residence based on a

9  -- a fact that may be false or may be true.

10 Q    Okay.  So if that -- if your definition is correct, their

11 entering the residence at that occasion was based on lies and

12 falsehoods, correct?

13 A    Again, I don't know if they had any information relating

14 to the residence being utilized for alien smuggling.

15 Q    Now, aliens were discovered at that residence at that --

16 at that time, correct?

17 A    There were; yes, sir.

18 Q    And the specific presence of these agents there, according

19 to their representation to the Alvarados, was to locate illegal

20 aliens, correct?

21 A    From my understanding, that's what they said; yes, sir.

22 Q    So the -- any consent that was provided -- was there a

23 consent provided according to -- according to the agents?

24 A    From my understanding, initially there was only a verbal

25 consent.

1   Q    Okay.  Was that consent was strictly for the purposes

2   allegedly of finding illegal aliens at the residence, correct?

3   A    Based on what I know, that would be yes.

4   Q    Okay.  So if that consent was based on that purpose,

5   supposedly Mr. Alvarado volunteered the information that there

6   were two illegal aliens in the attic, correct?

7   A    Correct.

8   Q    And the aliens were located at the attic, correct?

9   A    From my understanding, yes.

10  Q    So based on that, the search should have been or was

11  terminated, correct?

12  A    From my understanding, it was terminated at that point.

13  Q    Is it illegal to keep illegal aliens in your residence?

14  A    I believe so.

15          MR. ALANIZ:  Objection as to relevance, Judge.

16          MR. ALVAREZ:  Well, it -- it goes to the issue of

17  eventually whether he was arrested or not for any purpose.

18          MR. ALANIZ:  He was not arrested for illegal aliens.

19  He's not -- he wasn't charged with that.

20          THE COURT:  All right.  Well, but he -- but that is a

21  violation of federal law to harbor an alien.  So what's your

22  question?  Is -- is that legal to harbor an alien?

23          MR. ALVAREZ:  I want -- I want to ask you first if

24  that's a violation of law, whether he was arrested for that

25  reason.

Reneau - Cross / By Mr. Alvarez                    67

1          **THE COURT:**  Okay, those are two questions.  Is that a

2     violation of law is your question or --

3          **MR. ALVAREZ:**  Yes.

4          **THE COURT:**  -- is it was he arrested for that reason?

5          **MR. ALVAREZ:**  Can I ask him, your Honor?

6          **THE COURT:**  Of course.

7     **BY MR. ALVAREZ:**

8     Q    You heard the question from the Judge?

9     A    Yes, sir.  It is a violation of law to harbor aliens in

10    your residence.

11    Q    And was he arrested for that reason?

12    A    To my understanding, he was told he was being detained for

13    that reason, yes.

14    Q    Okay.  Was he restricted of his -- of his liberty at that

15    time?

16    A    I don't have that information.

17    Q    Now, at that point, no weapons were discovered, correct?

18    A    From my understanding, yes.

19    Q    And no ammunition was discovered?

20    A    From my understanding, yes.

21    Q    Okay.  That was the first entry into the home?:

22    A    From my understanding, yes.

23    Q    Based on a lie?

24    A    From -- again, what the agents said, I don't know if they

25    had information or not.  I don't know.

Reneau - Cross / By Mr. Alvarez                    68

1   Q    Now, the -- to your knowledge, was Mr. Alvarado -- that

2   is, my client, Pedro Alvarado -- was he asked as to whether --

3   as to where Rene Garcia lived?

4   A    From my understanding, yes, he was.

5   Q    Did he provide that information?

6   A    Yes, he did, from my understanding.

7   Q    And you had received information prior to that question

8   being asked that -- from the confidential informant -- that

9   Rene Garcia was involved in the shooting, correct?

10  A    Possibly involved in the shooting.

11  Q    Did your confidential informant call and say "Rene Garcia

12  is possibly involved in the shooting?"

13  A    Yes.

14  Q    Did he also say that the Alvarados were also possibly

15  involved in the shooting?

16  A    No.

17  Q    So what did -- what was the basis for your CI's

18  information implicating Garcia but not the Alvarados?

19  A    I don't know the basis of the information.

20  Q    Is that your informant or somebody else's informant?

21  A    It is mine.

22  Q    And you did not ask that question --

23  A    No, sir.

24  Q    -- if anybody else was involved?

25  A    Not at that time.

1   Q    Okay.  And did you ask him the basis of the information

2   which implicated Garcia?

3   A    No, I did not ask him at that time.

4   Q    So based on my client's information as to the location of

5   Mr. Garcia's residence, agents responded there on July 3rd at

6   approximately 1:30, correct?

7   A    I believe so.  Again, I wasn't there.

8   Q    And do you have any information or knowledge that Agent

9   Olivares and -- and Agent Juan Jose Flores responded to the

10  Garcia residence?

11  A    From what they've told me, yes, I believe they were there.

12  Q    And Mr. Garcia, was he interviewed at his residence or was

13  he interviewed at the FBI office?

14  A    He was spoken to at his residence as well as at the FBI

15  office.

16  Q    The statement that he made implicating the Alvarados did

17  the shooting, was that made at the FBI office or was that made

18  somewhere else?

19  A    I believe both -- both times, excuse me.

20  Q    Did the agents respond or do anything as a result or --

21  when you received that information at the -- at the residence

22  or did they respond after they received the information at the

23  FBI office?

24  A    I don't understand your question.

25  Q    Well, they eventually followed up on -- on the information

Reneau - Cross / By Mr. Alvarez                    70

1  given by Garcia, correct?

2  A    As far as "followed up", what do you mean?

3  Q    Well they continued their investigation to locate the

4  shooters, correct?

5  A    Correct.

6  Q    Now, did they respond after they got the information at

7  the FBI office or did they respond when they got the

8  information at another location?

9  A    Again, I don't understand "respond to" or where --

10          **THE COURT:**  You mean, did they respond by going to

11  the Alvarados --

12          **MR. ALVAREZ:**  Correct.

13          **THE COURT:**  -- is that your question?

14          **MR. ALVAREZ:**  Correct.

15          **THE COURT:**  Okay.

16          **THE WITNESS:**  They were still at the -- there were

17  several agents still at the Alvarados at the time they received

18  the information from Mr. Garcia at his residence, to my

19  understanding.

20  **BY MR. ALVAREZ:**

21  Q    Okay.  Well, why were there still at the Alvarado

22  residence since they had already located the illegal aliens and

23  that's the -- I mean, that's the totality of the consent that

24  had been provided to the agents at that time?  Why were they

25  still there?

Reneau - Cross / By Mr. Alvarez                              71

1   A    I can't answer that, I wasn't there.

2   Q    Where they inside the --

3            **THE COURT:**  How much time -- how much time -- I'm

4   trying to get an idea of how much time had elapsed?  Separate

5   agents are at the Garcia's, then at the Alvarados.  The

6   Alvarados' home is entered.  From that point, how much time did

7   the agents spend in the Alvarado home and was the -- were they

8   also contemporaneously at the Garcia home?  And if not, how

9   much after the entry into the Alvarado home did they enter the

10  Garcia's home, if you know, from what you've been told?  I know

11  you were neither --

12           **MR. ALANIZ:**  I'm -- I'm sure he can -- he can tell

13  the Court what he's been told but my following agents are --

14           **THE COURT:**  The ones who were there.

15           **MR. ALANIZ:**  -- Agent Olivares, also Victor Hugas --

16           **THE COURT:**  All right.

17           **MR. ALANIZ:**  -- the people who were there so --

18           **THE COURT:**  You don't even need to answer that

19  question.  I'm going to --

20           **MR. ALVAREZ:**  I won't go further, your Honor.

21           **THE COURT:**  Sure.  You don't have to answer that.

22  Yeah, next question.  We'll hear from the people actually

23  there.

24  //

25  //

1    **BY MR. ALVAREZ:**

2    Q    Were you present when the discovery of the ammunition at

3    the Alvarado residence was located?

4    A    No.

5    Q    Were you present when they discovered the weapons or any

6    other information regarding this case?

7    A    Well, I was present during other information regarding the

8    case but I was not present --

9    Q    Well --

10   A    -- at any time on July the 3rd in -- in Hargill.

11   Q    Okay.  I was just referring to the -- to the seizure of

12   the -- of the rifle, the pistol, the ammo in the first bedroom

13   that you testified to.  Were you present for the shell casings?

14   Were you present for any of that at the home?

15   A    No.

16   Q    Were you present at the Alvarado residence when

17   Mr. Alvarado -- that is, Pedro Alvarado -- was advised whether

18   he was allegedly willing to accompany agents to the FBI office?

19   A    No, I was not.

20   Q    How long was he detained, if you know?  You said he was

21   detained after the discovery of the -- of the illegal aliens.

22   How long was he detained by agents for that?

23   A    Based -- again, based on what I was told, the consent

24   would have occurred at approximately 12:15 and he was

25   transported to the FBI at approximately 2:30.

1   Q    So between the time he was detained and the voluntary

2   consent to accompany the agent, was there a time when he was

3   free to go?

4   A    I wasn't there.  I don't have that information.

5   Q    Okay.

6           **MR. ALVAREZ:**  That's all, your Honor.

7           **THE COURT:**  Any redirect?

8           **MR. ALANIZ:**  No, sir.

9           **THE COURT:**  All right.  Thank you, Agent Reneau.  You

10  may be excused.

11      **(Government witness Jean-Paul Reneau is excused)**

12          **THE COURT:**  Okay.  So who do we have next?

13          **MR. ALANIZ:**  Agent Olivares, your Honor.

14          **THE COURT:**  Olivares?

15          **MR. ALANIZ:**  Yes, your Honor.

16          **THE COURT:**  Olivares was at the Garcia home?

17          **MR. ALANIZ:**  At both.

18          **THE COURT:**  He was both?  Okay.

19      **(Pause)**

20          **THE COURT:**  Good morning, agent.  If you could step

21  forward and be administered the oath before you testify.  Raise

22  your right hand.

23  //

24  //

25  //

1          **ADRIAN OLIVARES, GOVERNMENT'S WITNESS, SWORN**

2          **THE COURT:**  Please be seated.

3          **MR. ALANIZ:**  May I proceed, your Honor.

4          **THE COURT:**  You may proceed.

5                       **DIRECT EXAMINATION**

6     BY MR. ALANIZ:

7     Q    Sir, can you please state your full name?

8     A    Adrian Olivares.

9     Q    And where are you employed, sir?

10    A    I am a special agent with Homeland Security

11    Investigations.

12    Q    And how long have you so -- been so employed?

13    A    This May, it will be five years.

14    Q    Were you out in the Hargill area, sir, helping in the

15    investigation of the shooting of ICE Agent -- of Agent Kelton

16    Harrison last year?

17    A    Yes, sir.

18    Q    That was on July the 3rd?

19    A    Yes, sir.

20    Q    Can you tell the Court what -- what time did you head out

21    to the Hargill area?

22    A    The initial operation began in the morning, I would say we

23    were out there by around 10:00 a.m. -- 9:00 a.m., 10:00 a.m.

24    Q    And when - you were asked by -- by, I assume, a supervisor

25    to go out there?

Olivares - Direct / By Mr. Alaniz                    75

1   A    Correct.

2   Q    Okay.  Were you instructed to go at a certain location or

3   where were you -- what were you supposed to do at that -- at

4   that time?

5   A    I was asked to go to another location located on 493 and

6   Cemetery Road.

7   Q    Okay.  And what location was that?

8   A    It was a residence and there was a person of interest that

9   we were looking for.

10  Q    Okay.  Is that where the tractor-trailer that was the

11  subject of the investigation was located?

12  A    I'm not sure.

13  Q    Not sure.  Do you know what -- do you know what the

14  residence looked like?

15  A    It was -- I don't recall the -- the actual -- I think it

16  was like a light-colored wood frame home.

17  Q    It was not the Alvarado residence though?

18  A    Yes, that --

19  Q    It was the Alvarado residence?

20  A    Correct.

21  Q    Okay.  So you were asked to go to the Alvarado residence?

22  A    Correct.

23  Q    Okay.  So what time did you get to the Alvarado residence?

24  A    It was before 1:00 p.m.  It was during the -- the

25  lunchtime.

Olivares - Direct / By Mr. Alaniz                    76

1  Q    And who -- who were you with when you went to the Alvarado

2  residence?

3  A    I was with several agents and a -- a state trooper was

4  with us as well.

5  Q    What was the purpose at that time, Agent Olivares, for

6  you-all to approach the Alvarado residence?

7  A    We were looking for a subject named Rene Garcia.

8  Q    And why were you-all looking for Rene Garcia?

9  A    The info that I got that he was a person of interest.

10  Q    In the shooting of ICE Agent Harrison?

11  A    Correct.

12  Q    Other -- other than that, did you have any other

13  information that -- specific to the Alvarado residence?

14  A    No, sir.

15  Q    Okay.  So what happens when -- when you get there?

16  A    When we get to the residence, two young males come to the

17  -- the gate, there's a locked gate.  We identified ourselves.

18  We asked for consent.  One of the young males says "my dad's

19  inside.  I can call him if you want to talk to him.  But we

20  have" --

21          THE COURT:  You asked for consent to what?  To enter?

22  To talk?

23          THE WITNESS:  To -- to ask for consent to search his

24  -- the house and the property.

25          THE COURT:  Okay.

Olivares - Direct / By Mr. Alaniz                    77

1   **BY MR. ALANIZ:**

2   Q    Okay.  And what did -- what did the -- the young man say?

3   A    He said his dad was inside and he can go get him.  So I

4   had him --

5   Q    Well --

6   A    -- go inside and call his -- his dad.

7   Q    Were -- were you already on the property?  Because I know

8   the property -- when you get in, is -- is there a gate to the

9   property?

10  A    There's a gate on the property, correct.

11  Q    Did you --

12  A    We were outside the property.

13  Q    You were outside the property --

14  A    Correct.

15  Q    -- on -- on the street.

16  A    Correct.

17  Q    On Eleventh Street?

18  A    Um-hum.

19  Q    Okay.  And so what happens when he goes and -- when this

20  young man gets his -- his father?

21  A    His dad comes out.  We identify ourselves again.  He

22  states his name is Pedro.  I ask him for consent of his -- of

23  the -- his property as well.

24  Q    Did -- did you tell him why -- why you were there?

25  A    No, sir.

Olivares - Direct / By Mr. Alaniz                    78

1   Q    Did you give him any -- give him any information about --

2   did you have a ruse to get into -- to try to get into the

3   property?

4   A    Yes, sir.  I had told him we had information there was

5   illegal aliens inside his property.

6   Q    Okay.  That was not true?

7   A    Correct.

8   Q    Okay.  So when you tell him that, what -- what does he

9   say?

10  A    He states that he does have two illegal aliens inside his

11  house.

12  Q    And does that -- at that point, do you ask for oral

13  consent?

14  A    Correct.

15  Q    Okay.  And when you ask for -- for consent, what does he

16  say?

17  A    He gives his consent and he opens the gate.

18  Q    Okay.

19  A    Gives us consent to search his house and he opens the gate

20  and he tells illegal aliens are inside his house.

21  Q    And did he tell you where in -- in the house they were at

22  -- the aliens were located?

23  A    He stated they were probably in the attic.

24  Q    Did you or other agents go in -- go inside the house?

25  A    Yes.

Olivares - Direct / By Mr. Alaniz                    79

1   Q    Okay.  And where -- where did you find the aliens?

2   A    In the attic.

3   Q    Okay.  And did you detain the aliens?

4   A    Yes, sir.

5   Q    And what happened then, Agent -- Agent Olivares?

6   A    From there, I started talking to Pedro and I tell him he's

7   going to be detained for having the illegal aliens in his

8   house.  And then I ask him if there was a subject named Rene

9   Garcia that lived at -- there at his residence.

10  Q    Let me ask you this.  Besides -- before you start asking

11  him about Rene Garcia --

12  A    Um-hum.

13  Q    -- I mean, Pedro -- Pedro Alvarado, when you get the

14  aliens out of the house, do you do any other search of the

15  house?

16  A    We do a quick sweep of the house just for protection.

17  Q    Did -- did -- did you recover any -- any items pursuant to

18  that oral consent other than grabbing or detaining the illegal

19  aliens?

20  A    No, sir.

21  Q    So you're outside and you're talking to Mr. Alvarado --

22  Pedro Alvarado; is that correct?

23  A    Yes, sir.

24  Q    And what did you -- what did you ask him in regards to

25  Rene Garcia?

Olivares - Direct / By Mr. Alaniz                    80

1    A    I asked him if there was a -- a subject named Rene Garcia

2    that lived at his residence.

3    Q    Well, what did he tell you?

4    A    He stated "no".  He stated he knew of a Rene Garcia that

5    lived up the road and he gave me a description and directions

6    to -- to the house.

7    Q    What did you do at that point?

8    A    At that point, I left some agents there with -- with Pedro

9    and I took the rest of the agents to that -- to the house that

10   he described.

11   Q    Besides Pedro at the house, were the -- you said there

12   were some sons of his there?

13   A    There was -- it was Pedro, his two older sons, and there

14   were some other kids there.  I'm not sure who they were though.

15   Q    Was Arnoldo Alvarado one of the other sons that was there?

16   A    Yes, sir.

17   Q    Did you identify Arnoldo?

18   A    Yes.

19   Q    Now --

20          THE COURT:  When you say "other kids", what age?

21          THE WITNESS:  I would say -- I remember two or three

22   other kids under ten -- ten years of age, maybe.

23          THE COURT:  All right.

24   //

25   //

1  **BY MR. ALANIZ:**

2  Q    Now, you said that you then left the Alvarado residence

3  but you left other agents with the Alvarados at their home?

4  A    Correct.

5  Q    Before you left -- before -- when -- when you there and

6  talked to Mr. Alvarado -- Pedro Alvarado or Arnoldo Alvarado --

7  did you place them in handcuffs?

8  A    I don't recall placing them in handcuffs.

9  Q    Did you put them in any kind of patrol vehicle at that

10 time?

11 A    No, sir.

12 Q    Were they allowed to walk around in -- on the property?

13 A    He was -- I think we had him sitting down.  I remember

14 having him sit down outside the house and we kind of kept him

15 away from -- from his kids.

16 Q    Now, once you -- once you left, you -- you traveled to

17 Rene Garcia's property?

18 A    Correct.

19 Q    How far away from the Alvarado residence is Rene Garcia's

20 home approximately?

21 A    I'd say maybe a mile.

22 Q    A mile?  And which direction did you head from -- from

23 there to get to -- to Garcia's property?

24 A    We went north on 493.

25 Q    And can you tell the Court what happens when you get to

Olivares - Direct / By Mr. Alaniz                    82

1    the -- to Rene Garcia's property?

2    A     Well, we get to the property and there's a gate as well, a

3    locked gate.  A female comes out of the house.  We identify

4    ourselves and we ask her for consent to search her property and

5    her house as well.

6    Q     And what does she tell you?

7    A     She states that her -- she gives us verbal consent.  She

8    states that her husband, her brother, and her brother's

9    girlfriend were inside the house.  And then she states that she

10   only wants six agents to go inside the house.

11   Q     So -- so what happens then?

12   A     At that point, I have her go to the door and to bring

13   everybody out before we enter the house.  And as people were

14   coming out, I was asking for their names and one subject came

15   out and he said his name was Rene Garcia, so I took him to the

16   side.

17   Q     And did you question Mr. Garcia?

18   A     Sure, yes.

19   Q     What did you tell him?

20   A     Myself and another agent, we -- as soon as he found out

21   who we were, we identified ourselves to him, and we asked him

22   -- I asked him "do you know why we're here?"  And he states

23   "yes, probably because of the shooting last night."

24   Q     So what did you ask him then at that point?

25   A     At that point, I said "what do you know about it?"  And he

1    said "I'll tell you everything I know."  I said "well, tell me

2    what you know."

3    Q    What -- what did he say exactly about it?

4    A    He stated that the night before, he observed several

5    suspicious vehicles around the neighborhood and that he had

6    also observed a suspicious vehicle by his friend -- by his

7    friend, Pete's, house.  He called him "Pete".  Then we later

8    identified it was Pedro Alvarado.  He stated that he called

9    Pedro and told him "hey, there's a suspicious vehicle by your

10   -- by your residence."  He then stated that he got into his

11   F250, went south on 493 towards Pedro's house, and when he got

12   to -- near Pedro's house, he saw a -- a jeep heading north --

13   northbound on 493 at a high rate of speed with the lights off

14   and that he saw Pedro's truck behind the jeep and someone was

15   shooting at the -- at the jeep.

16   Q    Did he say anything about Pedro's sons in regards to -- to

17   the vehicle?

18   A    I asked him who was in the vehicle and he said the thought

19   it was Pedro and his two sons.  And -- and that he thought

20   Pedro was driving.

21   Q    And once -- once he told you that, what -- what did you do

22   with that information, Agent Olivares?

23   A    With that information, I called the case agent just to

24   give him a -- a head's up.  We ended up mirandizing him.  We

25   mirandized Rene Garcia and from that moment, I sent more agents

Olivares - Cross / By Mr. Garcia                    84

1   back to Pedro's house to -- to make sure the -- they had enough

2   agents there to detain the kids as well.  I let them know that

3   the kids might be involved -- the sons might be involved and to

4   keep them all separated.

5   Q    And after that, did you ever go back to the Alvarado

6   residence?

7   A    No, sir.

8   Q    Did you ever have any more contact with either Mr. Pedro

9   Alvarado or Arnoldo Alvarado?

10  A    No, sir.

11  Q    That was the extent of -- of your involvement in this

12  case?

13  A    Yes, sir.

14          MR. ALANIZ:  I'll pass the witness, your Honor.

15          THE COURT:  You may proceed.

16          MR. GARCIA:  Thank you.

17                      CROSS EXAMINATION

18  BY MR. GARCIA:

19  Q    At the point that Rene Garcia tells you that the Alvarados

20  were involved in this, did you have probable cause to arrest

21  Arnoldo Alvarado?

22          MR. ALANIZ:  Your Honor, objection --

23          THE COURT:  Wait.

24          MR. ALANIZ:  -- as to -- that's a legal question.

25          THE COURT:  Okay.  Sorry, I did miss the predicate to

1    that question.  At the time of what?

2         MR. GARCIA:  At the time that Rene Garcia gave him

3    the information that the Alvarados were involved in the

4    shooting --

5         THE COURT:  Um-hum.

6         MR. GARCIA:  -- once he received that information,

7    did that give him probable cause to arrest my client?

8         THE COURT:  All right.  That's the decision I'm going

9    to make.  So sustain the objection.  I'm going to determine

10   that.

11   BY MR. GARCIA:

12   Q    Officer -- or Agent, have you ever heard the word

13   "probable cause" before?

14   A    Yes, sir.

15   Q    Okay.  And have you heard the word "reasonable suspicion"?

16   A    Yes, sir.

17   Q    Okay.  And sometimes, you would agree that "reasonable

18   suspicion" means that you have enough to suspect --

19        MR. ALANIZ:  Objection to this line of questioning.

20   What -- his -- his definition -- his understanding of

21   "reasonable suspicion" and "probable cause" is irrelevant to

22   what the Court has to decide today.

23        THE COURT:  Right.  It doesn't matter whether he

24   has a --

25        MR. ALANIZ:  And he's a factual witness not a legal

1  witness.

2          **THE COURT:**  -- correct or -- right, correct or

3  incorrect understanding.

4          You may ask him factually what he did or what he

5  knows but his knowledge of the law is not relevant to this

6  hearing.  Probably not relevant to this case.

7          **MR. GARCIA:**  Your Honor, I disagree with the Court.

8  I believe it is relevant to the hearing and --

9          **THE COURT:**  How would --

10          **MR. GARCIA:**  -- that they ordered their detention.

11  And why did he order the detention?  May I ask him that

12  question?

13          **THE COURT:**  You may ask him that question.

14          **MR. GARCIA:**  Thank you.

15  **BY MR. GARCIA:**

16  Q    You called other agents, did you not?

17  A    Yes, sir.

18  Q    Okay.  And you told them to detain my client, did you not?

19  A    Yes, sir.

20  Q    Okay.  In your mind, did you have probable cause to detain

21  my client?

22          **THE COURT:**  It doesn't matter.  Again, I'm not going

23  to let him -- he doesn't have to answer that question.  You may

24  ask him why he did that but whether he had probable cause or

25  not, the Court will determine that.

1          **MR. GARCIA:**  Thank you.

2     **BY MR. GARCIA:**

3     Q    Why did you ask them to detain my client?

4     A    Because they were going to be -- it was -- they're leads

5     to the investigation so they were going to be used for --

6     they're -- I guess the info that we got from Rene Garcia, I

7     determined they were going to be involved one way or the other,

8     so I needed them to be detained for questioning.

9     Q    Okay.  Why did you need them detained for questioning?

10    Let's make a list of what you had in regards to my client.  How

11    many -- let me ask you first.

12         **MR. ALANIZ:**  Judge, in order to cut this thing short,

13    I will stipulate that he -- what he had was in Rene Garcia's

14    statement.

15         **THE COURT:**  Well, he can ask though.  He doesn't have

16    to accept your stipulation.

17         **MR. GARCIA:**  Thank you.

18         **THE COURT:**  Mr. Garcia, you can ask him what he knew

19    and make your list.

20    **BY MR. GARCIA:**

21    Q    How many times had you met Rene Garcia before you met him

22    on that -- that afternoon?

23    A    No, I never met him before.

24    Q    Okay.  In fact, going in to speak to Rene Garcia, you had

25    information that he was involved in the shooting, correct?

1    A    No.  I had information -- he was just a person of

2    interest.  I didn't have -- I did not have information that he

3    was involved in the shooting.  He was just a person of interest

4    that might know something about the shooting.

5    Q    How many other times have you been part of an

6    investigation of an attempted murder of an ICE agent?

7    A    This actually is the first time.

8    Q    Okay.  The first time you're investigating an attempted

9    murder of an ICE agent and you receive information -- who did

10   you receive the information from that he was a person of

11   interest?

12   A    From a supervisor.

13   Q    Okay.  What supervisor?

14   A    Gabe -- Gabriel Gaytan.

15   Q    Gabe Gaytan.  And so Agent Gaytan gives you this name,

16   correct?

17   A    Correct.

18   Q    Did you ask why?

19   A    No, sir.

20   Q    So you just go on -- based on Agent Gaytan's information

21   -- he doesn't tell you the basis for the information, correct?

22   A    He just says "we're looking for this subject".

23   Q    Okay.  And everyone, you'd agree, that you work with is

24   out looking for someone who may have been involved in the

25   shooting of Agent Harrison; is that fair to say?

1   A    Yes, sir.

2   Q    Okay.  You're not out there for alien smuggling, right?

3   A    Correct.

4   Q    Okay.  People come out of this home where Rene Garcia is,

5   correct?

6   A    Yes, sir.

7   Q    All right.  How many people were in the home?

8   A    I remember at least four.

9   Q    Okay.  And then Rene Garcia comes out and tells you who he

10  is.  Is that fair to say?

11  A    Yes, sir.

12  Q    All right.  If you're not out there for alien smuggling

13  and you're out there for investigation for Agent Harrison, if

14  Rene Garcia is a person of interest, a person of interest as to

15  what, in your mind?

16  A    That he would have knowledge of the shooting.

17  Q    Okay.  You asked him what truck -- he told you what truck

18  he was driving that night, correct?

19  A    Correct.

20  Q    And in that truck, you find a night vision scope, right?

21  A    Yes, sir.

22  Q    What does that raise in your mind about Rene Garcia's

23  involvement?

24  A    That he was probably -- probably involved.

25  Q    Okay.  Now, Rene Garcia you've never met before.  You've

1   received information that you don't know the basis of from

2   Agent Gaytan, correct?

3   A     Correct.

4   Q     All right.  And you find a night vision scope in his

5   vehicle and he has now implicated other people, correct?

6   A     Yes, sir.

7   Q     Okay.  What information did you have besides him saying

8   that the Alvarado -- Pedro Alvarado and his sons were involved?

9   How many sons did he say were involved?

10  A     He said two sons.

11  Q     Okay.  What information that Rene Garcia gave you at that

12  point did you have that Arnoldo Alvarado was involved in the

13  shooting?

14  A     That's the only information I had.

15  Q     And is that enough to arrest somebody?

16  A     I did not ask to arrest him; I asked them to detain him

17  for further questioning.

18  Q     Okay.  And "detain" means that they're not free to leave,

19  right?

20  A     Correct.

21  Q     Okay.  Who did you give that information to?

22  A     I told the -- there was a supervisor -- supervisor on the

23  scene.  I told him and then I called an agent at -- who was at

24  Pedro's house.

25  Q     Who was the supervisor on the scene?

1  A    Arnold Gonzalez.

2  Q    Okay.  And now Arnold Gonzalez -- is that -- is it you

3  that called or was it Agent Gonzalez that called?

4  A    I called --

5  Q    Okay.

6  A    -- another agent at the -- Pedro's house.

7  Q    Is that Victor Hugas?

8  A    No, sir.

9  Q    Who was it?

10  A    I don't remember who exactly I called.  It was either

11  Martin Kehoe (phonetic) or Tom Mora (phonetic) because they

12  were part of my group.  And I left them behind.  So it was one

13  of those two that I called, I just don't recall which one it

14  was.

15         **THE COURT:**  Well, Mora and what's the other name?

16  Key --

17         **THE WITNESS:**  Martin Kehoe.

18         **THE COURT:**  How do you spell that last name?

19         **THE WITNESS:**  K-e-h-o-e.

20      **(Pause)**

21  **BY MR. GARCIA:**

22  Q    Once -- once you make that call, what do you do at the

23  Garcia residence?

24  A    We sit there.  We secure the scene and we just -- we sit

25  around waiting for a -- for somebody to come pick up Rene

1   Garcia.

2   Q    Okay.  Did you have any interaction or did you see when my

3   client was actually arrested?

4   A    No, sir.

5   Q    How did you give the description for the arrest or the

6   detention of my client?

7   A    I gave their names of the two older sons and I gave their

8   names.

9   Q    And you got those names from who?

10  A    From -- well, I knew their names from when I met them at

11  the gate at their house and Rene as well.

12  Q    Okay.  When you -- when you approached the home and he

13  came -- and my client came up to the gate --

14  A    Um-hum.

15  Q    -- and you asked for his permission to come in and search,

16  he didn't give you permission, did he?

17  A    He didn't give me an answer, he just said his dad was

18  inside.

19  Q    Okay.  So he didn't give you permission?

20  A    Correct.

21  Q    Okay.  And you didn't seek to detain him at that point for

22  the human -- the human smuggling case or harboring or anything

23  else, correct?

24  A    Correct.

25  Q    The only person that was detained for that was Pedro

1   Alvarado?

2   A    Yes, sir.

3   Q    Okay.  Did you question Rene Garcia anymore at that

4   location?

5   A    No, sir.

6   Q    Okay.  You -- you wrote a report in this case, correct?

7   A    Yes, sir.

8   Q    Okay.  And the -- the report that you wrote is based on

9   your memory or what is it based on?

10  A    Based on memory and a few notes that I took.

11  Q    Okay.  And have you provided those notes to the

12  Government?

13  A    I believe so.

14  Q    Okay.  Do you still have them?

15  A    I'm not sure.  I haven't seen them.

16          **MR. GARCIA:**  Your Honor, I pass the witness.

17          **THE COURT:**  All right.  Mr. Alvarez?

18                     **CROSS EXAMINATION**

19  **BY MR. ALVAREZ:**

20  Q    Agent Olivares, you testified that you approached the --

21  the Alvarado residence and that was at approximately 12:50,

22  right before 1:00; is that right?

23  A    Yes, sir.

24  Q    And when you arrived there, you were accompanied by Agent

25  Robert Castillion?

Olivares - Cross / By Mr. Alvarez                           94

1  A     Yes, sir.

2  Q     Am I saying that right?

3  A     Castillion.

4  Q     Castillion.  Was there any other agent with you at that

5  time?

6  A     There were several agents with us at that time.

7  Q     How many would you -- did you record how many agents were

8  there?

9  A     Along with a state trooper, at the -- near me, maybe three

10 or four others, and there was -- I had other agents on the

11 other side of the street.

12 Q     A total of how many agents?

13 A     Fifteen agents, maybe.

14 Q     All right.  And were all the agents in uniform or plain

15 clothes?

16 A     We were in -- not uniform but we had our -- our vests on

17 to identify ourselves.

18 Q     Okay.  So it was obvious you were law enforcement?  You

19 had -- did everybody have their weapons with them?

20 A     We all carry our weapons; yes, sir.

21 Q     All right.  Now, you approached the -- the front entrance

22 to the residence, right, in a gated area?

23 A     It's not a gated area.  It's -- the -- I guess, from the

24 street in order to approach the residence, there's a gate

25 there.  So we were -- we approached the gate that was in front

Olivares - Cross / By Mr. Alvarez                          95

1    of the street.

2    Q    Now, and were all the agents at that location or were they

3    all around the residence?

4    A    No, they were on the street.  We weren't around the -- the

5    residence.

6    Q    All right.  Were -- were -- so there was no agents behind

7    the residence at all?

8    A    No, not -- not that I recall, no.

9    Q    Now -- and when you asked permission to -- to search, you

10   were encountered by two young males; is that right?  And they

11   subsequently summoned their father, Pedro, correct?

12   A    Yes, sir.

13   Q    And when you eventually got permission to go inside and

14   you discovered the illegal aliens in the attic based on his

15   information that they were there, you indicated that he had

16   been detained, correct?

17   A    Yes, sir.

18   Q    Now, a protective sweep was done of the residence and no

19   other aliens were discovered, correct?

20   A    Correct.

21   Q    After their protective sweep was conducted, did all the

22   aliens remove themselves from inside the residence?

23   A    Yes, we had the aliens outside -- the illegal aliens

24   outside.

25   Q    Well, my -- my question is after they were -- after the

Olivares - Cross / By Mr. Alvarez                    96

1    aliens were discovered, were -- did all the -- did all the

2    agents remove themselves from the residence?

3    A    Oh, the agents?

4    Q    Yes.

5    A    Yes.  We were still outside.

6    Q    Okay.  And where -- where were the aliens located at that

7    time after they were discovered?

8         **THE COURT:**  You mean, like where did you remove them

9    to?

10   **BY MR. ALVAREZ:**

11   Q    Yeah, where did you take them to?

12   A    There were -- they were outside the house, away from

13   Pedro.

14   Q    All right.  Now, you -- did you tell Pedro that he was

15   being detained?

16   A    Yes.

17   Q    Okay.  And he was being detained for harboring aliens,

18   correct?

19   A    Correct.

20   Q    And that's a violation of federal law?

21   A    Yes, sir.

22   Q    And you had a perfect to right to detain him and -- and

23   -- and arrest him, correct?

24   A    Yes, sir.

25   Q    Now, you -- you -- was he placed in a particular part of

1   the property?

2   A    No.  When I was talking to him, I moved him away from the

3   house, away from his -- his sons.

4   Q    And where did you -- in relation to where the house is,

5   did -- was he outside of the house?

6   A    Yes.

7   Q    And did you -- did you or other agents take him to another

8   location away from the house?

9   A    While I was there, no.

10  Q    Okay.  But you placed him away from the rest of the

11  family?

12  A    Away from the -- I would say maybe 20 or 30 feet up the

13  driveway.

14  Q    Okay.  And who escorted him to that location?

15  A    I was walking with him when I was talking to him.

16  Q    Okay.  And did you advise him that you were escorting him

17  away from the family?

18  A    No.  I was just asking -- I was just talking to him.  We

19  were just walking up the driveway.

20  Q    Did he know that you were escorting him away from -- away

21  from -- away from his family?

22  A    I guess we would -- no.  I don't understand the question.

23  What --

24  Q    Okay.  You -- you had him about what, 30 feet away?

25  A    Correct.

1   Q    What was the purpose of you separating him from his

2   family?

3   A    Just so I can talk to him.

4   Q    Okay.  You indicated that you had him sit a while ago.

5   A    Well, after -- after I was done -- after he gave me the

6   information on Rene Garcia, I had him go back and sit by, I

7   believe, he was sitting down next to the house.

8   Q    Okay.  But you set him at a certain location away from the

9   family, correct?

10  A    Okay.  Yes.

11  Q    Yes, correct?

12  A    Correct.

13  Q    And would you agree with me that it was your decision and

14  not his decision to be placed at that location?

15  A    Yes, sir.

16  Q    And if he had attempted to move from that location and

17  comingle with his family, that would have been objectionable to

18  you, correct?

19  A    Yes, sir.

20  Q    You would have then gotten him and taken him back to that

21  -- to -- to the location where you had placed him, correct?

22  A    Yes, sir.

23  Q    And after -- after he was detained and placed there, you

24  gave instructions for somebody to sit with him there, correct?

25  A    To watch him, correct.

Olivares - Cross / By Mr. Alvarez                    99

1   Q    To watch him, for him not to move?

2   A    Yes, sir.

3   Q    So would you agree with me that -- that he was being

4   deprived of his liberty to move about his residence freely,

5   correct?

6   A    Yes, sir.

7   Q    Now, you -- you would agree with me that a person can be

8   arrested without having to be handcuffed, correct?

9   A    Yes, sir.

10  Q    And he remained in -- in that -- in that condition under

11  that restraint throughout this whole process, correct?

12  A    That I'm not -- I'm not aware because I left shortly

13  after.

14  Q    Well, you left but agents remained behind.

15  A    Okay.

16  Q    Correct?

17  A    Yes, sir.

18  Q    And after you called in regarding the information that was

19  provided by Rene Garcia, you had more law enforcement visit the

20  residence, correct?

21  A    Yes, sir.

22  Q    In addition to the 15 agents that had previously been

23  there, correct?

24  A    Well, when we left Rene Garcia, I believe only four --

25  four or five stayed behind.

1   Q     Stayed behind.

2   A     Correct.

3   Q     And how many more arrived when you gave the order that --

4   that, you know, that more agents should approach.  How many

5   more agents approached?

6   A     I'm not aware of how many more.

7   Q     Now, was Agent Hugas at the residence at that time with --

8   with the Alvarados?

9   A     At what residence?

10  Q     At the Alvarado residence.

11  A     At the time of?

12  Q     After you -- after you were finished talking to Rene

13  Garcia --

14  A     Um-hum.

15  Q     -- you called in your information back to the Alvarado

16  residence, correct?

17  A     Correct.

18  Q     Who did you talk to?

19  A     I talked to -- again, I spoke to either Martin Kehoe or

20  Tom Mora.

21  Q     So if a Government document has been filed in Court

22  indicating that you took -- that you and Agent Flores told

23  Hugas about the information that Garcia gave you, would that be

24  incorrect?

25  A     Well, Hugas was at Rene's house at the time.

1   Q    Correct, I know.

2   A    Okay.

3   Q    I know.

4   A    And from there, he went to Pedro's house.

5   Q    So did -- did you call Hugas -- did you ever --

6   A    I never called him; no, sir.  He was at Rene's house.

7   Q    Okay.  Who gave Hugas the information regarding what

8   Garcia had said about the Alvarados?

9   A    I did.

10  Q    Okay.

11  A    But I never called him.  He was at the location.

12       **THE COURT:**  Well, did he also overhear your

13  interview, Mr. Garcia (sic), or no?

14       **THE WITNESS:**  He didn't overhear.  I think he

15  overheard when I was giving the information to the supervisor

16  on the scene.

17       **THE COURT:**  All right.

18  **BY MR. ALVAREZ:**

19  Q    Now, when Hugas approached Alvarado -- I mean, do you

20  understand that on July 3rd, 2012, around 2:00, after receiving

21  the information, Agent Hugas approached Pedro and asked him

22  whether he owned any firearms.  Are you familiar with that --

23  A    No, sir.

24  Q    -- line of inquiry?

25  A    No, sir.

1  Q    You're not?  How far is Rene Garcia's house from the

2  Alvarado residence?

3  A    Again, I -- I would say maybe a mile.  I don't know the

4  exact -- the exact distance.

5  Q    To your knowledge, when Hugas -- when you called the --

6  when Hugas found out about the Garcia information --

7  A    Um-hum.

8  Q    -- and prior to the search being conducted regarding the

9  discovery of the firearms, the ammunition, etcetera, was -- to

10 your knowledge, was Mr. Alvarado still being detained on the

11 charge of -- of -- of harboring aliens?

12 A    To my knowledge, yes.

13 Q    Were you involved in escorting him to the I office?

14 A    No, sir.

15 Q    You were not.

16       **MR. ALVAREZ:**  That's all, your Honor.

17       **THE COURT:**  All right.  Thank you, Agent Olivares.

18 That concludes your testimony.  You're excused at this time,

19 thank you.

20    **(Government Witness Adrian Olivares is excused)**

21       **THE COURT:**  All right.  Next?

22       **MR. ALANIZ:**  Yes.  Victor Hugas.

23       **THE COURT:**  Hugas.

24       **MR. ALANIZ:**  Yes, sir.

25    **(Pause)**

1      **(Whispering)**

2          **THE COURT:**  Agent Hugas, I need you to step forward

3   up here near one of the microphones to be administered the oath

4   before you testify.  And raise your right hand.

5          **VICTOR HUGAS, GOVERNMENT'S WITNESS, SWORN**

6          **THE COURT:**  Please be seated.  You may --

7          **MR. SPEAKER:**  May I sit down?

8          **THE COURT:**  Yeah, as soon as he's seated and ready.

9                    **DIRECT EXAMINATION**

10  **BY MR. ALANIZ:**

11  Q    Sir, can you please state your full name?

12  A    My name is Victor Emerson Hugas.

13  Q    And where are you employed, sir?

14  A    I'm employed with the Homeland Security Investigations in

15  Harlingen, Texas.

16  Q    And how long have you been employed with -- with the

17  Homeland Security Investigations?

18  A    I've been employed with Homeland Security Investigations

19  and the agencies it was before since 1997, sir.

20  Q    Did -- did you get involved in the investigation -- the

21  subsequent investigation of the -- the HSI Agent Kelton

22  Harrison's shooting?

23  A    Yes, sir, I did.

24  Q    How did you become involved, sir?

25  A    I'm the supervisor for the Border Enforcement Security

Hugas - Direct / By Mr. Alaniz                    104

1   Task Force and when the shooting happened, we responded to

2   assist all state, local, and everybody -- all the other law

3   enforcement officers.

4   Q    When -- when were you informed about the shooting?  At

5   what time approximately?

6   A    It was early in the morning, sir.  I was -- I was awoken.

7   It was -- I -- three or four in the morning -- four in the

8   morning, somewhere in there.

9   Q    And then what -- what did you do at that point, sir?

10  A    I -- I dispatched agents to help in other areas that they

11  requested help for and then I went ahead and got dressed myself

12  and drove over this way to -- to render assistance also.

13  Q    And where did you -- where did you go to?

14  A    I went to the scene -- I went to the hospital first and

15  then I went to the scene of the shooting.

16  Q    Okay.  At the hospital, did you -- you did -- did you talk

17  to Agent Harrison at all?

18  A    No, sir, I did not.

19  Q    Were you there for very long?

20  A    Not too long, sir, 30 to 40 minutes maybe.

21  Q    And after leaving the hospital, where did you go?

22  A    I went out to Hargill, to the -- to the scene of the --

23  where the vehicle was.

24  Q    So you went to where the vehicle was -- was found when --

25  after Agent Harrison basically got, I guess, crashed in the

1   fence?

2   A     Yes, sir.  It was in the field.

3   Q     The field.  And then after that, I mean, where -- where

4   did you go then?

5   A     From there, we went to -- to the Hidalgo County Sheriff's

6   Office and then we went to a -- a residence and then we went --

7   I went to lunch after that.

8   Q    Okay.  And -- so after lunch, did -- did you go to the

9   residence of Rene Garcia?

10  A     Yes, sir, I did.

11  Q    Okay.  And what was the purpose of you going over to Rene

12  Garcia's residence?

13  A    I had met up with some other individuals.  I was with the

14  Texas Rangers at the time and we had met up at the scene where

15  the shooting had actually happened.  And a couple of the other

16  agents said they were going down the street to where a big

17  truck was and they would be interviewing somebody there.  And

18  we went with them just to assist.

19  Q    Okay.  And what -- what did -- what did you do and what

20  did -- after the point where you guys went to Rene Garcia's

21  home?

22  A    I -- I stood in the peripheral and -- and over in the

23  driveway away from where they were conducting the interview.  I

24  could see them talking to Rene but myself and other officers

25  were standing --

1   Q    Could -- could you overhear what they were discussing?

2   A    No, sir, I could not.

3   Q    After the agents were -- met with Mr. Garcia, did they

4   tell you what -- what he said?

5   A    Yes, sir.  And --

6   Q    What did -- what did --

7   A    -- I -- I wasn't told verbatim --

8   Q    Okay.

9   A    -- on what they said.

10  Q    Okay.  What were you told at that point?

11  A    I was told that -- that the individual down the street,

12  Pedro, a house where they had already been that he was -- that

13  him and his sons were involved or had knowledge of -- of the

14  shooting.

15  Q    And that was given -- that information was given to you by

16  who?

17  A    That was given by an agent.  They walked over to the group

18  of us standing there and basically said they needed some agents

19  to go back to that location.

20  Q    And -- and that information you got was that Mr. Garcia

21  had implicated Mr. Alvarado and his sons in the shooting?

22  A    That is correct.

23  Q    What did you do with that information, sir, at that point?

24  A    I went -- myself and other agents, we went to that

25  location just to make sure that the individuals were still

1    there and that it was secure.

2    Q    And when you "that location" do you mean the -- the

3    residence of Pedro Alvarado?

4    A    That is correct, sir.

5    Q    And was that the first time -- when you got there, was

6    that the first time that you had been to that place?

7    A    Yes, sir, that was the first time I had ever been there.

8    Q    When you got there, Agent Hugas, how many agents were

9    around, if you recall approximately that were there when you

10   first got there?

11   A    At least six, if I -- if I believe correctly.

12   Q    They were there -- they were there when you got there?

13   A    I -- I think so; yes, sir.  I mean, there was -- there was

14   multiple agents.

15   Q    Right.  And then when you got there, were you by yourself

16   or were you with other agents?

17   A    No, a -- a group of us had left from Rene Garcia's house,

18   a group of us went back.

19   Q    How many approximately were in the group?

20   A    Four or five, or maybe more like five or six.

21   Q    Okay.  And when you get there, do you see Mr. Pedro

22   Alvarado at that point?

23   A    I do, sir.

24   Q    Okay.  Where -- where is he and what is he doing at that

25   time?

1   A    He's standing by the front door and he's -- he's just

2   standing there.

3   Q    Is he handcuffed?

4   A    I -- I don't -- I don't believe so; no, sir.  No.

5   Q    And how did you know that he was Pedro -- Pedro Alvarado?

6   Did somebody tell you who he was or how did you find that out?

7   A    When we came up, he was the -- the only visible male and

8   I'm sure somebody informed me of that but when I -- when I

9   walked up, he had on shorts and a tee shirt.  He had tattoos

10  that were exposed but there was juveniles up against the -- the

11  house and there was people sitting.  And he was the only large,

12  grown male that was there.

13  Q    Did you see his -- his older -- his two older sons here

14  somewhere?

15  A    The -- when I came up, his two sons were right next to him

16  at the front door, sitting on what appeared, if I remember

17  correctly, to be the rear seat of like a minivan or something

18  that was sitting up against the house.

19  Q    Did you see whether or not they were handcuffed?

20  A    I -- no, they weren't handcuffed because I -- I --

21  Q    Okay.  Now, once -- once you get there, do you approach

22  Mr. Pedro Alvarado at that point?  Do you approach and talk to

23  him?

24  A    I -- I do at some point.  I talked to the agents there

25  first.

1    Q    Okay.  But what do you discuss with the agents at this

2    point, Agent Hugas?

3    A    Just, you know, who -- who the people were or -- or and

4    what the status was, if they had searched the residence or not,

5    if -- if anybody had --

6    Q    Okay.

7    A    -- you know, what -- what they had seen or not seen.

8    Q    Were you told at that time when you talked to the agents

9    that they had already found some illegal aliens inside the

10   home?

11   A    I was told that some of the individuals that were sitting

12   on the ground there, that they didn't have status.

13   Q    Okay.  Were you told at any point in time that

14   Mr. Alvarado and his sons were in custody at that point?

15   A    No.

16   Q    Once you found out who Pedro Alvarado was, did you then

17   approach and talk to him at -- at some point?

18   A    I did; yes, sir.

19   Q    By the way, do you know what time approximately it was

20   that you got to the Alvarado home?

21   A    I --

22   Q    Approximately?

23   A    -- I know it was after -- I know it was after lunch, sir

24   -- one or two -- I'd say it was sometime after lunch.

25   Q    Okay.  And so what happens when you approach Mr. Pedro

 1  Alvarado, sir?

 2  A    I -- I ask him if -- because the agents have told me they

 3  hadn't searched the house, that they had cleared the house for

 4  -- for bodies but they hadn't done a search.  I asked him if a

 5  -- a -- if he was the owner of the residence and -- and he --

 6  he said that he was.  He identified himself.  He showed me who

 7  his sons were and I actually had him move his sons to the other

 8  side of the -- to the front of the building or I had -- they --

 9  they got up off the -- the chair and they moved over to the

10  front of the building.  And then I asked him if he had any

11  weapons.

12  Q    Let me ask you this, Agent Hugas, did you identify

13  yourself to him?  Did you tell him who you were?

14  A    Oh yes, sir, I did.  And I was wearing fully arrayed gear

15  with all of our markings on it and everything else.

16  Q    And you -- you were speaking to him in English, I -- I --

17  I suppose?

18  A    Yes, sir, I was.

19  Q    Okay.  Did he have any trouble understanding your -- your

20  English language at all?

21  A    Not at all, sir.

22  Q    So you asked him whether or not he was the owner of the

23  property and he said yes.  What did you ask him then?

24  A    I asked him if he would -- if he had any guns or -- or --

25  in the -- in the home.

1   Q    What did he say, sir?

2   A    He said he did not.

3   Q    And what did you ask him then?

4   A    I asked him if -- if he would consent to us searching the

5   home.

6   Q    Okay.  And what -- what -- what was his response?

7   A    He -- he consented to a search of his home.

8   Q    At some point, did someone or some other agent have

9   Mr. Alvarado review a -- a Consent to Search form?

10  A    Yes, they did.

11  Q    Okay.  And do -- do you know who the other agent was, by

12  the way?

13  A    I do not, sir.

14  Q    But was -- was that done in your presence?

15  A    The form was brought to him in my presence.  I don't -- I

16  don't remember if I was physically still standing there as --

17  as he signed it or what.

18  Q    Okay.  Did -- did you find that before you went to the

19  home that he had actually signed the consent form?

20  A    Yes, sir.  I made sure that we had signed it, I believe,

21  before we went in there.

22  Q    Okay.  So after he signs the consent form, who goes into

23  the -- into the residence to search?  How many agents

24  approximately?

25  A    I would say I think there was maybe three of us that went;

 1  three or four.

 2  Q    So you personally go inside the residence?

 3  A    Yes, sir, I did.

 4  Q    Okay.  And what happens when you go inside the residence,

 5  sir?

 6  A    When we first walked in the residence, one of the agents

 7  immediately sees some rounds on a -- on a table on kind of the

 8  foyer or the hallway.  And then myself and another agent were

 9  in a room that was just inside and to the left.  And he had

10  found some rounds in a closet.  And I opened -- the first

11  drawer I opened on the dresser had a 9 mm magazine in it and 9

12  mm rounds and other rounds in the top drawer.  And at that

13  point, I called for all the agents that were in the house to go

14  ahead and let's clear out.

15  Q    Why -- why was that, sir?

16  A    Because there was -- there was a lot of people, there was

17  a lot of agencies, and it was a -- a lot of different

18  departments there.  The FBI Crime Scene teams were also out

19  there or being -- we had a command center.  So what I wanted to

20  do was I wanted to report that information back to the command

21  center and let them know, you know, this is -- you know, this

22  is what we have at this current point, just to try to

23  de-conflict (sic) with everything else that was going on.

24  Q    And so -- so you yourself and the other agents get out of

25  the residence and then you inform the -- the FBI command center

1    of your findings at that point?

2    A    Yes, sir.

3    Q    Okay.  Do you go back to Mr. Pedro Alvarado and ask -- and

4    confront him about the -- the ammunition?

5    A    I do, sir.

6    Q    What do you tell him?

7    A    I -- I come back to him and I -- and I tell him that we've

8    already found ammunition in the house.  And as I'm telling him

9    that, I look down on the ground and there's spent .22 casings

10   on the ground.  And I tell him that, you know, he's already

11   lied to me.  And he -- he just kind of acknowledged and then I

12   asked him if he owned a pickup truck.  And --

13   Q    Let me ask you this question, Agent Hugas.  Why do you ask

14   that question about does he own a pickup truck?

15   A    Because we had been looking for a pickup truck that was

16   involved and also from the information that -- that when I went

17   over there, I was already looking for a pickup truck.

18   Q    So what -- what does he say or what does a -- Mr. Pedro

19   Alvarado do when you ask him that question about whether he

20   owns a pickup truck?

21   A    He -- he kind of changes his facial and he -- and he tells

22   me, "yes, I do" and -- and I asked him where it was.  He said

23   that his wife was driving it, that it was at a -- a medical

24   center or an eye center, that it was there and --

25   Q    What does he say after that?  Pedro Alvarado?

1   A    He says that he -- he would like to talk to me in private.

2   Q    Okay.  And then what did you do at that point?

3   A    I took two steps myself and Officer -- or Ranger Mankin --

4   Q    Let me ask -- let me take you back for one second, Agent

5   Hugas.  When you asked Mr. Pedro Alvarado about whether he owns

6   a pickup truck, you said that his face -- his facial --

7   A    Always, sir.

8   Q    -- expression changed.  Can you be a little bit more

9   specific?  I mean, what -- what did you notice about his facial

10  expression or his demeanor when you asked that question about

11  whether he owned a pickup truck?

12  A    Just the way he -- he -- he looked at me like he already

13  knows the answer.  That -- that he's looking at me like he

14  knows.

15  Q    Okay.

16  A    You know and -- and that's when he answered me, you know,

17  in the affirmative, he did own it, and where it was.  But he --

18  Q    And then -- and then he asked you, "I want to talk to you

19  in private"?

20  A    Yes, sir.

21  Q    Okay.  So you step away from the other agents?

22  A    From them, from the ones -- and actually, from the people

23  that were still sitting on the ground right there next to the

24  house.  We moved just a few feet more to the right.

25  Q    Okay.  What did he say to you, if anything, after you

1  walked away a little bit from the other agents?

2  A    He said that he would -- he would like to -- to -- that he

3  needed to talk -- that he needed to -- he basically asked if he

4  could talk to us in -- in reference to why we were there.  I

5  had already told him, "look, you know why we're here.  And, you

6  know, that the agents have been here, you know, we're" -- and

7  he basically said, "you know, I need to talk to you about

8  that."

9  Q    What -- what did he say, if anything, Agent Hugas, when

10  you told him "you know why we're here".  But what did he say in

11  response to that?

12  A    He said "I know why you're here."

13  Q    And what happens after you have this conversation with

14  Mr. Pedro Alvarado on the side privately?  What happens then?

15  A    He wanted to sit down and -- and talk to us.  And -- and

16  at that point, I was with Texas Ranger Reuben Mankin and myself

17  were the two standing there talking to him.  And I asked -- I

18  once again, you know, said "well, give me a second" and we

19  called the command center to ask and -- and that was a matter

20  of getting a hold of different people and different things to

21  ask that "hey, this individual wants to talk to us.  Do you

22  want us to sit down and talk to him right here, right now, at

23  his residence, or do you want us to bring him back to talk to

24  him there at the FBI office?"

25  Q    Let me ask you, Agent Hugas, before I go any further.

1   When you're in the house and you find the 9 mm ammunition --

2   A    Yes, sir.

3   Q    -- you -- you and your -- you and the others, you pull out

4   of -- out of the residence upon your -- on your directive; is

5   that correct?

6   A    That is correct, sir.

7   Q    Why would -- why were the 9 mm ammunition that you saw --

8   saw there in the residence, why was that important to you?

9   A    Because some of the shell casings are the shell casings

10  that were picked up on the scene were 9 mm rounds.

11  Q    The casings that were used -- that were -- the spent

12  casings that were shot at Agent Harrison?

13  A    That is correct.

14  Q    So -- so you -- you at some point decide not -- not to

15  interview Mr. Pedro Alvarado at his residence but you then

16  decide to transport him to the FBI building?

17  A    Yes, sir.  I was told to transport him to the FBI

18  building.

19  Q    And what -- what vehicle did you put him into?

20  A    I was driving a silver suburban and we -- we -- we -- I

21  asked him if he would be willing.  And I said "will you go with

22  us to the FBI office" and -- and he said yes, he would.  And he

23  -- at that point, he told me that he had a -- that there was a

24  -- a child in the house and -- and asked if he could go inside

25  or if we could go inside and get the child.

1   Q    Okay.  And what -- what happened at that point?

2   A    He went inside and he -- and he got the child.  And then

3   he said he had a -- a 14-year-old son or a son that was there

4   at the residence that could watch the child and he gave the

5   child to that individual.

6   Q    When -- when he was -- when you allowed him to go into the

7   residence, do he go into the residence by himself or did you --

8   was he escorted by other agents?

9   A    There was somebody walking with him but he wasn't -- you

10  know, he walked in and somebody followed him and watched.

11  Q    So he agreed to go with you and you put him into your

12  suburban; is that correct?

13  A    Yes, sir.  We went -- we walked over to where the car was

14  and he talked to us some more about the car because actually,

15  when I was going to put him in it, we didn't handcuff him in

16  the car.  But I -- I wanted to -- to pat him down to make sure

17  he didn't have any weapons on him or anything because I didn't

18  -- I didn't know if anybody had already.  And I thought I was

19  going to be transporting in my -- my car.  That's the policy.

20  Q    Okay.  And then what -- what part of the vehicle did you

21  put him in?

22  A    The front driver's seat.

23  Q    And who else was with you?

24  A    I'm sorry, the passenger seat.

25  Q    Who else was with you when -- when you transported

1  Mr. Pedro Alvarado to the FBI office?

2  A    Texas Ranger Reuben Mankin was in the -- he was in the

3  back passenger seat of the vehicle with us.

4  Q    Do you recall, Agent Hugas, approximately what time it was

5  that -- that you left the Alvarado residence?

6  A    I -- I wouldn't know an exact time, sir.  I mean, I could

7  look at my notes or I could look at the --

8  Q    Approximate, if you can?

9          **THE COURT:**  Evening, mid-afternoon?

10 A    It was -- it was afternoon, sir.  I wasn't there very long

11 at all.  It would -- it would be like 2:00 o'clock, I guess;

12 2:30, somewhere in there.

13 Q    And then -- and then you drove from there to the FBI

14 building?

15 A    That is correct, sir.

16 Q    After you got to the FBI office, Agent Hugas, did you have

17 any -- any more direct contact with Mr. Pedro Alvarado after

18 you dropped him off there?

19 A    Just him -- him asking to speak with me a couple of times.

20 But --

21 Q    Did -- did you speak to him there at the FBI?

22 A    No.  No, I did not -- not in reference to any of the

23 incident or anything.

24 Q    And after that, that was the extent of your involvement,

25 sir?

1   A    Yes, sir.

2           MR. ALANIZ:  I'll pass the witness, your Honor.

3           THE COURT:  All right.  Any cross?

4           MR. GARCIA:  Thanks, Judge.

5                     CROSS EXAMINATION

6   BY MR. GARCIA:

7   Q    Agent Hugas, do you receive information, or you arrived

8   with information that you're looking for a pickup truck?

9   A    We were -- yes, sir.

10  Q    Okay.  Where did you get that from?

11  A    When -- when I first arrived on the scene and earlier in

12  the day we were already looking for a large pickup truck with a

13  brush guard.  I don't know exactly where that information

14  cultivated from the beginning, but that was already word from

15  the scene when I got there.

16  Q    And Pedro Alvarado's vehicle did not have a brush guard,

17  right?

18  A    No.  It -- oh, I'm sorry, I never saw his car.  I never

19  saw the pickup truck, sir.

20  Q    Well, you asked him if he owned a pickup truck?

21  A    Yes, sir, I did.

22  Q    How many people in Hargill own pickup trucks?

23  A    I have --

24          THE COURT:  He wouldn't know.  Come on, let's ask a

25  reasonable question.

Hugas - Cross / By Mr. Garcia                    120

1   **BY MR. GARCIA:**

2   Q    There's a lot of -- you would agree that there's a lot of

3   people in a rural area that own pickup trucks?

4   A    There's a lot of people in Texas, in general, that own

5   pickup trucks.  I have one, sir.

6   Q    And you would agree that Hargill is a rural community?

7   A    Yes, sir, it is.

8   Q    Does it have a police department?

9   A    I'm not sure about that, sir.

10  Q    Okay.  There's dirt roads, caliche roads all throughout

11  the community, correct?

12  A    Yes, sir.

13  Q    Okay.  You -- what other information besides the brush

14  guard were you looking for in regards to looking for a pickup

15  truck?  The description that you had?

16  A    I didn't have much of a description of the truck; I just

17  knew one of the vehicles was a truck.

18  Q    Okay, not much of a description.  I'm trying to assess and

19  I'd like to know because it's not in your notes, what

20  information did you have when you -- what time did you arrive

21  in Hargill?

22  A    What time did I arrive in Hargill?  It was probably 7:00

23  or 8:00 in the morning, if not earlier.

24  Q    Okay.  All right.  And so from 7:00 or 8:00 in the morning

25  until 2:00 or 3:00 in the afternoon when you finally are

1  driving Pedro Alvarado to the FBI office --

2  A    Yes, sir.

3  Q    -- during that time or before you arrived -- before you

4  arrived -- when you arrived at 7:30 you had information about a

5  pickup truck with a brush guard?

6  A    No, sir.  I'm not sure what time the pickup truck

7  information -- what time that was in the morning.  We were --

8  the descriptions of the vehicle that was chasing the agent was

9  a pickup truck was what -- is what I was told.

10 Q    Okay.  And before you had interaction -- when you placed

11 Pedro Alvarado into the Suburban, you had been at the Rene

12 Garcia residence, correct?

13 A    Yes, sir.

14 Q    And you saw his King Ranch vehicle there with the brush

15 guard, correct?

16 A    That's one of the reasons we were there.

17 Q    Okay.  And so what other reason were you there?

18 A    I was there because when I pulled up on scene I was told

19 the people I rolled up to were rolling to there and so I went

20 with them.

21        The agents that were already on scene at the

22 intersection close to Rene's house were actually moving -- or,

23 I'm sorry, next to Mr. Alvarado's house, were moving down

24 towards the -- Rene's house and I went with that just as more

25 bodies, and so did the Texas Ranger that was following behind

1   me.  I didn't go to Mr. Alvarado's house because he owned a

2   pickup truck; I went to Mr. Alvarado's house because Rene

3   Garcia said that him and his sons were involved in the

4   shooting.

5   Q    Okay.  And you wrote down some notes, correct?

6   A    I did.

7   Q    And in those notes you write down that the guy down the

8   street, Pete and his sons, were the ones that were there,

9   correct?

10  A    That is correct.

11  Q    Okay.  You didn't write down that they were involved in

12  the shooting, correct?

13  A    When I say, "were there," it meant at the shooting.

14  Q    Okay.  Why not write down that they were at the shooting?

15  A    I -- I didn't necessarily even have information at the

16  time that they were shooting or whatever; that's the way I

17  wrote it.  "They were there", those were my notes and that's

18  the way I took the notes.

19  Q    And you --

20  A    I infer my notes when I say "were there" and when I say --

21  I'm saying the guy at the house said "they were there" that's

22  the way it's worded in my notes.  They're the whole reason I'm

23  in Hargill, the whole reason that I am out at 4:00 in the

24  morning and then throughout the day and the rest of the day is

25  because I'm looking for the individuals who shot at the agent,

1   so in the context of "there" in that report, the "there" is

2   there at the crime scene, there at the shooting.  They are

3   taking part of "there" as either conspirators or part of the

4   crime.

5   Q    So that's what that means, all of that?

6   A    It does in my notes right there, yes, sir.

7   Q    Okay.  And when you received this information of "they

8   were there" --

9   A    Yes, sir.

10  Q    -- and all of that that you just described --

11  A    Yes, sir.

12  Q    -- that information came from someone with a pickup truck

13  and a brush guard, am I correct?

14  A    That is correct.

15  Q    To where you had found the night vision scope in that

16  vehicle, correct?

17  A    I didn't find anything in that vehicle, sir.

18  Q    You had information.  Not you, but someone else did,

19  correct?

20  A    I don't know if anybody did or anything, sir.  I left that

21  scene.  I was at Rene's house for a matter of seconds or

22  minutes before somebody came and said, "Can you-all go back

23  over to Mr. Alvarado's?" and I did.

24  Q    Who told you to go back over to Mr. Alvarado's?

25  A    I don't -- I don't know which agent it was or who it was,

1   sir.  There was multi-agencies out there, multi-people.  I'm

2   from the Harlingen office.  There was agents from all the

3   offices.  The law enforcement community pulled together very

4   well in the operation.  There was a lot of people there and

5   they were, you know, agents from the office that I'm familiar

6   with, but I don't know which agents or which people

7   specifically.

8   Q    And you're at the -- so how long were you at Rene Garcia's

9   residence?

10          **THE COURT:**  Asked and answered, he just said no more

11   than a few minutes.

12          **MR. GARCIA:**  I didn't recall that, your Honor.

13          **THE COURT:**  He just said "seconds" and then he

14   changed his answer to minutes.

15   **BY MR. GARCIA:**

16   Q    Okay, so you were there just a few minutes?

17   A    Yes, sir, I wasn't there very long.

18   Q    Okay.  And then you are instructed by an officer, you're

19   not sure who, to go back to --

20   A    No, it was an agent.  It was one of the McAllen office

21   agents.  There was another -- I'm a Supervisor with HSI.  There

22   was another HSI supervisor on that scene.  That supervisor

23   stayed there and I left with the other agents to the other

24   scene.

25   Q    Okay.  When you arrived with the agents to the other scene

1   and you -- you see that my client is outside the building --

2   A    Yes, sir.

3   Q    -- does he appear to be detained at that time?

4   A    He's -- he's there.  The individuals -- the agents are

5   there at his house.  I don't know -- he's obviously detained in

6   the fact that agents are there with the door open searching the

7   house and there's people sitting on the ground.

8   Q    And he's sitting on the ground?

9   A    No, Mr. Alvarado was standing at the door.

10  Q    Arnoldo Alvarado, my client, was standing at the --

11  A    Oh, no, I'm sorry.  He was sitting at the -- he was

12  sitting on the chair, I believe, on what I believe was a

13  minivan seat or something.

14  Q    Okay.  Was he free to leave?

15  A    I don't believe so, no.  He wouldn't have been free to

16  leave.

17  Q    Okay.  Who did you instruct to transport Arnoldo Alvarado?

18  A    The Constables transported them in a marked unit.

19  Q    Okay, and that was on your instruction?

20  A    Yes, sir.

21  Q    Okay.  And you gave them that instruction based on what?

22  A    When Mr. Alvarado asked if -- that he needed to speak with

23  us and asked if he could speak in private, and once the

24  decision was made that we weren't going to talk to them there

25  in their house, we were going to take them -- I asked him, I

Hugas - Cross / By Mr. Garcia                         126

1   said, "Would you and your sons be willing to accompany us back

2   to the FBI office?" and he said, "Yes" they would," and then I

3   explained that they would be transported in another -- in

4   another vehicle.  Or he asked at some point would they go with

5   us or the others, and I said, "No, they're right behind us in

6   the Constable cars."

7   Q    Okay.  But at that point you knew my client was 18 years

8   old, right?

9   A    I have no idea the age of your client.

10  Q    You never asked?

11  A    I never spoke with -- I spoke with Mr. Alvarado the entire

12  time.

13  Q    Okay, so you never thought to ask Mr. Pedro Alvarado how

14  old his son was?

15  A    I don't know if the fact that your client was 18 -- that

16  may have been addressed, I can't remember.  The only age that's

17  -- to my recollection that's popping up right now that I really

18  questioned because we were in the -- the care and custody of

19  Mr. Alvarado with his children.  He had asked if he could leave

20  his 4-month-old or 4 -- yeah, I guess, his 4-month-old daughter

21  or the infant child with one of his sons and we made sure that

22  that son was of a certain age, you know, 14 or however old

23  before we left and took the other ones with us.

24  Q    Okay.  So transported to the FBI office in McAllen was

25  Pedro Alvarado --

1   A     Yes, sir.

2   Q     -- in the vehicle with you?

3   A     Yes, sir.

4   Q     Did you watch as my client was handcuffed and placed in

5   the back of a Constable's unit?

6   A     No, I did not, sir.

7   Q     Okay.  Did you see the Constable's unit behind you?

8   A     Yes, sir.  They were behind us.  I could see them in the

9   mirror.

10  Q     Okay.  At some point did one of the Constable's units have

11  a flat tire?

12  A     I noticed the Constable unit had a flat tire once we

13  arrived at the FBI office and we were in the parking lot.  We

14  pulled in, we still had to wait to get in the building for

15  quite a while.  I thought the tire went flat in the FBI parking

16  lot, that he had got a puncture on the way, but it was flat in

17  the parking lot of the FBI office.

18  Q     As you're traveling with Mr. Alvarado in the vehicle --

19  A     Yes, sir.

20  Q     -- you're telling him all of these things about this is

21  just a misunderstanding, correct?

22        MR. ALANIZ:  Objection, Judge, as to the relevance

23  and, you know, the statement that he -- Mr. Pedro Alvarado, his

24  co-Defendant -- the co-Defendant made during the trip to the

25  FBI building.

1          THE COURT:  Okay, we're talking about Pedro Alvarado

2    --

3          MR. ALANIZ:  Right.

4          THE COURT:  -- the things that he said?

5          MR. ALANIZ:  Right.

6          THE COURT:  Right.  And we've decided that's not

7    going to be --

8          MR. ALANIZ:  We're not offering that into our --

9    during our Case-in-Chief so I don't know what the relevance as

10   to the issue of his client's statement about what his father

11   said during the period -- during the time that he was

12   transported from his home to the FBI building.

13         THE COURT:  So that's -- that's going to be an issue

14   is the statements that Arnoldo Alvarado made during the

15   transport with the --

16         MR. ALANIZ:  No.  He's asking the Agent --

17         THE COURT:  I know, but I want to know what the

18   issues are.

19         MR. ALANIZ:  Okay.

20         THE COURT:  To see whether this is relevant to any

21   other issues.

22         MR. ALANIZ:  Okay.

23         THE COURT:  Are we going to have issues about

24   statements that Arnoldo Alvarado made during the drive in the

25   custody of the Constable?

 1            **MR. ALANIZ:**  No, sir.  The testimony of the Constable

 2    is --

 3            **THE COURT:**  All right.

 4            **MR. ALANIZ:**  -- he testified he didn't say anything

 5    about the --

 6            **THE COURT:**  The incident.  All right.

 7            Are we going to have issues then about what he said

 8    at the FBI building after arriving?

 9            **MR. ALANIZ:**  What the issue was in what sense?

10            **THE COURT:**  Well, I've been led to believe that he

11    made statements that were incriminating --

12            **MR. ALANIZ:**  Yes, he --

13            **THE COURT:**  -- at the FBI office.

14            **MR. ALANIZ:**  He made a full confession, that's

15    correct.

16            **THE COURT:**  Okay.  And he was under arrest at this

17    point?

18            **MR. ALANIZ:**  Right.  He was under arrest when he was

19    -- when he was --

20            **THE COURT:**  Right.  Okay.  The Government concedes

21    that.

22            **MR. ALANIZ:**  There's no issue with that.

23            **THE COURT:**  Okay.  Just -- as long as the Government

24    concedes that then we'll accept it as an issue of whether I

25    need to make a finding about whether --

1          **MR. ALANIZ:**  Custody, no.  I -- we basically see that

2    --

3          **THE COURT:**  -- he was arrested --

4          **MR. ALANIZ:**  -- that custody was -- happened at the

5    time he was put into the Constable's vehicle at the residence.

6          **THE COURT:**  Okay.  Ask your question?

7          **MR. ALANIZ:**  Okay.

8          **THE COURT:**  All right.  I have your objection.  Let

9    me hear the question now and maybe you'll rephrase it, whatever

10   you'd like to ask.

11         **MR. GARCIA:**  Thank you.

12   **BY MR. GARCIA:**

13   Q    I'm not asking -- I don't want to ask you questions about

14   what Pedro Alvarado said.

15   A    Okay.

16   Q    I'd like to ask you questions about what you said.

17   A    Yes, sir.

18   Q    Okay.  You are telling Pedro Alvarado certain things at

19   the residence, correct?

20         You're talking to him?

21   A    Yes, I'm talking to him, yes, sir.

22   Q    Okay.  And you confront him with what you believe to be a

23   lie about his ownership of a weapon, correct?

24   A    I guess, yes, in the reference that he says there's no

25   guns there and we find ammunition and things that would go with

1    a gun.

2    Q    Okay.  And just to be clear, the 9 millimeter casings that

3    were found were found -- were found close to the intersection

4    of 11th Street and 493, correct?

5    A    I don't know the name of the street, sir.  I'm sorry.

6    Q    Okay.  You would agree that --

7    A    They were found by the intersection close to his

8    residence.

9    Q    Okay, but not on the dirt road, right?

10   A    I have no idea where the casings were found, sir.  I was

11   at the crime scenes in the morning when we were working in the

12   morning.  You had the shooting scene where the actual shooting

13   took place, and then you have where the car crashed.  At the

14   end I was at the scene where the car crashed so the evidence

15   that was collected at the scene where the shooting was in that

16   area that you are describing now, I wasn't at that area.  I

17   wasn't there when they picked up the evidence, I wasn't there.

18   I wouldn't be able to say, sir.

19   Q    Educate us.  You were there when all the agencies were

20   investigating, correct?

21          THE COURT:  Well, he can -- asked and answered.  He's

22   already testified when he got there.

23          THE WITNESS:  There's several areas, sir.

24   //

25   //

1   **BY MR. GARCIA:**

2   Q    Correct, there are several areas.  And during that time

3   the -- the -- 493, you would agree, goes north and south,

4   correct?

5   A    I can look at a map.  Like I said, I'm not familiar with

6   493, sir.  I don't -- like you said, Hargill is a rural area.

7   I don't -- I don't frequent Hargill, sir.

8   Q    Okay.  Anywhere that you remember, do you remember seeing

9   evidence markers all along the road there?

10  A    No, I don't remember seeing them.

11  Q    You don't remember seeing any evidence markers at all?

12  A    No.  By the time --

13  Q    Let me finish the question, please.

14       Whether at the crash scene or near the Alvarado

15  residence, did you see any evidence markers?

16  A    At the crash scene itself where I was at, I -- I don't

17  know if they had markers on the ground or not.  I don't -- I

18  don't -- I don't recall that.  I can see the berm, I can see

19  the road, the intersection and I can see the Jeep sitting in

20  the ground, but I don't remember because the Jeep was actually

21  quite a ways, I never walked down to the Jeep.  I stayed on the

22  hardball, I stayed up on the road.

23  Q    Okay.  You would agree that there -- you testified that

24  there's a Command Center, right?

25  A    There was a Command Center, yes, sir.

1    Q    Okay.  How were you communicating with the Command Center?

2    A    I called the Command Center via phone.

3    Q    Who were you speaking to there?

4    A    I was calling -- the person -- when I called to ask who we

5    could talk -- or who -- whether -- the only person I talked to

6    was Dwayne Cottrell (phonetic) who was an agent from -- another

7    supervisor from McAllen.  That was the number -- I didn't have

8    the Command Center number and I had been calling Dwayne who was

9    there or was getting me in touch with the information that I

10   needed to know.

11   Q    Okay.  So you're speaking to Agent Cottrell about what

12   you're observing or you-all are trying to communicate with one

13   another.  There's inner-agency communication, you would agree?

14   A    I had the one conversation with him of do I bring the guy

15   back to the office to talk to him, or do I do it here?  The guy

16   wants to talk, do I do it here or do I do it there, and he

17   said, "Let me call you back."  And he called me back and he

18   said, "Do it there."

19   Q    "Do it there."  Do it where?

20   A    Do the interview at the FBI office, sir.

21   Q    Okay.  "The guy wants to talk to me" is what you told him,

22   right?

23   A    Yes.  I said -- he's -- yes, he's wanting to talk.

24   Q    All right.  You didn't say that Arnoldo Alvarado wants to

25   talk to you, right?

1   A    No.

2   Q    Okay.  And you -- based on the instruction from Cottrell

3   you then instruct the Constable to take my client into custody

4   and drive him to the FBI office?

5   A    No, sir.  Not based on that.

6            Based on the fact that when I speak with

7   Mr. Alvarado, Mr. Alvarado is speaking to me in reference to

8   him and his sons.  I asked him if him and his sons will

9   accompany us back to the office, and he even asked me several

10  times within the drive, "My sons are behind us?  They are

11  behind us.  They are?" -- and I would look in the mirror and I

12  would tell him, "Yes, they're in the vehicles behind us,

13  they're in the Constable vehicles" or "Yes, they're in the

14  vehicles."

15  Q    Okay.

16  A    So when I transported him, that was even -- like I said

17  before, that was part of the issues when his sons were coming

18  with us was who would have care and custody of this child,

19  which relative or which other person would be there, besides

20  the other individuals who were there at the house that weren't

21  related with the -- with the infant child since these two other

22  sons were coming with us?

23  Q    Are you saying that Pedro Alvarado consented to the arrest

24  of his 18-year-old son?

25  A    I'm not -- I'm not saying he consented to the arrest of

1   his 18-year-old son.  What I'm saying is that he consented to

2   them being transported to the -- to the FBI office to talk in

3   reference to that, that we were all going there to speak at his

4   request.

5   Q    You did not ask Arnoldo Alvarado if he would voluntarily

6   go with you to the FBI office, did you?

7   A    I never spoke to either of the sons.  I spoke directly to

8   Mr. Alvarado and Mr. Alvarado was speaking as the head of the

9   family or as the adult there that I considered to be

10  responsible for, you know, the individuals that were there.

11  Q    So --

12  A    I never spoke to either child.  I never spoke to your

13  client and I never spoke to the other son.

14  Q    Okay.  Did my client consent to his arrest and his

15  transport to the FBI office?

16  A    I --

17  Q    If you know?

18  A    No.  The -- the part of the arrest, I understand that the

19  arrest is being consented or conceded to the fact that when

20  they were placed in the handcuffs -- or placed in the car they

21  were under arrest.

22       But what I'm saying is that wasn't the intent, moving

23  them -- them going to the office for all of us to talk or

24  whatever.  They were going -- following.  They could have all

25  ended up in the same vehicle with us if policy would have --

1   you know, we're not going to have everybody riding in there.

2   Q    At the point of the arrest, at the point that the

3   Government has conceded that he was arrested, what information

4   did you have that Arnoldo Alvarado was involved -- was probably

5   involved in the shooting of the ICE agent?

6   A    The information that I had was that I had been at the

7   other house where Rene had implicated Mr. Alvarado and his sons

8   in the shooting.  I had gone into the house.  I had seen --

9   after he had told me that there wasn't weapons in the house, I

10  found lots of evidence that weapons were.

11          When I came back out and I told him he had already

12  lied to me, and I looked at Mr. Alvarado and Mr. Alvarado and I

13  had a conversation there in front of the house, and I looked at

14  him and I said, "You know why I'm here and" -- I told him, I

15  said, "you've already lied to me."  And then I looked at him

16  straight in the eye and I said, "Do you have a pickup truck?"

17  And when I asked him that, he looked at me and he -- and just

18  the look on his face was that of this guy knows, and he said,

19  "Yes, I do."

20          And I said, "Where is it?", and he said, "It's at my

21  wife's work."  And at that point I sent an agent that way and

22  as soon as I told the agent, "Go to where the truck is, to that

23  -- to that business," that's when Mr. Alvarado said, "I need to

24  talk to you in private" and myself and Mr. Maikin (phonetic)

25  stepped to the side and we talked to him, and that's when he --

Hugas - Cross / By Mr. Garcia                    137

1   you know, and you used the comment a while ago, "a

2   misunderstanding."

3          Well, he said "there's been a misunderstanding."  And

4   that's where the term, "there's been a misunderstanding" comes

5   up later in the thing because when he's standing there he says,

6   "There's been a misunderstanding."  And I said, "Okay, well, if

7   there's been a misunderstanding we need to talk about the

8   misunderstanding."

9          And he said, you know, "I want to talk about it."

10         And that's when the call was made, do we talk about

11  it here or do we talk about it there?  So -- and Mr. Alvarado

12  was very concerned about his boys, you know, "Are my boys with

13  us?  Are my boys coming?  I need to speak with my boys, too."

14  Q   And he never told you that his boys were involved -- at

15  that point, when my client was arrested, he never told you that

16  Arnoldo Alvarado was involved in the shooting?  You didn't have

17  that information from Pedro Alvarado?

18  A   No.  No, I did not.

19  Q   Okay.  And your testimony now is that -- because we

20  reviewed two notes.  When did you take those handwritten notes?

21  At the scene?

22  A   Those were taken after we got to the FBI office and these

23  guys were put in their things and I had some time to -- to pull

24  off my gear and sit down.  I sat down and I thought, I'd better

25  scribe something down in case I'm asked at a later date, and

1    those were some of the notes that I scratched down.

2         **(Pause)**

3    Q    At the point that Arnoldo Alvarado is arrested, Pedro

4    Alvarado had not given you any indication that Arnoldo Alvarado

5    was involved in the shooting, correct?

6    A    No.  No, sir, not that I'm aware of.

7    Q    Okay.  At the point that my client was arrested, Arnoldo

8    Alvarado himself had not given you or anyone else, to your

9    knowledge, any information that he was involved in the shooting

10   of Agent Harrison?

11   A    He had not given any to me, sir.  I don't -- like I said,

12   I didn't speak to him and I can't speak for the other agents.

13        **THE COURT:**  Well, let me clarify that.  Then why did

14   you tell us that Mr. Pedro Alvarado wanted his sons to come to

15   the FBI office to talk?

16        **THE WITNESS:**  Because when -- when we -- when we were

17   transporting him and he was very talkative.

18        **THE COURT:**  No.  But let's -- before -- I want to

19   know about what he said, not once you already transported

20   Pedro.

21        Why did -- why did he lead you to believe that his

22   two sons needed also to go to the FBI offices to talk about

23   this incident?

24        **THE WITNESS:**  Because I had asked, will you and your

25   sons accompany us -- accompany me to talk.

Hugas - Cross / By Mr. Garcia                    139

1          **THE COURT:**  All right.

2          **THE WITNESS:**  I was already bringing the sons, and

3    the first thing that I did when I got to the scene, when the

4    sons were standing right next to him, I moved them to the front

5    of the house and told the Constables, "Watch these guys"

6    because we had received information that they were there, they

7    were part of the incident, or that they would know something

8    about the incident so they were already persons of interest,

9    they were already suspects.  I had physically moved them from

10   where they were at and they were out of his sight, and he had

11   even asked me a couple times, you know, about, you know, his

12   sons, because I -- I tried to think if I had mentioned to him

13   about his sons, or where they were or the different things, but

14   we had -- when I came over there and I was talking to him and

15   everything else and asking about the pickup truck, the suspects

16   that were in my mind were already, you know, him and his sons

17   because that's what we were told at the other residence.

18         **THE COURT:**  All right.  Do you have any other

19   questions?

20   **BY MR. GARCIA:**

21   Q    When you --

22         **MR. GARCIA:**  Yes, your Honor.

23         **THE COURT:**  All right.

24   //

25   //

**EXCEPTIONAL REPORTING SERVICES, INC**

1    **BY MR. GARCIA:**

2    Q     When you instructed the Constables -- when you instructed

3    my client and, again, Pedro Alvarado is the oldest person

4    there, correct?

5    A     That is correct.

6    Q     All right.  And earlier you said, "there's other

7    juveniles."

8              Are you referring to my client as a juvenile?

9    A     There was -- no, I don't -- I don't know the age of those

10   -- the children.  I didn't know.  The only one that I was

11   formally told the age of when I was there was when we were

12   leaving the infant with -- I believe it was a 14-year-old and

13   there was other agents and other officers still present, too.

14   Q     Okay.  And you didn't have a warrant to arrest my client,

15   correct?

16   A     No, I did not.

17   Q     Okay.  Did you ever think to get one?

18   A     Did I think to get a warrant to arrest your client?

19   Q     Yeah.

20   A     No, sir.  I -- I didn't arrest your client, sir.

21   Q     You directed the Constables --

22            **THE COURT:**  Let's not argue.  Let's not argue.

23            **MR. GARCIA:**  Okay.

24            **THE COURT:**  You know, that's a legal point.

25            **MR. GARCIA:**  Right.

1          **THE COURT:**  Nonresponsive anyway

2          **MR. GARCIA:**  Well, your Honor, may I ask --

3          **THE COURT:**  It's nonresponsive of the question

4    anyway.

5    **BY MR. GARCIA:**

6    Q    Okay.  In regards to the -- the arrest of my client, you

7    would agree that there was no warrant, correct?

8    A    There wasn't a warrant for the arrest of your client.

9    Q    Okay.  And in order to get a warrant, what do you need to

10   do?

11         **THE COURT:**  An arrest warrant, right?

12         **MR. GARCIA:**  I'm sorry.  Your Honor, I would ask that

13   the witness be allowed to answer the question.

14         **THE COURT:**  Well, is it a search warrant?  Is it a

15   different -- there are different types of warrants.  I want to

16   make sure the question is clear.

17   **BY MR. GARCIA:**

18   Q    In order -- the question was, in order to arrest my

19   client, what does he need to do?  What type of warrant do you

20   need?

21         **MR. ALANIZ:**  Objection just to relevance.  I mean

22   what actually --

23         **THE COURT:**  Speculation.  He never arrested your

24   client, he never spoke to your client.  He put your client in a

25   car --

1          **MR. GARCIA:**  Right, and I want to get to the point

2     that he had no reason to have him detained.  That's the point,

3     that he didn't have enough to get an arrest warrant.

4          **MR. ALANIZ:**  Well, that is a decision that the Court

5     makes.

6          **THE COURT:**  Right.  And you can ask him everything he

7     knew, which I think we've been over, but if you want to cover

8     anything else that he had -- he had knowledge of that would

9     form the basis of probable cause, you are welcome to ask him.

10    **BY MR. GARCIA:**

11    Q    Why didn't you seek to get a warrant?

12    A    Because I was going to speak with them in reference to

13    Mr. Alvarado, Pedro, and his sons in reference to their

14    knowledge based off the question that Mr. Alvarado asked me to

15    speak with him, asked if he could speak in private.

16         As far as arresting with a warrant, there's all kinds

17    of different warrants and ways to arrest somebody, whether it's

18    by Indictment, whether it's by criminal complaint, which is

19    without a warrant for the criminal complaint, or whether it's

20    just on the spot, like take, for instance, the individuals are

21    caught in the middle of doing crime in the presence of Federal

22    agents.  They -- we don't leave and say "We're going to come

23    back with a warrant," we're going to arrest them.

24    Q    Right.  But that didn't happen here, right?

25    A    No.  The whole reason that I had him transported once

1   again, sir, was I had Mr. Alvarado transported because I asked

2   Mr. Alvarado, "Will you speak with me at the office?"

3   Q    Which Mr. Alvarado are you referring to?

4            THE COURT:  The father.

5            THE WITNESS:  The father, sir, and we -- and we had

6   his sons and his sons came with us also.

7   BY MR. GARCIA:

8   Q    Okay, the sons -- you didn't ask the sons to come, right?

9   A    No, we asked Mr. Alvarado if him and his sons would

10  accompany us to the office.

11  Q    Okay.  And they did not go voluntarily, correct?

12  A    Mr. Alvarado consented to that, and he rode and he told us

13  -- he told us he was going with us.  He was transported in the

14  car.  He was not handcuffed.  He rode in the front seat.

15  Q    No, no.  I'm not talking about Pedro Alvarado.

16  A    Yes, sir.

17  Q    Arnoldo Alvarado, he didn't consent to being transported

18  --

19           THE COURT:  If you know.  I mean, he's already

20  testified he never spoke to him.  He wasn't involved in putting

21  him into custody, but if you know --

22           MR. GARCIA:  No, I think you were involved in putting

23  him into custody, didn't you?

24  //

25  //

1    **BY MR. GARCIA:**

2    Q    Didn't you instruct the Constables' officers to detain

3    him?  Transport him?

4    A    To transport him.  I didn't instruct the Constables to put

5    him into hand irons and whether that's their policy when

6    transporting anybody, that's their -- that may be their policy

7    or not.  Whether it's a person that's being under arrest or

8    anyone that they put in their car.

9         I chose and I made a conscious choice to not handcuff

10   Mr. Alvarado -- Mr. Pedro Alvarado.  That was my choice.

11        I also made the choice to let him right in the front

12   seat of the vehicle that didn't have a cage in it.  I also --

13   you know, those are choices I made.

14        I can't speak to the policies of Constables, the

15   choices that they make for their own officer safety, whether

16   it's an individual that's being placed under arrest or it's a

17   single individual driving a vehicle with somebody in the back

18   seat driving a distance in a rural area or somewhere else, and

19   somebody who may be involved in a crime, I can't speak to what

20   they did or what they didn't do, sir.

21   Q    Were you present when my client was placed in the back of

22   the vehicle?

23   A    I was -- I didn't see your client get placed in the

24   vehicle.  I didn't watch your client get placed in a vehicle.

25   I just saw on the opposite passenger side of the Suburban and I

1    was actually speaking with Mr. Alvarado -- Pedro Alvarado.  I

2    was patting him down and Mr. Alvarado was the focus of my

3    attention.  His sons were being watched by Constables and by

4    other officers.  He was not my focus, Mr. Alvarado was and I

5    was very in tune with Mr. Alvarado's behavior.

6              **MR. GARCIA:**  I pass the witness, your Honor.

7              **THE COURT:**  Anything else, Mr. Alvarez?  Do you have

8    any questions?

9              **MR. ALVAREZ:**  Yes, I do, your Honor.

10             **THE COURT:**  You may proceed.

11                       **CROSS EXAMINATION**

12   BY MR. ALVAREZ:

13   Q    Agent, were you present -- were you present when the

14   agents found the illegal aliens at the Alvarado residence?

15   A    I was not.

16   Q    Your first contact with the Alvarado residence was July

17   3rd, 2012 at around 2:00 p.m.?

18   A    I'm not sure of the exact time.  It was after lunch, sir.

19   Q    Okay.

20   A    It was after -- it was directly after I had left Mr. Rene

21   Garcia's house, which was just down the street.

22   Q    Okay.  So by the time you got to the Alvarado residence

23   the incident regarding the illegal aliens had already occurred,

24   correct?

25   A    Yes, sir.

1   Q    Okay.  And based on what you know of this investigation,

2   Mr. Alvarado was already being detained for harboring illegal

3   aliens, is that correct?

4   A    I didn't know that.

5   Q    Did you know that?

6   A    I didn't know that.  I knew that when I came up

7   individuals were sitting on the ground to include his son, and

8   I didn't know if those were just occupants of the house that

9   they had cleared out of the house or -- or what they had done.

10  Q    Did Agent Olivares tell you that he had already instructed

11  another agent to be standing or sitting next to Pedro Alvarado

12  while he was at the -- after the aliens were discovered?  Did

13  you know that?

14  A    I didn't -- I didn't -- I wasn't physically -- or I wasn't

15  told anything like that, but I know just in any incident where

16  we go and make contact with the public, especially after a

17  shooting or something like this, all of the individuals will be

18  watched just as policy.

19  Q    Now when you arrived at the Alvarado residence, you

20  indicated that there were about six officers already there?

21  A    I -- I believe.  I don't know how many were in -- if

22  anybody was inside or outside, but it seemed -- if I remember

23  right, there was maybe five or six, sir.

24  Q    And, to your knowledge, did you recall anybody being

25  inside of the residence when you arrived?

1  A    Not that I'm aware of, sir.  The only one that I --

2  because I was actually surprised when they said that a child

3  was in the house laying down sleeping because Mr. Alvarado was

4  out at the front door, the door was open.  But I don't believe

5  anybody was inside except the child.

6  Q    So the child was still -- there was no agent inside the

7  house taking care of the child?

8  A    There was an agent that was in the doorway or -- or in the

9  foyer there.  I don't -- I can't say specifically where they

10 were, sir.  I don't remember exactly.

11 Q    When you arrived you were accompanied by an additional

12 five or six officers, is that right?

13 A    At least, sir.  Yes, sir.  There -- I think it was about

14 five or six.  It was a couple Rangers and two or three McAllen

15 agents also.

16 Q    Okay.  Now is it fair to say that Mr. Alvarado -- Pedro

17 Alvarado, had been detained already for approximately one hour

18 prior to you arriving, would that be correct?

19 A    I have no idea how long he was detained, sir.

20 Q    Okay.  Now to your knowledge, prior to you arriving, the

21 Alvarado family were always under some sort of guard -- agents

22 were always there, they were never left alone, correct?

23 A    I'm sorry, sir.

24 Q    That's a bad question, the way I worded it.

25          Prior to you getting there --

Hugas - Cross / By Mr. Alvarez                         148

1    A    Yes, sir.

2    Q    -- five or six agents were there, and to your knowledge

3    they had remained there since the aliens had been discovered,

4    correct?

5              **THE COURT:**  If you know.

6              **THE WITNESS:**  I didn't really know.  I just knew they

7    were still at that -- there were some guys still at that scene.

8    **BY MR. ALVAREZ:**

9    Q    Now as far as your involvement with Pedro Alvarado, isn't

10   it correct that the first time his Miranda rights were ever

11   read to him was -- was after he had been removed from that

12   house and was being transported to the FBI office, correct?

13   A    That is correct, sir.

14   Q    And prior to that his Miranda rights had never been read,

15   correct?

16   A    I -- I would -- I didn't read him his rights until we were

17   in the car.  I don't know if anybody else did or --

18   Q    Based on your review of the investigative file, other than

19   you doing that on the way to the FBI office, is there any

20   record that his rights under Miranda had been read to him prior

21   to that?

22   A    Not to my knowledge.

23   Q    And that is even after he had been detained for harboring

24   illegal aliens his Miranda rights were never read, correct?

25   A    That -- that would be correct, sir.

1   Q     Okay.

2   A     I don't believe by anybody on the scene there.

3   Q     And even after being arrested he was allowed to engage

4   officers in conversation like yourself after 2:00 o'clock, not

5   having his rights read, correct?  You didn't know that, but

6   isn't that correct?

7   A     I -- if he was being arrested for the alien smuggling, the

8   transporting and my involvement with Mr. Alvarado was strictly

9   with the shooting, it had nothing to do with the other things.

10  Q     That's fine.  I just want to get a time line when he was

11  first advised of his Miranda rights, and that was, you say, on

12  his way to the FBI office, correct?

13  A     Yes, sir.

14  Q     Now -- and he did engage in conversation even at the

15  residence with you when you arrived, correct?

16  A     Yes, he did.  He was very talkative.

17  Q     And nobody told him at that time that he had a right to

18  remain silent, correct?  You didn't tell him?

19  A     No, sir.  As a matter of fact, he had asked -- he

20  requested to speak with me.

21  Q     But what I'm saying is you didn't tell him -- or anybody

22  else that you heard, advised him that he had a right to remain

23  silent, correct?

24  A     Right.

25  Q     Now -- because you had already told him that you -- that

1    he -- that you knew that he knew why you were there, correct?

2    A    Yes, sir.

3    Q    And what does that mean, he knew why you were there?  What

4    did that mean to you?

5    A    Because --

6    Q    What did that mean to you?  He knew you were there for

7    what reason?

8    A    He had told us he knew why we were there.

9    Q    To investigate what?

10   A    The shooting.

11   Q    And the -- this consent form that he signed, that he --

12   where did he sign that?

13   A    Which consent form are you talking about?

14   Q    To search the residence, when you were there.

15   A    When I was there I asked the agent to bring me -- when he

16   consented to search the residence, I asked the agent to bring

17   me a Consent to Search form.  The agent went to a car, got one,

18   brought it back and then had given that form to Mr. Alvarado.

19   I didn't physically watch him sign that form.  I do recall

20   seeing Mr. Alvarado with the form at his house at the front

21   door up against the wall.  I do recall him holding the form

22   there at the house.

23   Q    But you did not see him sign it?

24   A    No, sir, I did not.

25   Q    Have you seen a signed consent form?

1   A    I haven't seen it.

2   Q    So the search was -- who conducted the search?  Who led

3   the search?

4   A    I led the search that --

5   Q    So you did that without seeing an executed search warrant

6   -- consent form?

7   A    I already had verbal consent from Mr. Alvarado who had

8   given me verbal consent, and then I backed that up with -- for

9   our own, you know, reassurance with also a written copy, but

10  Mr. Alvarado had given me verbal consent to search his house.

11  The written consent was something that I did on top of the

12  consent that he had already granted.

13  Q    When did he give you that oral consent?

14  A    When I asked him, "Do you have any weapons in the house?"

15  and he said, "No."  And I said, "Can I take a look inside your

16  house?" and he said, "Yes, you can."  And then I turned and

17  told the guy, "Go get a consent form."

18  Q    Now are you sure you said, "Do you have any weapons in the

19  house?" or "Do you own any weapons?"

20  A    I don't know the exact words, sir.

21  Q    Okay.

22  A    I asked if he --

23  Q    There is a filing by the Government in this case

24  indicating that you asked him whether he owned any weapons, any

25  firearms?

1    A    Okay, sir.

2    Q    Okay, a bit different.

3    A    Okay, sir.  I don't understand the question.

4    Q    I'm just trying to find out what you said.  Did you ask

5    him, "Do you own any weapons?" or "Do you have any firearms in

6    the residence?"  That's a big difference.

7    A    I don't know the context of the words, sir.  I asked if

8    there was any -- I don't know which one I asked.

9    Q    Okay.  So it's possible that he could have been telling

10   you the truth, that he didn't own any weapons as opposed to

11   having weapons in the house, correct?

12   A    Is it possible he could have been telling me the truth?

13   Q    If he told you that he did not own any weapons as alleged

14   in the Government's filing, there's a big difference, correct?

15        Because I've got your report where it says that he

16   stated that he did not own any weapons.

17   A    Okay, is that my report or notes or?

18   Q    Report.

19   A    Okay, sir.  If that's what the report says then that's

20   what I wrote.

21   Q    Now --

22        **(Pause)**

23   Q    The items that were discovered in the house were rounds in

24   the closet, correct?  Some rounds in the closet?

25   A    We spent -- I don't remember exactly what everything was.

1   We spent probably 30 seconds in the house, if that, because we

2   immediately saw rounds all over the place pretty much.  I

3   opened one drawer in the first room I went in and then walked

4   out.

5   Q    What did you, yourself, find?

6   A    I found in the drawer, when I opened -- it was either the

7   first or second drawer in the dresser in the room to the left,

8   there were several rounds in the drawer and there was what

9   appeared to be either a Ruger or whatever, a 9 millimeter

10  magazine.

11  Q    How many magazines, one or more?

12  A    I only remember one magazine.  I remember quite a few

13  rounds, but I only remember one magazine.

14  Q    What kind of ammunition was it?

15  A    I -- it was multiple ammunition because that was something

16  I actually asked later, what -- what -- since I never saw any

17  of the shell casings I was asking what -- if anybody knew what

18  kind of rounds we were looking for.

19  Q    You don't presume that was --

20  A    Don't know.  Do not know, sir.

21  Q    The -- the pistols, where were those located?

22  A    I wasn't there when they found the pistol, sir.  I do know

23  from the report, sir, whenever that -- weapons were found in

24  the attic.

25  Q    Are you talking about the pistols and the weapons?

1   A    I -- I wasn't there when they found the weapons, sir, I

2   don't know what they were.

3   Q    Now the decision not to handcuff Pedro Alvarado was your

4   own, correct?

5   A    Right.  I didn't -- I -- that was my decision, yes, and

6   actually I conferred with Ranger Maikin to make sure that was

7   okay with him, and Mr. Alvarado said, "I'm not going to be --

8   I'm not going to be a problem.  I'm not -- I'm not -- nothing."

9   Q    Is that the reason he was not handcuffed because he

10  indicated he was not going to be a problem, he had been

11  cooperating and what not?

12  A    Yeah.  He was not -- he was -- I -- we chose not to

13  handcuff him.  And, like I said, he had consented to go to the

14  FBI office to speak with us and he had asked to speak with me.

15  Q    Did he have any choice whether to go or not?

16  A    I asked him.

17  Q    Well, he was already under detention for the illegal

18  aliens.

19  A    Well, that's something that I wasn't -- because -- here's

20  -- when you're saying, "Did he have to?"  Well, no, actually,

21  if he would have said, "No, I won't" then my option would have

22  been call back to the Center and say, "He's not going back with

23  me.  I can talk to him here.  Can Maikin and I talk to him

24  here?" and I would have gone inside and sat at the table in the

25  house and I would have had the conversation with him there.

1  Q    So your situation about him not being under arrest doesn't

2  -- does not relate to any activity involving the aliens, it

3  deals with the investigation on the shooting, correct?

4  A    Yes, sir.  When I came on scene I walked in directly for

5  the shooting.  My focus and my drive from the get go, from the

6  start, from clearing the property, was just, you know, can we

7  find a weapon, can we find a shooter?

8            **MR. ALVAREZ:**  I don't have any more questions, Judge.

9            **THE COURT:**  All right.  Thank you, Agent Hugas --

10           **MR. ALANIZ:**  Judge, I've got a couple of questions,

11  just Redirect.

12           **THE COURT:**  I don't think it necessary.

13           **MR. ALANIZ:**  With the one issue, Judge.  I think that

14  the record is not clear --

15           **THE COURT:**  Time-wise?

16           **MR. ALANIZ:**  No, about the written consent form.  I

17  think Mr. Alvarez raised some questions -- had some questions

18  concerning whether or not he knew that the consent form --

19  written consent form had been signed before he went into the

20  residence.

21           **THE COURT:**  It doesn't matter.  He had verbal

22  consent.

23           **MR. ALANIZ:**  Okay.  That was the only issue, Judge.

24           **THE COURT:**  That was clear to me.

25           All right, thank you, Agent.

1          **THE WITNESS:**  Thank you, sir.

2      **(Witness excused)**

3          **THE COURT:**  All right.  Does the Defendants want to

4   put on any evidence?

5          **MR. ALANIZ:**  We have more witnesses, Judge.

6          **THE COURT:**  Well, I want to finish up with the issues

7   of the searches and probable cause for the arrests.

8          **MR. ALANIZ:**  Okay.  Because the rest of the witnesses

9   I've got basically --

10         **THE COURT:**  Have to do with confessions at the FBI

11   office.

12         **MR. ALANIZ:**  And also the signed consent form by

13   Mr. Pedro Alvarado, I have the Agent who witnessed the signed

14   consent form.

15         **THE COURT:**  All right.  I gathered that he gave

16   consent.

17         **MR. ALANIZ:**  And I also have the Agent, the Constable

18   who transported him.

19         **THE COURT:**  All right.

20         **MR. ALANIZ:**  I think there's some allegations that he

21   asked for a lawyer.  That was --

22         **THE COURT:**  That would go to his confessions.

23         **MR. ALANIZ:**  Right.

24         **THE COURT:**  Okay, I want to kind of maybe handle that

25   a little bit separately.

1          **MR. ALANIZ:**  Sure.

2          **THE COURT:**  Let's -- because if --

3          **MR. ALVAREZ:**  Judge, that's something we can maybe

4  resolve because I'm -- you know, I'm seriously thinking about

5  not challenging the statements that he made, you know, and so

6  I'd like to conclude what we're doing at this stage because

7  I've got another Federal case at 2:00 o'clock in the afternoon.

8  I thought we'd be through by now.

9          **THE COURT:**  I thought we'd be through by now, too,

10  and I have nine cases at 2:00 o'clock.

11          **MR. ALVAREZ:**  So -- yeah.  So, you know, I've got --

12          **THE COURT:**  Did you-all intend to call any witnesses?

13          **MR. ALVAREZ:**  Not -- no, your Honor.  Not Pedro

14  Alvarado.

15          **THE COURT:**  Did you intend to call any witnesses on

16  this issue of the search of the home and the arrests of your

17  clients?

18          **MR. GARCIA:**  No.

19          **THE COURT:**  All right.

20          **MR. ALANIZ:**  There's another search, Judge.  There

21  was a search of the -- of their pickup truck.  Like after the

22  consent was given by the spouse of Mr. Alvarado --

23          **THE COURT:**  Okay.

24          **MR. ALANIZ:**  I don't know if they're going to contest

25  it or not because I've had witnesses to that consent also, a

1   written consent.

2           **THE COURT:**  All right.  Does anybody --

3           **MR. ALVAREZ:**  Judge, I hadn't even thought about that

4   issue.

5           **MR. GARCIA:**  I didn't -- it hasn't been brought up in

6   this case right now.

7           **THE COURT:**  It hasn't been raised.

8           **MR. GARCIA:**  I wasn't intending to argue that, so --

9           **THE COURT:**  Okay, nobody is contesting that at this

10  time.

11          **MR. GARCIA:**  No.

12          **THE COURT:**  All right.  Then I'm going to make my

13  Findings.

14          The Court finds that there was probable cause for the

15  arrests of both Pedro and Arnoldo Alvarado based on the

16  totality of the circumstances, the arrests being made, perhaps

17  given in -- looking at the light most favorable to the

18  Defendants, the arrests being made at the time they were placed

19  into custody by Agent Hugas on this charge, and at that time

20  Mr. Hugas was -- had been made aware of -- or had knowledge

21  that there had been a shooting of an agent that occurred near

22  this intersection of Cemetery and 493, also known as 11th

23  Street, 493 in Hargill, Texas;

24          That shell casings had been recovered from the scene

25  of that intersection that were consistent with a 9 millimeter;

1          That Mr. Garcia had advised Federal agents that he

2     was a witness to these events of that evening and that he had

3     seen Pedro Alvarado and his two sons in a pickup truck firing

4     their weapon at the fleeing vehicle of Agent Harrison.

5          While there's no -- in and of itself, that statement

6     from a source that the Government didn't know was reliable and

7     alone I would not have found sufficient probable cause, but

8     when that's corroborated with the physical evidence that was

9     discovered at the scene and the evidence discovered at the

10    Alvarado home, that being the shell casings that -- and that

11    Mr. Alvarado had lied about -- or at least led the agent to

12    believe that there were no weapons, that he didn't possess or

13    didn't own any weapons.

14         And then Mr. Alvarado's then admission to the agents

15    that he had lied and that he had knowledge or was involved in

16    the incident of the shooting and wanted to speak to them, all

17    of those, I believe, establish probable cause to believe that

18    the Defendants had been involved in this incident the night

19    before.

20         I find the consent voluntarily given on the search of

21    the residence by Mr. Alvarado who was the only one who had

22    standing to consent to that search.  So I deny the Motion to

23    Suppress.

24         When do you-all want to address the statements that

25    were made by these individuals?

1          **MR. ALANIZ:**  The Government -- whenever the Court

2    wants them.

3          **THE COURT:**  All right.  Mr. Alvarez was indicating he

4    no longer wants to challenge them so we'll have -- Mr. Garcia,

5    when do you want to address the statements your client made, if

6    any?  I don't know what he made.

7          **MR. GARCIA:**  He made one statement to the agents at

8    the FBI building.

9          **THE COURT:**  All right.  But I know you wanted to

10   challenge that because your claim is that your client asked for

11   a lawyer?

12         **MR. GARCIA:**  Right.

13         **THE COURT:**  All right.  So if -- okay.

14         When do you want to be ready to?

15         **MR. GARCIA:**  Today, tomorrow, any day.

16         **THE COURT:**  Okay.  I mean, I'm -- I could do it --

17   let's take a lunch recess and do it --

18         **MR. ALANIZ:**  We can do it whenever the Court wants.

19   The agents are here, are ready.  The agents are --

20         **THE COURT:**  Do you-all want to keep going or do you

21   want to take a brief recess?  Take an hour recess or something

22   --

23         **MR. ALANIZ:**  Judge, with regards to that statement,

24   there will only be two -- two short witnesses.  I mean, so --

25         **THE COURT:**  Let's just keep going then.

1          **MR. ALVAREZ:**  So I could attend this -- I'd like to
2    attend and I can't do it later this afternoon.  Maybe we could
3    just continue and finish up
4          **MR. ALANIZ:**  I've got really just two witnesses who
5    witnessed taking the statement.
6          **THE COURT:**  Okay.  So this is issue only as to
7    Mr. Arnoldo Alvarado?
8          **MR. ALANIZ:**  Right, and the other -- the only
9    witness, Judge, would be the Constable who would testify that
10   he -- this Defendant never asked for any lawyer.  We can put
11   him on the stand, it would take about 30 seconds.
12         **THE COURT:**  Sure.  All right.
13         **MR. ALANIZ:**  Unless he's got Cross.
14         **THE COURT:**  Okay.  Well, he probably will have some
15   cross.  All right.
16      **(voices overlap)**
17         **MR. GARCIA:**  Judge, I'm going to be calling my client
18   as a witness as well.
19         **THE COURT:**  Yes, I thought you might given the likely
20   testimony of the agents.  All right.
21         So, Mr. Pedro Alvarado can be removed from the
22   courtroom.  His hearings are all over.  These proceedings are
23   concluded as to Mr. Pedro Alvarado.  Of course, his counsel is
24   welcome to remain in the courtroom.
25         Right, so you -- can you have somebody get your next

1    witness?  This is --

2              **MR. ALANIZ:**  He is the Constable.

3              **THE COURT:**  Oh, all right.

4              **MR. ALANIZ:**  I'll go get the Constable.

5              **MR. WARNER:**  Judge, may I step out for just a brief

6    moment and return?

7              **THE COURT:**  Yes, okay.  Just make it quick.

8              And the next witness after the Constable will be --

9              **MR. ALANIZ:**  Will be FBI Agent Kyle Boynton who

10   helped during the waiver for Miranda rights and then perhaps

11   Mr. Baca, who was also present during the taking of the -- of

12   the statement.

13             **THE COURT:**  And then the statement, what was it?

14   What are we fighting over?  Is it a full confession, or was it

15   just one sentence?

16             **MR. ALANIZ:**  A full confession.  Well, if we could

17   approach the bench on that.  Could we approach the bench,

18   Judge?

19             **THE COURT:**  Sure.

20        **(Begin bench conference at 12:14 p.m.)**

21             **MR. ALANIZ:**  He's here if you need him.  I didn't

22   plan on calling him.  All the -- there was three -- there were

23   two agents who were present during the Miranda warnings which

24   is Kyle Boynton and Ernesto Baca.  And then for the taking of

25   the confession Kyle Boynton left and the only individuals

1   present during the confession -- to the statement were Jorge

2   Velasco and Agent Ernesto Baca.

3            THE COURT:  And was this statement ever recorded in

4   any way?

5            MR. ALANIZ:  No, just (indiscernible), that's it.

6            THE COURT:  Okay.

7            MR. ALANIZ:  And I didn't plan on calling

8   Mr. Velasco.

9            MR. GARCIA:  Well then I subpoenaed him.  I'll plan

10  on calling him.

11           MR. ALANIZ:  Yeah, he's here.  You can call him.

12           THE COURT:  Now you keep referring to these

13  confessions as "full confessions."

14           MR. ALANIZ:  Yeah, what does he say?

15           THE COURT:  Yeah.  I mean, does --

16           MR. ALANIZ:  He says "I shot" -- "my dad" you know,

17  "woke us up in the middle of the night, told us get the guns,

18  get in the truck.  We drove over there.  We saw the agent.  I

19  heard shots.  I got up and started shooting."

20           THE COURT:  So why can't we work this case out?  I

21  mean, is there a dispute that they said this or not, or it's

22  just a dispute that legally it's not admissible?

23           MR. GARCIA:  I'm sorry, what?  It's not --

24           THE COURT:  Okay, the Government is telling me they

25  have evidence, a full confession.

1          **MR. GARCIA:**  Uh-huh (yes).

2          **THE COURT:**  I'm trying to -- I thought I had an idea

3    about the defense of the case, but now I'm not sure that I do.

4    I thought the defense of the case was, yeah, we were -- we

5    happened to be out there, but it was crazy, the guy in the

6    pickup with the brush guard that was doing all the shooting.

7          **MR. GARCIA:**  Uh-huh (yes).

8          **THE COURT:**  But now I've been told, no, it's you're

9    -- your guy is actually going to hone up and say, "I was the

10   shooter."

11         **MR. ALANIZ:**  And we have a witness from the pickup

12   truck, not the driver but a passenger who says we followed --

13   we saw the shooting, we got behind the Alvarados.  We have a

14   video at a store when basically they're following the agent at

15   about 100 miles an hour and the passenger is -- you can see the

16   gun shooting.

17         **THE COURT:**  So what?  You-all can't work this case

18   out?

19         **MR. ALANIZ:**  He says that it's just too much time.

20   Well, I mean, it's --

21         **THE COURT:**  It's a lot more time when you don't have

22   acceptance.

23         **MR. ALANIZ:**  Well, that's --

24         **THE COURT:**  I mean, I have no idea what the

25   Guidelines are.  I've never even looked at them on this case.

1          **MR. ALANIZ:**  Well, it's up to life imprisonment

2    because you have the discretion to --

3          **THE COURT:**  I know what it's up to, but --

4          **MR. ALANIZ:**  Right.  If you look at the Guidelines,

5    there's 10 minimum on that 34-C Count, and on the agg. assault

6    or attempted murder it's about seven or eight years, so it's up

7    to about 18 years.

8          **THE COURT:**  All right.

9          **MR. ALANIZ:**  And that's what it comes down to.

10         **THE COURT:**  Now -- okay, is there -- and that's with

11   a acceptance and --

12         **MR. ALANIZ:**  Probably -- with acceptance, yes.

13         **THE COURT:**  Okay.

14         **MR. ALANIZ:**  But now we've got all this stuff, you

15   know, nobody is going to get acceptance --

16         **THE COURT:**  Well, he's not going to get the third

17   party point.

18         **MR. ALANIZ:**  Exactly.

19         **THE COURT:**  Because of this.

20         **MR. ALANIZ:**  Right.

21         **THE COURT:**  So 202 is that the end of the range?  Two

22   is probably six years.

23         **MR. ALANIZ:**  Uh-huh (yes), right.

24         **THE COURT:**  When you weigh it that high and that's

25   assuming low end to low end.

1          **MR. ALANIZ:**  Right.

2          **THE COURT:**  It doesn't always happen when you put the

3     Government to its burden and expense; you don't accept

4     responsibility.  I thought maybe Dad, following his order,

5     would take the bigger hit for his kid.  You know, maybe there's

6     a role issue.  If it was just a kid who's being directed by his

7     dad.

8          **MR. ALANIZ:**  Right.

9          **THE COURT:**  A lot of coercion, that's a 3553(a)

10    issue.

11         **MR. GARCIA:**  But I -- you know, those are issues that

12    we haven't even -- that we haven't even discussed.  I didn't

13    think that there was -- because from the beginning the

14    Government's position had been that there was no deals at all.

15         **MR. ALANIZ:**  No, the deal was to try to --

16        **(Voices overlap)**

17         **MR. ALANIZ:**  Sure, that is the deal.

18         **THE COURT:**  Yeah.

19         **MR. GARCIA:**  That there was no -- if there was no

20    deal, they (indiscernible) call to the Indictment, then, you

21    know, all we were looking at was acceptance.  So even

22    considering bringing up the issue of role or bringing up

23    coercion or bringing up anything else, you --

24         **THE COURT:**  You're always free to bring those up.

25         **MR. ALANIZ:**  Yeah --

1          **MR. GARCIA:**  How often are those things granted, in

2    my experience?

3          **THE COURT:**  I've done role adjustment more often than

4    not.

5          **MR. GARCIA:**  I agree.  And I guess this is --

6          **THE COURT:**  Because with the types of cases we're

7    getting --

8          **MR. GARCIA:**  But how many other attempted murders of

9    a Federal agent have we had?

10          **THE COURT:**  Right, and I don't know what kind of

11    preplanning or whether this was aberrant, not aberrant.

12          **MR. GARCIA:**  I know.

13          **THE COURT:**  I can't -- I don't know if

14    (indiscernible) from dad and son yet.  I don't have a feel for

15    that, and I don't know his criminal record if he's got

16    (indiscernible) or (indiscernible) some crazy hothead.

17          **MR. GARCIA:**  This kid is clean.  This kid is --

18          **THE COURT:**  Right.  He went to high school, has a

19    good record and everything and dad says, all right, we're going

20    to go --

21          **MR. GARCIA:**  Because what I've gotten in return is

22    basically a -- we're not going to plea, that's it.  I mean,

23    nothing else so I'm -- we are here.

24          **THE COURT:**  Yeah.

25          **MR. GARCIA:**  But, again, even today is the first

1  indication we have because it's not in any other reports that

2  one of the agents testified that Harrison said he had a gun.

3  That wasn't anywhere else.

4          **MR. ALANIZ:**  Yeah.  No, it's in the report, you just

5  didn't see it, it's in the report.  That Agent Harrison

6  countered.  I mean, he told -- that's why they were looking for

7  the weapon.

8          **THE COURT:**  Right.  Right.

9          **MR. ALANIZ:**  He told us -- that's why they spent --

10         **THE COURT:**  Right.  He told an agent, but they never

11  found any.

12         **MR. ALANIZ:**  Right.  (indiscernible), arrested.  You

13  know what, I forgot, I didn't have it with me, I left it at the

14  house.  Both weapons were found at his home so he didn't have a

15  weapon --

16         **MR. GARCIA:**  Uh-huh (yes).

17         **MR. ALANIZ:**  -- you know, so I don't know what

18  defense you have other than the agent --

19         **MR. GARCIA:**  That my client reasonably believed that

20  he was being shot at when he started shooting.

21         **MR. ALANIZ:**  And then did he follow for five miles

22  while shooting at him 15 times?

23         **THE COURT:**  Well, okay.  The -- when you say "full

24  confession" --

25         **MR. ALANIZ:**  Right.

1          **THE COURT:**  -- does his client ever -- do they ever

2     say, "Oh, we thought we were being shot at?"

3          **MR. ALANIZ:**  No.  He says, "I heard shots."

4          **THE COURT:**  Okay.

5          **MR. ALANIZ:**  "I heard shots" and that's it.  But what

6     happens, Judge, is the person who shoots first is his brother

7     with the rifle.

8          **THE COURT:**  Sure.

9          **MR. ALANIZ:**  He says, "I heard shots.  I ducked and

10    then my brother started shooting with the rifle and I started

11    shooting with mine -- into the air" he says.  Of course,

12    there's like five or six different bullet holes.

13         **THE COURT:**  Right.

14         **MR. ALANIZ:**  And all of the slugs matched the 9

15    millimeter that we found at his home.

16         **THE COURT:**  Okay.  All right.  Well, let's -- we'll

17    let the dust settle, yes, so we'll need to hear this thing and

18    then hopefully we-all can visit some more.

19         **(End bench conference at 12:20 p.m.)**

20         **THE COURT:**  Okay, so I'm going to hear these two

21    quick -- where's the Constable?

22              If you can step forward.  Sorry about the delay here.

23    If you would just raise your right hand and be administered the

24    oath before you testify.

25    //

1          **MARTIN BROWN, GOVERNMENT'S WITNESS, SWORN**

2          **THE WITNESS:**  Yes.

3          **THE COURT:**  All right.  Could you please be seated

4    over here?

5          **MR. ALANIZ:**  May I proceed, your Honor?

6          **THE COURT:**  Yes, you may.

7                        **DIRECT EXAMINATION**

8    BY MR. ALANIZ:

9    Q    Sir, could you please state your full name?

10   A    Martin Bradley Brown.

11   Q    And, sir, where are you employed?

12   A    With the County of Hidalgo, the Constables Office,

13   Precinct 4.

14   Q    Were you employed on -- as an officer back on July the 1st

15   of last year?

16   A    Yes, sir.

17   Q    And do you recall being asked by someone to go over to the

18   Hargill area to assist some Federal agents?

19   A    Yes.

20   Q    What were you told to do, sir?

21   A    Head out to Hargill and pick up some individuals and

22   transport them to the FBI building.

23   Q    Do you have any recollection, sir, about what time you got

24   to the residence there in Hargill?

25   A    According to my report, it was about 3:30 or so.

Brown - Direct / By Mr. Alaniz                    171

1   Q    In the afternoon?

2   A    Yes, sir.

3   Q    Okay, and what happens when you get there, sir?

4   A    I made contact with an agent, I can't recall the name.  He

5   tells us that there's three individuals that need to be

6   transported, so once they finished doing what they were doing I

7   picked up a gentleman and we transported him to the FBI

8   building.

9   Q    Who did you pick up?  (indiscernible) your report.

10  A    Arnoldo Alvarado.

11  Q    Did you talk to Mr. Alvarado before you put him in your

12  patrol vehicle, sir?

13  A    Just small talk, trying to --

14  Q    Okay.  What did you talk about, if you recall?

15  A    As far as small talk?

16  Q    Yes.

17  A    He had some dogs in the back which we spoke about his

18  dogs, just trying to keep the -- keep it light.

19  Q    Did you tell him -- when you put him into the vehicle,

20  what -- why -- where he was going?

21  A    I told him he was being detained, that we were going to --

22  that we had some questions for him, that he needs to be

23  transported to the FBI building.

24  Q    And then you put him in your vehicle?

25  A    Yes, sir, I did.

1   Q    Before putting him the vehicle, did you put handcuffs on

2   him?

3   A    Yes, I did.

4   Q    Why is that, sir?

5   A    Departmental policy and also officer safety.

6   Q    Okay.  You put him in your vehicle and then -- were you by

7   yourself with Mr. Arnoldo Alvarado on the way from Hargill to

8   the FBI building?

9   A    Yes.

10  Q    Okay.  On the way from the -- on the way to the FBI

11  building, did you talk to Mr. Alvarado at all?

12  A    Just small talk, making sure he was okay.  I believe we

13  talked about him wanting to become an AC tech, something like

14  that.

15  Q    At any time in the transport from Hargill to the FBI

16  building, sir, did Mr. Arnoldo Alvarado ever ask you or tell

17  you that he wanted to speak to a lawyer?

18  A    No, sir.

19  Q    Did he ever tell you that he wanted to remain silent?

20  A    No, sir.

21          **MR. ALANIZ:**  I'll pass the witness, your Honor.

22          **THE COURT:**  All right.  Any Cross?

23          **MR. GARCIA:**  Thank you, Judge.

24  //

25  //

1                        **CROSS EXAMINATION**

2    **BY MR. GARCIA:**

3    Q    Constable Brown --

4    A    Yes, sir.

5    Q    What kind of handcuffs did you use to handcuff my client?

6    A    Normally -- the ones that I carry are Smith and Wesson,

7    sir.

8    Q    Okay, and those are the ones with -- that have a chain in

9    the middle or --

10   A    Yes, sir.

11   Q    Okay.  They're not -- they're not fixed?

12   A    They're not the hinged, no, sir.

13   Q    Okay.  They're not hinged, okay.

14   A    Yes, sir.

15   Q    Did you also have leg irons?

16   A    I do carry leg irons.  I do not recall whether I put leg

17   irons on him or not.

18   Q    Okay.  You asked him if he was going to give you trouble

19   and whether or not you needed to use the leg irons, correct?

20   A    I can't -- I don't recall.

21   Q    In other words --

22   A    I don't remember asking him --

23   Q    Well, I mean, would you be surprised if that occurred when

24   you were going to place him in the car?  I mean, is that --

25   A    Normally I ask people, you know, it -- if they seem

Brown - Cross / By Mr. Garcia                    174

1    they're going to be calm it's just handcuffs in the front.  If

2    I think they're going to run from me or -- I'll put handcuffs

3    on them, but as far as the Departmental policy as to leg irons,

4    we don't have one.

5    Q    Okay.  So that's like a game time decision for you?

6    A    Right, officer preference I would say.

7    Q    Okay.  And did he seem -- you didn't sit him in the back

8    -- strike that.

9          You didn't sit him in the back seat -- I mean, the

10   front seat, correct?

11   A    That's correct.

12   Q    You sat him in the back seat?

13   A    Yes, sir.

14   Q    Okay.  And that would be in the Crown Victoria?

15   A    Yes, sir.

16   Q    Okay.  And is there a cage between you and my client?

17   A    On that particular Crown Victoria, yes, sir.

18   Q    Okay.  Earlier I showed you some photographs, correct?

19   A    Yes, sir.

20   Q    And I'm going to ask you that you look at those

21   photographs again.

22          **MR. GARCIA:**  May I approach the witness, your Honor?

23          **THE COURT:**  You may.

24   //

25   //

1   **BY MR. GARCIA:**

2   Q    And they've been previously marked as Defendant's Exhibit

3   Number 9, 10, 11 and 12.

4            Out of those -- and I've previously shown them to the

5   Government, out of those, which ones would you say best shows

6   the way the Crown Victoria was where he was sitting during the

7   transport?

8   A    9, 10 and 12.  Oh, I'm sorry, can you repeat this?

9   Q    Which photographs would you say best describe the

10  condition of the Crown Victoria that you transported him in?

11  A    I would say 9, 10 and 12, sir.

12  Q    Okay, 9, 10 and 12?

13  A    Yes, sir.

14  Q    And Number 11 you excluded because there's no cage,

15  correct?

16  A    That's correct.

17  Q    Okay.

18          **MR. GARCIA:**  Your Honor, at this time I would ask

19  that Defendant's 9, 10 and 12 be admitted for purposes of this

20  hearing.

21          **MR. ALANIZ:**  I have no objection, your Honor.

22          **THE COURT:**  Sure.  Demonstrative aid, the Court will

23  allow.

24      **(Defendant's Exhibits Numbers 9, 10 and 12 were received**

25  **in evidence)**

1          **MR. GARCIA:**  Thank you, your Honor.

2          **THE COURT:**  May I see them?

3          **MR. GARCIA:**  Yes, your Honor.

4      **(Pause)**

5  BY MR. GARCIA:

6  Q    The Smith and Wesson handcuffs --

7          **MR. GARCIA:**  May I approach, your Honor?

8          **THE COURT:**  You may.

9  Q    -- I'm handing him Defendant's 4, does that -- that looks

10 like them, right?

11 A    Yes, sir.

12 Q    Does that accurately depict what they look like, the ones

13 that he wore?

14 A    Yes, they were the same as up there.

15 Q    Okay.

16         **MR. GARCIA:**  Your Honor, I would ask that Defendant's

17 4 be admitted.

18         **MR. ALANIZ:**  No objection, your Honor.

19         **THE COURT:**  4 is admitted.

20     **(Defendant's Exhibit Number 4 was received in evidence)**

21         **MR. GARCIA:**  Thank you.

22 BY MR. GARCIA:

23 Q    Did you read my client his Miranda rights?

24 A    No, sir.

25 Q    How long did it take you to drive from Hargill to the FBI

Brown - Cross / By Mr. Garcia                    177

1    office in McAllen?  Or how long did it take you on that

2    occasion?

3    A    Twenty, 30 minutes, give or take.

4    Q    Okay.  Is that a common route for you to take?

5    A    It would be the fastest route which would just be down --

6    is it 490 to 281 South to Nolano, I believe.

7    Q    Okay.  Now if there's a difference there between 20 and 30

8    minutes, would you say it's 30 minutes or 20?  Closer to 20 or

9    closer to 30?

10   A    Closer to 30.

11   Q    Okay.  Did you have a warrant to arrest my client?

12   A    He wasn't under arrest, sir, no.

13   Q    Okay.  Had you seen him commit a crime?

14   A    No, sir.

15   Q    Who directed you off to that location?

16   A    I believe my supervisor, Sergeant Aaron Moreno.

17   Q    Would you agree that there were a lot of officers there?

18   A    Oh, yes.

19   Q    Had you ever seen that many before?

20   A    That many?

21   Q    Uh-huh (yes).

22   A    In one space -- in one spot?

23   Q    Yes.

24   A    Several times before, yes, sir, but not -- on different

25   occasions, different scenes.

EXCEPTIONAL REPORTING SERVICES, INC

Brown - Cross / By Mr. Garcia                              178

1  Q    Okay.  Had you ever responded to a shooting like this

2  before?

3  A    In my previous employment, yes.

4  Q    Okay.  Okay.

5  A    Yes.

6  Q    Constable Brown, I have no further questions.

7          MR. GARCIA:  Judge?

8          THE COURT:  All right.  Thank you, Constable, for

9  being here.

10         THE WITNESS:  May I be excused?

11         THE COURT:  Yes, you are.  Please.

12     (Witness excused)

13         THE COURT:  All right.  Next witness?

14         MR. ALANIZ:  Kyle Boynton, your Honor.

15         THE COURT:  Mr. Boynton.

16     (Pause)

17         THE COURT:  Agent Boynton, if you could please step

18 forward and raise your right hand and be administered the oath.

19      KYLE BOYNTON, GOVERNMENT'S WITNESS, SWORN

20         THE WITNESS:  I do.

21         THE COURT:  All right.  You may be seated, Agent

22 Boynton.

23     (Pause)

24         MR. ALANIZ:  May I proceed, your Honor?

25         THE COURT:  You may.

1                          **DIRECT EXAMINATION**

2    **BY MR. ALANIZ:**

3    Q    Okay, Mr. --Agent, would you state your full name?

4    A    Kyle Randolph Boynton.

5    Q    And where are you employed, sir?

6    A    The Federal Bureau of Investigation.

7    Q    How long have you been with the FBI, sir?

8    A    I've been with the FBI since August of 2010.

9    Q    And I'm going to ask you some questions regarding the

10   shooting of Agent Harrison back in July of last year.

11   A    Yes, sir.

12   Q    You were out there also helping out with the

13   investigation?

14   A    I was working that day, yes, sir.

15   Q    Were you at the FBI office, sir, when Mr. Arnoldo Alvarado

16   arrived?

17   A    I was.

18   Q    Okay.  Did you have a chance to meet up or have contact

19   with Mr. Arnoldo Alvarado?

20   A    Yes, I did.

21   Q    Where did that happen and approximately what time?

22   A    It happened in one of our interview rooms on the ground

23   floor of our building, and it was maybe around 2:45, 3:00

24   o'clock in the afternoon when I first had contact with him.

25   Q    Okay.  And this interview room on the first floor, can you

1  kind of briefly describe for the Court what it looks like?

2  A    Sure.  It's maybe 14 foot by 10 foot room.  There's a door

3  on -- I'm trying to think what side of the building that is.

4  There's a door on the north wall, a window on the south wall.

5  There's a table, basically a desk made out of wood that sits

6  towards the window and multiple chairs inside that room.

7  Q    And when you first went to that room was Mr. Alvarado

8  already in the room?

9  A    Yes, he was.

10  Q    Okay.  Do you know or do you recall who else was with him

11  when you walked into that room?

12  A    There was a Hidalgo County Constable.

13  Q    Okay.  And when you got into the room -- went to the room,

14  did the Constable leave?

15  A    I don't think he left immediately, but he was in and out

16  after I came into the room.

17  Q    Besides yourself and the Constable, who else came into

18  that room?

19  A    Special Agent Sandra Torres, also of the FBI.

20  Q    And you were there for a while.  Were you involved in

21  Mr. Arnoldo Alvarado's questioning?

22  A    His questioning, no.

23  Q    What was your involvement with Mr. Alvarado?

24  A    I was present basically for safety purposes and then also

25  remained present during the advisement of his Miranda rights.

1  Q    Before you read him his rights, can you tell the Court

2  where was Mr. Alvarado sitting or where was he when you walked

3  into the room?  Was he sitting down, standing up?

4  A    He was -- if I remember correctly, he was sitting in a

5  chair that was on the west side of the room pretty close to the

6  table and when I walked in I sat in a chair that was on the

7  south side of the room, maybe 5, 6 feet from him.

8  Q    And Mr. Arnoldo Alvarado, was he handcuffed at that time,

9  sir?

10  A    I don't recall.

11  Q    Do you recall whether you were wearing your weapon?

12  A    I was.

13  Q    Okay, where was your weapon, sir?

14  A    I had it on my -- what we call a thigh rig holster so it

15  would drop down from the belt that I was wearing and then

16  attach around my thigh.

17  Q    Was it visible to people who saw you?

18  A    Yes, it would have been.

19  Q    And at some point you said you were assisting or helping

20  advising Mr. Arnoldo Alvarado about his rights?

21  A    That's correct, sir.

22  Q    Okay.  When that occurred, sir, who was present in the

23  room?

24  A    Special Agent Ernesto Baca of HSI.

25  Q    Anybody else, sir?

Boynton - Direct / By Mr. Alaniz                            182

1  A    No, not that I recall.

2  Q    No other agents were there.  Was there any other Assistant

3  U.S. Attorney there?

4  A    I don't recall.

5  Q    You don't recall.  Okay.

6         Now, besides you and Agent Baca, the only two agents

7  that were there during the advisement of rights?

8  A    To the best of my recollection, but I do not recall.

9  Q    Okay.  And do you recall speaking to Mr. Alvarado in

10 English or -- at that time, sir?

11 A    Yes.

12 Q    Do you recall him having any problems speaking the English

13 language?

14 A    No.

15         MR. ALANIZ:  May I approach the witness, your Honor?

16         THE COURT:  You may.

17 BY MR. ALANIZ:

18 Q    I'm going to show you, sir, what's been marked as the

19 Government's Pretrial Exhibit Number 1 and ask you whether you

20 recognize that document, sir?

21 A    I do.

22 Q    What is that, sir?

23 A    It's an FD-395 which is the FBI standard form for the

24 advisement of Miranda rights.

25 Q    Okay.  Can you take us through how you approached

1   Mr. Alvarado in regards to the advisement of rights?  What did

2   you tell him, what ---did you have him read it?  Do you recall

3   that, sir?

4   A    Special Agent Baca was the one who went through each and

5   individual right with him and actually read them to him.  I was

6   present basically as a witness to the advisement.

7   Q    Okay.  So you were present when Mr. Arnoldo Alvarado

8   signed it?

9   A    Yes, I was.

10  Q    Okay, do you recall Agent Baca asking him whether or not

11  he understood his rights?

12  A    Yes, I do.

13  Q    And do you recall whether or not what Mr. Alvarado said in

14  response?

15  A    He said that he did understand his rights.

16  Q    And before Mr. Alvarado signed that -- that document did

17  you-all threaten him in any way?

18  A    No, absolutely not.

19  Q    Did you-all ever promise him anything in return for

20  signing that waiver?

21  A    No.

22  Q    At any time before he signed the waiver of Miranda rights,

23  sir, did he ever tell you that he wanted to speak to a lawyer?

24  A    No, he did not.

25  Q    Did he ever tell you that he didn't want to talk to you?

Boynton - Direct / By Mr. Alaniz                              184

1   A     No, he did not.

2   Q     What was his demeanor, sir, at that time when you were

3   talking to him about the Miranda rights?

4   A     He seemed calm to me, quiet.

5   Q     Okay.  And you also -- you said you witnessed Mr. Alvarado

6   signing the rights form.

7          What time did he sign that, sir, or what time did you

8   witness it?

9   A     According to the form it was 3:41 p.m.

10  Q     And what date, sir, on the form?

11  A     The form reflects the 2nd of July, but that is a mistake;

12  it was the 3rd of July.

13  Q     And do you recall making that mistake?

14  A     I do.

15  Q     Okay.

16          **MR. ALANIZ:**  Your Honor, at this time the Government

17  would offer into evidence Government's Exhibit -- Pretrial

18  Exhibit Number 1.

19          **THE COURT:**  All right.  The Court admits Number 1.

20          **(Government's Pretrial Exhibit Number 1 was received in**

21  **evidence)**

22  **BY MR. ALANIZ:**

23  Q    Sir, after the rights form was read to him and he signed

24  the Miranda rights waiver, did you stay in the room during the

25  interrogation?

1  A    No, I did not.

2  Q    You left?

3  A    I did.

4  Q    Okay.  So you were not present during the questioning of

5  Mr. Alvarado?

6  A    No, I wasn't.

7            **MR. ALANIZ:**  I'll pass the witness, your Honor.

8            **THE COURT:**  All right.  Any Cross?

9            **MR. GARCIA:**  Yes, your Honor.

10                         **CROSS EXAMINATION**

11 **BY MR. GARCIA:**

12 Q    Agent Boynton -- Boynton, right?

13 A    Yes, sir.

14 Q    How many officers were in the room -- agents and officers,

15 not Arnoldo Alvarado, how many people were in that room, that

16 14 by 10 room, when you entered it?

17 A    When I entered it there was one Constable in the room and

18 I entered it with one other agent.

19 Q    And the other agent was Agent Baca?

20 A    No, the other agent was Sandra Torres.

21 Q    Sandra Torres?

22 A    Yeah.

23 Q    Okay, and after you entered the room, other agents

24 followed besides Agent Torres?

25 A    No, there was just the three of us with Mr. Alvarado for a

1    period of time.

2    Q    Okay.  At the signing of the document that you just spoke

3    of that has a date of July 2nd, who was present for that

4    signing?

5    A    Special Agent Baca, myself and I can't recall if anyone

6    else was present.

7    Q    There could have been other people in the room?

8    A    Yes, sir.

9    Q    In fact, there's a video camera in that room, isn't there?

10   A    There is.

11   Q    In the top corner?

12   A    There is.

13   Q    Does it also record audio?

14   A    I don't know.

15   Q    Who knows?

16   A    I'm not sure who would know.  I assume some personnel in

17   our office would be aware.

18   Q    Okay.  Why not record that signing of the -- all the

19   things that are said there?  Why don't you do that?

20   A    I don't know.

21   Q    The fact is there's a practice not to record things,

22   correct?

23   A    In the FBI, yes, that's correct.

24   Q    All right.  When someone arrives at the FBI office, for

25   example, that's not an agent, you can't even bring a cell phone

1    in there, right?

2    A     That's correct.

3    Q     And that's for fear of somebody recording something?

4    A     That's for a variety of reasons.

5    Q     Which would be what?

6    A     Safety and security, there's confidential documents,

7    sensitive documents that are contained within FBI facilities.

8    Q     Are any sensitive documents held in this interrogation

9    room?

10   A     Maintained there regularly now.

11   Q     At the time that my client was in there, were there any

12   documents?

13   A     No.

14         **(Pause)**

15   Q     Besides Agent Baca, the Constable, yourself, what other

16   person came into the room?

17   A     Sandra Torres was present in the room initially.  I don't

18   believe the Constable was present when Agent Baca was in the

19   room with me.

20   Q     Okay.  So then is it safe to say then that when this

21   document was executed in your presence, it was executed with

22   just you and Agent Baca and my client?

23   A     As I've stated, I can't recall.

24         **(Pause)**

25   Q     Okay.

1       **(Pause)**

2    Q    Earlier you were asked if my client was threatened in any

3    way, do you remember that?

4    A    Yes, I do.

5    Q    Do you know if anyone else threatened him?

6    A    I would only know if he was threatened in my presence.

7    Q    Okay.  Earlier you were asked if you had promised him

8    anything.  Do you know if anyone else promised him anything?

9    A    I don't know.

10   Q    You were asked if he asked for a lawyer.  Do you know if

11   he asked anyone else for a lawyer?

12   A    I don't know.

13   Q    Why did you not stay for the statement?  Why just come in

14   -- in fact, another, Jorge Velasco, came in, correct?

15   A    That's correct.

16   Q    Were you there when he came into the room?

17   A    I was.

18   Q    Why is that happening?  Why are there -- why is Sandra

19   Torres there and you're there, and then Agent Baca comes in and

20   then Sandra Torres leaves, and then you stay with Agent Baca,

21   and then you leave and then Agent Jorge Velasco comes in?  Why

22   does that happen?

23   A    To the best of my knowledge the reason that happened was

24   because Agent Baca, Agent Velasco were the two who were

25   intending to interview Mr. Alvarado.  Agent Torres and I were

1    there for safety purposes and when the interview was ready to

2    commence that was time for Agent Torres and I to step out of

3    the room.

4    Q    Okay.  So then -- in other words, there's a -- you know,

5    there's a method to what's going on?

6    A    Yes, sir.

7    Q    You and Agent Torres are there for security reasons,

8    you're not there to conduct the interview, and then basically

9    because you are there they use you as a witness on the

10   document?

11   A    That's correct.

12   Q    Okay.  Had you been briefed on what was happening there?

13   A    I was familiar with the events of the day, yes, sir.

14   Q    Was Sandra Torres wearing a weapon?

15   A    I don't recall.

16   Q    Is it standard practice for FBI agents to be wearing

17   weapons?

18   A    Yes, it is.

19   Q    Okay.  Was Agent Baca wearing a weapon?

20   A    I do not know.

21   Q    Jorge Velasco?

22   A    I do not know.

23   Q    Okay.

24            **MR. GARCIA:**  I have no further questions, your Honor.

25            **MR. ALANIZ:**  No further questions, your Honor.

1        **THE COURT:**  Okay.  All right.  Thank you, Agent, for

2    being here.  That concludes your testimony.  You are excused at

3    this time.

4        **THE WITNESS:**  Thank you.

5      **(Witness excused)**

6        **MR. ALANIZ:**  Ernesto Baca, your Honor.

7      **(Pause)**

8        **MR. GARCIA:**  Your Honor, I hate to interrupt, but my

9    client has been asking for a long time already to go to the

10   bathroom.

11       **THE COURT:**  Sure.  Just tell us.

12       **MR. GARCIA:**  I don't, but I was trying to get through

13   this if we could, briefly?

14       **THE COURT:**  All right.  You can take him.

15       **MR. GARCIA:**  Thank you.

16       **THE COURT:**  A brief recess.

17     **(Recess taken from 12:41 to 12:43 p.m.)**

18       **THE COURT:**  All right, Agent Baca, if you could step

19   forward and have the oath administered to you before you

20   testify?  Please raise your right hand to be administered the

21   oath.

22           **ERNESTO BACA, GOVERNMENT'S WITNESS, SWORN**

23       **THE COURT:**  All right, you may be seated.  We'll wait

24   until your client returns before we actually start the

25   questioning.

1          **MR. GARCIA:**  Thank you, your Honor.

2      **(Pause)**

3          **THE COURT:**  All right.  Your witness has already been

4    administered the oath, Mr. Alaniz, so you may begin your

5    examination.

6                        **DIRECT EXAMINATION**

7    **BY MR. ALANIZ:**

8    Q    Sir, can you please state your full name?

9    A    My name is Ernesto Baca.

10   Q    And where are you employed, sir?

11   A    I'm a Special Agent for Homeland Security Investigations.

12   Q    How long have you been so employed?

13   A    Since the inception of the Immigration and Customs

14   Enforcement.  Prior to that, since '97, with the -- what used

15   to be the United States Customs Service, and prior to that I

16   was a Deputy United States Marshal.

17   Q    And, sir, were you also involved in the investigation of

18   the shooting of the ICE agent back in the summer of last year?

19   A    Yes, I was.

20   Q    Were you at the FBI office that afternoon on July the 3rd

21   when Mr. Arnoldo Alvarado arrived at the FBI building?

22   A    Yes, I was.

23   Q    And were you involved in his questioning that afternoon?

24   A    Yes, I was.

25   Q    When -- when was the first time that you had contact with

1   Mr. Arnoldo Alvarado that day?

2   A    The first time was -- well, I didn't have contact with him

3   until I actually spoke with him when he arrived at the office

4   and I observed him coming in.

5   Q    Okay, and the first time you spoke to him was when?

6   A    Was in the interview room.

7   Q    Okay, and in the interview room, do you recall when you

8   first walked in to enter the interview room, who was with

9   Mr. Alvarado at that time, if you recall?

10  A    It was two FBI agents in the room with Mr. Alvarado.

11  Q    Okay.  Those two FBI agents, did they leave at some point,

12  sir?  Or did they stay?

13  A    One of them left.

14  Q    Okay.  And when you saw Mr. Alvarado, can you tell us

15  where he was, what was he doing?

16  A    He was sitting in the interview room in one of the chairs.

17  Q    Okay.  Do you recall whether he was handcuffed, sir?

18  A    No, he was not.

19  Q    How about you, sir?  Did you have your weapon with you?

20  A    I don't recall if I had my weapon with me.  I don't know

21  if I did.  If I would have had it, it would have been

22  concealed.

23  Q    Okay.  Now once you're in there with another -- with an

24  FBI agent, besides you and the other FBI agent, was anybody

25  else in the room with you?

1   A    Yes, I believe so, there was.

2   Q    Who was that, sir?

3   A    That was you.

4   Q    Okay.  Now at some point when you're with Mr. Alvarado and

5   the other FBI agent, did you or the -- and this other FBI

6   agent, did you-all read Mr. Alvarado the Miranda rights that he

7   had with the FBI form?

8   A    Yes, we did.  I was the one that actually administered

9   that.

10            **MR. ALANIZ:**  May I approach, your Honor?

11            **THE COURT:**  You may.

12            **MR. ALANIZ:**  Can I get Pretrial Exhibit Number 1?

13            **THE COURT:**  Here it is.

14            **MR. ALANIZ:**  Okay.

15  **BY MR. ALANIZ:**

16  Q    Do you recognize Pretrial Exhibit Number 1, sir?

17  A    Yes.  This is the FBI form that we filled out when I

18  advised him of his rights.

19  Q    Okay.  And can you tell the Court how you went about

20  advising Mr. Arnoldo Alvarado of his Miranda rights, sir?

21  A    Basically I asked Mr. Alvarado if he understood English

22  and read English, and he indicated yes.  So I went ahead and

23  read the form -- I asked him to read the form along with me.  I

24  actually recited the form, but I asked him to follow with me on

25  the form and read the form.

Baca - Direct / By Mr. Alaniz                          194

1  Q    Okay, and once you did that, did you ever ask him whether

2  he had any questions regarding any of those rights?

3  A    Yes, I did.

4  Q    And what did he say, sir?

5  A    He said, "No."

6  Q    Okay.  Then after that did he agree to sign and waive his

7  Miranda rights, sir?

8  A    Yes, he did.

9  Q    And did he sign that form in your presence?

10 A    Yes, he did.

11 Q    And you and the FBI agent witnessed that signature?

12 A    Yes.

13 Q    And after that happened did you ask Mr. Alvarado whether

14 he wanted to speak to you and the other agent concerning the

15 events of that day?

16 A    Yes.

17 Q    After Mr. Alvarado signed that waiver of rights form, sir,

18 did the other FBI agent leave and another agent came in?

19 A    Yes, another agent came in to assist in the interview.

20 Q    Who came in, sir?

21 A    Special Agent Velasco.

22 Q    So the interrogation or the questioning of Mr. Alvarado

23 was done by you and Mr. Velasco?

24 A    Yes, it was.

25 Q    And who else was present during that questioning, sir?

1   A    You were.

2   Q    Anybody else -- were there some agents who would come in

3   and out, or was it just the three of us in that room during

4   that period of time?

5   A    I believe it was just the three of us.  There was another

6   U.S. Attorney, Mr. Sturgis, I think that would came in -- that

7   came in and out, but I don't believe he was there during the

8   interview.  I -- to be honest with you, I don't remember seeing

9   him.  He may have come in and out, but I was more concentrated

10  on the interview so he may have been in and out during that

11  time, but no other agents came in and out that I remember.

12  Q    Now during the process of interviewing Mr. Alvarado, at

13  any point in time that you or Mr. Velasco are questioning him,

14  does he ever ask or tell you that he wants to speak to a

15  lawyer, sir?

16  A    No, he never did.

17  Q    Did he ever tell you that he wanted to stop the

18  questioning?

19  A    At the very end of the interview we had re-approached him

20  about narcotics being in the house.  At that point he said,

21  "I'd rather not talk about it.  I don't want to talk anymore."

22  And at that time we actually terminated the interview.

23  Q    That was after he had told you about his involvement in

24  the shooting of ICE Agent Harrison, is that correct?

25  A    Yes, that was well after that.

1   Q    At any time, sir, did you-all promise -- did you or

2   Mr. Velasco promise him anything if he would answer these

3   questions, sir?

4   A    No.

5   Q    What was his demeanor?  I mean, was he scared, were you-

6   all yelling at him or what were you-all doing?

7   A    We were just asking him questions.  We weren't raising our

8   voice or anything that I recall, just normal -- his demeanor

9   was just normal.  He was answering the questions normally.

10          **MR. ALANIZ:**  I'll pass the witness, your Honor.

11          **THE COURT:**  All right.  Any Cross?

12          **MR. GARCIA:**  Thank you.

13                    **CROSS EXAMINATION**

14   BY MR. GARCIA:

15   Q    Agent Baca, you just testified that he had nothing to say

16   about any drugs in the house, correct?

17   A    We had questioned him about -- there was -- well, during

18   the interview he had said somebody had shown up in a white

19   truck and he assumed that drugs had been dropped off at the

20   house.  And -- but he had gone to a movie -- I would have to

21   review the report to the exact -- the exact tone of

22   questioning, but he had gone to a movie, but that when he came

23   back he didn't see any drugs in the house and so he had assumed

24   that they had moved the drugs.

25          But he had also said that the individual who showed

Baca - Cross / By Mr. Garcia                           197

1    up in the white truck had normally dropped off drugs so he

2    assumed -- he had never seen the drugs in the house or seen

3    drugs being dropped off.

4    Q     During the interview with my client, the fact is he did

5    ask for a lawyer, didn't he?

6    A     No, he did not.

7    Q     Oh, he didn't?  He may have asked -- maybe he didn't ask

8    you, but he asked someone else, correct?

9    A     Not that I recall.  He didn't ask anybody that I -- that

10   was in that room at that time.

11   Q     I'd like to go over the sequence of who was in the room

12   when you arrived.

13         When you went into the room, who was in the room?

14   A     Special Agent Boynton and a female Special Agent, I don't

15   recall her name.

16   Q     Torres?

17   A     I don't recall her name.

18   Q     A female, though?

19   A     Yes.

20   Q     Okay.  And so then at some point it's you, Boynton and my

21   client, correct?

22   A     Yes, and Mr. Alaniz.

23   Q     So Mr. Alaniz was already there in the room?

24   A     I don't recall if he was already there or he came in with

25   us -- with me.  I don't recall if he was already there.

1  Q    Were you in communication with Mr. Alaniz before you went

2  into the room?

3  A    I don't recall if we were in communication.  I -- all I

4  remember is that I was in communication with Mr. Velasco and

5  several agents.  I don't remember talking to Mr. Alaniz, to be

6  honest with you.

7  Q    Why would you go into that room?

8  A    Because I was going to conduct the interview with Special

9  Agent Velasco.

10  Q    Why?

11  A    I was instructed to.

12  Q    By whom?

13  A    By my supervisor.

14  Q    Who is your supervisor?

15  A    Mario Campbell.

16  Q    In relation to the interview room, where is Mario

17  Campbell?

18  A    He was upstairs in the -- I guess we had a Command Center

19  set up, yeah, they had a Command Center set up so he was

20  upstairs in the Command Center.

21  Q    How were you communicating with him?

22  A    The only time I communicated with him was when he told me

23  to go downstairs and assist the FBI in interviewing the witness

24  and whatever assistance they needed.  I didn't communicate with

25  him after that.

1          **(Pause)**

2     Q    Did he tell you that in person or by telephone?

3     A    I believe I was upstairs at the time they were

4     transporting your client back to the office, and that's when I

5     was instructed to go downstairs.

6     Q    Okay.

7          **(Pause)**

8     Q    Besides the handwritten notes and the rudimentary maps,

9     are there any other documents that you generated as a result of

10    this case?

11    A    No.

12         **(Pause)**

13    Q    During the interview process, are you in communication

14    with Mr. Alaniz in the room?

15    A    No, it was just myself and Mr. Velasco.

16    Q    Okay.  During the interview process did you ever step

17    outside the room to speak to Mr. Alaniz?

18    A    No.

19    Q    With anybody else?

20    A    No.

21    Q    So once you entered the room you didn't leave?

22    A    I was there the whole time.

23    Q    Okay.  So the only communication you had was with either

24    Mr. Velasco or with my client?

25    A    Yes, during the interview.

Baca - Cross / By Mr. Garcia                    200

1    Q    Okay.  Exactly, during the interview.

2         How about before the interview, before you entered,

3    besides your supervisor, Mario Campbell, did you have any

4    communication with any United States Attorney before going in

5    there?

6    A    I don't -- I don't think so.  I don't recall if I did.  I

7    was just instructed to go in and assist with the interview.  I

8    was -- most of my communication was with Mr. Velasco.

9    Q    Okay.  While you were in the room was Mr. Alaniz asking my

10   client questions?

11   A    No.

12   Q    While you were in the room, was Mr. Alaniz or Mr. Sturgis

13   asking my client questions?

14   A    Not that I recall, it was just myself and Mr. Velasco.

15   Q    While you were in the room, were either Mr. Alaniz or

16   Mr. Sturgis directing you to ask certain questions?

17   A    No.  I -- there was one point, I think -- as a matter of

18   fact, there was one point where he had -- when I told you we

19   had re-approached him about the drugs, I think we had stepped

20   out to discuss that because we were going to re-approach him

21   about narcotics, but that's the only communication that I had,

22   and I'm not sure if it was Mr. Sturgis or Mr. Alaniz.  But we

23   came back in -- I came back into the room and re-approached

24   him, and that's when he said he didn't want to talk about it

25   and we terminated his interview.

1  Q    Okay.  And so at some point during the interview you did

2  communicate with a United States Attorney about what direction

3  the interrogation should go?

4  A    That was at the end of the interview, yes, sir.

5  Q    Okay.  And once you took that direction, then the

6  interview was terminated?

7  A    Yes.

8  Q    Did you give Arnoldo Alvarado anything to eat?

9  A    I didn't give him anything to eat.

10 Q    Did you witness anyone else give him anything to eat?

11 A    No.

12 Q    Did you give him anything to drink?

13 A    I don't think so.  I -- I don't recall, but I don't think

14 so.

15 Q    Did you witness anyone else give him anything to drink?

16 A    No.

17 Q    Did you ask him how old he was?

18 A    I don't recall if I asked him how old he was.

19        **MR. GARCIA:**  May I approach, your Honor?

20        **THE COURT:**  You may.

21 BY MR. GARCIA:

22 Q    I'm going to show you your -- are these your handwritten

23 notes?

24 A    Yes.

25 Q    Okay, and on the top of that it has my client's name, does

1    it not?

2    A     Yes.

3    Q     And does it have a date of birth?

4    A     That 12/29/93, I believe that I didn't notate that as the

5    date of birth, I was assuming that's probably what I was

6    notating.

7    Q     Okay.  So you would agree that would have made him 18 at

8    the time of your interview, correct?

9    A     Yes.

10   Q     Okay, that was 2012?

11   A     Yes.

12   Q     Okay.  When the interview is -- when you're conducting the

13   interview, at the point that he signs the document there, do

14   you ask him, you know, how far he went in school?

15   A     No, I didn't ask him that.

16   Q     Did you ask him if he had any drugs or alcohol in his

17   system?

18   A     No, I did not ask him that.

19   Q     Okay.  Did you -- what did you ask him?

20   A     Exactly as I stated in the report.  I went over -- I asked

21   him if he spoke English and he was able to read and write

22   English, and that's -- at that point is when I read the form

23   and followed it along with him.

24   Q     Okay, so other --

25   A     He followed along with me.

1  Q    That other -- other than the top form, you never asked him

2  about his -- you never asked him about his education, his

3  occupation, correct?

4  A    No.

5  Q    You never asked him about his -- any kind of schooling

6  that he may have had as far as training, correct?

7  A    No, I did not ask him.

8  Q    You never asked him about his physical or his mental

9  condition, correct?

10  A    No, I did not.

11  Q    You never asked him if he had been diagnosed with some

12  sort of a mental disorder --

13          **MR. GARCIA:**  May I approach, your Honor?

14          **THE COURT:**  You may.

15          **THE WITNESS:**  No, I did not ask him that.

16  **BY MR. GARCIA:**

17  Q    And those are important things that you might want to ask

18  someone before you ask them to waive something, correct?

19  A    I have never -- my basic routine has always been to read

20  the form and ask them if they understand their rights.  First

21  of all, when I normally do this, I'll either ask if they speak

22  English or they speak Spanish because in some cases they only

23  speak Spanish.

24          If they acknowledge that they speak English, the next

25  question is "Can you read English?" and then we go over the

Baca - Cross / By Mr. Garcia                            204

1   form, and then I ask them if they understand, but I don't go

2   into details of whether they have a mental condition or whether

3   they have alcohol in their system, or those types of questions.

4   That's basically how I've always done it.

5   Q    That's the way you were trained to do it?

6   A    Yes.

7   Q    Okay.

8          **MR. GARCIA:**  Your Honor, I have no further questions.

9          **THE COURT:**  All right.  Agent Baca, thank you so

10  much.  You are excused.

11         **THE WITNESS:**  Thank you, your Honor.

12     **(Witness excused)**

13         **MR. ALANIZ:**  I have no other witnesses, your Honor.

14         **THE COURT:**  All right.  Does the Defense want to put

15  on any evidence?

16         **MR. GARCIA:**  Yes, your Honor.  I have -- the

17  Defendant would call Agent Velasco -- Jorge Velasco.

18         **THE COURT:**  That's the other one who was in the room?

19         **MR. GARCIA:**  Yes, your Honor.

20     **(Pause)**

21         **THE COURT:**  Agent Velasco, let me redirect you over

22  here to this side.  If you could raise your right hand to be

23  administered the oath before you testify?

24  //

25  //

1              **JORGE VELASCO, DEFENDANT'S WITNESS, SWORN**

2              **THE WITNESS:**  Yes, I do.

3              **THE COURT:**  Please be seated.

4        **(Pause)**

5              **MR. GARCIA:**  Thank you, your Honor.

6              **THE COURT:**  And you may proceed.

7              **MR. GARCIA:**  Thank you.

8                         **DIRECT EXAMINATION**

9   BY MR. GARCIA:

10  Q    Sir, please state your name for the record.

11  A    Jorge Velasco.

12             **MR. GARCIA:**  Your Honor, may I have a moment?

13             **THE COURT:**  Okay.

14       **(Pause)**

15  BY MR. GARCIA:

16  Q    Agent, how long have you worked for the FBI?

17  A    A little bit over 17 years, sir.

18  Q    I'd like to draw your attention to July the 3rd of last

19  year.  Do you remember that day?

20  A    Yes, sir.

21  Q    Why do you remember it?

22  A    That was the day of the -- that the ICE agent was shot.

23  Q    Okay.  And what time did you begin your involvement with

24  that investigation?

25  A    When I came to the office around 7:30 or 8:00 o'clock, the

1    -- they were assembling -- or they were talking about it and

2    shortly after they -- when the Command Post was set up they

3    asked agents to be on standby.

4    Q    Okay.  You say "they."  Who is "they?"

5    A    The supervisor, Special Agent Supervisor, Special Agent

6    Dan Snow (phonetic).

7    Q    Okay, and then at some point are -- you participate in the

8    interview of my client, correct?

9    A    Yes, sir.

10   Q    Why did you do that?

11   A    I was told to -- to be on standby to assist and that was

12   going to be my role, to help with the interviews.

13   Q    And who asked you to do that?

14   A    One of the supervisors.  I'm assuming if it was -- it

15   wasn't -- it was Daniel Snow or Mike Lasawicki (phonetic) who

16   was one of the acting supervisors.

17   Q    Okay.

18          **MR. GARCIA:**  Your Honor, may I approach?

19          **THE COURT:**  You may.

20   **BY MR. GARCIA:**

21   Q    There is a document in front of you.  Do you recognize

22   that document?

23   A    Yes, sir.

24   Q    That's Government's Exhibit -- Pretrial Exhibit Number 1.

25   A    Yes, sir.

1    Q    All right.  Do you -- what is it?

2    A    It's an advice of rights.

3    Q    Okay, and were you present when that document was signed?

4    A    I was -- yes, sir.

5    Q    Okay, and when you came into the room, who was in that

6    interview room?

7    A    It was your client, Special Agent Kyle Boynton with the

8    FBI, Special Agent Ernest Baca with ICE, Assistant United

9    States Attorney Anibal Alaniz and Assistant United States

10   Attorney Sturgis, James Sturgis.

11   Q    My client told you that he wanted a lawyer, correct?

12   A    No, sir.

13   Q    And you told him, "We're going to get you one, just tell

14   us what happened", correct?

15   A    No, sir.

16   Q    You told him that anything he told you was not going to

17   affect him, correct?

18   A    No, sir.

19   Q    Did he tell someone else?

20   A    No, sir.

21   Q    Did he ask anyone else for a lawyer?

22   A    No, sir.

23   Q    Did he ask anyone else for an attorney?

24   A    No, sir.

25   Q    The recording device that's in that room in the corner,

1   the camera --

2   A     Yes, sir.

3   Q     -- does it also record the audio, or just the video?

4   A     Just the video.

5   Q     Okay.  During the warnings of my client, Mr. Alaniz was in

6   the room?

7   A     Yes, sir.

8   Q     Mr. Sturgis was in the room?

9   A     I -- that day I had to go up -- I think I was looking for

10  an Advice of Rights.  When I came down to the interview room

11  they had already gone through the -- through some of the

12  rights.  I don't remember if Sturgis was there during the whole

13  time or not, but Mr. Alaniz was.

14         **(Pause)**

15  Q     During the interview of my client did you have

16  communication with Mr. Alaniz and Mr. Sturgis?

17  A     Yes, sir.

18  Q     Okay.  What kind of communication?

19  A     The -- I just remember not directly with them two, but

20  everybody in the room, I said, "Hey, I need to ask the

21  questions, you know, I write slow, I need to repeat my

22  questions, I need to be doing the question -- the questions."

23  I don't remember exactly whether I talked to Mr. Alaniz or any

24  of the other agents.

25         Once the rights were read, I remember going over them

1    and explaining if he understood his rights, and then I

2    proceeded with my interview.

3    Q    Okay.  So then you're the one who actually explained the

4    rights to him?

5    A    No, sir.  I -- the rights were explained to him by Agent

6    Kyle Boynton and Agent Baca --

7    Q    Okay.

8    A    -- but as a practice I wanted to make sure that he

9    understood and he wanted to talk to me, and I proceeded with my

10   interview.

11   Q    Okay, so then if my client said that he asked you for a

12   lawyer, he'd be lying?

13   A    Yes, sir.

14   Q    Okay.  If my client said that he asked you or the other

15   agents for an attorney, he'd be lying?

16   A    Yes, sir.

17   Q    Okay.  Why didn't you record the interview?

18   A    That's not a practice -- that's not a practice that we --

19   we do in the agency.

20   Q    You mean it's your policy not to, correct?

21   A    I don't know if it's a policy, but I -- we don't -- I've

22   never interviewed -- or recorded an interview.

23   Q    Have you -- have you ever seen another FBI agent that

24   would do that?

25   A    No, sir.

1          **(Pause)**

2     Q    During the -- so is it safe to say that then you took

3     control of the room then, of the interview because, you know,

4     because you told everyone, "I'm going to ask the questions

5     because I'm" -- because of the way that you write?

6     A    Yes, sir.

7     Q    Okay.  Why did you do that?

8     A    Because that's the way I conduct my interviews and I'm the

9     one that's going to write it up so I want to make sure I get

10    everything right.

11    Q    Okay, but -- but did you do that as a result of other

12    people questioning my client, or why did you say that?

13    A    That's -- just like I said, sir, that's the way -- when I

14    write my 302 I'm going to write it up, I'm going to be the one

15    asking the questions.

16         I mean, Agent Baca also asked a lot of questions --

17    Q    Okay.

18    A    -- but I knew that it was going to be written in an FBI

19    document so I wanted to make sure I understood the answers.

20    Q    Okay.  And did you understand the answers?

21    A    Yes, sir.

22    Q    Okay.  You are sitting there in the room taking notes, are

23    you not?

24    A    Yes, sir.

25    Q    Okay, and after you take the notes do you ask the person

1    -- or in this case, did you ask my client is this what you

2    meant to say?

3    A    I -- as a habit I repeat over and over what my question to

4    understand -- I usually go back over to make sure I got it

5    right, and I'm sure I did, yes.

6    Q    Okay.  So how long did the interview take then?

7    A    I would say approximately an hour, an hour, 20 minutes.

8    Q    Okay.

9    A    It could have been longer.

10        **(Pause)**

11   Q    At any time during the hour or hour and a half, or however

12   long the interview would take, at any time did my client ever

13   ask for a lawyer?

14   A    No, sir.

15   Q    Did he ever ask for an attorney?

16   A    No, sir.

17   Q    Did he ever ask for advice of counsel?

18   A    No, sir.

19   Q    Did he ask to go to the bathroom?

20   A    I don't remember, sir.

21   Q    Did he ask for something to drink or anything to eat?

22   A    I don't remember, sir.

23   Q    Did you ask him about his education?

24   A    If I have it in my note, in my report, then I did.  If

25   not, I don't have it.  I don't remember if I asked him or not.

1    Q    Okay, it's not in there, but --

2    A    Then I didn't ask him.

3    Q    Okay.  Did you ask him about his physical condition or his

4    state of mind?

5    A    No, sir.

6    Q    Okay.  Did you ask him about where he worked or his

7    occupation?

8    A    Again, sir, if it's not in my report, I don't remember.

9    Q    Okay.  Did you ask him if he had had any drugs or alcohol

10   in his system?

11   A    Sir, if it's not in my report, I don't remember.  I don't

12   think I would have or if -- I would have wrote it in my report.

13   Q    During the interview in the interrogation room you have --

14   just so we're sure we do, we have Agent Baca, Agent Boynton,

15   there was a female officer in the room, too?

16   A    No, sir.

17   Q    Initially was Agent Torres there?

18   A    I don't remember.

19   Q    You don't remember.  Okay.

20        James Sturgis, was he there?  The United States

21   Attorney?

22   A    He was there initially, but he was not there during the

23   interview and the same with Mr. Boynton.  Once the interview

24   proceeded, it was just myself, Agent Baca and Mr. Alaniz.

25        **MR. GARCIA:**  Your Honor, may I have a moment?

1              **THE COURT:**  You may.

2         **(Pause)**

3              **MR. GARCIA:**  Your Honor, I have no further questions.

4              **THE COURT:**  Mr. Alaniz?

5              **MR. ALANIZ:**  I have no questions, your Honor.

6              **THE COURT:**  You are excused at this time, Agent.

7    Thank you for being here.

8              **THE WITNESS:**  Yes, sir.

9         **(Witness excused)**

10             **THE COURT:**  All right.  Any additional witnesses from

11   the Defense?

12             **MR. GARCIA:**  Your Honor, we have no further

13   witnesses.

14             **THE COURT:**  All right.  The -- based on the

15   preponderance of the evidence, the only evidence before the

16   Court is that Mr. Pedro Alvarado never asked for a lawyer

17   during any --

18             **MR. ALANIZ:**  Arnoldo Alvarado, your Honor, Arnoldo.

19             **THE COURT:**  Arnoldo, excuse me.  Arnoldo Alvarado

20   never asked for a lawyer during any part of this interrogation.

21   The Court denies the Motion to Suppress.

22             All right, so do I need to address anything else here

23   today?

24             **MR. ALANIZ:**  The only issue is the disqualification

25   and also the subpoena --

1          **THE COURT:**  Okay, two things.  Let's deal with the

2    Motion to Disqualify.  I assume it's not going to be urged in

3    the case against Mr. Sturgis anymore given apparently he wasn't

4    in the room other than just in and out.

5          And with regard to Mr. Alaniz, the only testimony

6    before the Court on this issue is that it was consistent by

7    three different agents who were in there, and I don't believe

8    that Mr. Alaniz is a -- would be a witness to any matter where

9    there are not already other witnesses.  Mr. Alaniz's testimony

10   would just be cumulative.

11         However, I'm not going to allow the Government to use

12   Mr. Alaniz's presence there as some kind of a sword to sort of

13   bring greater credibility to what the other agents testified

14   to, and so I'm not going to allow them to discuss his presence

15   there at the -- in the interview room as an observer.

16         Right, so I deny the Motion to Disqualify.

17         The subpoena, there are certain requirements required

18   under Federal law.  Those weren't complied with.  That seems

19   like an easy one to deny without prejudice though.  I didn't

20   even -- it was so obvious to me that you didn't complete the

21   technical requirements, I didn't even reach the substantive

22   issues.

23         **MR. GARCIA:**  The first indication that they were

24   going to object to testifying was at the Suppression Hearing.

25   I understood their position as to the -- them being recused,

1   but at the Suppression Hearing was the Motion that was filed

2   yesterday, and so we haven't had an opportunity to respond to

3   that or to comply with the --

4           **THE COURT:**  The technical requirements.

5           **MR. GARCIA:**  -- technical requirements.

6           **THE COURT:**  All right.  So I'm going to grant the

7   Motion to Quash, but you may -- if you'd like to re-urge it and

8   meet the technical requirements for subpoenaing the testimony

9   of a Government agent I'll consider it at that time if you want

10  to re-urge that.

11          **MR. GARCIA:**  Very well.

12          **THE COURT:**  All right.  Is there anything else I need

13  to address specifically at this time?

14          **MR. WARNER:**  Nothing more from me, your Honor.

15          **THE COURT:**  All right.  I'm glad you made it down

16  here for this.

17          Okay, so nothing else on this case that we need to

18  address?

19          **MR. GARCIA:**  Not at this time.

20          **THE COURT:**  Okay, then we're not scheduled to be

21  together again until Final Pretrial.  Does anybody believe that

22  that's -- at this point that that's okay to proceed in that

23  fashion, or does anybody believe we need to have another

24  hearing for any reason between now and then?

25          **MR. ALVAREZ:**  We have another trial date, right?  I

1  wasn't here when --

2       **THE COURT:**  You had a new trial date yesterday -- I'm

3  sorry, you were not here, you were out of town and I excused

4  your -- but I think it was --

5       **MR. ALANIZ:**  I believe it was --

6       **THE COURT:**  Whenever we were last here, Monday?  The

7  parties all agreed that there was insufficient time to prepare

8  the case for trial, you needed more than the week that we now

9  have left before the prior trial date, so the Court formally

10 reset it to the June trial date?

11      **MR. ALANIZ:**  Yes.  The only issue, Judge, is whether

12 or not the Defense expert would be able to get their testing

13 done by that -- by the new trial date.  That's the only issue,

14 you know, that we're having to deal with.

15      **THE COURT:**  So the new Final Pretrial is May 31 and

16 the new trial date is June 4th.  I would expect that the

17 testing could be done very quickly.  I don't know, unless he

18 just can't get to it.

19      I would like to visit about that just C.J.

20 requirement stuff, not substantively, but I need to do that ex

21 parte.

22      I assume that on short notice the evidence could

23 be --

24      **MR. ALANIZ:**  Right.  We could coordinate it once they

25 tell us, you know, what we're getting, then we could coordinate

1    getting that evidence to the expert in some form or fashion

2    that we have control over it, but he can do the testing and do

3    what he needs to do.  We just know we can't release the

4    evidence --

5            THE COURT:  Sure, but if he wants to stick it under a

6    microscope, you're going to let him do that, weigh it, just

7    anything nondestructive.

8            MR. ALANIZ:  Right, exactly, but once we get that

9    information and we can coordinate it with the FBI to get that

10   done.

11           MR. GARCIA:  But, your Honor, can we approach?

12           THE COURT:  Okay.  Yes, you may.  Ex parte or

13   together?

14           MR. GARCIA:  No, with everyone.

15           THE COURT:  Everybody, okay.

16       **(Begin bench conference at 1:18 p.m.)**

17           MR. GARCIA:  I've been speaking with my co-counsel

18   here in regards to I need to speak to my client about the

19   little conference we had up here.

20           THE COURT:  Uh-huh (yes).

21           MR. GARCIA:  And the other issues that we may be able

22   to argue on his behalf.

23           THE COURT:  Uh-huh (yes).

24           MR. GARCIA:  I think it's important that I do this

25   now that he's here, his mother is here --

1          **THE COURT:**  Uh-huh (yes).

2          **MR. GARCIA:**  And also I believe that, you know, that

3   his client may be amenable to, you know, taking the lead on --

4   on the culpability in the case.

5          **THE COURT:**  All right.

6          **MR. GARCIA:**  So I need to have some serious

7   discussions with my client.

8          **THE COURT:**  Okay, well, I think that would be

9   fruitful.

10          **MR. GARCIA:**  So I just wanted to maybe --

11          **THE COURT:**  Hold off a little bit then.

12          **MR. GARCIA:**  Yeah.  There may be a move in another

13   direction after I have my conversation.

14          **THE COURT:**  Okay.

15          **MR. ALANIZ:**  Okay.

16          **MR. ALVAREZ:**  Is there any money anywhere?

17          **THE COURT:**  I mean, it's tough for me not to cross

18   the limit, $2,400 without getting Fifth Circuit approval.

19          **MR. ALVAREZ:**  Twenty-four --

20          **THE COURT:**  Yeah, it's not really much, so --

21          **MR. ALVAREZ:**  No.

22       **(End bench conference at 1:19 p.m.)**

23          **THE COURT:**  All right.  So I'm just going to let you-

24   all work on the case and revisit some of these other issues of

25   the ex parte motion maybe next week.

1          **MR. GARCIA:**  Thank you, your Honor.

2          **THE COURT:**  Later next week.  All right, we'll be in

3  recess until 2:00 p.m.

4          **THE CLERK:**  All rise.

5       **(This proceeding was adjourned at 1:19 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    August 7, 2013


                    TONI HUDSON, TRANSCRIBER